UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

PUBLIC CITIZEN, INC.,
      1600 20th Street NW
      Washington, DC  20009,

NATURAL RESOURCES DEFENSE
COUNCIL, INC.
      40 W. 20th Street, 11th floor
      New York, NY 10011,

and

COMMUNICATIONS WORKERS OF
AMERICA, AFL-CIO,
      501 3rd Street NW
      Washington, DC  20001,

v.

DONALD TRUMP, President of the United
States,
      1600 Pennsylvania Avenue NW
      Washington, DC  20500,

UNITED STATES OF AMERICA,

MARK SANDY, Acting Director of the Office
of Management and Budget,
      725 17th Street NW
      Washington, DC  20503,

GRACE BOCHENEK, Acting Secretary of
Energy, U.S. Department of Energy,
      1000 Independence Avenue SW
      Washington DC  20585,

ELAINE L. CHAO, Secretary of
Transportation, U.S. Department of
Transportation,
      1200 New Jersey Avenue SE
      Washington, DC  20590,

JACK DANIELSON, Executive Director,
National Highway Traffic Safety

Case No.


**COMPLAINT FOR DECLARATORY
AND INJUNCTIVE RELIEF**

Administration,
        1200 New Jersey Avenue SE
        Washington, DC  20590,

DOROTHY DOUGHERTY,  Deputy Assistant
Secretary of Labor, U.S. Department of Labor,
        200 Constitution Avenue NW
        Washington, DC  20210,

EDWARD HUGLER, Acting Secretary of
Labor, U.S. Department of Labor,
        200 Constitution Avenue NW
        Washington, DC  20210,

KEVIN HAUGRUD, Acting Secretary of the
Interior, U.S. Department of the Interior,
        1849 C Street NW
        Washington, DC  20240,

DAPHNE Y. JEFFERSON, Deputy
Administrator, Federal Motor Carrier Safety
Administration,
        1200 New Jersey Avenue SE
        Washington, DC  20590

JIM KURTH, Acting Director, U.S. Fish and
Wildlife Service,
        5275 Leesburg Pike
        Falls Church, VA  22041,

CATHERINE McCABE, Acting
Administrator, U.S. Environmental Protection
Agency,
        1200 Pennsylvania Avenue NW
        Washington, DC  20460,

HOWARD McMILLAN, Executive Director,
Pipeline and Hazardous Materials Safety
Administration,
        1200 New Jersey Avenue SE
        Washington, DC  20590,

SAMUEL D. RAUCH III, Acting Assistant
Administrator for Fisheries, National Marine
Fisheries Service,
        1315 East-West Highway

Silver Spring, MD  20910,

PATRICIA W. SILVEY, Deputy Assistant
Secretary for Operations, Mine Safety and
Health Administration,
     201 12th Street South, Suite 401
     Arlington, VA  22202,

and

PATRICK WARREN, Executive Director,
Federal Railroad Administration,
     1200 New Jersey Avenue SE
     Washington, DC  20590.

## INTRODUCTION

1.     This action seeks declaratory and injunctive relief with respect to an Executive Order on "Reducing Regulation and Controlling Regulatory Costs" issued by President Donald Trump on January 30, 2017, and Interim Guidance issued by the Office of Management and Budget (OMB) on February 2, 2017, regarding implementation of the Executive Order. The Executive Order exceeds President Trump's constitutional authority, violates his duty under the Take Care Clause of the Constitution, and directs federal agencies to engage in unlawful actions that will harm countless Americans, including plaintiffs' members.

2.     The January 30, 2017, Executive Order states, among other things, that an agency may issue a new regulation only if it rescinds at least two existing regulations in order to offset the costs of the new regulation. It directs agencies, among other things, (1) to identify at least two existing regulations to repeal for every new regulation proposed or issued, and (2) to promulgate regulations during fiscal year 2017 that, together with repealed regulations, have combined incremental costs of $0 or less, regardless of the benefits. The total incremental cost limit for future fiscal years is to be identified later by the Director of OMB.

3.      The Executive Order will block or force the repeal of regulations needed to protect health, safety, and the environment, across a broad range of topics—from automobile safety, to occupational health, to air pollution, to endangered species.

4.      The Executive Order mandates that, when implementing the command to repeal at least two rules for each new one, agencies must focus on costs while ignoring benefits. Indeed, the Executive Order directs agencies to disregard the benefits of new and existing rules— including benefits to consumers, to workers, to people exposed to pollution, and to the economy—even when the benefits far exceed costs. The Executive Order's direction to federal agencies to zero out costs to regulated industries, while entirely ignoring benefits to the Americans whom Congress enacted these statutes to protect, will force agencies to take regulatory actions that harm the people of this nation.

5.      To repeal two regulations for the purpose of adopting one new one, based solely on a directive to impose zero net costs and without any consideration of benefits, is arbitrary, capricious, an abuse of discretion, and not in accordance with law, for at least three reasons. First, no governing statute authorizes any agency to withhold a regulation intended to address identified harms to public safety, health, or other statutory objectives on the basis of an arbitrary upper limit on total costs (for fiscal year 2017, a limit of $0) that regulations may impose on regulated entities or the economy. Second, the Executive Order forces agencies to repeal regulations that they have already determined, through notice-and-comment rulemaking, advance the purposes of the underlying statutes, and forces the agencies to do so for the sole purpose of eliminating costs that the underlying statutes do not direct be eliminated. Third, no governing statute authorizes an agency to base its actions on a decisionmaking criterion of zero net cost across multiple regulations.

6. Rulemaking in compliance with the Executive Order's "1-in, 2-out" requirement cannot be undertaken without violating the statutes from which the agencies derive their rulemaking authority and the Administrative Procedure Act (APA).

7. The implementation of governing statutes, passed by Congress and signed into law by previous Presidents, will slow to a halt under the Executive Order. In addition to complying with the substantive requirements of those laws and the procedural requirements of the APA, agencies, to issue a new proposed or final rule, will be required to undertake new cost assessments both of the new proposed or final rule and at least two existing rules—although the new rule and the existing rules need not have any substantive relationship to one another and, with approval from OMB, need not even be issued by the same agency. Moreover, for each new regulation that an agency promulgates, it must undertake at least two additional rulemakings to repeal existing regulations.

8. As the OMB's Interim Guidance makes clear, under the Executive Order, a federal motor vehicle safety standard issued under the Motor Vehicle Safety Act (and at least one other rule) will need to be repealed to enable one other motor vehicle safety standard. Or an occupational health standard issued under the Occupational Health and Safety Act (and at least one other rule) will need to be repealed to enable an employee overtime regulation issued under the Fair Labor Standards Act. Or an occupational health standard (and one other rule) will need to be traded in for a motor vehicle safety standard. And the netting out of costs is divorced from any consideration of the *benefits* of these protections. This approach is not only irrational, it flies in the face of every one of these and similar statutes.

9. In seeking to impose rulemaking requirements beyond and in conflict with the requirements of the APA and the statutes from which the federal agencies derive their

rulemaking authority, the Executive Order exceeds the President's authority under the Constitution, usurps Congress's Article I legislative authority, and violates the President's obligation to "take Care that the Laws be faithfully executed." U.S. Const. art. II, § 3.

10.     The Executive Order is unlawful on its face. Implementation and enforcement of the Executive Order should be enjoined.

## JURISDICTION AND VENUE

11.     This Court has jurisdiction under 28 U.S.C. § 1331.

12.     Venue is proper in this district because plaintiff Public Citizen resides and has its principal place of business in this judicial district, and because a substantial part of the acts or omissions giving rise to the claim occurred in this judicial district. 28 U.S.C. § 1391(c)(2), (e)(1).

## PARTIES

13.     Plaintiff Public Citizen, Inc., is a national, non-profit consumer advocacy organization with more than 400,000 members and supporters nationwide. Public Citizen engages in research, advocacy, media activity, and litigation related to advancing health and safety, consumer protection, and the environment, among other things. Public Citizens' members, like most Americans, are the beneficiaries of consumer protection, public health, environmental, and other statutes that Congress enacted to serve the public interest and protect the public. Public Citizen's members rely on Public Citizen to petition the government on their behalf, to advocate for strong protections with respect to auto safety, drug and medical device safety, workplace safety, consumer finance, and the environment, among other things. On behalf of its members, and in furtherance of its mission and the interests of its members, Public Citizen petitions federal agencies for rulemaking and comments on proposed regulations issued by federal agencies, and it publishes reports, writes op-eds, and litigates in support of its members'

interests in health and safety, consumer protection, and environmental regulation. The Executive Order will adversely affect Public Citizen's members by deterring new regulations to implement laws protecting their interests, and by forcing the repeal of existing regulations that already do so. The Executive Order will also adversely affect Public Citizen's ability to advocate on its members' behalf by forcing Public Citizen to choose between advocating for new regulations at the cost of potential loss of other beneficial regulations and refraining from advocating for necessary new public protections. The Executive Order will also injure Public Citizen and its members by causing agencies to delay, not issue, or repeal regulations that protect their concrete interests in order to comply with the Executive Order.

