# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

PUBLIC CITIZEN, INC., *et al.*,

                      Plaintiffs,

v.

DONALD J. TRUMP, in his official capacity as President of the United States, *et al.*,

                      Defendants.

Civil Action No. 1:17-cv-00253  RDM

## MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF DEFENDANTS' MOTION TO DISMISS

DATED:  April 10, 2017

CHAD A. READLER
*Acting Assistant Attorney General*
Civil Division

CHANNING D. PHILLIPS
*United States Attorney*

ERIC R. WOMACK
*Assistant Branch Director*
Civil Division, Federal Programs Branch

*/s/ Daniel Bensing*
DANIEL BENSING (D.C. Bar No. 334268)
*Senior Trial Counsel*

MICHAEL DREZNER (VA Bar No. 83836)
*Trial Attorney*

U.S. Department of Justice
Civil Division, Federal Programs Branch
20 Massachusetts Ave, NW
Washington, DC 20530
Telephone: (202) 305-0693
Facsimile: (202) 616-8460
Email: Daniel.Bensing@usdoj.gov

*Counsel for Defendants*

## **TABLE OF CONTENTS**

INTRODUCTION ...................................................................................................1

BACKGROUND ..................................................................................................3

I.  FACTUAL BACKGROUND ...........................................................................3

    A.  Presidents Have Routinely Issued Executive Orders Addressing Regulatory
        Reform, Including Executive Order 12,866 Issued by President Clinton........................4

        1.  Principles of Regulation.........................................................................4

        2.  OMB Review of Significant Regulatory Actions ...................................6

    B.  Executive Order 13,771 ("Reducing Regulation and Controlling Regulatory Costs") ....8

    C.  OMB Interim Guidance Implementing Section 2 of Executive Order 13,771 ..............10

II.  PROCEDURAL BACKGROUND..........................................................................13

STANDARD OF REVIEW ..................................................................................13

ARGUMENT ......................................................................................................14

I.  PLAINTIFFS LACK STANDING TO CHALLENGE THE EXECUTIVE ORDER
   AND IMPLEMENTING GUIDANCE....................................................................14

    A.  Plaintiffs Have Failed to Establish Associational Standing to Sue on Behalf
        of Their Members ...............................................................................15

        1.  Plaintiffs Have Failed to Identify a Member Who Has Been Harmed ................15

        2.  Plaintiffs' Allegations of Injury to Their Members Are Insufficient to
            Establish Standing..........................................................................16

            a.  Plaintiffs Have Failed to Allege an Injury-in-Fact to Their Members..........16

                i.  Plaintiffs' Allegations of Future Injury are Entirely Speculative ........17

                ii.  Plaintiffs' Generalized Grievances About the Potential Effects
                   of the Executive Order Do Not Establish Injury-in-Fact ...................20

            b.  It Is Entirely Speculative to Assume that Plaintiffs' Purported
               Injuries Would Be Traceable to the Executive Order ...................................21

            c.  Plaintiffs' Purported Injuries Are Not Redressable by the Relief
               They Seek......................................................................................22

        3.  Plaintiffs Have Failed to Establish Standing to Sue in Their Own Right .............23

    B.  Plaintiffs' Purported Injuries Are Not Ripe for Resolution ...............................25

II.  PLAINTIFFS HAVE FAILED TO STATE A CLAIM THAT WOULD PERMIT
   THEM TO CHALLENGE EXECUTIVE ORDER 13,771 OR THE
   IMPLEMENTING GUIDANCE ..........................................................................28

A.    Plaintiffs Have Failed to Provide a Basis for a Facial Challenge to the Executive Order .......................................................................................................28

      1.    Executive Order 13,771 is Consistent With Separation of Powers Principles....................................................................................................29

      2.    Plaintiffs Cannot State a Claim under the Take Care Clause ................................33

B.    Plaintiffs' Third and Fourth Causes Of Action Fail To State A Claim Because None Of The Defendant Agencies Acted *Ultra Vires* .....................................35

      1.    Because Plaintiffs Have a Meaningful and Adequate Means of Challenging the Statutory Violations Alleged in their Third and Fourth Causes of Action Through the APA, *Ultra Vires* Review is Unavailable ............35

      2.    The Consideration of Costs by Defendant Agencies Is Not *Ultra Vires* ...............37

      3.    OMB's Actions to Assist the President in the Implementation of Executive Order 13,771 Does Not Constitute *Ultra Vires* Action........................38

C.    OMB's Interim Guidance Does Not Constitute Final Agency Action ..........................40

CONCLUSION.................................................................................................................42

## TABLE OF AUTHORITIES

*Abbott Labs. v. Gardner*,
    387 U.S. 136 (1967)............................................................................................26

*Am. Petroleum Inst. v. EPA*,
    683 F.3d 382 (D.C. Cir. 2012).....................................................................25, 26

*Arpaio v. Obama*,
    797 F.3d 11 (D.C. Cir. 2015)......................................................................17, 22

*Ashcroft v. Iqbal*,
    556 U.S. 662 (2009)............................................................................................14

*Ashwander v. TVA*,
    297 U.S. 288 (1936)............................................................................................29

*Atl. States Legal Found. v. EPA*,
    325 F.3d 281 (D.C. Cir. 2003)..........................................................................26

*Baker v. Carr*,
    369 U.S. 186 (1962)............................................................................................33

*Bd. of Governors of the Fed. Reserve Sys. v. MCorp Fin., Inc.*,
    502 U.S. 32 (1991)..............................................................................................36

*Bennett v. Spear*,
    520 U.S. 154 (1997)............................................................................................40

*Bell Atl. Corp. v. Twombly*,
    550 U.S. 544 (2007)............................................................................................14

*Bldg. & Constr. Trades Dep't v. Allbaugh*,
    295 F.3d 28 (D.C. Cir. 2002).......................................................................*passim*

*Catawba County, N.C. v. EPA*,
    571 F.3d 20 (D.C. Cir. 2009).............................................................................41

*Center for Biological Diversity v. U.S. Dep't of Interior*,
    563 F.3d 466 (D.C. Cir. 2009)......................................................................20, 21

*Center for Law & Educ. v. Dep't of Educ.*,
    396 F.3d 1152 (D.C. Cir. 2005)........................................................................24

*Chamber of Commerce of U.S. v. EPA*,
    642 F.3d 192 (D.C. Cir. 2011)..........................................................................15

*Chi. & S. Air Lines, Inc. v. Waterman S. S. Corp.*,
    333 U.S. 103 (1948) ................................................................................ 34

*City of Los Angeles v. Lyons*,
    461 U.S. 95 (1983) .................................................................................. 20

*Clapper v. Amnesty Int'l USA*,
    133 S. Ct. 1138 (2013) ................................................................. 17, 19, 24

*Clinton v. Jones*,
    520 U.S. 681 (1997) ............................................................................ 29, 33

*DaimlerChrysler Corp. v. Cuno*,
    547 U.S. 332 (2006) ................................................................................ 14

*Dalton v. Specter*,
    511 U.S. 462 (1994) ................................................................................ 34

*Dep't of HHS v. FLRA*,
    844 F.2d 1087 (4th Cir. 1988) ................................................................ 39

*Duke Power Co. v. Carolina Envtl. Study Grp., Inc.*,
    438 U.S. 59 (1978) .................................................................................. 28

*Equal Rights Ctr. v. Post Props., Inc.*,
    633 F.3d 1136 (D.C. Cir. 2011) ......................................................... 14, 15

*Food & Water Watch, Inc. v. Vilsack*,
    808 F.3d 905 (D.C. Cir. 2015) ........................................................... 23, 24

*Fla. Audubon Soc'y v. Bentsen*,
    94 F.3d 658 (D.C. Cir. 1996) ............................................................. 21, 22

*Forrester v. U.S. Parole Comm'n*,
    310 F. Supp. 2d 162 (D.D.C. 2004) ........................................................ 14

*Franklin v. Massachusetts*,
    505 U.S. 788 (1992) ..................................................................... 29, 33, 34

*Freedom Republicans, Inc. v. Fed. Election Comm'n*,
    13 F.3d 412 (D.C. Cir. 1994) .................................................................. 22

*Free Enter. Fund v. Pub. Co. Accounting Bd.*,
    561 U.S. 477 (2010) ................................................................................ 33

*Griffith v. Fed. Labor Relations Auth.*,
  842 F.2d 487 (D.C. Cir. 1988) ................................................................. 36, 37, 38

*Grocery Mfrs. Ass'n v. EPA*,
  693 F.3d 169 (D.C. Cir. 2012) ............................................................................ 21

*Heckler v. Chaney*,
  470 U.S. 821 (1985) ........................................................................................... 33

*In re Aiken Cty.*,
  645 F.3d 428 (D.C. Cir. 2011) ........................................................................... 26

*La. Envtl. Action Network v. Browner*,
  87 F.3d 1379 (D.C. Cir. 1996) ........................................................................... 26

*Laird v. Tatum*,
  408 U.S. 1 (1972) ............................................................................................... 24

*Leedom v. Kyne*,
  358 U.S. 184 (1958) ........................................................................................... 35

*Lujan v. Defenders of Wildlife*,
  504 U.S. 555 (1992) .......................................................................... 13, 14, 19

*Marbury v. Madison*,
  5 U.S. (1 Cranch) 137 (1803) ............................................................................ 33

*Meyer v. Bush*,
  981 F.2d 1288 (D.C. Cir. 1993) ......................................................................... 39

*Michigan v. EPA*,
  135 S. Ct. 2699 (2015) ....................................................................................... 38

*Mississippi v. Johnson*,
  71 U.S. (4 Wall.) 475 (1867) ....................................................................... 33, 34

*Morrison v. Olson*,
  487 U.S. 654 (1988) ........................................................................................... 33

*Myers v. United States*,
  272 U.S. 52 (1926) ............................................................................................. 30

*Nat'l Ass'n of Home Builders v. EPA*,
  667 F.3d 6 (D.C. Cir. 2011) ........................................................................ 15, 19

*Nat'l Family Planning & Reproductive Health Ass'n v. Gonzales,*
    468 F.3d 826 (D.C. Cir. 2006) ................................................................. 25

*Nat'l Park Hosp. Ass'n v. Dep't of Interior,*
    538 U.S. 803 (2003) ............................................................................... 28

*Nat'l Treasury Emps. Union v. United States,*
    101 F.3d 1423 (D.C. Cir. 1996) ......................................................... 25, 27

*Nat'l Wildlife Fed'n v. EPA,*
    945 F. Supp. 2d 39 (D.D.C. 2013) .......................................................... 41

*New York v. Shalala,*
    959 F. Supp. 614 (S.D.N.Y. 1997) ......................................................... 39

*Nixon v. Fitzgerald,*
    457 U.S. 731 (1982) ............................................................................... 34

*Nixon v. United States,*
    506 U.S. 224 (1993) ............................................................................... 33

*Nyunt v. Chairman, Broad. Bd. of Governors,*
    589 F.3d 445 (D.C. Cir. 2009) ....................................................... 36, 37, 40

*Perry Capital LLC v. Mnuchin,*
    848 F.3d 1072 (D.C. Cir. 2017) .............................................................. 26

*Printz v. United States,*
    521 U.S. 898 (1997) ............................................................................... 33

*Pub. Citizen Health Research Grp. v. FDA,*
    740 F.2d 21 (D.C. Cir. 1984) .................................................................. 27

*Reliable Automatic Sprinkler Co. v. Consumer Prod. Safety Comm'n,*
    324 F.3d 726 (D.C. Cir. 2003) ............................................................... 41

*Sabri v. United States,*
    541 U.S. 600 (2004) ............................................................................... 29

*Sherley v. Sebelius,*
    689 F.3d 776 (D.C. Cir. 2012) ......................................................... 30, 39

