**IN THE UNITED STATES DISTRICT COURT FOR
THE DISTRICT OF COLUMBIA**

PUBLIC CITIZEN, INC., *et al.*,          )
                                                        )
             *Plaintiffs*,                     )
                                                        )
v.                                                      )          Case No. 1:17-cv-00253
                                                        )
DONALD TRUMP, *et al.*,                 )
                                                        )
             *Defendants*.                    )
                                                        )

**BRIEF OF *AMICI CURIAE* THE STATES OF
WEST VIRGINIA, WISCONSIN, AND 12 OTHER STATES**

Brad D. Schimel
   ATTORNEY GENERAL OF WISCONSIN
Misha Tseytlin (DC Bar 1991031)
   *Solicitor General*
Wisconsin Department of Justice
17 West Main Street
Madison, WI  53707
Telephone:  (608) 267-9323
Fax: (608) 261-7206
E-mail: tseytlinm@doj.state.wi.us

***Counsel for* amicus curiae *the State of
Wisconsin***

Patrick Morrisey (DC Bar 459399)
   ATTORNEY GENERAL OF WEST
   VIRGINIA
Elbert Lin (DC Bar 979723)
   *Solicitor General*
Thomas M. Johnson, Jr. (DC Bar 976185)
   *Deputy Solicitor General*
   *Counsel of Record*
Erica N. Peterson
   *Assistant Attorney General*
Office of the Attorney General
State Capitol Building 1, Room E-26
Charleston, WV 25305
Telephone: (304) 558-2021
Fax: (304) 558-0140
E-mail: tjohnson@wvago.gov

***Counsel for* amicus curiae *the State of
West Virginia***

May 19, 2017

**TABLE OF CONTENTS**

TABLE OF CONTENTS.............................................................................................. ….i

TABLE OF AUTHORITIES…………………………………………………………………...ii

INTEREST OF *AMICI* AND SUMMARY OF ARGUMENT ..................................................... 1

ARGUMENT ...................................................................................................................... 2

    I.   The President Has Inherent Authority To Conduct Centralized Review Of
       Administrative Rulemaking………............................................................................3

    II.  Presidents Of Both Parties Have Conducted Centralized Review And
       Required Agencies To Consider Factors Such As Cumulative Costs,
       The National Economy, And Effect On State And Local Governments…...................6

    III. The Executive Order At Issue In This Case Is A Reasonable Exercise Of
        The President's Historical Authority…....................................................................11

CONCLUSION………………………...…………………………..............................................14

# TABLE OF AUTHORITIES

**Cases**

*Center for Auto Safety v. Peck,*
   751 F.2d 1336 (D.C. Cir. 1985) ........................................................................... 4, 5
*Elizabethtown Gas Co. v. FERC,*
   10 F.3d 866 (D.C. Cir. 1993) ............................................................................... 5, 6
*Franklin v. Pinnacle Entm't, Inc.,*
   1 F. Supp. 3d 979 (E.D. Mo. 2014) ........................................................................ 4
*Free Enter. Fund v. Pub. Co. Accounting Oversight Bd.,*
   561 U.S. 477 (2010) ............................................................................................... 3
*Myers v. United States,*
   272 U.S. 52 (1926) ................................................................................................. 3
*Nat'l Small Shipments Traffic Conference v. Civil Aeronautics Bd.,*
   618 F.2d 819 (D.C. Cir. 1980) ............................................................................ 5, 6
*NetCoalition v. SEC,*
   615 F.3d 525 (D.C. Cir. 2010) ............................................................................ 5, 6
*NetCoalition v. SEC,*
   715 F.3d 342 (D.C. Cir. 2013) ............................................................................ 5, 6
*Sierra Club v. Costle,*
   657 F.2d 298 (D.C. Cir. 1981) ............................................................................ 4, 5

**Constitutional Provision**

U.S. Const. art II, § 1, cl. 1 ..................................................................................... 3

**Regulations**

Order Announcing Commission Findings, Modifying Interim Relief, and Instituting
   Proceedings,
   49 Fed. Reg. 17,640 (Apr. 24, 1984) ...................................................................... 5
Regulation of Market Information Fees and Revenues,
   64 Fed. Reg. 70,613 (proposed Dec. 17, 1999) ...................................................... 5

**Other Authorities**

1 M. Farrand, The Records of the Federal Convention of 1787 (1911) ...................... 4
2 M. Farrand, The Records of the Federal Convention of 1787 (1911) ...................... 4
Exec. Order No. 11,821, 39 Fed. Reg. 41,501 (Nov. 27, 1974) ............................. 7, 9
Exec. Order No. 12,044, 43 Fed. Reg. 12,661 (Mar. 23, 1978).............................. 7, 8