14.    Plaintiff Natural Resources Defense Council, Inc. (NRDC) is a non-profit environmental and public health organization with hundreds of thousands of members nationwide. NRDC members, like most Americans, benefit from statutes that Congress has enacted to protect health and the environment, and these members rely on NRDC to represent their interests in advocating for such protections. For example, NRDC members are exposed to and injured by exposure to pollution regulated under the Clean Air Act and exposed to and injured by exposure to toxic chemicals regulated under the Toxic Substances Control Act; such exposures increase NRDC members' risk of injury to their health. NRDC members live and/or work near enough to rail lines used to convey oil and other dangerous substances that an explosion involving such cargo would threaten their health and property. NRDC members study, observe, and enjoy species protected under, and that meet the standards for protection under, the Endangered Species Act. And NRDC members use residential conventional cooking and other appliances, increased efficiency of which would reduce these members' utility bills and while also reducing air pollution that causes them health, recreational, aesthetic, and economic harms.

The Executive Order threatens NRDC's members' health, scientific, recreational, aesthetic, and other interests by delaying and deterring the adoption of new regulations to implement laws that protect these members' interests, and by forcing the repeal of existing regulations that already do so. On behalf of its members, NRDC engages in research, advocacy, public education, and litigation to protect public health and the environment. As part of its work, NRDC petitions federal agencies for rulemaking and comments on proposed regulations issued by federal agencies. The Executive Order threatens this petitioning activity and NRDC's participation in the rulemaking process because, under the Executive Order, successful advocacy in favor of new regulations will result in repeal of other important health or environmental regulations. The Executive Order thus chills NRDC's activity, to the detriment of its mission and its members.

15.     The Communications Workers of America, AFL-CIO (CWA), is an international labor union representing 700,000 workers in the telecommunications, media, manufacturing, airline, and health care industries and in a wide variety of public sector positions in the United States, Canada and Puerto Rico. In representing such workers, CWA seeks to improve their working conditions, including their health and safety at work, through collective bargaining and public policy advocacy. CWA frequently engages in the federal agency rulemaking process under the APA, advocating for rules that improve workers' wages, hours, and working conditions. The Executive Order threatens this First Amendment-protected petitioning activity and participation in the rulemaking process because, under the Executive Order, successful advocacy in favor of a particular regulation will result in repeal of other important regulations protecting workers' wages, hours, and working conditions. Workplace hazards currently slated for the federal regulatory process include matters within the scope of federal safety and health laws and that directly affect the health and safety of CWA-represented workers, such as

trichloroethylene exposure for manufacturing workers and infectious disease exposure for nurses. Although in these examples CWA would press for strong worker protections that would save lives and are feasible, the Executive Order imposes a disturbing Sophie's Choice by insisting that other to-be-determined health and safety protections for one set of workers must be repealed in exchange for health and safety protections for another set of workers. The Executive Order thus chills CWA's activity, to the detriment of its mission and its members. The Executive Order will also injure CWA and its members by causing agencies to not issue, delay, or repeal regulations that protect the members' health and safety at work, or other workplace rights, in order to comply with the Executive Order.

16.     Defendant Donald J. Trump is the President of the United States and issued the Executive Order challenged in this complaint. Plaintiffs sue President Trump in his official capacity.

17.     Defendant Mark Sandy is the Acting Director of OMB and OMB's highest-ranking official. He is charged with the supervision and management of all decisions and actions of that agency. Plaintiffs sue Acting Administrator Sandy in his official capacity. OMB is an agency within the meaning of the APA.

18.     Defendant Grace Bochenek is Acting Secretary of Energy for the Department of Energy and that agency's highest ranking official. She is charged with the supervision and management of all decisions and actions of that agency. Plaintiffs sue Acting Secretary Bochenek in her official capacity. The Department of Energy is an agency within the meaning of the APA.

19.     Defendant Elaine L. Chao is the Secretary of Transportation and charged with the supervision and management of all decisions and actions within the U.S. Department of

Transportation. She is charged with the supervision and management of all decisions and actions of that agency. Plaintiffs sue Secretary Chao in her official capacity. The Department of Transportation is an agency within the meaning of the APA.

20.     Defendant Jack Danielson is the Executive Director, National Highway Traffic Safety Administration (NHTSA), and that agency's highest-ranking official. He is charged with the supervision and management of all decisions and actions of that agency. Plaintiffs sue Executive Director Danielson in his official capacity. NHTSA is an agency within the meaning of the APA.

21.     Defendant Dorothy Dougherty, Deputy Assistant Secretary of Labor for Occupational Safety and Health (OSHA), is that agency's highest-ranking official. She is charged with the supervision and management of all decisions and actions of that agency. Plaintiffs sue Deputy Assistant Secretary in her official capacity. OSHA is an agency within the meaning of the APA.

22.     Defendant Kevin "Jack" Haugrud is Acting Secretary of the Interior and the highest ranking officer in the Department of the Interior. He is charged with the supervision and management of all decisions and actions of that agency. Plaintiffs sue Acting Secretary Haugrud in his official capacity. The Department of the Interior is an agency within the meaning of the APA.

23.     Defendant Edward Hugler is the Acting Secretary of Labor, U.S. Department of Labor, and the highest ranking officer in the Department of Labor. He is charged with the supervision and management of all decisions and actions of that agency. Plaintiffs sue Acting Secretary Hugler in his official capacity. The Department of Labor is an agency within the meaning of the APA.

24.     Defendant Daphne Y. Jefferson is the Deputy Administrator, Federal Motor Carrier Safety Administration (FMCSA), and the agency's highest-ranking official. She is charged with the supervision and management of all decisions and actions of that agency. Plaintiffs sue Acting Administrator Jefferson in her official capacity. FMCSA is an agency within the meaning of the APA.

25.     Defendant Jim Kurth, is the Acting Director, U.S. Fish and Wildlife Service, and the agency's highest-ranking official. He is charged with the supervision and management of all decisions and actions of that agency. Plaintiffs sue Acting Director Kurth in his official capacity. The Fish and Wildlife Service is an agency within the meaning of the APA.

26.     Defendant Catherine McCabe, Acting Administrator of the Environmental Protection Agency (EPA), is the agency's highest-ranking official. She is charged with the supervision and management of all decisions and actions of that agency. Plaintiffs sue Acting Administrator McCabe in her official capacity. EPA is an agency within the meaning of the Executive Order and the APA.

27.     Defendant Howard McMillan is the Executive Director of the Pipeline and Hazardous Materials Safety Administration (PHMSA) and the agency's highest-ranking official. He is charged with the supervision and management of all decisions and actions of that agency. Plaintiffs sue Executive Director McMillan in his official capacity. PHMSA is an agency within the meaning of the APA

28.     Defendant Samuel D. Rauch III is the Acting Assistant Administrator for Fisheries, National Marine Fisheries Service (NMFS) and the agency's highest-ranking official. He is charged with the supervision and management of all decisions and actions of that agency.

Plaintiffs sue Acting Assistant Administrator Rauch in his official capacity. NMFS is an agency within the meaning of the APA.

29.     Defendant Patricia W. Silvey is the Deputy Assistant Secretary for Operations, Mine Safety and Health Administration (MSHA) and the agency's highest-ranking official. She is charged with the supervision and management of all decisions and actions of that agency. Plaintiffs sue Deputy Assistant Secretary Silvey in her official capacity. MSHA is an agency within the meaning of the APA.

30.     Defendant Patrick Warren is the Executive Director of the Federal Railroad Administration and the agency's highest-ranking official. He is charged with the supervision and management of all decisions and actions of that agency. Plaintiffs sue Executive Director Warren in his official capacity. The Federal Railroad Administration is an agency within the meaning of the APA.

## BACKGROUND

**The Executive Order**

31.     On January 30, 2017, defendant President Trump signed Executive Order 13771, entitled "Reducing Regulation and Controlling Regulatory Costs." 82 Fed. Reg. 9339 (2017).

32.     The Executive Order directs that, "[u]nless prohibited by law, whenever an executive department or agency (agency) publicly proposes for notice and comment or otherwise promulgates a new regulation, it shall identify at least two existing regulations to be repealed." Sec. 2(a).

33.     The Executive Order further directs that, for the current fiscal year, "the heads of all agencies are directed that the total incremental cost of all new regulations, including repealed

regulations, to be finalized this year shall be no greater than zero, unless otherwise required by law or consistent with advice provided in writing by the Director of [OMB]." Sec. 2(b).

34.     In furtherance of the requirement quoted in paragraph 32, above, the Executive Order further directs that "any new incremental costs associated with new regulations shall, to the extent permitted by law, be offset by the elimination of existing costs associated with at least two prior regulations. Any agency eliminating existing costs associated with prior regulations under this subsection shall do so in accordance with the Administrative Procedure Act and other applicable law." Sec. 2(c).

35.     The Executive Order further directs that, for fiscal year 2018 and subsequent years, "the head of each agency shall identify, for each regulation that increases incremental cost, the offsetting regulations described in paragraph 34, and provide the agency's best approximation of the total costs or savings associated with each new regulation or repealed regulation." Sec. 3(a).

36.     The Executive Order further states that, "[d]uring the Presidential budget process, the Director [of OMB] shall identify to agencies a total amount of incremental costs that will be allowed for each agency in issuing new regulations and repealing regulations for the next fiscal year. No regulations exceeding the agency's total incremental cost allowance will be permitted in that fiscal year, unless required by law or approved in writing by the Director. The total incremental cost allowance may allow an increase or require a reduction in total regulatory cost." Sec. 3(d).

37.     The Executive Order directs agencies to offset costs of new regulations without consideration of the benefits associated with that rule or the existing rules designated for repeal, or of whether, taking into account costs and benefits, those rules have net benefits.

38.     A true and correct copy of the Executive Order is appended as Exhibit A.

39.     The Executive Order instructs the Director of OMB to "provide the heads of agencies with guidance on the implementation of" the requirements of section 2, described in paragraphs 32-34, above.