*Sierra Club v. Costle,*
    657 F.2d 298 (D.C. Cir. 1981) ............................................................... 30

*Sierra Club v. EPA*,
  292 F.3d 895 (D.C. Cir. 2002) ............................................................... 15

*Simon v. E. Ky. Welfare Rights Org.*,
  426 U.S. 26 (1976) ............................................................................... 21

*Spokeo, Inc. v. Robins*,
  136 S. Ct. 1540 (2016) ......................................................................... 20

*Springer v. Gov't of Philippine Islands*,
  277 U.S. 189 (1928) ............................................................................. 33

*Steel Co. v. Citizens for a Better Env't*,
  523 U.S. 83 (1998) .......................................................................... 22, 42

*Summers v. Earth Island Inst.*,
  555 U.S. 488 (2009) ........................................................................ 15, 16

*Susan B. Anthony List v. Driehaus*,
  134 S. Ct. 2334 (2014) ..................................................................... 17, 25

*Swan v. Clinton*,
  100 F.3d 973 (D.C. Cir. 1996) ............................................................... 29

*Swann v. Walters*,
  620 F. Supp. 741 (D.D.C. 1984) ............................................................ 39

*Swanson Grp. Mfg. LLC v. Jewell*,
  790 F.3d 235 (D.C. Cir. 2015) ............................................................... 19

*Tellabs, Inc. v. Makor Issues & Rights, Ltd.*,
  551 U.S. 308 (2007) ............................................................................. 14

*Texas v. United States*,
  523 U.S. 296 (1998) ............................................................................. 25

*Turlock Irrigation Dist. v. FERC*,
  786 F.3d 18 (D.C. Cir. 2015) ................................................................ 24

*United States v. Salerno*,
  481 U.S. 739 (1987) ............................................................................. 28

*United States v. Stevens*,
  559 U.S. 460 (2010) ............................................................................. 28

*United Transp. Union v. ICC*,
  891 F.2d 908 (D.C. Cir. 1989) ........................................................................ 17

*Vill. of Bald Head Island v. Army Corps of Eng'rs*,
  714 F.3d 186 (4th Cir. 2013) ......................................................................... 41

*Wash. State Grange v. Wash. State Republican Party*,
  552 U.S. 442 (2008) ....................................................................................... 28

*West v. Lynch*,
  845 F.3d 1228 (D.C. Cir. 2017) ..................................................................... 22

*Whitmore v. Arkansas*,
  495 U.S. 149 (1990) ....................................................................................... 16

*Youngstown Sheet & Tube Co. v. Sawyer*,
  343 U.S. 579 (1952) ................................................................................. 31, 34

## STATUTES & REGULATIONS

3 U.S.C. § 301 ....................................................................................................... 3
5 U.S.C. § 704 ..................................................................................................... 40
31 U.S.C. §§ 1101 *et seq.* ............................................................................... 3, 39
31 U.S.C. § 1105 .................................................................................................. 3
44 U.S.C. §§ 3501 *et seq.* ................................................................................... 7

## LEGISLATIVE MATERIALS

*Repeal of Civil Aviation Regulations*,
  80 Fed. Reg. 76,630 (Dec. 10, 2015) ............................................................. 21

*Repeal of Disclosure Regulations*,
  78 Fed. Reg. 15,869 (Mar. 13, 2013) ............................................................. 21

*Final Rule: Special Areas; State Petitions for Inventoried Roadless Area Mgmt.*,
  70 Fed. Reg. 25,654 (May 13, 2005) .............................................................. 21

## EXECUTIVE MATERIALS

*Regulatory Regulation and Controlling Regulatory Costs*,
  Executive Order No. 13,771 (2017) .........................................................*passim*

*Regulatory Planning and Review*,
  Executive Order No. 12,866 (1993) .........................................................*passim*

*Improving Regulation and Regulatory Review*,
  Executive Order No. 13,563 (2011)...........................................................4, 10, 38

*Inflation Impact Statements*,
  Executive Order No. 11,821 (1974)..............................................................4

*Improving Government Regulations*,
  Executive Order No. 12,044 (1978)........................................................4, 5, 10, 38

*Federal Regulation*,
  Executive Order No. 12,291 (1981)..........................................................5, 10, 38

*Enforcing the Regulatory Reform Agenda*,
  Executive Order No. 13,777 (2017)...............................................................9, 18

*Preservation of Open Competition & Gov't Neutrality Towards Gov't Contractors'*
*Labor Relations on Federal & Federally Funded Construction Projects*,
  Executive Order No. 13,202 (2001)..............................................................29, 30

## OTHER AUTHORITIES

Jeffrey A. Rosen & Brian Callanan, *The Regulatory Budget Revisited*,
  66 Admin. L. Rev. 835 (2014)...............................................................................3

Cass R. Sunstein, *Valuing Life, Humanizing the Regulatory State*,
  (Univ. of Chi. Press 2014)....................................................................................7

Cary Coglianese, *Moving Forward With Regulatory Lookback*,
  30 Yale J. on Reg. 57 (2013) ...............................................................................10

Sean Speer, *Regulatory Budgeting: Lessons from Canada*, R Street Inst., Mar. 2016
  https://www.rstreet.org/wp-content/uploads/2016/03/RSTREET54.pdf...........................3, 4

Maeve P. Carey, Cong. Research Serv., R43056, Counting Regulations:
  An Overview of Rulemaking, Types of Federal Regulations, and Pages
  in the *Federal Register* (2016), *available at*
  https://www.rstreet.org/wp-content/uploads/2016/03/RSTREET54.pdf.......................10, 11

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

|  |  |
|---|---|
| PUBLIC CITIZEN, INC., *et al.*,<br><br>                             Plaintiffs,<br><br>v.<br><br>DONALD J. TRUMP, in his official capacity as President of the United States, *et al.*,<br><br>                             Defendants. | Civil Action No. 1:17-cv-00253  RDM |

## MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF DEFENDANTS' MOTION TO DISMISS

## INTRODUCTION

According to Plaintiffs, the President of the United States lack the Constitutional authority to issue Executive Orders requiring Executive Branch agencies to identify and revise or repeal outdated or unnecessary regulations.  Unable to cite final agency action relying on Executive Order 13,771, Plaintiffs instead assert a host of constitutional and non-statutory claims that are either wholly unprecedented or exceedingly rare.  These unprecedented claims ignore a 40-year history of Presidential Executive Orders directing agencies, to the extent permitted by law, to revise or repeal regulatory requirements that are not necessary or cost justified.  Both history and precedent confirm that the latest Executive Order in this unbroken history, Executive Order 13,771, is a valid exercise of the President's Article II powers to supervise and manage the Executive Branch.

For today's purposes, however, Plaintiffs' claims fail on the threshold ground that they are premature.  Plaintiffs ask the Court to declare the Order, and OMB's implementing guidance,

1

unconstitutional before any agency has taken any action that impacts either Plaintiffs or their members.  Absent such concrete action, Plaintiffs can only speculate about the effect (if any) on them from the Executive Order and its implementing guidance.  Such speculation plainly fails Article III standing requirements.

Even had Plaintiffs pled a concrete, individualized injury flowing from the Executive Order, their complaint nonetheless fails to state a claim.  Plaintiffs assert four constitutional (or non-statutory) claims, including that the Executive Order violates the Separation of Powers and the Take Care Clause, and that it constitutes *ultra vires* action when or if implemented.  These claims are either squarely foreclosed by D.C. Circuit precedent or have not been recognized by this Circuit as a valid cause of action.  For example, the D.C. Circuit rejected a Separation of Powers challenge to an Executive Order that, like Executive Order 13,771, expressly applied only "to the extent provided by law."  *See Bldg. & Constr. Trades Dep't v. Allbaugh*, 295 F.3d 28 (D.C. Cir. 2002).  Likewise, neither this Circuit nor any other has recognized a cause of action against the President under the Take Care Clause.  And in any event, the Order does not require agencies to do anything they are forbidden to do by legislative command.  *See id.*

Plaintiffs' *ultra vires* claim is similarly flawed.  To start, it ignores the strict limitations the D.C. Circuit has placed on that cause of action, requiring that the Plaintiffs have no other means for reviewing the purported *ultra vires* action.  Yet as revealed by Plaintiffs' Administrative Procedure Act claim, Plaintiffs purport to have a statutory basis for review.  However, that claim, even if proper, is entirely premature until an agency action becomes final.  All Plaintiffs point to is OMB's guidance, which applies only to the internal workings of the Executive Branch.  That is far from the final agency action required for a potential claim to accrue.

2

For all of these reasons, the Court should dismiss this lawsuit for lack of standing pursuant to Federal Rule of Civil Procedure 12(b)(1) or, in the alternative, for failure to state a claim pursuant to Rule 12(b)(6).

## BACKGROUND

### I.     FACTUAL BACKGROUND

The President issued Executive Order 13,771 ("Reducing Regulation and Controlling Regulatory Costs") pursuant to his authority under the Constitution and laws of the United States, including the Budget and Accounting Act of 1921, 31 U.S.C. §§ 1101, *et seq*., 31 U.S.C. § 1105 (Budget contents and submission to Congress) and 3 U.S.C. § 301 (Presidential delegation authority).  Exec. Order No. 13,771, Preamble.  As the Order explains, "[i]t is the policy of the executive branch to be prudent and financially responsible in the expenditure of funds, from both public and private sources." *Id*., § 1.  The Order seeks to achieve those ends through the "manage[ment of] the costs associated with governmental imposition of private expenditures required to comply with Federal regulations." *Id.*  To manage those costs, the Order requires agencies to identify two prior regulations for elimination or revision for every new regulation issued, and requires agencies prudentially to manage the cost of planned regulations through an annual regulatory allowance. *Id.*

These regulatory reforms follow successful offset regulatory reform efforts in Australia, the United Kingdom, and Canada.  Since its inception in 2011, the UK's initiative has reduced the annual cost to business by an estimated 1.19 billion pounds. *See* Jeffrey A. Rosen & Brian Callanan, The Regulatory Budget Revisited, 66 Admin. L. Rev. 835, 858-59 (2014), (https://www.kirkland.com/files/The_Regulatory_Budget_Revisited.pdf).  And Canada's one-for-one offset requirement saved 21 million dollars of administrative costs in two years. *See*

Regulatory Budgeting: Lessons from Canada, R Street Inst., (March 2016) p. 7

(https://www.rstreet.org/wp-content/uploads/2016/03/RSTREET54.pdf).

Executive Order 13,771 draws from these models to further advance a longstanding

process, across many Presidents, seeking to reduce regulatory burdens.  Indeed, Executive Order

13,771 builds on similar efforts by prior administrations, including, most significantly, Executive

Order 12,866 ("Regulatory Planning and Review"), which President Clinton signed in 1993 and

has remained in effect over 23 years, across four administrations, and Executive Order 13,563,

signed by President Obama in 2001, which specifically asked agencies to focus on reviewing

existing rules that may be outmoded, ineffective, or excessively burdensome.  Executive Order

13,771 will supplement the framework for review established by Executive Order 12,866, both

of which endeavor to account for costs imposed by Executive Branch rulemaking.

**A.      Presidents Have Routinely Issued Executive Orders Addressing Regulatory Reform, Including Executive Order 12,866 Issued by President Clinton.**

**1.      Principles of Regulation**

Although Executive Order 12,866 represents the current framework for evaluating costs

and benefits to proposed rules, the concept of analyzing regulatory cost as a factor in rulemaking

long pre-dated that Executive Order.  As early as the Nixon Administration, the Council on

Wage and Price Stability had regularly commented on new rules that could impose costs on the

economy, thereby contributing to inflation.  Executive Order 11,821 ("Inflation Impact

Statements"), adopted by President Ford in 1974, required agencies to certify that they had

evaluated the inflationary impact of new regulations before issuing them.  Exec. Order No.