Exec. Order No. 12,291, 46 Fed. Reg. 13,193 (Feb. 17, 1981) .................................................. 8

Exec. Order No. 12,498, 50 Fed. Reg. 1,036 (Jan. 4, 1985).......................................................... 9

Exec. Order No. 12,861, 58 Fed. Reg. 48,255 (Sept. 11, 1993) ........................................ 9, 10, 14

Exec. Order No. 12,866, 58 Fed. Reg. 51,735 (Sept. 30, 1993) .................................................. 9, 13

Exec. Order No. 13,132, 64 Fed. Reg. 43,255 (Aug. 4, 1999) ................................................... 11

Exec. Order No. 13,422, 72 Fed. Reg. 2,763 (Jan. 18, 2007)..................................................... 10

Exec. Order No. 13,563, 76 Fed. Reg. 3,821 (Jan. 18, 2011)................................................ 10, 14

Exec. Order No. 13,771, 82 Fed. Reg. 9,339 (Jan. 30, 2017)................................................ 1, 14

FCC Public Notice, Commission Exceeds President's Goal To Eliminate One-Half Of Its
    Internal Regulations,
    1997 WL 606259 (Oct. 3, 1997)............................................................................................ 10

Harold H. Bruff, *Presidential Management of Agency Rulemaking*,
    57 Geo. Wash. L. Rev. 533 (1989) .......................................................................................... 9

John D. Graham et al., *Managing the Regulatory State: The Experience of the Bush
    Administration*,
    33 Fordham Urb. L.J. 953 (2006) .......................................................................................... 10

John F. Manning & Matthew C. Stevenson, Legislation & Regulation: Cases and Materials
    (Foundation Press 2010)…………………………………………………………………..6, 7

Memorandum to the Heads of Executive Departments and Agencies, 74 Fed. Reg. 24,693
    (May 20, 2009) ......................................................................................................................... 11

Michael R. See, *Willful Blindness: Federal Agencies' Failure to Comply with the Regulatory
    Flexibility Act's Periodic Review Requirement—And Current Proposals to Invigorate the
    Act*,
    33 Fordham Urb. L.J. 1199 (2006) ................................................................................... 1, 15

Philip Hamburger, Is Administrative Law Unlawful? (2014) ...................................................... 1

Richard J. Pierce, Jr., *Reconciling Chevron and Stare Decisis*,
    85 Geo. L.J. 2225 (1997) ........................................................................................................... 7

Stephen G. Breyer, *Analyzing Regulatory Failure: Mismatches, Less Restrictive Alternatives,
    and Reform*,
    92 Harv. L. Rev. 549 (1979)................................................................................................... 7, 9

The Federalist No. 70 (Alexander Hamilton) (C. Rossiter ed. 1961) .......................................... 4

## INTEREST OF *AMICI* AND SUMMARY OF ARGUMENT

The States of West Virginia, Wisconsin, Alabama, Arizona, Arkansas, Georgia, Kansas, Louisiana, Michigan, Nevada, Oklahoma, South Carolina, Texas, and Wyoming file this brief as of right under LCvR 7(o)(1),[1] because they have a significant interest in executive actions that lessen regulatory burdens on the States and their citizens. Over the last several years, the administrative state has accelerated further the long-term growth of new regulatory burdens, while rarely eliminating unnecessary regulations issued in the past. *See generally* Philip Hamburger, Is Administrative Law Unlawful? 26–29 (2014); Michael R. See, *Willful Blindness: Federal Agencies' Failure to Comply with the Regulatory Flexibility Act's Periodic Review Requirement—And Current Proposals to Invigorate the Act*, 33 Fordham Urb. L.J. 1199 (2006). The result is a situation where agencies have implemented far more regulatory burdens than Congress ever envisioned. This unlawfully-imposed burden has been largely borne by the States and their citizens.

The Executive Order at issue in this case, the so-called "1-in 2-out" rule, is based upon a reasonable, easy-to-administer principle, which will help limit the cumulative costs of these ever-growing regulations on States and their citizens.  Exec. Order No. 13,771 82 Fed. Reg. 9,339 (Jan. 30, 2017). The Executive Order, when finally implemented, will reduce the sprawl of unnecessary, costly regulations, consistent with Congressional intent and important public policy considerations. For these reasons, many *amici* States previously outlined in a January 9, 2017 letter to the White House and Congressional leaders various proposals for regulatory reform and urged the administration to make such reform a critical priority.