**OMB's Interim Guidance**

40.     On February 2, 2017, OMB issued "Interim Guidance Implementing Section 2 of the Executive Order," which addresses regulations to be issued in fiscal year 2017. The Interim Guidance states that guidance addressing application of the Executive Order for fiscal years 2018 and beyond will be issued at a later date.

41.     The Interim Guidance states that the Executive Order applies "only to those significant regulatory actions," as defined in Executive Order 12866, issued after noon on January 20, 2017, including final regulations for which a proposed rule was issued before that date. Executive Order 12866 defines "significant regulatory actions" to mean, among other things, regulatory actions that have an annual effect on the economy of $100 million or more or adversely affect in a material way the economy, jobs, the environment, public health or safety, or State, local, or tribal governments or communities, or that raise novel legal or policy issues.

42.     The Interim Guidance further states that "[p]urely deregulatory actions that confer only savings to all affected parties generally will not trigger" the Executive Order's requirement that the agency identify two existing rules for repeal, but that "if such deregulatory actions impose costs on individuals or entities, agencies will need to offset those costs."

43.     The Interim Guidance does not, however, allow an agency to treat consumer cost savings or other benefits of new or repealed rules as offsets to costs incurred by regulated entities. For example, the Guidance states that energy cost savings to consumers from rules

requiring appliance manufacturers to make more energy efficient equipment "would not be counted as offset to costs" incurred by those manufacturers.

44.     The Interim Guidance states that, in general, agencies cannot base the estimated cost savings of repealing an existing rule on the regulatory impact analysis (RIA) produced when the rule was issued. This direction will require agencies to undertake new cost estimates for each existing rule considered for elimination.

45.     The Interim Guidance further states that agencies should not count the "sunk" (or already incurred) costs of repealed rules, but must instead count only those costs that would be incurred after the effective date of the repeal. Because often the bulk of the cost of existing rules (such as the cost of new equipment purchases to meet pollution standards) will already have been incurred, this requirement will greatly magnify the number of rules that need to be repealed to permit new rules to be promulgated consistent with the Executive Order.

46.     The Interim Guidance states that cost savings from repeal of a rule by one component of an agency may be used to offset the costs of a rule issued by another component of that agency. It further states that cost savings can be transferred between agencies if OMB approves the transfer.

47.     A true and correct copy of the Interim Guidance is appended as Exhibit B.

**Administrative Procedure Act**

48.     Under the APA, an agency must publish a notice of proposed rulemaking in the Federal Register and solicit public comment before adopting, modifying, or repealing a rule. 5 U.S.C. § 553. The APA defines "rule making" as the "agency process for formulating, amending, or repealing a rule." *Id*. § 551(5). The APA defines "rule" to include "the whole or a part of an agency statement of general or particular applicability and future effect designed to implement,

interpret, or prescribe law or policy." *Id.* § 551(4). The Executive Order (Sec. 4) largely tracks this definition of a rule.

49.     In the APA, Congress directed federal agencies to undertake reasoned and evidence-based decision-making when exercising their delegated authority to promulgate rules. An agency must consider the factors that Congress has directed it to consider and cannot "rel[y] on factors which Congress has not intended it to consider." *Motor Vehicle Mfrs. Ass'n v. State Farm Mutual Auto. Ins. Co.*, 463 U.S. 29, 43 (1983).

50.     Under the APA, final agency action is judicially reviewable. A reviewing court shall "hold unlawful and set aside" agency action that is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A).

51.     The governing regulatory statutes enacted by Congress do not authorize federal agencies to consider the costs of other regulations issued in the same fiscal year or of regulations issued in prior years when determining whether to promulgate new or repeal existing regulations. Those statutes do not authorize federal agencies to condition issuance of new regulations on repealing existing regulations to offset the costs of the new ones.

**Application of the Executive Order**

52.     In promulgating a new rule (including a rule repealing an existing rule), each agency must comply with the substantive and procedural requirements of the APA and the agency's governing statute. In a rulemaking, an agency may make decision based on costs only to the extent and in the manner Congress has set forth in the statute delegating rulemaking authority to the agency.

53.     The agencies' governing statutes do not authorize agencies to repeal an existing regulation, weaken a new regulation, or forgo or delay a new regulation that it would otherwise issue, for the purpose of offsetting costs of new regulations.

54.     The Executive Order, by requiring that agencies promulgating new regulations take into account the cost of the new regulation in relation to costs of existing regulations that need to be repealed to comply with the Executive Order, as well as the costs of other regulations issued and repealed in the same fiscal year, requires the agencies to consider factors not specified in or inconsistent with their governing statutes, and to repeal, weaken, or delay regulations for an impermissible purpose.

55.     Agencies that comply with the Executive Order in their decisions regarding whether to propose, issue, or repeal regulations are acting in violation of their governing statutes. Decisionmaking based on the factors set forth in the Executive Order also constitutes action that is arbitrary and capricious, contrary to law, and in excess of agency authority, in violation of the APA. The adverse impact of the Executive Order is particularly egregious when the new or repealed regulations are designed to address health, safety, or environmental concerns.

56.     By instructing the agencies to consider factors and take deregulatory action for reasons beyond those authorized by the agencies' governing statutes, the Executive Order exceeds presidential authority and usurps Congress's legislative authority. And by directing agencies to violate the law or rendering them unable to regulate as required by the law, the President, through the Executive Order, is violating his obligation to take care that the law shall be faithfully executed.

57.     The Executive Order states that it shall be "implemented consistent with applicable law," Sec. 5(b); sections 2 and 3 include similar language. That language appears to

mean that the agencies must use notice-and-comment rulemaking to repeal offsetting regulations and that they must comply with existing statutory and judicial deadlines for taking particular regulatory actions. Thus, that language does not render the Executive Order or its implementation lawful. If, however, the language were interpreted to mean that the agencies may disregard the Executive Order when applicable statutes do not authorize conditioning regulation on the repeal of regulations with offsetting costs, that language would render the Executive Order without effect.

58.     The Executive Order adversely affects agencies' ability to issue any significant regulations that are intended to benefit plaintiffs and their members. The following examples demonstrate the adverse effects of the Executive Order on plaintiffs and their members, as well as how the Executive Order directs agencies to act unlawfully and why it is unconstitutional.

**A.     Motor Vehicle Safety Act and Motor Carrier Safety Act**

59.     The Motor Vehicle Safety Act was enacted "to reduce traffic accidents and deaths and injuries resulting from traffic accidents." 49 U.S.C. § 30101. The Act mandates motor vehicle safety standards that are practicable, meet the need for motor vehicle safety, and are stated in objective terms. *Id.* § 30111(a). "Motor vehicle safety standard" means a minimum performance standard for motor vehicles or motor vehicle equipment. When prescribing such standards, the National Highway Traffic Safety Administration (NHTSA) must consider all relevant, available motor vehicle safety information, and whether a proposed standard is reasonable, practicable, and appropriate for the types of motor vehicles or motor vehicle equipment for which it is prescribed and the extent to which the standard will further the statutory purpose of reducing traffic accidents and associated deaths. *Id.* §§ 30111(a), (b).

60.     The Motor Carrier Safety Acts of 1935 and 1984 require the Federal Motor Carrier Safety Administration (FMCSA) to "prescribe requirements for … safety of operation and equipment of, a motor carrier; and … standards of equipment of, a motor private carrier, when needed to promote safety of operation." 49 U.S.C. § 31502(b). Safety standards must, "[a]t a minimum … ensure that—(1) commercial motor vehicles are maintained, equipped, loaded, and operated safely; (2) the responsibilities imposed on operators of commercial motor vehicles do not impair their ability to operate the vehicles safely; (3) the physical condition of operators of commercial motor vehicles is adequate to enable them to operate the vehicles safely …; (4) the operation of commercial motor vehicles does not have a deleterious effect on the physical condition of the operators; (5) an operator of a commercial motor vehicle is not coerced by a motor carrier, shipper, receiver, or transportation intermediary to operate a commercial motor vehicle in violation of" various laws and regulations. *Id.* § 31136(a).

61.     The Executive Order, by requiring that safety regulations issued under the Safety Acts take into account cost—the cost of a new safety standard, the cost in relation to the costs of existing standards to be repealed, and the costs of any other standards issued or repealed in that fiscal year—requires the agencies to add a consideration not among the considerations specified in the Safety Acts.

62.     For example, pursuant to their authority under the two Safety Acts, and in light of the numerous studies concluding that the severity of a crash increases with increased travel speed, NHTSA and FMCSA in September 2016 proposed to require new multipurpose passenger vehicles, trucks, buses and school bus vehicles with a gross vehicle weight rating of more than 26,000 pounds to be equipped with speed limiting devices, and to require motor carriers operating such vehicles in interstate commerce to maintain functional speed limiting devices set

at not more than the maximum specified speed for the service life of the vehicle. 81 Fed. Reg. 61942 (2016). The comment period ended in December 2016. *See* 81 Fed. Reg. 78103 (2016). NHTSA and FMCSA estimate net benefits of $500 million to $5 billion annually from the rule, including fuel savings and the prevention of thousands of traffic injuries and deaths. 81 Fed. Reg. at 61945, 61961-64. They estimate that the rule will impose minimal cost on vehicle manufacturers related to the installation of speed limiters, but they estimate a social cost from lower travel speeds of $200 million to $1.5 billion annually. *Id*. Therefore, despite the proposed rule's huge net benefits to society, including to plaintiffs' members, the rule will fall within the scope of the Executive Order and cannot be finalized under that Executive Order unless two other regulations that impose equivalent or greater costs are repealed.