11,821, § 1.

Executive Order 12,044 ("Improving Government Regulations"), signed by President

Carter in 1978, continued this practice by requiring agencies to consider several factors,

including costs, before issuing new rules.  That Order provided that when an agency adopted a "significant regulation" it must determine that "alternative approaches have been considered and the least burdensome of the acceptable alternatives has been chosen."  Exec. Order No. 12,044, § 2(d)(3).  Agencies were directed to establish criteria for identifying significant regulations based on the anticipated "direct and indirect effects of the regulation," the persons affected, compliance and reporting requirements and the impact on other programs and agencies.  *Id.*, § 2(c).  The Order also required agencies to "review and revise their procedures for developing regulations . . . in a manner that minimizes paperwork."  *Id.* § 2.

Executive Order 12,291 ("Federal Regulation"), signed by President Reagan, was even more explicit in mandating the weighing of benefits and costs in the adoption of agency rules.  Specifically, that Order required that regulatory action not be undertaken unless "the potential benefits to society for the regulation outweigh the potential costs to society," Exec. Order No. 12,291, § 2(b), and that in considering regulatory alternatives, "the alternative involving the least net cost to society shall be chosen," *id.* § 2(d).  President Clinton's Executive Order 12,866, which replaced Executive Order 12,291, continues the policy of assessing the benefits and costs of regulations to the present day.

To that end, Executive Order 12,866 adopted fundamental "[r]egulatory [p]hilosophy and [p]rinciples" that agencies should "select those approaches that maximize net benefits . . . unless a statute requires another regulatory approach."  Exec. Order No. 12,866, § 1(a).  The Order elaborates on that philosophy by directing each agency to "design its regulations in the most cost-effective manner to achieve the regulatory objective," *id.*, § 1(b)(5), and to "adopt a regulation only upon a reasoned determination that the benefits of the intended regulation justify its costs," *id.*, § 1(b)(6).

To effectively apply the principles of benefit-cost analysis and reach the optimal regulatory outcome, Executive Order 12,866 requires agencies to utilize best practices in making regulatory policy decisions, including the initial decision whether regulation is even warranted. For example, agencies are directed to "identify and assess available alternatives to direct regulation," such as providing economic incentives or enhancing information disclosure.  Exec. Order No. 12,866, § 1(b)(3).  Agencies are also directed to "identify and assess alternative forms of regulation" such as the use of "performance standards" rather than rules dictating the means of compliance.  *Id.*, § 1(b)(8).  And agencies are directed to "examine whether existing regulations (or other law) have created, or contributed to, the problem that a new regulation is intended to correct and whether those regulations (or other law) should be modified to achieve the intended goal of regulation more effectively."  *Id.*, § 1(b)(2).  Further, Executive Order 12,866 directed each agency to "periodically review its existing significant regulations to determine whether any such regulations should be modified or eliminated so as to make the agency's regulatory program more effective in achieving the regulatory objectives, less burdensome, or in greater alignment with the President's priorities."  *Id.*, § 5(a).

## 2.      OMB Review of Significant Regulatory Actions

Under Executive Order 12,866, an economic analysis, or for larger rulemakings a Regulatory Impact Analysis of significant regulatory actions, is the mechanism through which an agency identifies and weighs the benefits and costs of proposed regulatory actions.  In doing so, agencies must assess the costs and benefits of the regulatory action, and, to the extent permitted by law, describe how it promotes the President's priorities.  Exec. Order No. 12,866, § 6(a)(3)(B)(ii).  The Office of Management and Budget ("OMB") has issued extensive guidance

on best practices in conducting such regulatory analyses.  *See* Circular A-4 (explaining how to evaluate costs and benefits).

Executive Order 12,866 requires OMB to review all Executive Branch agencies' proposed and final rules that are determined to be a "significant regulatory action" under section 3(f) of the Order. Exec. Order No. 12,866, § 6(b).  From 1981 to the present, the OMB oversight responsibility contained in Executive Order 12,866 (and before 1993, in Executive Order 12,291), has been carried out by the Office of Information and Regulatory Affairs ("OIRA") -- an office within OMB.  The Paperwork Reduction Act of 1980 ("PRA"), 44 U.S.C. §§ 3501, *et seq.*, established OIRA as the United States Government's central authority for the review of information collection requests by federal agencies, establishment of Government statistical practices, and coordination of federal privacy policy.  OIRA carries out its PRA responsibilities in conjunction with its duties under the Executive Orders to review significant regulatory actions. Cass R. Sunstein, *Valuing Life, Humanizing the Regulatory State,* 11 (Univ. of Chi. Press 2014).

One major benefit of OMB review of significant regulatory actions is promoting enhanced inter-agency cooperation in setting regulatory policy.  To that end, Executive Order 12,866 included several requirements to promote agency regulatory planning and coordination. For example, all agencies are required to prepare an annual "Regulatory Plan" of all regulations under development and review, including critical information about each such regulation, which is published as part of a "Unified Regulatory Agenda" of all agencies' expected regulatory actions.  Exec. Order No. 12,866, § 4. OIRA will also identify possible inter-agency conflicts or actions that "may be inconsistent with the President's priorities or the principles set forth in this Executive Order."  *Id.*, § 4(c)(5).

**B.      Executive Order 13,771 ("Reducing Regulation and Controlling Regulatory Costs")**

Consistent with the purposes underlying these earlier Presidential regulatory efforts, the aim of Executive Order 13,771 is "to be prudent and financially responsible in the expenditure of funds, from both public and private sources."  Exec. Order No. 13,771, § 1.  To encourage a comprehensive review of existing rules, the Order imposes, to the extent permitted by law, several requirements on Executive Branch agencies.  First, whenever an agency proposes or adopts a new regulation, "it shall identify at least two existing regulations to be repealed," unless doing so is "prohibited by law."  *Id.*, § 2(a).  Second, any new incremental costs from a new regulation "shall, to the extent permitted by law, be offset by the elimination of existing costs associated with at least two prior regulations."  *Id.*, § 2(c).  The Order further directs that for Fiscal Year 2017, "the total incremental cost of all new regulations, including repealed regulations, to be finalized this year shall be no greater than zero."  *Id.*, § 2(b).

Section 3 of Executive Order 13,771, titled "Annual Regulatory Cost Submissions to the Office of Management and Budget," establishes a regulatory allowance permitting OMB to assign the total amount of incremental regulatory costs that agencies can impose annually. Beginning with the Regulatory Plans for Fiscal Year 2018, agencies "shall identify, for each regulation that increases incremental cost, the offsetting regulations described in section 2(c) of this order" and "provide the agency's best approximation of the total costs or savings associated with each new regulation or repealed regulation."  Exec. Order No. 13,771, § 3(a).  During the annual Presidential budget process, the Director will then "identify to agencies a total amount of incremental costs that will be allowed for each agency" for issuing new regulations in the next fiscal year.  *Id.*, § 3(d).  Agencies will be required to operate within their allotted regulatory allowance "unless required by law or approved in writing by the Director."  *Id.*  To promote

enforcement of this new budgetary limitation on the issuance of new regulations, no regulation may be issued by an agency unless it was included on the Unified Regulatory Agenda or was approved in advance by the Director, "[u]nless otherwise required by law." *Id.*, § 3(c).  The Order also provides that "[a]ny agency eliminating existing costs associated with prior regulations under this subsection shall do so in accordance with the Administrative Procedure Act and other applicable law." *Id.*, § 2(c).

Finally, section 5 of the Order includes a general savings clause providing that nothing in the Order should be "construed to impair or otherwise affect" the authority of an agency or the Director's authority over budgetary, administrative or legislative proposals.  Exec. Order No. 13,771, § 5(a).  Section 5 also confirms, in accordance with the plain text of the Order throughout, that the Order "shall be implemented consistent with applicable law and subject to availability of appropriations." *Id.*, § 5(b).  The Order also provides that it does not create any right or benefit enforceable against the United States or its agencies. *Id.*, § 5(c).

Executive Order 13,771 is complemented by a second executive order, Executive Order 13,777 ("Enforcing the Regulatory Reform Agenda").  That Order reaffirms that "[i]t is the policy of the United States to alleviate unnecessary regulatory burdens placed on the American people" in carrying out various Executive Orders focused on regulatory cost, including Executive Order 13,771 and Executive Order 12,866.  Exec. Order No. 13,777, § 1.  Specifically, Executive Order 13,777 directs each agency to establish a "Regulatory Reform Task Force" to facilitate the retrospective analysis of existing agency rules as required by Executive Order 13,771.  Exec. Order No. 13,777, § 3(a).  The Order identifies six categories of rules that agencies should consider for modification or repeal pursuant to Executive Order 13,771,

including regulations that: (1) "eliminate jobs or inhibit job creation;" (2) "are outdated, unnecessary, or ineffective;" and (3) "impose costs that exceed benefits." *Id.*, § 3(d)(i) – (iii).

As discussed previously, the focus on rules that impose costs that exceed benefits is a familiar concept. And the same could be said for "outdated, unnecessary, or ineffective rules," which have been targeted for repeal or revision by every administration since President Carter. *See* Exec. Order No. 12,044, § 4; Exec. Order No. 12,291, § 3(i); Exec. Order No. 12,866, § 5.[1] *See also* Cary Coglianese, *Moving Forward with Regulatory Lookback*, 30 Yale J. on Reg. 57, 59 (2013) (noting that the federal government's retrospective regulatory review of existing rules lags behind agencies' analysis of proposed regulations). Most recently, President Obama signed Executive Order 13,563 ("Improving Regulation and Regulatory Review"), requiring agencies to identify existing rules that "may be outmoded, ineffective, insufficient, or excessively burdensome, and to modify, streamline, expand or repeal them." Exec. Order No. 13,563, § 6(a). To facilitate this retrospective review directive, each agency was required to provide OIRA with a plan, "consistent with law and its resources and regulatory priorities" to periodically review its significant rules to identify candidates for modification or repeal. *Id.*, § 6(b).

## C.     OMB Interim Guidance Implementing Section 2 of Executive Order 13,771

The Director of the Office of Management and Budget is charged with providing agencies with guidance in implementing this offset policy. Exec. Order No. 13,771, § 2(d). Pursuant to that directive, on February 2, 2017, Dominic J. Mancini, Acting Administrator of OIRA, issued written Interim Guidance implementing section 2 of the Executive Order. *See*

---

[1] Notably, President Clinton directed Executive Branch agencies to reduce administrative costs by a fixed percentage, rising from a three percent reduction in fiscal year 1994 to the goal of a 14 percent reduction by fiscal year 1997. Exec. Order No. 12,837, § 2. In another Order, President Clinton ordered agencies to eliminate at least 50 percent of its civilian internal management regulations not required by law within three years. Exec. Order No. 12,861, § 1.

Attachment B to Plaintiffs' Complaint.  On April 5, 2017, OIRA issued additional guidance that "supplements" the Interim Guidance and supersedes it where there is a conflict.  Guidance Implementing Executive Order 13771 ("April Guidance"), Exhibit A, hereto at 1.[2]  Both guidance documents are in the form of questions and answers and the April Guidance applies to Fiscal Years 2017 and beyond.

At the outset, the Guidance explains that the offset requirements of section 2 of the Executive Order will only apply to "significant regulatory actions" as that phrase is defined in section 3(f) of Executive Order 12,866.  April Guidance, ¶ Q2.  Notably, in FY 2015 Executive Branch agencies published far fewer final rules designated as significant under EO 12,866 than the total number of final rules they publish.  *See* CRS, *Counting Regulations*, available at https://fas.org/sgp/crs/misc/R43056.pdf.  Also excluded are rules that "only cause income transfers from taxpayers to program beneficiaries" such as rules governing Medicare expenditures.  April Guidance, ¶ Q13.  Thus the Guidance, like the Executive Order itself, reflects an intention to focus OMB and agency resources on review of rules that impose the largest costs.