---

[1] "[A] state may file an *amicus curiae* brief without the consent of the parties or leave of Court." LCvR 7(o)(1).

The Executive Order here achieves this laudable goal using a mechanism—an order setting administrative policies—that has a long pedigree. Indeed, since the dawn of the modern administrative state, Presidents of both parties have put mechanisms in place to ensure centralized review of regulations within the Executive Office of the President. These past Presidents have also issued executive orders instructing federal agencies to consider, in the exercise of their sound discretion and as permitted by law, factors such as the cumulative costs of regulations, the national economy as a whole, and (of particular interest to *amici*) the effect of rules on state and local governments. The Order is a reasonable exercise of that inherent authority, and will forward the interests of a more law-abiding administrative state.

## ARGUMENT

Plaintiffs claim that requiring the defendant agencies to consider the costs of rulemaking conflicts with separation of powers principles. Am. Compl. ¶¶ 129–33. This claim fails because, among other reasons, the President has inherent authority to review administrative rulemakings and the Order fits within a longstanding tradition of orders exercising such authority. *See* Mot. to Dismiss Am. Compl. at 20–34.

Presidents of both parties since the dawn of the modern administrative state have used Office of Management and Budget (OMB) and other executive tools to review holistically the work of the executive branch, in order to better achieve the public policy aims imbedded in legislation. To that end, past Presidents have issued executive orders directing federal agencies to consider a variety of factors in exercising their discretion as to whether and how to regulate—including the cumulative costs of regulations and their effect on state and local governments. The Executive Order at issue in this case fits squarely within this longstanding tradition.

I.     **The President Has Inherent Authority To Conduct Centralized Review Of Administrative Rulemaking.**

The President's duty to take care that the laws enacted by Congress are faithfully executed carries with it the authority to direct the agencies to adopt certain policies or regulatory priorities when carrying out their work. The Constitution provides that "[t]he executive Power shall be vested in a President of the United States of America," U.S. Const. art II, § 1, cl. 1, and that the President "shall take Care that the Laws be faithfully executed," *id.* § 3, cl. 4.  As James Madison explained, "if any power whatsoever is in its nature Executive, it is the power of appointing, overseeing, and controlling those who execute the laws." 1 Annals of Cong. 463 (1789).

The Supreme Court has recognized that, in exercising this power, the President "must execute [the laws] by the assistance of subordinates." *Myers v. United States*, 272 U.S. 52, 117 (1926) (collecting cases); *see also Free Enter. Fund v. Pub. Co. Accounting Oversight Bd.*, 561 U.S. 477, 483 (2010) (citing 30 Writings of George Washington 334 (J. Fitzpatrick ed. 1939)). But ultimately, "[i]t is [the President's] responsibility to take care that the laws be faithfully executed," *Free Enter. Fund*, 561 U.S. at 492 (2010). Therefore, if the President is to retain full authority and accountability for executive action, the President must be able to "select those who [are] to act for him under his direction in the execution of the laws" and "remov[e] those for whom he cannot continue to be responsible." *Myers*, 272 U.S. at 117.

Because the President's subordinates ultimately serve at his or her pleasure, it follows that the President may direct their actions or set the agenda for their department or agencies. Indeed, it is inherent in the nature of "at-will" employment that an employer may set the terms and conditions under which employees are expected to complete their work. *See, e.g.*, *Franklin v. Pinnacle Entm't, Inc.*, 1 F. Supp. 3d 979, 988 (E.D. Mo. 2014). Executive power under Article II

of the U.S. Constitution is no different. The D.C. Circuit has long "recognize[d] the basic need of the President and his White House staff to monitor the consistency of executive agency regulations with Administration policy," and that "[t]he authority of the President to control and supervise executive policymaking is derived from the Constitution." *Sierra Club v. Costle*, 657 F.2d 298, 405–06 (D.C. Cir. 1981).

This feature of our constitutional system reflects the Founders' conscious decision to vest executive power in a single person who would be directly accountable to the People, rather than diffuse such authority through a "plural executive" or a "President with a council of state"—options explicitly considered and rejected by the Constitutional Convention. *See id.* at 405; *see also* The Federalist No. 70 (Alexander Hamilton) (C. Rossiter ed. 1961); 1 M. Farrand, The Records of the Federal Convention of 1787, at 65–73, 93, 110 (1911); 2 M. Farrand, The Records of the Federal Convention of 1787, at 542 (1911). Accordingly, the D.C. Circuit has observed, for example, that there is "nothing either extraordinary or unlawful in the fact that a federal agency opens an inquiry into a matter which the President believes should be inquired into," because "the system is supposed to work that way." *Center for Auto Safety v. Peck*, 751 F.2d 1336, 1368 (D.C. Cir. 1985).