63.     In another example, NHTSA in January 2017 proposed to require all new light vehicles to include crash-avoidance technologies known as vehicle-to-vehicle (V2V) communications, such that they will send information about a vehicle's speed, heading, brake status, and other data to surrounding vehicles, and receive the same information from other vehicles. 82 Fed. Reg. 3854, 3855-57 (2017). NHTSA expects V2V technology to identify and prevent potential crashes, and to advance development of vehicle automation. *Id.* The comment period will end April 12, 2017. *Id*. at 3858. If finalized, the safety standard will be phased in over time, with costs that change over that period. Total estimated vehicle costs per year range from $2 to $5 billion ($135-$300 per vehicle). *Id.* at 3857. On the benefit side, the technology "could potentially prevent 424,901–594,569 crashes and save 955-1,321 lives [annually] when fully deployed throughout the light-duty vehicle fleet. Converting these and the accompanying reductions in injuries and property damage to monetary values, [NHTSA] estimate[s] that in 2051 the proposed rule could reduce the costs resulting from motor vehicle crashes by $53 to $71

billion (expressed in today's dollars)." *Id*. at 3858. NHTSA estimates that the safety standard will have net positive benefits within 3-5 years. *Id.* at 3982-4000. Despite the huge net benefits to society, including benefits to plaintiffs' members, NHTSA will not be able to promulgate this safety standard without repealing two other regulations that impose equivalent or greater costs.

64.     The Executive Order conditions NHTSA's and FMCSA's promulgation of these standards on the agencies' ability to offset the costs of these safety regulations by repealing "at least two prior regulations," Executive Order sec. 2(c), without taking into account the net benefits either of the new standards or the existing standards. To promulgate the speed-limiting-device regulation, the agencies would have to repeal regulations with costs of $200 million to $1.5 billion annually, without regard to the net benefits of the new regulation and the repealed regulations. To promulgate the V2V rule, NHTSA would have to repeal regulations with annual costs of $2 billion to $5 billion, again without regard to the net benefits of both the new and repealed regulations.

65.     The Executive Order requires the agencies when engaged in rulemaking to make decisions based on a impermissible and arbitrary choice—whether to issue a new standard at the cost of the loss of benefits of two existing standards. To repeal two vehicle safety standards for the purpose of adopting one is arbitrary, capricious, an abuse of discretion, and contrary to the Safety Acts.

66.     By instructing the agencies to repeal two standards for the purpose of adopting one, the Executive Order adds considerations inconsistent with the Safety Acts and, accordingly, exceeds the President's authority under the Constitution, usurps Congress's Article I legislative authority, and violates the President's obligation to take care that the laws be faithfully executed.

67.     Public Citizen advocates for strong health and safety regulation by NHTSA and FMCSA, petitions NHTSA and FMCSA to issue new rules to protect health and safety, and comments on proposed NHTSA and FMCSA rules to urge NHTSA and FMCSA to craft rules that best protect consumers. Public Citizen's members rely on Public Citizen to represent their interests with respect to vehicle safety. By requiring NHTSA and FMCSA to eliminate two rules for the purpose of issuing one new rule, and to consider the net costs of other regulations previously promulgated by NHTSA and FMCSA, the Executive Order requires the agency to reduce existing protections, including vehicle safety protections, to the detriment of Public Citizen and its members.

### B.     Occupational Safety and Health Act

68.     The Occupational Safety and Health Act (OSH Act) aims "to assure so far as possible every working man and woman in the Nation safe and healthful working conditions and to preserve our human resources." 29 U.S.C. § 651(b). It reflects Congress's finding that "personal injuries and illnesses arising out of work situations impose a substantial burden upon, and are a hindrance to, interstate commerce in terms of lost production, wage loss, medical expenses, and disability compensation payments." *Id*. § 651(a).

69.     The OSH Act requires an occupational health standard involving "toxic materials or harmful physical agents" to "adequately assur[e], to the extent feasible, on the basis of the best available evidence, that no employee will suffer material impairment of health or functional capacity even if such employee has regular exposure to the hazard dealt with by such standard for the period of his working life." *Id*. § 655(b)(5). After a significant risk is identified, OSHA must promulgate a standard that will eliminate that risk, unless doing so is infeasible in a particular industry. *AFL-CIO v. OSHA*, 965 F.2d 962, 973 (11th Cir. 1992). OSHA has a "duty to

keep adding [protective] measures so long as they afford benefit and are feasible, up to the point where [it] no longer finds significant risk." *Building & Constr. Trades Dep't v. Brock*, 838 F.2d 1258, 1269 (D.C. Cir. 1988).

70.     Under the OSH Act, "feasibility" encompasses economic feasibility. Under the OSH Act, a "standard is economically feasible if the costs it imposes do not 'threaten massive dislocation to, or imperil the existence of, the industry.'" *Am. Iron & Steel Inst. v. OSHA*, 939 F.2d 975, 980 (D.C. Cir. 1991) (quoting *United Steelworkers of Am. v. Marshall*, 647 F.2d 1189, 1265 (D.C. Cir. 1980)). It is infeasible if it would "threaten the existence or competitive structure of an industry." *Steelworkers*, 647 F.2d at 1272.

71.     The Executive Order, by requiring that health regulations issued under the OSH Act take into account the cost of the new health standard, the cost in relation to the costs of existing standards to be repealed, and the costs of any other standards issued or repealed in that fiscal year, requires the agency to add considerations not among those exclusive considerations specified in the OSH Act.

72.     For example, OSHA is currently considering whether to set a new occupational health standard for styrene, an industrial chemical that can harm workers' respiration, eyes, and nervous system, and classified by the Department of Health and Human Services' National Toxicology Program as "reasonably anticipated to be a human carcinogen."[1] The current federal permissible exposure limit is two to five times higher than the limits established by the Centers for Disease Control, the State of California, and the European Union. Setting a new standard would be a "significant regulatory action." Therefore, to issue a proposed rule to update the limit, OSHA will be required by the Executive Order to offset the costs by repealing "at least two prior

_____

[1] *See* https://www.reginfo.gov/public/do/eAgendaViewRule?pubId=201610&RIN=1218-AD09.

regulations," Executive Order sec. 2(c) and 3(a)—without taking into account the benefit either of the new standard or the existing ones to be repealed.

73.     Likewise, OSHA is developing a standard to protect health care employees and employees in other high-risk environments from exposure to pathogens that can cause significant infectious disease, such as tuberculosis, pandemic influenza, and SARS. 75 Fed. Reg. 24835 (2010). The standard would require employers to establish a comprehensive infection control program and control measures. OSHA anticipates issuing a proposed rule in October 2017. Therefore, OSHA will be required by the Executive Order to offset the costs of this rule by repealing "at least two prior regulations," Executive Order sec. 2(c) & 3(a)—without taking into account the benefit either of the new standard or the existing standards to be repealed.

74.     The Executive Order requires the agency to make decisions based on an impermissible and arbitrary choice—whether to issue a new standard at the cost of the loss of benefits of two existing standards. To repeal two occupational safety and health standards for the purpose of adopting one is arbitrary, capricious, an abuse of discretion, and contrary to the OSH Act. Likewise, to condition OSHA's ability to regulate safety or health risks on identifying unrelated regulations of equal cost that the agency may be able to persuade some other agency to repeal is arbitrary, capricious, an abuse of discretion, and contrary to the OSH Act.

75.     By instructing OSHA to repeal two standards for the purpose of adopting one, or conditioning OSHA's ability to regulate safety and health risks on identifying unrelated regulations of equal cost that the agency may be able to persuade some other agency to repeal, the Executive Order adds considerations inconsistent with the agency's and the courts' longstanding interpretations of the OSH Act, and accordingly, exceeds the President's authority

under the Constitution, usurps Congress's Article I legislative authority, and violates the President's obligation to take care that the laws be faithfully executed.

76.     CWA has advocated for health and safety improvements for workers in the OSHA rulemaking process. CWA represents nurses in a number of private hospitals across the country, as well as other workers in high-risk environments, whose health is at unnecessary risk without federal rulemaking on measures to protect health care employees and employees in other high-risk environments from infectious disease exposures to pathogens that can cause significant disease. Public Citizen has in the past commented on OSHA proposed rules; it has also petitioned OSHA to issue new occupational safety and health rules and is currently contemplating petitioning OSHA to issue two new safety rules. Because the Executive Order requires the agency, before it can issue either a proposed or final workplace safety standard, to undertake new cost assessments of two or more existing rules to identify two or more for repeal, compliance with the Executive Order will slow the issuance of proposed rules and final rules, to the detriment of CWA, Public Citizen, and their members. Because the Executive Order requires the agency to repeal two existing rules as a condition of issuing a new workplace safety or health standard, and because the repealed rules must have combined costs equal to or higher than the new rule, compliance with the Executive Order will decrease workplace safety and health, to the detriment of CWA, Public Citizen, and their members.