The Guidance explains that under Section 2 of the Order any action that will "repeal or revise" existing rules and will produce verifiable savings may qualify as a deregulatory action and so an offset against new regulatory burdens.  April Guidance, ¶ Q4.  In addition, regulations overturned by legislative action, including those reviewed under the Congressional Review Act, will generally qualify as a deregulatory action for purposes of Section 2.  *Id.*, ¶ Q15.  Moreover, because the requirements of section 2 of the Executive Order apply agency-wide, a deregulatory

---

[2] Unless otherwise noted, Defendants will cite to the April Guidance as the latest and most comprehensive statement of OIRA's interpretation of Executive Order 13,771.

action "issued by a component in one agency can be used to offset an EO 13771 regulatory action by a different component in that same agency." *Id.*, ¶ Q30. Cabinet departments are considered a single agency for purposes of the Order. *Id.*, ¶ Q1.[3]

The Guidance also addresses the relationship between a new rule and the deregulatory actions identified to offset the costs associated with a new rule. "[T]he agency should identify all EO 13771 deregulatory actions . . . by the time it submits… the corresponding EO 13771 regulatory action." April Guidance, ¶ Q37. The Guidance recognizes that agencies will need some flexibility in coordinating the separate rulemaking actions but advises that "[t]o the extent practicable, agencies should issue EO 13771 deregulatory actions before or concurrently with the EO 13771 regulatory actions they are intended to offset." *Id.*, ¶ Q38. Moreover, the Guidance approves of "bundling" of a new regulatory requirement and a deregulatory action that can be joined in the same rulemaking, such as "logically-connected changes to multiple but related sections of the Code of Federal Regulations." *Id.*, ¶ Q36. But in that situation, the agency must examine the net cost impact of the changes to "determine whether such actions are EO 13771 regulatory actions that need to be offset, or EO 13771 deregulatory actions" that can be used as an offset. *Id.*

The Guidance recognizes that OMB can exercise its authority to provide a "full or partial exemption from EO 13771's requirements" as needed to facilitate its efficient implementation. Guidance, ¶ Q.33. The Guidance provides that "regulatory actions addressing emergencies such as critical health, safety, financial, non-exempt national security matters, or for some other compelling reason, may qualify for an exemption from some or all of the requirements of Section

---

[3] Agencies may also offset the costs of a new regulation by identifying cost savings from the deregulatory action of another agency, but only after a written request to permit such an offset has been approved by the Director of OMB. *Id.*, ¶ Q31.

2." *Id.*  The Guidance also expressly recognizes that agencies must comply with "an imminent statutory or judicial deadline" regardless of whether offsetting savings have been identified. *Id.* Finally, the Guidance confirms that the regulatory cost allocation of Executive Order 13,771 does not change the continuing requirements of Executive Order 12,866, including the consideration of the benefits of a proposed regulatory action. *Id.*, Q32.

## II.   PROCEDURAL BACKGROUND

Plaintiffs filed this suit on February 8, 2017.  Plaintiffs' Complaint alleges five causes of action: (1) a violation of separation of powers on the ground that Executive Order 13,771 "purports to amend . . . statutes," Compl. ¶ 124; (2) a violation of the "Take Care" clause of Article II, § 3 of the Constitution based on the allegation that "[t]he Executive Order directs agencies to take action contrary to numerous laws passed by Congress," Compl. ¶ 136; (3) *ultra vires* action by the agency defendants (other than OMB) by applying the regulatory offset directive of the Executive Order in violation of "the statutes from which they derive their rulemaking authority," *id.* ¶ 144; (4) ultra vires agency action by the Director of OMB in implementing a purportedly unconstitutional Executive Order, *id.* ¶ 151; and (5) a violation of the Administrative Procedure Act ("APA") by OMB in issuing interim guidance to implement the Executive Order, *id.* ¶ 158.  Plaintiffs seek declaratory relief that the Executive Order is unconstitutional and that the Guidance is unlawful as well as an order enjoining all of the agency defendants from complying with the Order. *Id.*, p. 49 (Prayer for Relief).

## <u>STANDARD OF REVIEW</u>

Defendants move to dismiss the Complaint for lack of subject matter jurisdiction under Federal Rule of Civil Procedure 12(b)(1).  Plaintiffs bear the burden of demonstrating jurisdiction. *See Lujan v. Defenders of Wildlife*, 504 U.S. 555, 561 (1992).  It is "presume[d] that

federal courts lack jurisdiction unless the contrary appears affirmatively from the record." *DaimlerChrysler Corp. v. Cuno*, 547 U.S. 332, 342 n.3 (2006) (citation omitted).  Because the Court has "an affirmative obligation . . . to ensure that it is acting within the scope of its jurisdictional authority," the Court may "consider matters outside the pleadings" in addressing Defendant's motion to dismiss under Rule 12(b)(1) without converting it to a motion for summary judgment.  *Forrester v. U.S. Parole Comm'n*, 310 F. Supp. 2d 162, 167 (D.D.C. 2004) (citation omitted).

Defendants alternatively move to dismiss the Complaint under Federal Rule of Civil Procedure 12(b)(6).  Under this rule, the Court may consider well-pleaded factual allegations, as well as "documents incorporated into the complaint by reference, and matters of which a court may take judicial notice."  *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 322 (2007).  Although the Court must accept all well-pleaded factual allegations as true, it need not accept "a legal conclusion couched as a factual allegation."  *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007) (citation omitted).   "Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice."  *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).

## ARGUMENT

## I.   PLAINTIFFS LACK STANDING TO CHALLENGE THE EXECUTIVE ORDER AND IMPLEMENTING GUIDANCE

To establish Article III standing, a plaintiff must demonstrate: (1) an "actual or imminent," "concrete and particularized" injury-in-fact, (2) a "causal connection between the injury" and the challenged action, and (3) a likelihood that the "injury will be redressed by a favorable decision."  *Lujan*, 504 U.S. at 560-61.  As organizations, Plaintiffs appear to assert standing on their own behalf and on behalf of their members, *see Equal Rights Ctr. v. Post*

*Props., Inc.,* 633 F.3d 1136, 1138 (D.C. Cir. 2011), by their repeated contention that the

Executive Order harms both groups.  Compl. ¶¶ 13, 14, 15, 67, 76, 90, 97, 104.  However, the

Complaint fails to allege facts sufficient to support either theory of standing.

**A.      Plaintiffs Have Failed to Establish Associational Standing to Sue on Behalf of Their Members**

**1.      Plaintiffs Have Failed to Identify a Member Who Has Been Harmed**

Establishing associational standing requires an organization to demonstrate that "(1) at

least one of its members would have standing to sue in his own right, (2) the interests the

association seeks to protect are germane to its purpose, and (3) neither the claim asserted nor the

relief requested requires that an individual member of the association participate in the lawsuit."

*Sierra Club v. EPA*, 292 F.3d 895, 898 (D.C. Cir. 2002).  "When a petitioner claims associational

standing, it is not enough to aver that unidentified members have been injured.  Rather, the

petitioner must specifically 'identify members who have suffered the requisite harm.'"  *Chamber

of Commerce v. EPA*, 642 F.3d 192, 199–200 (D.C. Cir. 2011) (quoting *Summers v. Earth Island

Inst.*, 555 U.S. 488, 499 (2009)).  Where plaintiffs have "not identified a single member who was

or would be injured by [a Government action]," associational standing is lacking.  *Id*. at 200; *see

also Nat'l Ass'n of Home Builders v. EPA*, 667 F.3d 6, 15 (D.C. Cir. 2011) (affirming dismissal

where declarations "fall short of establishing certainly impending dangers for any particular

member of the petitioners' associations").

The Complaint fails to identify a single member of any of the Plaintiff organizations who

allegedly will be harmed by application of the Executive Order.  Rather, the Complaint asserts

only that unnamed "members" will be harmed.  *See, e.g.*, Compl. ¶¶ 13-15.  This deficiency is

fatal to a claim of associational standing.  Without identifying any actual member supposedly

harmed or threatened by the Executive Order, this Court is unable to determine whether

Plaintiffs, as organizations, indeed have standing to sue on behalf of their members.  *See Summers,* 555 U.S. at 499.

> **2.      Plaintiffs' Allegations of Injury to Their Members Are Insufficient to Establish Standing**

Even if Plaintiffs had identified an individual member in their Complaint, their assertion of associational standing would fail because their allegations of injury are wholly speculative, not traceable to the Executive Order and implementing guidance, and not redressable by the relief they seek.

> **a.      Plaintiffs Have Failed to Allege an Injury-in-Fact to Their Members**

The Complaint sets forth a host of alleged harms, typically without distinguishing how the various injuries supposedly affect the named Plaintiffs, their members, or both.  Two general categories of alleged harms appear to relate to Plaintiffs' members.  First, the Complaint repeatedly claims that the Executive Order will cause proposed regulations to be deterred, delayed, or weakened.  *See, e.g.,* Compl. ¶¶ 13, 14, 76, 82, 97.  Second, the Complaint avers that the Executive Order will cause existing regulations to be repealed, leading in turn to harmful regulatory outcomes such as "decrease[d] safety" and "reduce[d] existing protections."  Compl. ¶¶ 13-15, 67, 82.  These allegations of associational injury fail at each stage of the standing inquiry.

First, an actual injury-in-fact is absent.  "The complainant must allege an injury to himself that is 'distinct and palpable,' as opposed to merely '[a]bstract,' and the alleged harm must be actual or imminent, not 'conjectural' or 'hypothetical.'"  *Whitmore v. Arkansas*, 495 U.S. 149, 155 (1990) (citations omitted).  "An allegation of future injury may suffice if the threatened injury is 'certainly impending,' or there is a 'substantial risk' that the harm will

occur." *Susan B. Anthony List v. Driehaus*, 134 S. Ct. 2334, 2341 (2014) (quoting *Clapper v. Amnesty Int'l*, 133 S. Ct. 1138, 1147, 1150 n.5 (2013)).

Where, as here, Plaintiffs seek declaratory and injunctive relief for a "predicted future injury," Plaintiffs "bear[] a 'more rigorous burden' to establish standing." *Arpaio v. Obama*, 797 F.3d 11, 21 (D.C. Cir. 2015) (quoting *United Transp. Union v. ICC*, 891 F.2d 908, 913 (D.C. Cir. 1989)).  On a motion to dismiss the Court should accept Plaintiffs' allegations of "historical" facts or those "'otherwise demonstrable,' as true." *Id.*  However, a court "may reject as overly speculative those links which are predictions of future events (especially future actions to be taken by third parties), as well as predictions of future injury that are 'not normally susceptible of labelling as 'true' or 'false.'" *Id.*

### i.     Plaintiffs' Allegations of Future Injury are Entirely Speculative

The injuries-in-fact allegedly suffered by Plaintiffs' members–(1) the purported harm from the repeal of existing rules and (2) the purported harm from the delay, weakening or deterrence in the issuance of previously proposed rules–are not imminent for multiple reasons. First, Plaintiffs' suggestion that the repeal of existing rules will harm their members misconstrues the Order's requirements.  For instance, the Complaint states that defendant agencies will be forced to "repeal two vehicle safety standards for the purpose of adopting one," or in another area, "two railroad safety regulations [would be repealed] for the purpose of adopting one . . . ."  *See* Compl. ¶¶ 65, 95.  In other words, Plaintiffs assume, without any basis, that whenever an agency issues a future regulation, that agency must repeal another existing regulation on the same subject, such as vehicle or worker safety.  Plaintiffs use this assumption as the basis for a chain of conjectural inferences to support Plaintiffs' claim that the Executive

Order will cause harmful regulatory outcomes such as "reduce[d] . . . vehicle safety protections" and "decrease[d] safety."  *Id.* ¶¶ 67, 97.