Besides political accountability, centralized executive power also promotes sound administration. It enables the President, in overseeing rulemaking, to engage in a "careful weighing of cost, environmental, and energy considerations," and consider each rule's "broad implications for national economic policy." *Sierra Club*, 657 F.2d at 406. Indeed, "[o]ur form of government simply could not function effectively or rationally if key executive policymakers were isolated from each other and from the Chief Executive." *Id.* Rather, each agency head

"needs to know the arguments and ideas of policymakers in other agencies as well as in the White House," if they are to function properly. *Id.*

To be sure, the President cannot exercise power over executive departments or agencies in a manner inconsistent with statutes that delineate the boundaries of agency authority. *See, e.g.*, *Peck*, 751 F.2d at 1368. But where discretion exists, the President may choose to set a regulatory agenda—including whether, how, and in what order to take action—consistent with his or her general regulatory philosophy and policy preferences. That is true even where the President selects a deregulatory approach to addressing public policy issues. To cite one prominent historical example, federal agencies used to engage routinely in heavy-handed, cost-of-service ratemaking to carry out various statutory mandates that prices or fees be "fair," "just," or "reasonable."[2] But experience and advances in economic theory led many commentators to conclude that such command-and-control regulation was both inefficient and ineffective.[3] Accordingly, starting in the 1980s, federal agencies gradually abandoned this approach in favor of increased reliance on market competition to set prices, and the D.C. Circuit has repeatedly upheld applications of this seismic shift in regulatory philosophy against claims that it was somehow inconsistent with the agencies' statutory mandates.[4]

---

[2] *See, e.g.*, Regulation of Market Information Fees and Revenues, 64 Fed. Reg. 70,613, 70,627 (proposed Dec. 17, 1999); Order Announcing Commission Findings, Modifying Interim Relief, and Instituting Proceedings, 49 Fed. Reg. 17,640, 17,647 (Apr. 24, 1984); *see also Elizabethtown Gas Co. v. FERC*, 10 F.3d 866, 869 (D.C. Cir. 1993); *Nat'l Small Shipments Traffic Conference v. Civil Aeronautics Board*, 618 F.2d 819, 821–22 (D.C. Cir. 1980).

[3] Richard J. Pierce, Jr., *Reconciling Chevron and Stare Decisis*, 85 Geo. L.J. 2225, 2232 (1997); *see also* Stephen G. Breyer, *Analyzing Regulatory Failure: Mismatches, Less Restrictive Alternatives, and Reform*, 92 Harv. L. Rev. 549, 565 (1979).

[4] *See, e.g.*, *NetCoalition v. SEC*, 615 F.3d 525, 533 (D.C. Cir. 2010) (upholding SEC's "market-based" approach to setting fees for market-data products under the Exchange Act), *superseded by statute by statute on other grounds*, 15 U.S.C. § 78s(b)(1)(2006), *as recognized in NetCoalition v. SEC*, 715 F.3d 342, 344 (D.C. Cir. 2013); *Elizabethtown*, 10 F.3d at 870 (upholding FERC's decision to rely on "market-based prices in lieu of cost-of-service regulation" when it could

In short, the President has inherent authority and significant discretion under the U.S. Constitution to set a regulatory agenda across the various departments and agencies that the President directly oversees. And the President may consider factors such as cost, economic policy, and the availability of market-based alternatives when setting that regulatory agenda, so long as those considerations are not prohibited by congressional actions.

## II. Presidents Of Both Parties Have Conducted Centralized Review And Required Agencies To Consider Factors Such As Cumulative Costs, The National Economy, And Effect On State And Local Governments.

Since at least the New Deal era, Presidents have grappled with how best to reconcile the President's ultimate authority to administer the laws and set policy direction for the Executive Branch with the realities of the sprawling modern administrative state. Accordingly, Presidents of both parties have devised ways in which the President can conduct centralized review of regulations to ensure that federal rulemaking as a whole cohered with the President's policies and priorities. *See generally* John F. Manning & Matthew C. Stevenson, Legislation and Regulation: Cases and Materials 548–54 (Foundation Press 2010). The Executive Order at issue here fits comfortably within this longstanding tradition.