### C.     Mine Safety and Health Act

77.     The Mine Safety and Health Act (MSH Act) was enacted to protect the health and safety of miners. 30 U.S.C. § 801(a) ("[T]he first priority and concern of all in the coal or other mining industry must be the health and safety of its most precious resource—the miner."). Mirroring the language of the OSH Act, the MSH Act requires a mine safety standard involving

"toxic materials or harmful physical agents" to "adequately assure on the basis of the best available evidence that no miner will suffer material impairment of health or functional capacity even if such miner has regular exposure to the hazards dealt with by such standard for the period of his working life." *Id*. § 811(a)(6). Further, the MSH Act also specifically provides that "[n]o mandatory health or safety standard promulgated under this subchapter shall reduce the protection afforded miners by an existing mandatory health or safety standard." *Id.* § 811(a)(9). The Mine Safety and Health Administration (MSHA) is delegated the authority to promulgate regulations under the MSH Act. *Id.* § 811(a).

78.     The Executive Order, by requiring that safety regulations issued under the MSH Act take into account cost—the cost of the new safety standard, the cost in relation to costs of existing standards to be repealed, and the costs of other standards issued and repealed that fiscal year—requires the agency to consider a factor in addition to those exclusive considerations specified in the MSH Act.

79.     For example, to reduce mining deaths from pinning, crushing, or striking injuries to miners who work near certain mobile equipment, MSHA has proposed a rule requiring underground coal mine operators to equip that equipment with proximity detection systems, with a phase-in schedule for newly manufactured and existing equipment. 80 Fed. Reg. 53070 (2015). The comment period for the proposed rule is scheduled to close on April 10, 2017. 82 Fed. Reg. 9369 (2017). The agency estimates that the rule will both impose annualized costs of $16 to $18 million and create annualized benefits of $16 to $18 million, not including benefits that could not be quantified due to a lack of definitive information (such as savings to mine operators who would be able to avoid production delays typically associated with mine accidents). 80 Fed. Reg. at 53082. Because MSHA has determined that the rule qualifies as "significant," the rule will fall

within the scope of the Executive Order. The Executive Order will require the agency to offset the costs of the rule by repealing "at least two prior regulations," Executive Order sec. 2(c) & 3(a), without taking into account the benefits to miner safety either of the new standard or the existing standards to be repealed.

80.     The Executive Order requires the agency to make decisions based on an impermissible and arbitrary choice—whether to issue a new standard at the cost of the loss of benefits of two existing standards. To repeal two standards for the purpose of adopting one would be arbitrary, capricious, an abuse of discretion, and contrary to the MSH Act. Because MSHA is not permitted by statute to reduce protections from existing standards, the Executive Order forces MSHA either to forgo new standards altogether or to convince some other agency to repeal unrelated regulations to offset the cost of any new safety standard.

81.     By instructing MSHA to repeal two regulations for the purpose of adopting one, the Executive Order adds considerations inconsistent with the underlying statutes and, accordingly, exceeds the President's authority under the Constitution, usurps Congress's Article I legislative authority, and violates the President's obligation to take care that the laws be faithfully executed.

82.     Public Citizen advocates for strong mine-safety protections, including through press statements, comments to MSHA, and advocacy before Congress. Because the Executive Order requires the agency, before it can issue either a proposed or final safety standard, to undertake new cost assessments of two or more existing rules to identify two or more for repeal, compliance with the Executive Order will slow the issuance of proposed rules and final rules. Because the Executive Order requires the agency to repeal two existing rules as a condition of

27

issuing a new safety regulations, and because the repealed rules must have combined costs equal to or higher than the new rule, compliance with the Executive Order will decrease safety.

### D.   Toxic Substance Control Act

83.    The Toxic Substance Control Act (TSCA), as amended in 2016, is based on congressional findings that "human beings and the environment are being exposed each year to a large number of chemical substances and mixtures" that "may present an unreasonable risk of injury to health or the environment." 15 U.S.C. § 2601(a).

84.    TSCA directs the administrator of the EPA to evaluate existing chemicals under a risk-based safety standard "without consideration of costs or other nonrisk factors." *Id.* §§ 2604(b)(4)(A), (f).

85.    For example, to prevent documented harms to developing fetuses, carcinogenic effects from all routes of exposure, and respiratory, nervous system, kidney, liver, and immune system effects, EPA proposed two rules in December 2016 and January 2017 that would phase out trichloroethylene (TCE), a highly toxic volatile organic compound, for use in vapor degreasing, aerosol degreasing, and spot cleaning in dry cleaning facilities. 82 Fed. Reg. 7432 (2017) (vapor degreasing); 81 Fed. Reg. 91592 (2016) (aerosol degreasing and spot cleaning). The comment periods close on March 20, 2017, and February 14, 2017, respectively. The agency estimates that the vapor degreasing rule will impose costs of $30 million to $45 million annually but have net benefits (including health protection benefits) of $35 million to $402 million annually, and that the aerosol degreasing and spot cleaning rule will impose costs of $170,000 annually but have net benefits of $9 million to $24.6 million annually. 82 Fed. Reg. at 7453; 81 Fed. Reg. at 91594. Both rules are classified as "significant," 82 Fed. Reg. at 7458; 81 Fed. Reg. at 91622, and will fall within the scope of the Executive Order.

86.     In another example, methylene chloride poses neurotoxicity, liver toxicity, and liver and lung cancer risks to workers, consumers, and bystanders where it is used, and N-Methylpyrrolidone (NMP) poses health risks to pregnant women and women of child-bearing years. In January 2017, the EPA proposed a rule to regulate methylene chloride and NMP in paint removers. 82 Fed. Reg. 7464 (2017). The comment period closes on April 19, 2017. When finalized, the rule will either prohibit methylene chloride and NMP for all consumer and most types of commercial paint removal or impose a series of restrictions such as limitations on the amount of the substances in paint removal products, requiring warning labels for consumers, and requiring commercial users to have worker protection programs in place, including specialized gloves, as well as other equipment and hazard communication. The rule has been classified as a significant regulatory action and therefore falls within the scope of the Executive Order.

87.     The Executive Order requires the EPA to offset the costs of these health regulations by repealing "at least two prior regulations," Executive Order sec. 2(c), without taking into account the net benefits either of the new standards or the existing standards that will be repealed. To promulgate the regulations, the EPA must repeal at least twice as many existing regulations to offset costs of the new standards, without regard to the net benefits of the new regulations and the repealed regulations.

88.     The Executive Order requires the EPA to make decisions based on an impermissible and arbitrary choice—whether to issue a new standard at the cost of the loss of benefits of two existing standards. To repeal two toxic substance safety standards for the purpose of adopting one would be arbitrary, capricious, an abuse of discretion, and contrary to the TSCA.

89.     By instructing the agencies to repeal two standards for the purpose of adopting one, the Executive Order adds considerations inconsistent with the TSCA and, accordingly,

exceeds the President's authority under the Constitution, usurps Congress's Article I legislative authority, and violates the President's obligation to take care that the laws be faithfully executed.

90.     Members of Public Citizen, NRDC, and CWA are and will be exposed to TCE and methylene chloride, and NMP, and/or serious health risks associated with exposure to these chemicals. To protect their members and limit their exposure to toxic chemicals, Public Citizen and NRDC have long advocated for regulation of toxic substances, including advocacy for the 2016 TSCA amendments. NRDC has also advocated for effective, timely implementation of TSCA and has formally urged EPA to do so through the rulemaking process. CWA similarly advocates for regulation of toxic substances which threaten the health of its members. Moreover, trichloroethylene, for example, is present in at least one manufacturing facility where CWA members work, and if EPA adopts a rule regarding the human health risks of this substance, OSHA would normally follow with a rule protecting workers, including CWA members, from the substance's risks in the workplace. Because the Executive Order requires the agency, before it can issue either proposed or final safety standards, to undertake new cost assessments of two or more existing rules to identify two or more for repeal, and because the Executive Order requires the agency to repeal two existing rules as a condition of issuing a new safety regulation, compliance with the Executive Order will decrease safety and protection from toxic substances, to the detriment of plaintiffs and their members.

**E.     Hazardous Materials Transportation Act, Federal Railroad Safety Act, and the Federal Water Pollution Control Act**

91.     In the past several years, a surge in the transport of volatile and explosive crude oil by rail has led to catastrophic train accidents, causing fire balls, oil spills into rivers, destruction of a city's downtown, and loss of lives. The National Transportation Safety Board

has investigated rail accidents and recommended strengthening regulations to prevent future accidents and reduce the harm when accidents occur.

92.     The Department of Transportation regulates rail safety under two overlapping statutes: (1) the Hazardous Materials Transportation Act (HMTA), which directs the Secretary of Transportation to "prescribe regulations for the safe transportation, including security, of hazardous materials in intrastate, interstate, and foreign commerce," 49 U.S.C. § 5103(b), and (2) the Federal Railroad Safety Act (FRSA), which authorizes the Secretary to issue regulations and orders "for every area of railroad safety," 49 U.S.C. § 20103(a). The Pipeline and Hazardous Materials Safety Administration (PHMSA) administers HMTA, and the Federal Railroad Administration (FRA) administers the FRSA. 49 C.F.R. §§ 1.89, 1.97(b). PHMSA has also been delegated authority under the Federal Water Pollution Control Act to issue regulations requiring railroads and other facilities to submit and obtain approval of oil-spill response plans. 33 U.S.C. § 1321. Such plans must respond "to the maximum extent practicable, to a worst case discharge, and to a substantial threat of such a discharge, of oil." *Id*. § 1321(j)(5)(A)(ii).

93.     In July 2016, PHMSA, in consultation with the FRA, proposed a rule to require railroads to submit and obtain approval of comprehensive oil-spill response plans, to share information about high-hazard flammable train routes and contents with state and tribal emergency response organizations, and to update boiling point testing procedures. 81 Fed. Reg. 50068 (2016). The agency estimates that the rule will provide net benefits by substantially reducing the incidents and severity of oil spills. *Id.* at 50114. The final rule is scheduled for July 2017.