However, as even Plaintiffs appear to concede, these predictions are baseless, because agencies are not limited to identifying rules for repeal or revision that those specific agency components previously issued.  *See id.* ¶ 46 ("The Interim Guidance states that the cost savings from repeal of a rule by one component of an agency can be used to offset the costs of a rule issued by another component of that agency.")  Indeed, agencies may submit a request to the Director of OMB to assess whether it would be appropriate to transfer deregulatory actions and cost-savings from an entirely separate agency altogether to support the promulgation of a new significant rule.  *Id.* ¶¶ 46, 80, 102.  Moreover, the OMB Guidance clarifies that certain regulations may qualify for a "full or partial exemption from EO 13,771's requirements," including where compliance would "be impracticable or contrary to the public interest," April Guidance, ¶ VI.Q33, and the Executive Order itself provides that the Director of OMB has the authority to exempt "any . . . category of regulations."  Exec. Order No. 13,771 § 4(c).

The broad discretion provided by the Executive Order and its implementing guidance precludes any non-speculative assumption that any specific regulation, or even a regulation on a particular topic, will necessarily be repealed or revised to permit the promulgation of new rules. Indeed, as shown by Executive Orders 13,771 and 13,777, the only proper interpretation is that agencies will focus their revision or repeal efforts on rules that are not justified based on a cost-benefit analysis, including outdated rules, rather than repealing rules that are most beneficial to Plaintiffs' members.  *See* Exec. Order No. 13,777 § 3(d); April Guidance ¶ VI.Q32 (noting that Executive Order 12,866 cost-benefit analysis continues to apply to both regulatory and deregulatory actions).  Thus, Plaintiffs cannot plausibly contend that defendant agencies will

imminently repeal the types of regulations that they fear will be targeted as a consequence of the

Executive Order, let alone that their members are at imminent risk of harm from such repeal or

revision.  *See Clapper*, 133 S. Ct. at 1147 ("Although imminence is concededly a somewhat

elastic concept, it cannot be stretched beyond its purpose, which is to ensure that the alleged

injury is not too speculative for Article III purposes—that the injury is certainly impending.")

(quoting *Lujan*, 504 U.S. at 565 n.2); *Nat'l Ass'n of Home Builders*, 667 F.3d at 13 (holding that

the mere "*possibility* of regulation" does not constitute an imminent injury required to allege

standing).

Second, in the absence of imminent harm from repeal or revision of existing regulations,

Plaintiffs allege that the Executive Order will deter or "slow the issuance of proposed rules and

final rules" in a manner that would harm their members.  Compl. ¶¶ 76, 82, 97, 104, 113.  But

Plaintiffs can only speculate whether any of the proposed rules cited in the Complaint will be

delayed or otherwise affected by Executive Order 13,771.  *See id.* ¶ 63 ("*If* finalized, the safety

standard will be phased in over time, with costs that change over that period.") (emphasis

added); *id.* ¶ 104 ("Plaintiffs and their members . . . will be harmed *if* the Executive Order delays

needed regulation . . . .") (emphasis added).  Plaintiffs also concede that it is conjectural whether

the Executive Order would result in future significant rules being "weakened," or otherwise

altered in a manner disfavored by Plaintiffs.  *See id.* ¶ 111 ("NRDC members' . . . interests will

be adversely affected *if* Atlantic sturgeon critical habitat is not designated or *if* insufficient

critical habitat is designated.") (emphasis added).

Where, as here, a plaintiff's alleged injury-in-fact is speculative on the face of the

Complaint, standing is absent.  *See Swanson Grp. Mfg. LLC v. Jewell*, 790 F.3d 235, 242 (D.C.

Cir. 2015) (holding that where plaintiff had alleged that its operations "*may not* be able to

continue . . . .  This is . . . the kind of uncertain and unspecific prediction of future harm that is

inadequate to establish Article III standing."); *Ctr. for Biological Diversity v. Dep't of Interior*,

563 F.3d 466, 478 (D.C. Cir. 2009) (holding that where petitioners could only aver that "any

significant adverse effects . . . 'may' occur at some point in the future," it did "not amount to

the . . . 'certainly impending' injury required to establish standing.").

> **ii.      Plaintiffs' Generalized Grievances About the Potential Effects of the Executive Order Do Not Establish Injury-in-Fact**

Plaintiffs' alleged harms are also not particularized enough to confer standing.  In the

recent case of *Spokeo, Inc. v. Robins*, 136 S. Ct. 1540, 1548 (2016), *as revised* (May 24, 2016),

the Supreme Court reiterated the well-established proposition that "[f]or an injury to be

'particularized,' it 'must affect the plaintiff in a personal and individual way.'"  In addition,

"injury in fact must also be 'concrete'" as opposed to "'abstract.'"  *Id*.

Allegations of such particularized, concrete injury are lacking in this case.  Plaintiffs

allege that their members maintain general interests in particular subjects, such as "interests with

respect to vehicle safety," that will purportedly be harmed because the Executive Order will

cause agencies to "reduce existing protections, including vehicle safety protections." Compl.

¶ 67; *see also id*. ¶ 76 (workplace safety), ¶ 120 (environmental safety).  It is no doubt a product

of the prematurity of Plaintiffs' Complaint that Plaintiffs allege their concerns in such a

generalized fashion.  Although they are able to identify certain rules in their Complaint that

could be of benefit or interest to their members, they cannot identify how the Executive Order

will ultimately affect those interests with any particularity.  As such, they are forced to complain

generally about the possible effects on such rules–complaints that could be shared in equal

measure by any entity that is subject to regulation.  Such generalized grievances are

inappropriate for litigation in federal court.  *See City of L.A. v. Lyons*, 461 U.S. 95, 101 (1983)

("Abstract injury is not enough."); *Simon v. E. Ky. Welfare Rights Org.*, 426 U.S. 26, 40 (1976)

(noting that "abstract concern with a subject . . . does not substitute for the concrete injury

required by Art. III."); *Ctr. for Biological Diversity*, 563 F.3d at 478 (holding that injury is "too

generalized" where the alleged harm is "shared by humanity at large").

> **b.**     **It Is Entirely Speculative to Assume that Plaintiffs' Purported**
> **Injuries Would Be Traceable to the Executive Order**

Plaintiffs lack standing under Article III for the independent reason that Plaintiffs cannot

establish that their claimed injuries are caused by or traceable to the Executive Order.  "It is well

established that '[c]ausation, or 'traceability,' examines whether it is substantially probable that

the challenged acts of the defendant, not of some absent third party, will cause the particularized

injury of the plaintiff.'"  *Grocery Mfrs. Ass'n v. EPA*, 693 F.3d 169, 176 (D.C. Cir. 2012)

(quoting *Fla. Audubon Soc'y v. Bentsen,* 94 F.3d 650, 663 (D.C. Cir. 1996)).

It is purely hypothetical whether the Executive Order, rather than some other factor,

would cause Plaintiffs' alleged harms.  Agencies maintain broad discretion to delay, revise, or

repeal rules for a number of reasons unrelated to the Executive Order, such as agency priorities,

limited resources, information received in public comments, new technological developments,

changes in the marketplace, or legislative changes.[4]  In other words, regulatory actions that

Plaintiffs fear—which, as discussed, are entirely speculative at this time—could be undertaken

by agencies even in the absence of the Order.  Further, the repeal or revision of a rule may not

directly impact one of Plaintiffs' members, but may instead affect the manner in which a third

---

[4] Just a few examples of repealed or revised rules, exemplifying the various reasons for such action, are noted here.  *See, e.g.*, Repeal of Civil Aviation Regulations, 80 Fed. Reg. 76,630 (Dec. 10, 2015); Repeal of Disclosure Regulations, 78 Fed. Reg. 15,869 (Mar. 13, 2013); Final Rule, Special Areas; State Petitions for Inventoried Roadless Area Management, 70 Fed. Reg. 25,654 (May 13, 2005).

party is regulated.  As this Court is well aware, "'it is ordinarily substantially more difficult to

establish' standing based on the actions of third parties."  *Arpaio*, 797 F.3d at 27 (quoting *Lujan*,

504 U.S. at 562).  In light of the multitude of factors that may affect the outcome of a

rulemaking, Plaintiffs have not shown that their purported injuries are traceable to the Executive

Order.

           **c.**       **Plaintiffs' Purported Injuries Are Not Redressable by the Relief They Seek**

      Plaintiffs' allegations also fail to establish redressability. The redressability inquiry

"examines whether the relief sought, assuming that the court chooses to grant it, will likely

alleviate the particularized injury alleged by the plaintiff." *Fla. Audobon Soc'y*, 94 F.3d at 663-

64.  As the D.C. Circuit has highlighted, "[t]he key word is 'likely.'" *West v. Lynch*, 845 F.3d

1228, 1235 (D.C. Cir. 2017).  "Relief that does not remedy the injury suffered cannot bootstrap a

plaintiff into federal court; that is the very essence of the redressability requirement." *Steel Co.

v. Citizens for a Better Env't*, 523 U.S. 83, 107 (1998).

      Plaintiffs here request, *inter alia*, that the Executive Order be held unconstitutional,

declared invalid, and agency Defendants enjoined from compliance.  It is pure conjecture

whether such relief is likely to alleviate any of Plaintiffs' feared harms.  Invalidating the

Executive Order would not, for example, prevent agencies from identifying regulations for repeal

or revision or speed the promulgation of future regulations.  Consequently, neither Plaintiffs nor

this Court can "begin to predict on this record what impact," if any, invalidating the Executive

Order would have.  *See Freedom Republicans, Inc. v. Fed. Election Comm'n*, 13 F.3d 412, 419

(D.C. Cir. 1994).  Plaintiffs have accordingly failed to allege facts which show that their

requested relief will likely remedy the claimed injuries to their members.

### 3.      Plaintiffs Have Failed to Establish Standing to Sue in Their Own Right

Plaintiffs also lack organizational standing, *i.e.*, standing based on the alleged injury to the organizations themselves.  Organizations, "like an individual plaintiff," must show "actual or threatened injury in fact that is fairly traceable to the alleged illegal action and likely to be redressed by a favorable court decision."  *Food & Water Watch, Inc. v. Vilsack*, 808 F.3d 905, 919 (D.C. Cir. 2015).

Plaintiffs' primary theory of organizational injury appears to be that the Executive Order will cause them to refrain from their usual lobbying activities.  Specifically, Plaintiffs proffer that they normally petition for rulemaking and comment on proposed rules before the named defendant agencies, and that the Executive Order "chills" this petitioning activity because "successful advocacy in favor of new regulations will result in repeal of other important . . . regulations."  Compl. ¶ 15; *see also id*. ¶¶ 13, 14, 112.[5]  For instance, the Complaint avers that the petitioning activity of Plaintiff Communications Workers of America is chilled because the Executive Order "insist[s] that other to-be-determined health and safety protections for one set of workers must be repealed in exchange for health and safety protections for another set of workers."  *Id*. ¶ 15; *see also id*. ¶¶ 13, 14 (claiming similar injuries for NRDC and Public Citizen).[6]  Such claims are insufficient to establish standing for three independent reasons.

First, Plaintiffs advance a flawed understanding of the Executive Order's scope and substance.  As noted above, the Order does not require the repeal of "health and safety

---

[5] Although Plaintiffs suggest in passing in the Complaint that these lobbying activities are "First Amendment-protected petitioning activit[ies]," no First Amendment violation is alleged. Compl. ¶ 15.