In 1937, President Franklin Roosevelt established a commission called the Brownlow Committee to propose potential ways in which the President could exercise "direction and control of all departments and agencies in the Executive Branch." *Id.* at 548 (quoting *Memorandum from Louis Brownlow, President's Committee on Administrative Management, to President Franklin Delano Roosevelt* (Nov. 5, 1936) (A-II-33 Roosevelt Library)). That committee's recommendations resulted in the creation of the Executive Office of the President

---

demonstrate the existence of a "competitive market"); *Nat'l Small Shipments*, 618 F.2d at 821–23 (upholding Civil Aeronautic Board's authority to rely on economic incentives for domestic air-cargo carriers to make their rates known rather than tariff-filing requirements).

("EOP") and the transfer of the Bureau of the Budget from the Treasury Department to EOP, among other reforms. *See id.* Then, in the 1970s, President Nixon reorganized the Bureau of the Budget into what is now the OMB. *See id.* at 550. The OMB promptly instituted an interagency review process, in which proposed rules on issues ranging from consumer protection to public health to the environment were circulated to other agencies for comment before the rule could be finalized. *See id.* (citing Harold H. Bruff, *Presidential Management of Agency Rulemaking*, 57 Geo. Wash. L. Rev. 533, 546-47 (1989)).

Presidents after Nixon issued a series of executive orders that instructed agencies engaged in rulemaking to consider a variety of factors aimed at reducing costs and unnecessary waste and evaluating the impact on the economy as a whole. For example, in 1974, President Ford issued an order requiring major regulatory proposals to include a statement that the agency had considered the impact of the proposed rule on inflation. Exec. Order No. 11,821, 39 Fed. Reg. 41,501 (Nov. 27, 1974). In identifying what regulations would be subject to this order, the Director of OMB was charged with considering the "cost impact on consumers, businesses, markets, or Federal, State or local government;" the "effect on productivity of wage earners, businesses or government;" the "effect on competition;" and the "effect on supplies of important products or services." *Id.*

Then, in 1978, President Carter further instructed federal agencies to minimize "compliance costs, paperwork and other burdens on the public" when developing regulations. Exec. Order No. 12,044, 43 Fed. Reg. 12,661 (Mar. 23, 1978). This new order also required agencies to conduct a thorough analysis of alternative approaches for regulations with "major economic consequences," including an assessment of major alternative ways of dealing with the problem and an analysis of the economic consequences of the alternatives. *Id.* The President also

created a Regulatory Analysis Review Group consisting of the Council of Economic Advisors, OMB, and two other agencies on a rotating basis with authority to review certain regulations with significant economic impact. John D. Graham et al., *Managing the Regulatory State: The Experience of the Bush Administration*, 33 Fordham Urb. L.J. 953, 958–959 & n.26 (2006).

President Reagan further standardized and centralized the process for review of federal regulatory actions. He issued an executive order early in his presidency that required all executive branch agencies to submit proposals for "major" regulations to the Office of Information and Regulatory Affairs ("OIRA"), a new division within the OMB. *See* Exec. Order No. 12,291, 46 Fed. Reg. 13,193 (Feb. 17, 1981). The President instructed the agencies to include a regulatory impact analysis in their submissions to OIRA that would include a cost-benefit analysis. *See id.* at 13,194. This requirement was not a mere formality; rather, the executive order instructed that "[r]egulatory action shall not be undertaken unless the potential benefits to society for the regulation outweigh the potential costs to society." *Id.* at 13,193. Further, when choosing among regulatory alternatives, the order instructed that "the alternative involving the least net cost to society shall be chosen." *Id.* The order also set forth a number of other considerations that agencies should take into account when deciding whether and how to regulate, namely, (1) "the condition of the particular industries affected by regulations," (2) "the condition of the national economy," and (3) "other regulatory actions contemplated in the future." *Id.* at 13,193–94. In short, the order instructed agencies to conduct a cost-benefit analysis of their regulations and to consider the cumulative effect of those regulations on the economy.

In 1984, President Reagan issued a follow-up executive order that established a "regulatory planning process" in which executive branch agencies were required to submit a

draft regulatory program annually to OMB that described all significant rulemakings that the agency planned to pursue in the coming year. *See* Exec. Order No. 12,498, 50 Fed. Reg. 1,036 (Jan. 4, 1985). Under that order, the OMB would review each agency's plan to determine whether it was consistent with the President's policies and regulatory agenda and send it back to the agency with comments. *See id.* at 1,036–38.