94.     Because the rule is classified as a significant regulatory action, *id*. at 50108, it is subject to the Executive Order. Therefore, to issue a final rule, the agency will be required to

31

offset the costs by repealing "at least two prior regulations," Executive Order sec. 2(c) & 3(a), without taking into account the net benefits either of the new regulation or the existing regulations to be repealed.

95.     The Executive Order requires the agencies to make decisions based on an impermissible and arbitrary consideration—whether the one new regulation is more important to rail safety than the combined benefits of two existing standards—that is nowhere specified in the governing statutes. To repeal two railroad safety regulations for the purpose of adopting one would be arbitrary, capricious, an abuse of discretion, and contrary to the underlying statutes.

96.     By instructing the PHMSA and FRA to repeal two standards for the purpose of adopting one, the Executive Order adds considerations inconsistent with the underlying statutes and, accordingly, exceeds the President's authority under the Constitution, usurps Congress's Article I legislative authority, and violates the President's obligation to take care that the laws be faithfully executed.

97.     In the face of crude oil train disasters, NRDC has advocated on behalf of its members who live in the blast zone along rail lines on which hazardous crude oil is shipped. NRDC has commented on proposed rules that improve rail safety, advocated for legislation to require rules to reduce crude oil shipping hazards, and advocated for and commented on rules that will require the railroads to have comprehensive oil spill response plans. Because the Executive Order requires the agency, before it can issue either proposed or final safety standards, to undertake new cost assessments of two or more existing rules to identify two or more for repeal, compliance with the Executive Order will necessarily slow the issuance of proposed rules and final rules, to the detriment of NRDC and its members. Because the Executive Order requires the agency to repeal two existing rules as a condition of issuing a new safety regulation,

and because the repealed rules much have combined costs equal to or higher than the new rule, compliance with the Executive Order will decrease safety, to the detriment of NRDC and its members.

### F.    Energy Policy and Conservation Act

98.     The Energy Policy and Conservation Act (EPCA) authorizes the Department of Energy to set energy conservation standards for various consumer products and certain commercial and industrial equipment. President Reagan signed into law the provisions of EPCA that establish appliance efficiency standards, while Presidents George H.W. Bush and George W. Bush signed into law strengthening legislation. *See* Pub. L. 100-12; Pub. L. 100-357; Pub, L. 102-486; Pub. L. 109-58; Pub. L. 110-140. The Department of Energy (DOE) projects that national energy efficiency standards completed through 2016 will save, by 2020, as much energy as the entire nation consumes in a year, and that consumers will save $1 trillion on their utility bills by 2020, and $2 trillion on their utility bills by 2030.[2]

99.     EPCA achieves these savings by providing that any new or amended energy conservation standard for a covered product must be designed to achieve the maximum improvement in energy efficiency that DOE determines is technologically feasible and economically justified. 42 U.S.C. § 6295(o)(2)(A). DOE must periodically review already established energy conservation standards, and any new or amended standard must result in significant conservation of energy. *Id.* §§ 6295(m), (o)(3)(B). In deciding whether a new or amended standard is economically justified, DOE must determine whether the benefits of the standard exceed its burdens. *Id.* § 6295(o)(2)(B)(i). DOE must make this determination after

---

[2] *See* U.S. Dep't of Energy, Saving Energy and Money with Appliance and Equipment Standards in the United States (2017), *available at* https://energy.gov/sites/prod/files/2017/01/f34/Applian ce%20and%20Equipment%20Standards%20Fact%20Sheet-011917_0.pdf.

considering seven statutory factors: (1) the economic impact of the standard on manufacturers and consumers of the products subject to the standard; (2) the savings in operating costs throughout the estimated average life of the covered products in the type (or class) compared to any increase in the price, initial charges, or maintenance expenses for the covered products that are likely to result from the standard; (3) the total projected amount of energy (or as applicable, water) savings likely to result directly from the standard; (4) any lessening of the utility or the performance of the covered products likely to result from the standard; (5) the impact of any lessening of competition, as determined in writing by the Attorney General, that is likely to result from the standard; (6) the need for national energy and water conservation; and (7) other factors the Secretary of Energy considers relevant. *Id.* § 6295(o)(2)(B)(i)(I)-(VII). EPCA also contains an "anti-backsliding" provision that bars the agency from prescribing any standard that either increases the maximum allowable energy use or decreases the minimum required energy efficiency of a covered product. *Id*. § 6295(o)(1).

100.    The Executive Order requires DOE, when setting energy conservation standards, to make regulatory decisions based on factors other than the exclusive factors specified by EPCA, including the cost of the energy conservation standard in isolation from its cost-saving and pollution-reducing benefits, and the cost (but not the benefits) of an energy efficiency standard in relation to the costs of unrelated regulations.

101.    For example, in June 2015, DOE proposed a rule under EPCA to amend the energy efficiency standards for residential conventional cooking products, such as stoves and ovens. 80 Fed. Reg. 33030 (2015). In September 2016, DOE issued a supplemental notice of proposed rulemaking. 81 Fed. Reg. 60784 (2016). DOE must publish a final rule no later than two years after the original proposal—that is, by June 2017. 42 U.S.C. § 6295(m)(3)(A). DOE

estimates that the standard will impose an additional $42.6 million in increased equipment costs annually, but result in more than $293 million in energy bill savings for consumers, and more than an additional $88 million in reduced pollution benefits, for a net annual benefit of more than $339 million per year. 81 Fed. Reg. at 60789. In light of the magnitude of these net benefits, the standard will fall within the scope of the Executive Order challenged here. Notwithstanding the considerable net benefit to consumers and to the public more generally of this new standard, the Executive Order will require the agency to offset the costs of the standard by repealing "at least two prior regulations," Executive Order sec. 2(c), regardless of the net benefits either of the new standard and the existing regulations that would be repealed.

102.    The Executive Order requires the agency to make decisions based on an impermissible and arbitrary choice—whether to issue a new standard at the cost of the loss of benefits of two existing standards. To repeal two standards for the purpose of adopting one would be arbitrary, capricious, an abuse of discretion, and contrary to EPCA. Because DOE is not permitted by statute to reduce protections from existing standards, the Executive Order forces DOE either to forgo new standards altogether or to convince some other agency to repeal unrelated regulations to offset the cost of any new standard.

103.    By instructing DOE to repeal two regulations for the purpose of adopting one, the Executive Order adds considerations inconsistent with the underlying statutes and, accordingly, exceeds the President's authority under the Constitution, usurps Congress's Article I legislative authority, and violates the President's obligation to take care that the laws be faithfully executed.

104.    Public Citizen's and NRDC's members benefit from improved appliance energy efficiency, including improved energy efficiency for residential conventional cooking products. Plaintiffs' members use these products, and improved energy efficiency standards will reduce

these members' utility bills. In addition, reduced consumption of energy will lessen air pollution to which Plaintiffs' members are exposed and that adversely affects Plaintiffs' members' health, recreational, aesthetic, and economic interests. Public Citizen and NRDC have long advocated for strong energy efficiency standards. NRDC has submitted multiple rounds of formal public comments in support of stronger energy efficiency standards for residential conventional cooking products, in particular. Plaintiffs and their members directly benefit from the significant energy savings and pollution reductions achieved through EPCA energy efficiency standards, and will be harmed if the Executive Order delays needed regulation, including amended energy efficiency standards such as the proposed standard for residential conventional cooking products, or weakens final regulations to avoid imposing regulatory costs that would need to be offset by repealing other rules. Because the Executive Order requires DOE to identify two or more existing rules for repeal before DOE can issue either a proposed or final energy efficiency standard, compliance with the Executive Order will delay the issuance of proposed rules and final rules, to the detriment of plaintiffs and their members. Because the Executive Order requires the agency to repeal two existing rules as a condition of issuing a new energy efficiency standard, and because the repealed rules must have combined costs equal to or higher than the new rule, compliance with the Executive Order will limit the adoption of new and more stringent energy efficiency standards, to the detriment of plaintiffs and their members.

G.   **Endangered Species Act**

105.   Congress enacted the Endangered Species Act (ESA) with the "plain intent … to halt and reverse the trend toward species extinction, whatever the cost." *Tenn. Valley Auth. v. Hill*, 437 U.S. 153, 184 (1978). To achieve that purpose, the Act requires the Secretaries of the Interior and of Commerce to list species that are threatened or endangered with extinction, 16

U.S.C. § 1533(a)(1), and to designate those species' "critical habitat" (including habitat that is critical to the conservation of the species that may require special protection), *id*. § 1533(a)(3)(A); *id*. § 1532(5)(A). The ESA does not permit the Secretaries to consider cost when determining whether a species is threatened or endangered, but directs that cost should be considered, and specifies how it should be considered, in designating critical habitat. Specifically, the Secretaries must "tak[e] into consideration the economic impact … of specifying any particular area as critical habitat." *Id*. § 1533(b)(2). The ESA permits the relevant Secretary to "exclude any area … if he determines that the benefits of such exclusion outweigh the benefits of specifying such area as part of the critical habitat, unless … the failure to designate such area as critical habitat will result in the extinction of the species concerned." *Id*. The Secretaries have delegated their authority under the ESA to the Directors of the Fish and Wildlife Service and the National Marine Fisheries Service, respectively (collectively, the Services).