[6] To the extent that Plaintiff organizations claim injuries similar to those alleged to have occurred to the detriment of their members, such allegations remain meritless for the reasons set forth above.

protections" for one set of workers when an agency intends to promulgate a regulation on that subject.  Compl. ¶ 15; *see* supra at § I(A)(2)(a)(i).

Second, the D.C. Circuit has consistently rejected organizational standing based on the types of issue-advocacy injuries alleged by Plaintiffs.  The court has emphasized that no organizational standing exists where the claimed injury is "frustration of an organization's objective" or the "service impaired is pure issue-advocacy."  *Ctr. for Law & Educ. v. Dep't of Educ.*, 396 F.3d 1152, 1161-62 (D.C. Cir. 2005).  Put another way, "an organization must allege that the defendant's conduct perceptibly impaired the organization's ability to provide services," specifically through "'inhibition of [the organization's] daily operations' in order to establish injury in fact."  *Food & Water Watch, Inc.*, 808 F.3d at 919-20.  Plaintiffs have not alleged that their provision of services and daily operations will be impaired in any way by the Executive Order, or that they will be forced to expend additional resources as a result of it.  Rather, Plaintiffs claim injury based solely on their own purported hesitancy in their advocacy and lobbying activities, which cannot constitute injury-in-fact.  *See, e.g., Turlock Irrigation Dist. v. FERC*, 786 F.3d 18, 24 (D.C. Cir. 2015).

Finally, these specific limitations are based in part on the broader principle that an organization does not suffer a cognizable injury simply because it expresses a subjective fear based upon possible future Government action.  As the Supreme Court explained in *Laird v. Tatum*, 408 U.S. 1 (1972), standing is not present where "the chilling effect [on First Amendment activities] arise[s] merely from the individual's knowledge that a governmental agency was engaged in certain activities or from the individual's concomitant fear that, armed with the fruits of those activities, the agency might in the future take some other and additional action detrimental to that individual."  *Id*. at 11; *see also Clapper v. Amnesty International*, 133

S. Ct. at 1151 ("[R]espondents cannot manufacture standing merely by inflicting harm on themselves based on their fears of hypothetical future harm that is not certainly impending."). Accordingly, to the extent that Plaintiffs choose to silence themselves based on a misunderstanding of the Executive Order, that is a self-inflicted injury that fails to establish standing. *See Nat'l Family Planning & Reprod. Health Ass'n v. Gonzales*, 468 F.3d 826, 831 (D.C. Cir. 2006) ("We have consistently held that self-inflicted harm doesn't satisfy the basic requirements for standing.").[7]

## B.    Plaintiffs' Purported Injuries Are Not Ripe for Resolution

Intertwined with the requirement under Article III that an injury-in-fact be certainly impending, the doctrine of ripeness concerns "when a federal court can or should decide a case." *Am. Petroleum Inst. v. EPA*, 683 F.3d 382, 386 (D.C. Cir. 2012). A "claim is not ripe for adjudication if it rests upon 'contingent future events that may not occur as anticipated, or indeed may not occur at all.'" *Texas v. United States,* 523 U.S. 296, 300 (1998). Although the constitutional component of ripeness is coextensive with the injury-in-fact requirement of standing, *Nat'l Treasury Employees Union v. United States*, 101 F.3d 1423, 1427 (D.C. Cir. 1996), the doctrine of ripeness also includes prudential considerations. Thus, even if the Court were to conclude that Plaintiffs had alleged a "certainly impending" injury-in-fact, which it should not, the prudential considerations of ripeness counsel against permitting the instant challenge to go forward.[8]

---

[7] Indeed, even if Plaintiffs were correct about the scope of the Order, it is unclear how Plaintiffs would be prevented from engaging in the activities that they claim would be chilled. Plaintiffs would remain free to advocate where costs should be offset and how, as well as whether rules should be repealed or revised, consistent with the language of the Order.

[8] In dicta in *Susan B. Anthony List v. Driehaus*, 134 S. Ct. 2334, 2347 (2014), the Supreme Court expressed concern that prudential ripeness "is in some tension with our recent reaffirmation of the principle that 'a federal court's obligation to hear and decide' cases within its jurisdiction 'is

The ripeness factors help to "prevent the courts, through avoidance of premature adjudication, from entangling themselves in abstract disagreements . . . and also . . . protect . . . agencies from judicial interference until an administrative decision has been formalized and its effects felt in a concrete way by the challenging part[y]." *Abbott Labs. v. Gardner*, 387 U.S. 136, 148-49 (1967).  "In assessing the prudential ripeness of a case, [courts] focus on two aspects: the 'fitness of the issues for judicial decision' and the extent to which withholding a decision will cause 'hardship to the parties.'" *Am. Petroleum Inst.*, 683 F.3d at 387.  The "fitness" factor depends "on whether the issues are purely legal, whether consideration of the issues would benefit from a more concrete setting, and whether the agency's actions are sufficiently final." *In re Aiken Cty.*, 645 F.3d 428, 434 (D.C. Cir. 2011).

As the D.C. Circuit has explained in an analogous context, "'the classic institutional reason to postpone review'" is the "'need to wait for a rule to be applied [to see] what its effect will be.'" *Atl. States Legal Found. v. EPA*, 325 F.3d 281, 285 (D.C. Cir. 2003) (quoting *La. Envtl. Action Network v. Browner*, 87 F.3d 1379, 1385 (D.C. Cir. 1996)).  Accordingly, the D.C. Circuit has consistently held that cases are not prudentially ripe unless and until an agency position is sufficiently final to enable judicial review.  *See, e.g., Am. Petroleum Inst.*, 683 F.3d

----

virtually unflagging.'" (quoting *Lexmark Int'l, Inc. v. Static Control Components, Inc.*, 134 S. Ct. 1377, 1386 (2014)).  It went on to decline to "resolve the continuing vitality of the prudential ripeness doctrine," by finding that the prudential ripeness factors applied to the case before it favored review.  *Id.*  This dicta notwithstanding, the prudential ripeness doctrine is well established in Supreme Court and D.C. Circuit precedent, *see, e.g., Perry Capital LLC ex rel. Inv. Funds for Which it Acts as Inv. Manager v. Mnuchin*, 848 F.3d 1072, 1112-13 (D.C. Cir. 2017), and will remain so until the Supreme Court holds otherwise.  Further, this Court retains the inherent equitable authority to refrain from issuing injunctive or declaratory relief prematurely.  *See Abbott Labs.*, 387 U.S. at 148  ("The injunctive and declaratory judgment remedies are discretionary, and courts traditionally have been reluctant to apply them to administrative determinations unless these arise in the context of a controversy 'ripe' for judicial resolution.").

387-88 ("[P]ermitting the administrative process to reach its end can at least solidify or simplify the factual context and narrow the legal issues at play, allowing for more intelligent resolution of any remaining claims and avoiding inefficient and unnecessary 'piecemeal review.'") (quoting *Pub. Citizen Health Research Grp. v. FDA*, 740 F.2d 21, 30-31 (D.C. Cir. 1984)); *Nat'l Treasury Emps. Union*, 101 F.3d at 1431 (holding challenge prudentially unripe because while the legal theory was clear, "the facts upon which its resolution may depend are not 'fully crystallized,' nor do the appellants feel their effects in a concrete way").

This case is not ripe for judicial review under these principles.  A litany of contingencies is apparent, including but not limited to: (i) whether defendant agencies–in the first instance– engage in rulemaking to either issue, amend or repeal a regulation; (ii) whether and to what extent, if at all, such action might impact Plaintiffs; (iii) which regulations defendant agencies may identify for revision or repeal; (iv) what justification or explanation the agencies would provide as the basis for their decision; and (v) any harm to Plaintiffs that might result.[9]  Each of these contingencies must ripen to evaluate Plaintiffs' standing and legal arguments in a specific case or controversy, such as whether a particular agency action contravenes specific statutory rulemaking directives or otherwise violates the APA.  *See* Compl. ¶ 125.

The doctrine of constitutional avoidance also supports finding Plaintiffs' Complaint to be prudentially unripe.  "If there is one doctrine more deeply rooted than any other in the process of constitutional adjudication, it is that [courts] ought not to pass on questions of constitutionality . . . unless such adjudication is unavoidable."  *Spector Motor Serv. v. McLaughlin*, 323 U.S. 101, 105 (1944).  Given the numerous uncertainties regarding the

---

[9] In addition, the President and OMB may well issue further guidance or interpretive materials concerning the Executive Order by the time that any concrete action occurs.

potential future application of the Executive Order, the Court should decline to rule on Plaintiffs'
constitutional claims at this time.

In short, because no legal "rights or obligations" have been imposed on any private
parties and "further factual development would 'significantly advance [the Court's] ability to
deal with the legal issues presented,'" *see Nat'l Park Hosp. Ass'n v. Dep't of Interior*, 538 U.S.
803, 809, 812 (2003) (quoting *Duke Power Co. v. Carolina Envtl. Study Grp., Inc.*, 438 U.S. 59,
82 (1978)), this case is prudentially unripe.

## II.     PLAINTIFFS HAVE FAILED TO STATE A CLAIM THAT WOULD PERMIT THEM TO CHALLENGE EXECUTIVE ORDER 13,771 OR THE IMPLEMENTING GUIDANCE

### A.     Plaintiffs Have Failed to Provide a Basis for a Facial Challenge to the Executive Order

Plaintiffs here seek to challenge the President's ability to provide direction and guidance
to Executive Branch agencies before those agencies have even applied that guidance to the
plaintiffs or their members.  As such, their extraordinary and novel challenge seeks to declare
Executive Order 13,771 invalid on its face.  *See* Compl. ¶ 10.  Such a challenge requires
Plaintiffs to show that "'no set of circumstances exists under which the [Order] would be valid,'
*i.e.*, that the [Order] is unconstitutional in all of its applications."[10] *Wash. State Grange v. Wash.
State Republican Party*, 552 U.S. 442, 449 (2008) (quoting *United States v. Salerno*, 481 U.S.
739, 745 (1987)).  "Facial challenges are disfavored for several reasons.  Claims of facial
invalidity often rest on speculation.  As a consequence, they raise the risk of 'premature
interpretation of statutes on the basis of factually barebones records.'"  *Id.* at 450 (quoting *Sabri*

---

[10] The Supreme Court has alternatively characterized the standard as examining whether a
Government action "lacks any 'plainly legitimate sweep.'"  *United States v. Stevens*, 559 U.S.
460, 472 (2010) (citation omitted).   Under either standard, Plaintiffs fail to state a valid claim.

*v. United States*, 541 U.S. 600, 609 (2004)).  Further, "[f]acial challenges also run contrary to the fundamental principle of judicial restraint that courts should neither 'anticipate a question of constitutional law in advance of the necessity of deciding it' nor 'formulate a rule of constitutional law broader than is required by the precise facts to which it is to be applied.'"  *Id*. (quoting *Ashwander v. TVA*, 297 U.S. 288, 346-47 (1936) (Brandeis, J., concurring)).

### 1.    Executive Order 13,771 is Consistent With Separation of Powers Principles

Plaintiffs claim that by requiring defendant agencies to consider "impermissible and arbitrary" factors in rulemaking, *i.e.*, the costs of that rulemaking, the Executive Order "purports to amend the statutes through which Congress has delegated rulemaking authority to federal agencies."  Compl. ¶ 125.  Such alterations of statutory schemes, Plaintiffs allege, amount to a violation of the separation of powers.[11]

This assertion is meritless.  Far from "amending statutes," Executive Order 13,771 explicitly establishes that it should be applied consistent with governing law.  Indeed, the two-page Executive Order states no fewer than eight times that its directives apply only "to the extent permitted by law."  Exec. Order No. 13,771 §§ 2(a), (b), (c), 3(c), (d), 5(a), (b); *see also* § 2(c); § 5(a)(i).  In light of that language, D.C. Circuit precedent squarely forecloses Plaintiff's claim.