While President Clinton modified some features of President Reagan's process for OMB review, he retained the core requirements of centralized OIRA review of all proposed major rules and the annual regulatory planning process. *See* Exec. Order No. 12,866, 58 Fed. Reg. 51,735 (Sep. 30, 1993). In addition, President Clinton identified 12 principles to guide the agencies' discretion in conducting rulemaking. Among other things, these principles instructed the agencies to: (1) "identify the problem that it intends to address[,] including, where applicable, the failures of private markets or public institutions"; (2) "examine whether existing regulations [ ] have contributed to[ ] the problem"; (3) assess alternatives to direct regulation; (4) design any regulation in the most cost-effective manner to achieve the objective; (5) seek the views of State, local, and tribal officials to the extent appropriate; and (6) tailor the regulation "to impose the least burden on society, including individuals [and] businesses" and take into account "the costs of cumulative regulations." *Id.* The order applied only to the extent permitted by law. *See id.*

President Clinton also issued a separate executive order requiring executive departments to streamline internal government operations by "undertak[ing] to eliminate not less than 50 percent of its civilian internal management regulations that are not required by law within 3 years." Exec. Order No. 12,861, 58 Fed. Reg. 48,255 (Sept. 11, 1993). This order instructed agencies to focus on areas "that will result in the greatest improvement in productivity,

streamlining of operations, and improvement in customer service." *Id.* Although the order did not require independent agencies to comply, it requested that such agencies comply. *Id.*

This order was successfully implemented. The Federal Communications Commission ("FCC"), for example, eliminated 71% of its internal regulations, totaling 89 eliminated directives and revisions of 15 others and resulting in a reduction of 2,220 pages of regulations. [5] The FCC found that eliminating these regulations allowed its "employees to work more efficiently" and expressed its commitment to "being an agency that works better and costs less."[6]

President George W. Bush retained the basic elements of President Clinton's regulatory reform executive orders, while making minor modifications in an executive order issued in his second term. Exec. Order No. 13,422, 72 Fed. Reg. 2,763 (Jan. 23, 2007). President Obama, in turn, issued an executive order that reiterated that agencies must "propose or adopt a regulation only upon a reasoned determination that its benefits justify its costs," and "select, in choosing among alternative regulatory approaches, those approaches that maximize net benefits." Exec. Order No. 13,563, 76 Fed. Reg. 3,821 (Jan. 18, 2011). The same order instructed agencies to engage in a "retrospective analysis of rules that may be outmoded, ineffective, insufficient, or excessively burdensome, and to modify, streamline, expand, or repeal them in accordance with what has been learned." *Id.*

Finally, of particular interest to *amici*, at least two executive actions from the two most recent Democratic Presidents focused specifically on instructing agencies to consider the impact of proposed regulations on state and local governments. In 1999, President Clinton signed an executive order that directed agencies to "consult, to the extent practicable, with appropriate

---

[5] FCC Public Notice, *Commission Exceeds President's Goal To Eliminate One-Half Of Its Internal Regulations*, 1997 WL 606259 (Oct. 3, 1997).

[6] *Id.*

State and local official[s]" in the event that they foresaw a possible conflict between their proposed regulations and state law. Exec. Order No. 13,132, 64 Fed. Reg. 43,255 (Aug. 4, 1999). President Obama then reaffirmed the principles in that executive order in a Presidential memorandum. Memorandum for the Heads of Executive Departments and Agencies, 74 Fed. Reg. 24,693 (May 20, 2009). That memorandum established a "general policy . . . that preemption of State law by executive departments and agencies should be undertaken only with full consideration of the legitimate prerogatives of the States and with a sufficient legal basis for preemption." *Id.* The memorandum also required agencies to complete a retrospective review of regulations to ensure that they comply with legal principles of preemption. *Id.*

### III.   The Executive Order At Issue In This Case Is A Reasonable Exercise Of The President's Historical Authority.

The Executive Order at issue in this case fits squarely within the tradition of orders enacted by prior administrations and shares numerous features in common with those past orders.

*First*, like the orders issued by former administrations, the Order takes a comprehensive approach to federal rulemaking that acknowledges the President's ultimate responsibility for ensuring consistency in regulatory approach across executive agencies.[7] The Order also takes a significant step toward solving a pressing need that has arisen as a result of the growth of significant regulations, on the one hand, and the failure of agencies to eliminate unnecessary regulations on the other hand. Between 2010 and 2015 the federal government added on average 57 significant regulations per year.[8] In 2012 the cumulative total of regulations cost businesses

---

[7] Memorandum: Interim Guidance Implementing Section 2 of the Executive Order of January 30, 2017 (Feb. 2, 2017), https://www.whitehouse.gov/the-press-office/2017/02/02/interim-guidance-implementing-section-2-executive-order-january-30-2017.