106.   The Executive Order requires the Secretaries and the Services to consider factors when designating critical habitat that are outside the exclusive factors specified by the ESA itself. In particular, the Executive Order purports to require the Secretaries and the Services to consider the cost of critical habitat designations in isolation from the critical habitat's benefits, and to consider the costs of critical habitat designations in relation to the costs of other regulations, including critical habitat designations for entirely distinct species.

107.   Insofar as the Secretaries and the Services comply with the Executive Order when designating critical habitat, they will be acting in violation of the ESA. Insofar as the Executive Order instructs the Secretaries and the Services to consider the cost of a new critical habitat designation relative to the cost of existing or planned critical habitat designations, as a basis for

making determinations under the ESA, the Executive Order exceeds presidential authority, usurps Congress's Article I legislative authority, and violates the President's obligation to take care that the laws be faithfully executed.

108.    For example, the National Marine Fisheries Service has proposed critical habitat under the ESA for several distinct population segments of the Atlantic sturgeon. 81 Fed. Reg. 35701 (2016). This action has been classified as "significant" under Executive Order 12866, *id.* at 35714, a trigger for application of the Executive Order challenged here. The Fisheries Service is required to finalize critical habitat designation for these species by May 2017. Compliance with the Executive Order requires the Secretary of Commerce and the Fisheries Service to offset the costs of the critical habitat designations by repealing "at least two prior regulations," Executive Order sec. 2(c), without taking into account the net benefits either of the Atlantic sturgeon critical habitat or of the existing standards that would be repealed.

109.    Requiring the Secretary of Commerce and the Fisheries Service to offset the costs of the critical habitat designation by repealing other regulations would force the Secretary of Commerce and the Fisheries Service to consider an impermissible and arbitrary factor—whether to promulgate critical habitat at the cost of the loss of benefits to two existing regulations—that is nowhere specified in the governing statute. To repeal two regulations for the purpose of adopting one, or to designate inadequate critical habitat to reduce associated cost, would be arbitrary, capricious, an abuse of discretion, and contrary to the ESA.

110.    By instructing agencies to repeal two regulations for the purpose of adopting one, the Executive Order adds considerations inconsistent with the underlying statutes and, accordingly, exceeds the President's authority under the Constitution, usurps Congress's Article

I legislative authority, and violates the President's obligation to take care that the laws be faithfully executed.

111.    NRDC has for many decades advocated for strong protections for critical habitat of threatened and endangered species, including the Atlantic sturgeon. Indeed, the Fisheries Service proposed to designate critical habitat for the five distinct population segments of Atlantic sturgeon only after NRDC and another organization sued to compel the Service to do so. Since prevailing in that litigation, NRDC and coalition partners have filed formal comments regarding the Fisheries Service's proposed designation of that Atlantic sturgeon critical habitat. Over the years, NRDC has advocated for, commented on, and litigated to ensure strong critical habitat designations for many other threatened and endangered species as well. NRDC members' scientific, recreational, aesthetic, and other interests will be adversely affected if Atlantic sturgeon critical habitat is not designated or if insufficient critical habitat is designated.

112.    NRDC anticipates bringing lawsuits within the next year to compel the Secretary of Commerce or the Secretary of the Interior to designate critical habitat for specific other species that are listed as threatened or endangered, and in the protection of which NRDC's members have scientific, recreational, aesthetic, and other interests, but for which critical habitat has not been designated. Such litigation is authorized by the ESA, 16 U.S.C. § 1540(g), and protected by the Petition Clause of the First Amendment to the U.S. Constitution. However, the Executive Order provides that each regulation designating critical habitat must be offset by the repeal of two other regulations that impose equal or greater cost. This puts NRDC in the untenable position of choosing between either: (a) engaging in statutorily authorized and constitutionally protected advocacy to compel designation of critical habit, even though under the Executive Order the agency would then have to repeal two other critical habitat designations

or regulations; or (b) forsaking this authorized and protected advocacy and allowing the Secretaries to continue to violate the Endangered Species Act's mandatory critical habitat designation provisions, to the detriment of NRDC's members who have scientific, recreational, aesthetic, and other interests in the protection of the relevant threatened or endangered species.

113.    NRDC's members study, view, and enjoy species referenced in this Complaint, and their interests in those activities will be harmed by reduced or delayed protections for these species. The Executive Order will slow the issuance of proposed rules and final rules, including critical habitat designations, to the detriment of NRDC and its members. The Executive Order purports to require the Secretaries and the Services to undertake new cost assessments of other existing rules and to identify two or more rules for repeal before critical habitat is designated. Because the Executive Order requires the Secretaries and the Services to repeal two existing rules as a condition of issuing a new regulation, including new critical habitat designations, and because the repealed rules must have combined costs equal to or higher than the new regulation, compliance with the Executive Order will reduce protections for threatened and endangered species to the detriment of NRDC and its members.

### H.    Clean Air Act

114.    Congress enacted the Clean Air Act to protect and enhance air quality "to promote the public health and welfare and the productive capacity of [the] population." 42 U.S.C. § 7401(b)(1). The Act requires EPA to establish emissions standards and to review and update the standards to ensure they meet the statutory criteria and keep up with technological advances. *Id.* § 7411. The Clean Air Act has saved over 150,000 lives per year and spared more than 100,000 people per year from hospital visits from respiratory ailments like asthma and bronchitis. According to the EPA, in the Act's first 40 years, benefits—in the form of longer

lives, healthier children, greater workplace productivity, and ecosystem protection—outweighed costs by more than 30 to 1.[3]

115.    In the Clean Air Act, Congress directed EPA to establish several types of standards based on prescribed factors. For example, the Act directs EPA to promulgate national ambient air quality standards (NAAQS) for air pollution from numerous and diverse mobile and stationary sources, including emissions of such substances as ozone, particulate matter, and sulfur dioxide. *Id*. § 7409. The Act directs EPA to set primary NAAQS at levels "requisite to protect the public health" with "an adequate margin of safety." *Id*. § 7409(b)(1). At five-year intervals, EPA must review and revise the NAAQS as appropriate to meet the controlling statutory standard. *Id*. § 7409(d)(1). The Act does not permit EPA to consider implementation costs in setting the NAAQS. *Whitman v. Am. Trucking Ass'ns*, 531 U.S. 457 (2001).

116.    The Clean Air Act also requires EPA to set new source emission standards for a wide range of industries and to review and update those standards every 8 years. 42 U.S.C. § 7411. EPA must require the best system of emission reduction that has been adequately demonstrated. In doing so, it is to take into account the cost of achieving emission reductions, as well as health and environmental impact and energy requirements. *Id*. § 7411(a)(1). EPA is allowed to consider costs only in this manner.

117.    In addition, under the Clean Air Act, because greenhouse gasses are "air pollutants," EPA had a duty to determine whether greenhouse gas pollution in the atmosphere endangers public health and welfare. *Massachusetts v. EPA*, 549 U.S. 497 (2007). In 2009, EPA made an endangerment determination, which was upheld in *Coalition for Responsible Regulation v. EPA*, 684 F.3d 102 (D.C. Cir. 2012), *cert. denied* 134 S. Ct. 468 (2013). In light of this

---

[3] EPA, The Benefits and Costs of the Clean Air Act from 1990 to 2020, *available at* https://www.epa.gov/sites/production/files/2015-07/documents/fullreport_rev_a.pdf (Apr. 2011).

determination, when EPA determines that emissions from a category of mobile sources (e.g., cars, trucks, airplanes) "cause or contribute" to elevated atmospheric greenhouse gas levels, EPA has a mandatory obligation to promulgate a regulation controlling the emissions. *E.g.*, 42 U.S.C. § 7521(a)(1). The Executive Order introduces statutorily irrelevant and thus unlawful factors into the "cause or contribute" determination. It also requires the repeal of at least two independent rules to offset costs from a new regulation limiting greenhouse gas emissions, in derogation of the Clean Air Act.

118.    The Executive Order requires the agency to make an impermissible and arbitrary choice—whether to issue a new standard at the cost of the loss of benefits of two existing standards. To repeal two regulations for the purpose of adopting one would be arbitrary, capricious, an abuse of discretion, and contrary to the Clean Air Act.

119.    By instructing EPA to repeal two regulations for the purpose of adopting one, the Executive Order adds considerations inconsistent with the underlying statutes and, accordingly, exceeds the President's authority under Constitution, usurps Congress's Article I legislative authority, and violates the President's obligation to take care that the laws be faithfully executed.

120.    NRDC, for more than 45 years, has worked to protect its members' lives, health, and welfare, advocating on behalf of its members for vigorous and effective implementation of the Clean Air Act. NRDC regularly advocates on behalf of its members in rulemakings over national standards, state implementation proceedings, and enforcement cases. NRDC has prevailed in dozens of cases challenging failures to perform mandatory duties or to meet statutory deadlines, and overturning regulatory standards and actions that are arbitrary, capricious, or contrary to EPA's delegated rulemaking authority. NRDC has also supported EPA as an intervenor in many cases to defend EPA rules against challenges by regulated entities.

NRDC's members are adversely affected by the Executive Order because it will cause the delay, weakening, or repeal of critical life-saving and environment-protecting air pollution limits.

## FIRST CAUSE OF ACTION

### (Violation of separation of powers)

121.    Plaintiffs incorporate by reference the allegations contained in the preceding paragraphs as if fully set forth herein.

122.    Plaintiffs have a non-statutory right of action to enjoin and declare unlawful official action that is ultra vires.