In *Building & Construction Trades Department, AFL-CIO v. Allbaugh*, 295 F.3d 28, 30 (D.C. Cir. 2002), the court addressed the legality of Executive Order 13,202 which provided that,

---

[11] Of note, this cause of action is directed against the President of the United States, who is generally immune from suits challenging his official actions; instead, officials "attempt[ing] to enforce the President's directive," would be the proper defendants.  *Franklin v. Massachusetts*, 505 U.S. 788, 828 (1992) (Scalia, J., concurring); *see also Clinton v. Jones*, 520 U.S. 681, 718-19 (1997) (Breyer, J., concurring) (acknowledging "the apparently unbroken historical tradition . . . implicit in the separation of powers that a President may not be ordered by the Judiciary to perform particular Executive acts"); *Swan v. Clinton*, 100 F.3d 973, 978 (D.C. Cir. 1996) (noting that the Supreme Court has issued a "stern admonition" that injunctive relief against the President personally is an "extraordinary measure").

"[t]o the extent permitted by law," no federal agency could require or bar bidders or contractors from entering into a project labor agreement.  Exec. Order No. 13,202, §§ 1, 3.  Several entities, including labor organizations, brought suit, arguing that the Executive Order was invalid as a violation of the separation of powers because the Executive Order was purportedly "beyond the scope of the President's authority."  *Allbaugh*, 295 F.3d at 32.

In rejecting this claim, the D.C. Circuit first noted that "the President's power necessarily encompasses 'general administrative control of those executing the laws,' throughout the Executive Branch of government, of which he is the head."  *Id*. at 32 (quoting *Myers v. United States*, 272 U.S. 52, 164 (1926)); *see also Sierra Club v. Costle*, 657 F.2d 298, 406 (D.C. Cir. 1981) ("The authority of the President to control and supervise executive policymaking is derived from the Constitution . . . .  Our form of government simply could not function effectively or rationally if key executive policymakers were isolated from each other and from the Chief Executive.") (citations omitted).  Accordingly, the President's "faithful execution of the laws enacted by the Congress . . . ordinarily allows and frequently requires the President to provide guidance and supervision to his subordinates."  *Allbaugh*, 295 F.3d at 32; *see also Sherley v. Sebelius*, 689 F.3d 776, 784 (D.C. Cir. 2012) ("[A]s an agency under the direction of the executive branch, it must implement the President's policy directives to the extent permitted by law.").

In light of this express grant of constitutional authority to the President to oversee the Executive Branch, the *Allbaugh* court turned to the question of whether this authority had been exercised in a manner that exceeded the President's constitutional powers.  The resolution of that question began and ended, however, with the plain language of the Executive Order, which provided that it applied by its terms only "[t]o the extent permitted by law."  *Allbaugh*, 295 F.3d

30

at 33.  "Thus, if an executive agency, such as the FEMA, may lawfully implement the Executive Order, then it must do so; if the agency is prohibited, by statute or other law, from implementing the Executive Order, then the Executive Order itself instructs the agency to follow the law."  *Id.* As a result, the Court noted that any comparison to the inter-Branch conflict at play in *Youngstown Sheet & Tube Company v. Sawyer*, 343 U.S. 579 (1952), was misguided.  "Indeed," the court noted, "had President Truman merely instructed the Secretary of Commerce to secure the Government's access to steel '[t]o the extent permitted by law,' *Youngstown* would have been a rather mundane dispute over whether the Secretary had statutory authority to act as he did."  *Id*.

Notably, the D.C. Circuit rejected plaintiffs' attempt to go beyond the plain language of the Order based on speculation that "a particular agency may try to give effect to the Executive Order when to do so is inconsistent with the relevant funding statute."  *Id*.  Instead, the court held that "[t]he mere possibility that some agency might make a legally suspect decision to award a contract or to deny funding for a project does not justify an injunction against enforcement of a policy that, so far as the present record reveals, is above suspicion in the ordinary course of administration."  *Id*.  The court concluded that if an agency were to "contravene the law in a particular instance, an aggrieved party may seek redress through any of the procedures ordinarily available to it."  *Id.*

Here, just as in *Allbaugh*, the explicit limitation that Executive Order 13,771 is to be applied "to the extent permitted by law" precludes a facial claim that the Order violates the separation of powers.  Perhaps recognizing this dilemma, Plaintiffs attempt their own gloss on the Executive Order's wording: "[t]hat language appears to mean that the agencies must use notice-and-comment rulemaking to repeal offsetting regulations and that they must comply with

existing statutory and judicial deadlines for taking particular regulatory actions."  Compl. ¶ 57.
On the other hand, Plaintiffs contend that if the language "were interpreted to mean that the
agencies may disregard the Executive Order when applicable statutes do not authorize
conditioning regulation on the repeal of regulations with offsetting costs, that language would
render the Executive Order without effect."  *Id.*

Of course, no gloss is necessary to interpret the plain language of the Executive Order;
the Order means precisely what it says.  For instance, in Section 2(a), the Order states that
"[u]nless prohibited by law, whenever an executive . . . agency publicly proposes for notice and
comment or otherwise promulgates a new regulation, it shall identify at least two existing
regulations to be repealed."  Exec. Order No. 13,771, § 2(a).  Similarly in Section 2(c), the Order
states that "any new incremental costs associated with new regulations shall, to the extent
permitted by law, be offset by the elimination of existing costs associated with at least two prior
regulations."  Exec. Order No. 13,771, § 2(c).  Accordingly, if a statute were to bar the
identification of regulations to repeal or revise in this circumstance, or otherwise preclude the
offset of cost elimination associated with prior regulations, then the agency would act
consistently with that statutory directive.  *See* April Guidance, ¶ IV.Q18.  As such, the Executive
Order is no different from the one upheld in *Allbaugh*.  The President has acted within his
authority to guide the Executive Branch, while ensuring that no statutory directives are violated.
If and when Plaintiffs believe that an agency, in applying the Order, has contravened a statute,
they may seek redress against that agency.  But the instant Complaint, seeking an injunction
against an Executive Order precisely calibrated to respect statutory limits, fails to state a facial
claim for a violation of the separation of powers.

32

### 2.        Plaintiffs Cannot State a Claim under the Take Care Clause

"The Constitution does not leave to speculation who is to administer the laws enacted by

Congress; the President, it says, 'shall take Care that the Laws be faithfully executed,' Art. II, §

3, personally and through officers whom he appoints. . . ."  *Printz v. United States*, 521 U.S. 898,

922 (1997).  In conjunction with other provisions of Article II, the Take Care Clause establishes

in the President the power to carry into execution the laws enacted by Congress.  *Springer v.*

*Gov't of Philippine Islands*, 277 U.S. 189, 201 (1928).  It creates and vests personally in the

President the authority to supervise officers of the Executive Branch in the performance of their

duties.  *Free Enter. Fund v. Pub. Co. Accounting Bd.*, 561 U.S. 477, 495-96 (2010).  And it

ensures that the President is principally responsible for the actions of the Executive Branch and

directly accountable to the people through the political process.  *Id.*; *Morrison v. Olson*, 487 U.S.

654, 689-90 (1988); *Clinton v. Jones*, 520 U.S. 681, 712-13 (1997) (Breyer, J., concurring).

The grant of power to the President and its corresponding requirement of political

accountability is not, however, judicially enforceable.  The courts lack jurisdiction over a claim

where there is "a textually demonstrable constitutional commitment of the issue to a coordinate

political department" or "a lack of judicially discoverable and manageable standards for

resolving it."  *Nixon v. United States*, 506 U.S. 224, 228 (1993) (quoting *Baker v. Carr*, 369 U.S.

186, 217 (1962)); *see also Heckler v. Chaney*, 470 U.S. 821, 830 (1985).  Courts accordingly

have no authority to second-guess "discretion[ary]" acts taken by the President "in the

performance of his official duties."  *Mississippi v. Johnson*, 71 U.S. (4 Wall.) 475, 501 (1867);

*see also Franklin v. Massachusetts*, 505 U.S. 788, 827 (1992) (Scalia, J., concurring in part).

The Court explained in *Marbury v. Madison*, 5 U.S. (1 Cranch) 137, 165-66 (1803), that under

"the constitution of the United States, the President is invested with certain important political

powers, in the exercise of which he is to use his own discretion, and is accountable only to his country in his political character."  The courts' refusal to police the President's discretionary acts is "a functionally mandated incident of the President's unique office, rooted in the constitutional tradition of the separation of powers and supported by our history."  *Nixon v. Fitzgerald*, 457 U.S. 731, 749 (1982).

The Supreme Court therefore has held that "the duty of the President in the exercise of the power to see that the laws are faithfully executed" is not judicially enforceable, adding that any attempt by the judiciary to oversee the President's Take Care authority "might be justly characterized . . . as 'an absurd and excessive extravagance.'"  *Mississippi*, 71 U.S. at 499.  And the Court has repeatedly refused to second-guess the legality of the President's discretionary decisions.  *See*, *e.g.*, *Dalton v. Specter*, 511 U.S. 462, 474-75 (1994) (refusing to address whether President improperly closed a military base because judicial review "is not available" when a statute or constitutional provision "commits the decision to the discretion of the President"); *Chicago & Southern Air Lines, Inc. v. Waterman S. S. Corp.*, 333 U.S. 103, 114 (1948) (refusing to review President's decision to disapprove an international air route because the decision "embod[ied] Presidential discretion as to political matters beyond the competence of the courts to adjudicate"); *Mississippi*, 71 U.S. at 499 (refusing to review President's enforcement of Reconstruction Acts given the "general principles which forbid judicial interference with the exercise of Executive discretion").

Of course, "[r]eview of the legality of Presidential action can ordinarily be obtained in a suit seeking to enjoin the officers who attempt to enforce the President's directive."  *Franklin*, 505 U.S. at 828 (Scalia, J., concurring in part); *see*, *e.g.*, *Youngstown Sheet & Tube Co. v. Sawyer*, 343 U.S. 579 (1952).  But the Take Care Clause, which speaks to the President alone,

provides no means for courts to review the actions of subordinate Executive officials.  A subordinate Executive officer cannot violate the President's duty to faithfully execute the laws, and a court cannot direct the actions of subordinate officers on the basis of the Take Care Clause without exercising authority that the Clause commits to the President himself rather than to courts.

If the Court were to recognize such a claim, however, the claim would lack merit.  The basis for Plaintiffs' purported Take Care Clause claim is no different than the basis for their separation of powers claim, in that they assert that the President "lacks the authority to direct federal officers or agencies to act in derogation of the statutes that delegate rulemaking authority to them."  Compl. ¶ 135; *see* supra at § II(A)(1).

**B.**     **Plaintiffs' Third and Fourth Causes Of Action Fail To State A Claim Because None Of The Defendant Agencies Acted *Ultra Vires***

Plaintiffs also allege that the non-OMB defendant agencies will act *ultra vires* if they comply with the offset requirements of section 2 of Executive Order 13,771, Compl. ¶¶ 141-44, and that OMB is acting *ultra vires* in assisting the President in implementing Executive Order 13,771, *id.* ¶¶ 149-51.  Plaintiffs have not carried their substantial burden of alleging *ultra vires* conduct in connection with either of these causes of action.