[8] *See* GW Regulatory Studies Center, Economically Significant Regulations Issued Each Year, https://regulatorystudies.columbian.gwu.edu/sites/regulatorystudies.columbian.gwu.edu/files/downloads/econsig2016.JPG (table showing significant regulations added each year).

and individuals an estimated $2.028 trillion in compliance costs.[9] At the same time, few agencies have even conducted retrospective analyses to determine whether existing regulations are necessary, let alone eliminated unnecessary regulations.[10] This growth in unnecessary federal regulations has had a deleterious effect on the States and their citizens. The 1-in 2-out concept properly orients agencies to solving this long-term problem, which has only grown more dire in the past several years, and to lifting unnecessary regulatory burdens on the States.

*Second*, the Order requires agencies to take a cumulative approach to considering the costs of their regulations. Plaintiffs claim that it is somehow unusual or unlawful for Presidents to consider the cumulative effect of regulations or to adopt a cross-agency approach to regulation. *See* Am. Compl. ¶ 146. But Presidents have been taking this cumulative approach for decades. As noted above, President Nixon instituted an interagency review process when he first created OMB. President Reagan, in turn, directed agencies to consider the effect of their regulations on the economy as a whole and to consider the effect of future planned regulations. And President Clinton directed agencies to consider the cumulative costs of their regulations. President Trump's Order simply builds upon that foundation by adopting a mechanism whereby agencies must off-set new regulations with the elimination of old ones so as not to increase incremental costs (or at least not above the cost ceilings set by OMB in future years).

---

[9] W. Mark Crain & Nicole V. Crain, The Cost of Federal Regulation to the U.S. Economy, Manufacturing and Small Business 1 (Sept. 10, 2014), http://www.nam.org/Data-and-Reports/Cost-of-Federal-Regulations/Federal-Regulation-Full-Study.pdf.

[10] Randall Lutter, The Role of Retrospective Analysis and Review in Regulatory Policy 10–11 (Mercatus Center, Working Paper No. 12-14, 2012), https://www.mercatus.org/system/files/Lutter_Retrospective_v1-2.pdf; Michael R. See, *Willful Blindness: Federal Agencies' Failure to Comply with the Regulatory Flexibility Act's Periodic Review Requirement—And Current Proposals to Invigorate the Act*, 33 Fordham Urb. L.J. 1199, 1215–18 (2006) (finding that agencies rarely review existing rules and, even when such review does occur, the agency rarely reduces regulatory burden as a result).

*Third*, and related, by requiring that each agency identify two rules for repeal for every one new rule proposed, the Executive Order is easy to administer—furthering the efficiency goals that underlie President Clinton's executive orders. In particular, the clear, quantifiable "1-in 2-out" rule adopts a bright-line approach similar to President Clinton's call for a 50% reduction in internal management rules. Indeed, Cass Sunstein, former Director of OMB for President Obama, has written that "after [the] considerable regulatory activity" of the Obama years, "it makes sense to take a relative pause in 2017," and the "'one in, two out' policy could be an effective way both to enforce that pause and to press agencies to remove regulations that are taking an excessive toll on the economy, on small businesses and on individuals."[11]

To place the current Order in perspective, in 2015, federal agencies issued over 80,000 pages of regulations in the Federal Register.[12] In that same year, the agencies issued 59 economically significant regulations as defined in Section 3(f) of Executive Order 12,866.[13] Given the volume of rules produced each year, the ease of administering an executive policy concerning regulation is paramount. In 2015, President Trump's Order would have required the agencies to identify a manageable 118 rules for repeal to offset the costs of significant new rules enacted (assuming the repeals in each case were permitted by law). This number would be lower to the extent the new administration issues fewer new proposed rules than its predecessor. The Order also serves efficiency because it allows the President and the public to easily determine

---

[11] Cass Sunstein, *The (Sensible) Fine Print On Trump's Regulation Order*, The Salt Lake Tribune (Feb. 9, 2017), http://www.sltrib.com/opinion/4921990-155/cass-sunstein-the-sensible-fine-print.

[12] GW Regulatory Studies Center, Pages in the Federal Register, https://regulatorystudies.columbian.gwu.edu/sites/regulatorystudies.columbian.gwu.edu/files/downloads/Pages.JPG.

[13] GW Regulatory Studies Center, Economically Significant Regulations Issued Each Year, https://regulatorystudies.columbian.gwu.edu/reg-stats#Economically Significant Regulations Issued Each Year.

from each notice of proposed rulemaking whether the agency is complying and how it is complying—thus facilitating the notice-and-comment rulemaking process and any further judicial review.