123.    The Constitution vests executive power in the President. U.S. Const., art. II. The President of the United States has only those powers conferred on him by the Constitution and federal statutes.

124.    Federal legislation must be passed by both chambers of Congress before it may be presented to the President and, if signed, become law. U.S. Const., art. I. The President has no authority under the Constitution to amend federal statutes unilaterally.

125.    By requiring agencies engaged in rulemaking to consider and take final action or to withhold final action based on factors that are impermissible and arbitrary under the governing statutes, the Executive Order purports to amend the statutes through which Congress has delegated rulemaking authority to federal agencies.

126.    Such action by the President exceeds presidential authority and usurps legislative authority conferred by the Constitution on the Congress.

127.    Accordingly, the Executive Order violates the separation of powers.

128.    Plaintiffs and their members will suffer irreparable injury if the Executive Order is not declared unlawful, and plaintiffs and their members have no adequate remedy at law.

129.    The public interest favors entry of a declaration that the Executive Order is unconstitutional, in violation of the separation of powers, because implementation of the Executive Order will deter, weaken, delay, and eliminate regulations that protect plaintiffs and the public from harm.

SECOND CAUSE OF ACTION

(Violation of the Take Care Clause)

130.    Plaintiffs incorporate by reference the allegations contained in the preceding paragraphs as if fully set forth herein.

131.    Plaintiffs have a non-statutory right of action to enjoin and declare unlawful official action that is ultra vires.

132.    Under the Constitution, the President has duty to "take Care that the Laws be faithfully executed." U.S. Const. art. II, § 3.

133.    The Take Care Clause is judicially enforceable against presidential action that undermines statutes enacted by Congress and signed into law. *See, e.g.*, *Angelus Milling Co. v. Comm'r of Internal Revenue*, 325 U.S. 293, 296 (1945) ("Insofar as Congress has made explicit statutory requirements, they must be observed and are beyond the dispensing power of [the Executive Branch]."); *Kendall v. United States ex. Rel. Stokes*, 37 U.S. (12 Pet.) 524, 612-13 (1838).

134.    The Take Care Clause limits the President's power and ensures that he will faithfully execute Congress's laws.

135.    Under the Constitution, the President lacks the authority to direct federal officers or agencies to act in derogation of the statutes that delegate rulemaking authority to them.

136.    The Executive Order directs agencies to take action contrary to numerous laws passed by Congress, including but not limited to the Motor Vehicle Safety Act, the Motor Carrier Safety Acts of 1935 and 1984, the OSH Act, the MSH Act, TSCA, HMTA, the FRSA, the Federal Water Pollution Control Act, the EPCA, the ESA, the Clean Air Act, and the APA.

137.    Plaintiffs and their members will suffer irreparable injury if the Executive Order is not declared unlawful and in violation of the Take Care Clause. Plaintiffs and their members have no adequate remedy at law.

138.    The public interest favors entry of a declaration that the Executive Order is contrary to law and unconstitutional, because implementation of the Executive Order will deter, weaken, delay, and eliminate regulations that protect plaintiffs and the public from harm.

139.    Accordingly, the Executive Order is in violation of the Take Care Clause and compliance with or enforcement of the Executive Order violates the Take Care Clause.

THIRD CAUSE OF ACTION

(Non-statutory review of ultra vires action by agency officials)

140.    Plaintiffs incorporate by reference the allegations contained in the preceding paragraphs as if fully set forth herein.

141.    Plaintiffs have a non-statutory right of action to enjoin and declare unlawful official action that is ultra vires.

142.    Neither the statutes from which the agency defendants derive their rulemaking authority nor the APA authorizes these defendants to consider and take action based on the cost

of a new rule in relation to the costs of existing standards for the purpose of offsetting costs as a condition of issuing a new standard in compliance with the Executive Order.

143.    Neither the statutes from which the agency defendants derive their rulemaking authority nor the APA authorize these defendants, when determining whether to issue a proposed or final rule, to choose between the benefits of that rule and the benefits of other rules required by the Executive Order to be issued or repealed in the fiscal year in which the new rule is adopted.

144.    The Executive Order directs these defendants to exercise their delegated authority in ways that are arbitrary, capricious, an abuse of discretion, contrary to the Constitution and the governing statutes, and in violation of the APA, 5 U.S.C. § 706. The agency defendants cannot implement the Executive Order without violating the statutes from which they derive their rulemaking authority and the APA.

145.    Plaintiffs and their members will suffer irreparable injury if the agency defendants comply with the Executive Order. Plaintiffs and their members have no adequate remedy at law.

146.    The public interest favors barring the agency defendants from complying with the Executive Order because compliance is be contrary to law, and will deter, weaken, delay, and eliminate regulations that protect plaintiffs and the public from harm.

147.    Because the Executive Order directs agencies to violate the law, this Court should declare that the Executive Order is of no force and effect and enjoin compliance with the order.

FOURTH CAUSE OF ACTION

(Non-statutory review of ultra vires actions by director of OMB)

148.    Plaintiffs incorporate by reference the allegations contained in the preceding paragraphs as if fully set forth herein.

149.    Plaintiffs have a non-statutory right of action to enjoin and declare unlawful official action that is ultra vires.

150.    The director of OMB may act only pursuant to authority lawfully delegated by Congress or the President. 31 U.S.C. § 501 *et seq.*

151.    Because the Executive Order violates the President's authority under the Constitution and directs action contrary to law, implementation of the Executive Order by the director of OMB is arbitrary, capricious, an abuse of discretion, and contrary to law.

152.    Plaintiffs and their members will suffer irreparable injury if the agency defendants comply with the Executive Order and OMB's implantation of it. Plaintiffs and their members have no adequate remedy at law.

153.    The public interest favors entry of an injunction barring implementation by OMB of the Executive Order and OMB's Interim Guidance because the Interim Guidance and the Executive Order on which it is based are contrary to law, and implementation will deter, weaken, delay, and eliminate regulations that protect plaintiffs and the public from harm.

154.    Because the Executive Order directs agencies to violate the law, this Court should declare that the OMB Interim Guidance implementing the Executive Order and the Executive Order are of no force and effect and enjoin the director of OMB from implementing the Executive Order.

## FIFTH CAUSE OF ACTION

### (Violation of the APA)

155.    Plaintiffs incorporate by reference the allegations contained in the preceding paragraphs as if fully set forth herein.

156.    The APA requires this Court to hold unlawful and set aside any agency action that is "(A) arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law; (B) contrary to constitutional right, power, privilege, or immunity; [or] (C) in excess of statutory jurisdiction, authority, or limitations, or short of statutory right." 5 U.S.C. § 706(2).

157.    The OMB Interim Guidance, which implements section 2 of the Executive Order and purports to be binding on federal agencies, constitutes final agency action under the APA.

158.    The President lacks constitutional authority to issue the Executive Order and to direct the director of OMB to implement it, including by issuing the Interim Guidance. The Interim Guidance is arbitrary, capricious, an abuse of discretion, and not in accordance with law, in contravention of the APA. *Id*.

159.    Plaintiffs and their members will suffer irreparable injury if the director of OMB implements the Executive Order. Plaintiffs and their members have no adequate remedy at law.

160.    The public interest favors entry of an injunction barring implementation of the Interim Guidance because that Guidance violates the APA and is in excess of OMB's authority, chills First Amendment activity, and stands as an obstacle to fulfillment of congressional mandates and purposes discharged through agency rulemaking.

161.    Because the Executive Order directs unlawful action, its implementation by the director of OMB will cause other federal agencies to violate the APA and numerous statutes, as discussed above. This Court should hold the Interim Guidance unlawful and set it aside, declare that it is of no force and effect, and enjoin the director of OMB from implementing the Executive Order.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs pray that this Court:

(A)     Declare the Executive Order in violation of the Take Care Clause, in excess of presidential authority under Article II of the Constitution, an infringement on legislative authority, and invalid; and

(B)     Declare that defendants cannot lawfully implement or comply with sections 2 and 3(a) and (d) of the Executive Order;

(C)     Declare unlawful and set aside the OMB Interim Guidance;

(D)     Enjoin the agency defendants, including the director of OMB, from complying with the Executive Order;

(E)     Grant such other relief as this Court may deem just and proper.

Dated: February 8, 2017                              Respectfully submitted,

 

     /s/                      .

| | |
|---|---|
| Michael E. Wall | Allison M. Zieve |
| (CA Bar No.170238) | (DC Bar No. 424786) |
| NATURAL RESOURCES DEFENSE | Scott L. Nelson |
|   COUNCIL, INC. | (DC Bar No. 413548) |
| 111 Sutter Street, Floor 21 | Sean M. Sherman |
| San Francisco, CA 94104 | (NY Bar No. 5115456, application for DC |
| (415) 875-6100 | Bar membership pending) |
| | PUBLIC CITIZEN LITIGATION GROUP |
| Counsel for Natural Resources Defense | 1600 20th Street NW |
| Council, Inc. | Washington, DC  20009 |
| | (202) 588-1000 |
| Guerino J. Calemine, III | |
| (DC Bar No. 465413) | Patti A. Goldman |
| COMMUNICATIONS WORKERS OF | (DC Bar No. 398565) |
| AMERICA | EARTHJUSTICE |
| 501 3rd Street NW | 705 2nd Avenue, #203 |
| Washington, DC  20001 | Seattle, WA  98104 |
| (202) 434-1100 | (206) 343-7340 |
| | |
| Counsel for Communications Workers | Counsel for all Plaintiffs |
| of America | |