**1.**     **Because Plaintiffs Have a Meaningful and Adequate Means of Challenging the Statutory Violations Alleged in their Third and Fourth Causes of Action Through the APA, *Ultra Vires* Review is Unavailable**

As the Supreme Court acknowledged in *Leedom v. Kyne,* 358 U.S. 184 (1958), courts have jurisdiction to review agency action, despite an implied provision in a statute precluding judicial review, where it is alleged that the agency acted "in excess of its delegated powers and contrary to a specific prohibition" in the statute.  *Id.* at 188.  This is an exceedingly narrow exception to the general principle of sovereign immunity.  "The *Leedom v. Kyne* exception

applies, . . . only where (i) the statutory preclusion of review is implied rather than express; (ii) there is no alternative procedure for review of the statutory claim; and (iii) the agency plainly acts 'in excess of its delegated powers and contrary to a specific prohibition in the' statute that is 'clear and mandatory.'" *Nyunt v. Chairman, Broad. Bd. of Governors,* 589 F.3d 445, 449 (D.C. Cir. 2009).  An agency's actions must "be 'so extreme that one may view it as jurisdictional or nearly so.'"  *Id.* (quoting *Griffith v. FLRA*, 842 F.2d 487, 493 (D.C. Cir. 1988)).  As a result, "a *Leedom v. Kyne* claim is essentially a Hail Mary pass – and in court as in football, the attempt rarely succeeds."  *Id.*

Here, of course, there is no statute that precludes judicial review, thus rendering it doubtful that the *Leedom* exception applies at all.  Indeed, *Leedom* requires a plaintiff to show that "there is no alternative procedure for review of the statutory claim."  *Nyunt,* 589 F.3d at 449; *see also Bd. of Governors of the Fed. Reserve Sys. v. MCorp Fin., Inc.*, 502 U.S. 32, 43 (1991) (noting that "central to our decision in *Kyne* was the fact that the Board's interpretation of the Act would wholly deprive the union of a meaningful and adequate means of vindicating its statutory rights").  That threshold showing cannot be met here because Plaintiffs have an avenue for redress against defendant agencies under the APA, and Plaintiffs even attempt to pursue remedy in this very case.  Compl. ¶¶ 155-161.  To be sure, Plaintiffs' APA claim is premature, *see infra* at II.C, but Plaintiffs cannot assert that future agency actions taken under the Executive Order will never be subject to challenge when final.

## 2.    The Consideration of Costs by Defendant Agencies Is Not *Ultra Vires*

Even if Plaintiffs could demonstrate that they lack a "meaningful and adequate" means of challenging the alleged statutory violations by the defendant agencies,[12] they must still demonstrate that those agencies acted *ultra vires* under the third factor identified by the D.C. Circuit.  To do so, Plaintiffs must demonstrate that "the agency plainly acts 'in excess of its delegated powers and contrary to a specific prohibition in the' statute that is 'clear and mandatory.'"  *Nyunt,* 589 F.3d at 449 (citations omitted).  As the *Griffith* Court stressed, "[g]arden-variety errors of law or fact are not enough."  842 F.2d at 493.  Instead, the error must be "so extreme . . . as [to be] jurisdictional or nearly so."  *Id.*  Plaintiffs fail to satisfy this demanding standard for establishing *ultra vires* conduct by the defendant agencies.

Plaintiffs' suggestion that the defendant agencies will act *ultra vires* in the future should they weigh the costs of existing rules against the cost of potential new rules misunderstands the statutory question and misrepresents the nature of cost considerations in drafting new regulatory actions.  The inquiry in such a rulemaking would be not whether the defendant agency's enabling statutes or the APA "*authorizes* [the agency] to consider and take action based on the cost of a new rule in relation to the costs of existing standards."  Compl. ¶ 142 (emphasis added).  The question the agency would evaluate would be instead whether its statute prohibited it from considering such costs.  *Griffith,* 842 F.2d at 493.  If an agency correctly concludes that consideration is not prohibited, it certainly cannot be *ultra vires* for the agency to take costs into consideration.

---

[12] Defendants use the phrase "defendant agencies" in this subsection to refer to all named defendants except the President (who is not an "agency"), and OMB.

Far from *ultra vires*, consideration of the costs of a rulemaking is frequently a relevant factor in regulatory decisions.   As the Supreme Court noted recently, "[c]onsideration of cost reflects the understanding that reasonable regulation ordinarily requires paying attention to the advantages *and* the disadvantages of agency decisions." *Michigan v. EPA,* 135 S. Ct. 2699, 2707 (2015).  To the extent that a statute does prohibit consideration of cost, agencies may nonetheless analyze costs for other purposes (*e.g.* compliance with the Regulatory Flexibility Act or as a matter of policy pursuant to long-standing Executive Orders, such as Executive Order 12,866). Indeed, the management of regulatory costs as a component of an agency's overall priorities is distinct from an agency's consideration of costs during a particular rulemaking and instead reflects the long-standing executive branch policy to prudently manage regulatory costs. *See* Exec. Order No. 13,563, § 1; 12,866, § 1; Exec. Order No. 12,291, § 2; Exec. Order No. 12,044, § 2(e).  In sum, while the extent to which and the manner in which costs are a relevant legal factor in decisionmaking varies among statutes, agencies have routinely analyzed the costs of key regulatory decisions to provide information to decisionmakers, whether under statutory authority for the decision or to comply with other statutory requirements or, as a matter of policy. Simply put, it is difficult to see how this historical practice could now form the basis for an *ultra vires* claim.

### 3.  OMB's Actions to Assist the President in the Implementation of Executive Order 13,771 Does Not Constitute *Ultra Vires* Action

Plaintiffs contend that because Executive Order 13,771 is unconstitutional, actions by OMB to implement and administer the Order are "arbitrary and capricious" and therefore *ultra vires*.  Compl. ¶ 151.  However, Plaintiffs' conflation of the standard for *ultra vires* action with the standard of review under the APA vastly understates their burden in establishing this type of claim.  *See Griffith*, 842 F.2d at 493.

Plaintiffs cannot establish that OMB lacks statutory authority to carry out a Presidential directive in an Executive Order to oversee the rulemaking process, including the consideration of the costs of that process. OMB has broad statutory authority to assist the President in managing the Executive Branch. *See* Budget and Accounting Act of 1921, 31 U.S.C. § 1101, *et seq.;* Reorganization Plan No. 2 of 1970, Message of the President, 5 U.S.C.App., *reprinted in* 1970 U.S.Code Cong. & Admin. News, 6315, 6316. And, as the D.C. Circuit has recognized, OMB is permitted to assist the President in implementing Executive Orders that are issued pursuant to his constitutional authority to oversee the Executive Branch. *See Meyer v. Bush,* 981 F.2d 1288, 1294 (D.C. Cir. 1993) (OMB's duties "include aiding the President in managing the entire executive branch"); *Sherley*, 689 F.3d at 784 (agencies "must implement the President's policy directives to the extent permitted by law"). Indeed, for decades OMB has overseen the rulemaking of federal agencies on behalf of the President, coordinating review of agencies' significant regulatory actions with other federal agencies, non-governmental stakeholders, and the public. *See, e.g.*, Exec. Order No. 12,866, § 6(a)(3)(B), 6(b); *see also, e.g.*, OMB Circular A-4 (providing guidance to agencies on "key concepts needed to estimate benefits and costs" in making regulatory decisions). And those types of actions have been recognized to be within the scope of OMB's authority. *Swann v. Walters*, 620 F. Supp. 741, 744 (D.D.C. 1984); *see also New York v. Shalala,* 959 F. Supp. 614, 618 (S.D.N.Y. 1997) (OMB Circular A-87 which sets forth cost principles for federal grants to State and local governments, is within OMB's "management and budgetary role."); *U.S. Dept. of HHS v. F.L.R.A.,* 844 F.2d 1087, 1096 (4th Cir. 1988) (OMB Circular A-76 was properly "issued pursuant to the executive branch's budget and management authority").

In light of this authority and historical practice, Plaintiffs cannot plausibly contend that OMB lacks jurisdiction to implement the Executive Order when so directed by the President. What Plaintiffs instead seek to do is to challenge the Order on its face under the guise of *ultra vires* agency action.  But such a claim is impermissible.  *See Nyunt*, 589 F.3d at 449.

## C.     OMB's Interim Guidance Does Not Constitute Final Agency Action

In Plaintiffs' Fifth Cause of Action they claim that OMB's Interim Guidance on the operation of Executive Order 13,771 is arbitrary and capricious agency action under the APA. Compl. ¶ 157.  That claim fails at the outset however, because intra-Branch guidance from OMB regarding Executive Order 13,771 does not constitute final agency action reviewable under the APA, 5 U.S.C. § 704.

An agency action is considered final for purposes of APA review only if two elements are met.  First, the action must "mark the 'consummation' of the agency's decisionmaking process" and, thus, cannot be tentative or interlocutory, and second, "the action must be one by which 'rights or obligations have been determined,'" or from which "legal consequences will flow."  *Bennett v. Spear*, 520 U.S. 154, 177-78 (1997) (citations omitted).  In the present case, the Guidance fails at the second step of the test for final agency action, in that it does not decide any "rights or obligations" or impose "legal consequences" on the regulated public.  *Spear*, 520 U.S. at 177-78.  The Guidance provides general guidelines to agencies regarding how OMB intends to exercise its discretion in reviewing agency regulatory actions under Executive Order 13,771.  As such, it does not directly seek to regulate any party outside of the government.  The Guidance is therefore one step removed from any possible final agency action that may affect rights and obligations and will therefore only be relevant when it is relied upon by an agency that seeks to regulate a private entity.

Indeed, the failure of the Guidance to determine rights and obligations of the public is emphasized by its language.  For example, it repeatedly answers questions beginning with the caveat that the response will apply "in general," or "generally."  Guidance, ¶¶ Q10; Q15; Q18; Q19; Q21.  In other areas, the Guidance states that particular questions and matters will "be addressed on a case-by-case basis," *id.*, ¶¶ Q16; Q19; Q28, or advises agencies to confer with OIRA, *id.*, ¶¶ Q4; Q6; Q14; Q17; Q21; Q33.  Finally, the Guidance states that OIRA may grant a "full or partial exemption from EO 13,771's requirements" in several categories of cases, including in cases "addressing critical health, safety, financial, non-exempt national security matters, or for some other compelling reason."  *Id.*, ¶ Q33.  *See Catawba County, N.C. v. EPA,* 571 F.3d 20, 24 (D.C. Cir. 2009) (document announcing a rebuttable presumption preserves the agency's discretion and hence does not constitute a legislative rule).

Because the Guidance does not independently impose any legal consequences on or determine any rights of plaintiffs or their members, the Guidance is not final agency action reviewable under the APA.  *See, e.g., Reliable Automatic Sprinkler Co. v. Consumer Prod. Safety Comm'n*, 324 F.3d 726, 732 (D.C. Cir. 2003) (explaining that "the agency has not yet made any determination or issued any order imposing any obligation *on Reliable*, denying any right *of Reliable*, or fixing any legal relationship.") (emphasis added); *Vill. of Bald Head Island v. Army Corps of Eng'rs*, 714 F.3d 186, 195 (4th Cir. 2013) ("project implementation" is not final agency action); *Nat'l Wildlife Fed'n v. EPA,* 945 F. Supp. 2d 39, 46 (D.D.C. 2013) (practical consequences of preliminary agency action are not legally binding).[13]

---

[13] Even if the Court were to conclude that the Guidance was final agency action, Plaintiffs would not have standing to challenge its application outside of the context of its application in a concrete agency action.  An order invalidating the Guidance will not provide Plaintiffs with redress for their alleged harms since, even without the benefit of the Guidance, agencies would still comply with the directives of the Executive Order in implementing regulatory actions.  Thus an order

## <u>CONCLUSION</u>

The Court should dismiss Plaintiffs' Complaint pursuant to Rule 12(b)(1) on standing or ripeness grounds.  Should the Court reach the merits, Plaintiffs' Complaint should be dismissed under Rule 12(b)(6) for failure to state a claim.

---

invalidating the Guidance is a classic instance of "[r]elief that does not remedy the injury," *Steel Co.,* 523 U.S. at 107, and hence Plaintiffs would lack standing to pursue their Fifth Cause of Action.