*Fourth, and finally*, the Executive Order and accompanying OMB Guidance, like those of prior administrations, contain exceptions where a particular approach would not be permitted by law.[14] That may be the case, for example, where a federal statute requires an agency to promulgate a rule on a particular timetable. *See* Exh. C, Am. Compl., at 5. But it is impossible to speculate when, if ever, the specific approach to rulemaking in the President's Order would be forbidden or impracticable outside the context of a specific rulemaking.

## CONCLUSION

For the reasons stated above and in Defendants' motion to dismiss, Plaintiffs' Complaint should be dismissed in its entirety.

---

[14] *See* Exec. Order No. 13,771, § 5, 82 Fed. Reg. 9,339 (Jan. 30, 2017); Memorandum: Interim Guidance Implementing Section 2 of the Executive Order of January 30, 2017 (Feb. 2, 2017), https://www.whitehouse.gov/the-press-office/2017/02/02/interim-guidance-implementing-section-2-executive-order-january-30-2017; Exh. C, Am. Compl.; Exec. Order No. 13,563 § 1(b), 76 Fed. Reg. 3,821 (Jan. 18, 2011); Exec. Order No. 12,861 § 1, 58 Fed. Reg. 48,255 (Sept. 11, 1993); Exec. Order No. 12,291 § 2, 46 Fed. Reg. 13,193 (Feb. 17, 1981).

Respectfully submitted,

Brad D. Schimel
  ATTORNEY GENERAL OF WISCONSIN

Patrick Morrisey (DC Bar 459399)
  ATTORNEY GENERAL OF WEST VIRGINIA

<u>s/ Elbert Lin</u>

Misha Tseytlin (DC Bar 1991031)
  *Solicitor General*
Wisconsin Department of Justice
17 West Main Street
Madison, WI 53707
Telephone: (608) 267-9323
Fax: (608) 261-7206
E-mail: tseytlinm@doj.state.wi.us

**Counsel for the State of Wisconsin**

Elbert Lin (DC Bar 979723)
  *Solicitor General*
Thomas M. Johnson, Jr. (DC Bar 976185)
  *Deputy Solicitor General*
  *Counsel of Record*
Erica N. Peterson
  *Assistant Attorney General*
Office of the Attorney General
State Capitol Building 1, Room E-26
Charleston, WV 25305
Telephone: (304) 558-2021
Fax: (304) 558-0140
E-mail: tjohnson@wvago.gov

**Counsel for the State of West Virginia**

Dated: May 19, 2017

15

# COUNSEL FOR ADDITIONAL *AMICI*

**Steven T. Marshall**
Attorney General
State of Alabama
501 Washington Ave.
Montgomery, AL 36130
(334) 242-7300

**Mark Brnovich**
Attorney General
State of Arizona
1275 West Washington Street
Phoenix, AZ 85007
(602) 542-5025

**Leslie Rutledge**
Attorney General
State of Arkansas
323 Center St.
Little Rock, AR 72201
(501) 682-2007

**Christopher M. Carr**
Attorney General
State of Georgia
40 Capitol Square, SW
Atlanta, GA 30334
(404) 656-3300

**Derek Schmidt**
Attorney General
State of Kansas
120 SW 10th Ave., 2nd Floor
Topeka, KS 66612
(785) 296-2215

**Jeff Landry**
Attorney General
State of Louisiana
1885 N. Third Street
Baton Rouge, LA 70802
(225) 326-6079

**Bill Schuette**
Attorney General
State of Michigan
P.O. Box 30212
Lansing, MI 48909
(517) 373-1110

**Adam Paul Laxalt**
Attorney General
State of Nevada
100 North Carson Street
Carson City, NV 89701
(775) 684-1150

**Mike Hunter**
Attorney General
State of Oklahoma
313 NE 21st Street
Oklahoma City, OK 73105
(405) 521-3921

**Alan Wilson**
Attorney General
State of South Carolina
P.O. Box 11549
Columbia, SC 29211
(803) 734-3970

**Ken Paxton**
Attorney General
State of Texas
300 W. 15th Street
Austin, TX 78701
(512) 936-1700

**Peter K. Michael**
Attorney General
State of Wyoming
2320 Capitol Avenue
Cheyenne, WY 82002
(307) 777-7841

**<u>CERTIFICATE OF SERVICE</u>**

I certify that on May 19, 2017, the Brief of *Amici Curiae* the States of West Virginia and Wisconsin and 12 other States was served via the CM/ECF filing system of the United States District Court for the District of Columbia on all registered parties.

<u>/s/ Elbert Lin</u>

Elbert Lin