IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| PUBLIC CITIZEN, INC., et al., | ) |
| | ) |
| | ) |
| Plaintiffs, | ) |
| | ) |
| | ) |
| v. | ) |
| | ) Civ. No. 17-253 (RDM) |
| | ) |
| DONALD TRUMP, PRESIDENT of the | ) |
| UNITED STATES, et al., | ) |
| | ) |
| | ) |
| Defendants. | ) |

**BRIEF OF LAW PROFESSORS AS *AMICI CURIAE* IN SUPPORT OF PLAINTIFFS'
OPPOSITION TO DEFENDANTS' MOTION TO DISMISS AND IN SUPPORT OF
PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT**

Respectfully submitted,

\_\_\_/s/_____
Katherine A. Meyer
D.C. Bar No. 244301
Meyer Glitzenstein & Eubanks, LLP
4115 Wisconsin Ave., N.W.
Suite 210
Washington, D.C. 20016
(202) 588-5206 (phone)
(202) 588-5049 (fax)
kmeyer@meyerglitz.com
Counsel for *Amici Curiae*
Law Professors

# TABLE OF CONTENTS

**PAGE**

TABLE OF AUTHORITIES ........................................................................................................ ii

INTEREST OF AMICUS CURIAE ............................................................................................. 1

ARGUMENT ................................................................................................................................ 1

Introduction ............................................................................................................................. 1

I.   From the Founding to the New Deal and Great Society: Regulating for Public
     Benefit ............................................................................................................................... 3

II.  The Great Society to the Present:  The Paramount Importance of Regulatory
     Benefits ............................................................................................................................. 8

III. The Executive Order Represents an Abrupt About-Face from Decades of
     Academic and Public Policy Literature on Regulatory Reform ................................. 16

Conclusion ............................................................................................................................. 21

# TABLE OF AUTHORITIES

**CASES**                                                                **PAGE**

*Am. Textile Mfrs. Inst., Inc. v. Donovan*,
   452 U.S. 490 (1981)..........................................................................................................12, 13

*Charles River Bridge v. Warren Bridge*,
   36 U.S. 420 (1837)....................................................................................................................4

*Citizens to Pres. Overton Park v. Volpe*,
   401 U.S. 402 (1971) *(Overton Park)* ...................................................................10, 11, 12, 15

*Entergy Corp. v. Riverkeeper*,
   556 U.S. 208 (2009)..........................................................................................................14, 16

*EPA v. EME Homer City Generator, L.P.*,
   134 S. Ct. 1584 (2014)......................................................................................................14, 15

*Loan Ass'n v. Topeka*,
   87 U.S. 655 (1874)....................................................................................................................5

*Michigan v. EPA*,
   135 S. Ct. 2699 (2015)......................................................................................................15, 16

*Munn v. Illinois*,
   94 U.S. 113 (1876)................................................................................................................5, 6

*Pa. Coal Co. v. Mahon*,
   260 U.S. 393 (1922)..................................................................................................................8

*Tenn. Valley Auth. v. Hill*,
   437 U.S. 153 (1978) (Burger, C.J.).......................................................................1, 10, 11, 12

*Tr. of Dartmouth Coll. v. Woodward*,
   17 U.S. 518 (1819)....................................................................................................................4

*Union Elec. Co. v. EPA*,
   427 U.S. 246 (1976)......................................................................................................9, 10, 11

*United States v. Gettysburg Elec. Ry. Co.*,
   160 U.S. 668 (1896)..................................................................................................................5

*Whitman v. Am. Trucking Assn's*,
   531 U.S. 457 (2001)......................................................................................9, 10, 13, 14, 16

**STATUTES**

16 U.S.C. § 1536.............................................................................................................................12

16 U.S.C. § 1536(a)(2) ................................................................................................9

29 U.S.C. § 655(b)(5) ..............................................................................................12

42 U.S.C. § 7409(b) ...................................................................................................9

42 U.S.C. § 7409(b)(1) ............................................................................................13

42 U.S.C. § 7410(a)(2)(D)(i) ...................................................................................15

42 U.S.C. § 7410(a)(2) & (k)(3) ...............................................................................9

42 U.S.C. § 7412(n)(1)(A) .......................................................................................15

## OTHER AUTHORITIES

*2015 Report To Congress On The Benefits And Costs Of Federal Regulations And Unfunded Mandates On State, Local, And Tribal Entities* ......................................................19

Amy Siden, *A "Cost-Benefit State?" Reports of Its Birth have been Greatly Exaggerated*, 46 ENVTL. L. REP. 10933 (2016) ........................................................15

ANTHONY E. BOARDMAN ET AL., COST-BENEFIT ANALYSIS: CONCEPTS AND PRACTICE 32 (4th ed. 2011) ...............................................................................17

Congressional Research Service, *EPA Regulations: Too Much, Too Little, or On Track?* (Dec. 30, 2016) ..............................................................................................19

Disease Control and Prevention, *Injury Prevention & Control: Motor Vehicle Safety* (July 5, 2016) ............................................................................................2

Donna Glassbrenner, *Estimating the Lives Saved by Seat Belts and Air Bags* ...............................2

FERGUS M. BORDEWICH, THE FIRST CONGRESS: HOW JAMES MADISON, GEORGE WASHINGTON, AND A GROUP OF EXTRAORDINARY MEN INVENTED THE GOVERNMENT (2016) ...............................................................................................3

FRANK ACKERMAN & LISA HEINZERLING, PRICELESS: ON KNOWING THE PRICE OF EVERYTHING AND THE VALUE OF NOTHING (2004) ...............................................17

Herbert Hovenkamp, *Inventing the Classical Constitution*, 101 IOWA L. REV. 1, 11 (2015) ........................................................................................................5

JERRY L. MASHAW, CREATING THE ADMINISTRATIVE CONSTITUTION: THE LOST ONE HUNDRED YEARS OF AMERICAN ADMINISTRATIVE LAW (2012) ......................3

Jeffrey A. Rosen & Brian Callanan, *The Regulatory Budget Revisited* 66 ADMIN. L. REV. 835 (2014) ..................................................................................17, 20

Lisa Heinzerling & Frank Ackerman, *The $1.75 Trillion Lie*, 1 MICH. J. EVTL. & ADMIN. LAW 127 (2012) ...........................................................................................................19

Marcus Peacock, *Implementing a Two-for-One Regulatory Requirement in the U.S. (Working Paper)* GEO. WASH. U. REG. STUD. CTR. 22 (2016)................................................18

W. Mark Crain & Nicole V. Crain, *The Impact of Regulatory Costs on Small Firms*, 6 (Sept. 1 2010)..............................................................................................................19

MATTHEW D. ADLER & ERIC A. POSNER, NEW FOUNDATIONS OF COST-BENEFIT ANALYSIS (2006) ...........................................................................................................17

National Audit Office, *The Business Impact Target: Cutting the Cost of Regulation: 2016-17*, HC 236 (UK, 2016) ........................................................................................17

Office of Mgmt. & Budget, Office of Info. & Reg. Aff., *2015 Report To Congress On The Benefits And Costs Of Federal Regulations And Unfunded Mandates On State, Local, And Tribal Entities*...........................................................................................19

Rena Steinzor & Sidney Shapiro, *The People's Agents and the Battle to Protect the Public: Special Interests, Government, and Threats to Health, Safety, and the Environment* (2010) ...................................................................................................... 3

RICHARD L. REVESZ & MICHAEL A. LIVERMORE, RETAKING RATIONALITY: HOW COST-BENEFIT ANALYSIS CAN BETTER PROTECT THE ENVIRONMENT AND OUR HEALTH (2008) ...................................................................................................9, 17

Sam Batkins, *A Reply: The Regulatory Budget Takes Form*, 67 ADMIN. L. REV. 115, 128-30 (2016)...........................................................................................................20

SIDNEY A. SHAPIRO & JOSEPH P. TOMAIN, ACHIEVING DEMOCRACY: THE FUTURE OF PROGRESSIVE REGULATION Ch. 2 (2014)............................................................. 4

U.S. Envtl. Prot. Agency, *The Benefits and Costs of the Clean Air Act from 1990 to 2020* ...................................................................................................................... 2

U.S. Government Accountability Office, *Small Business Administration: Office of Advocacy Needs to Improve Controls Over Research, Regulatory, and Workforce Planning Activities*, GAO-14-525 (July 2014).......................................................19

This *amicus curiae* brief is submitted on behalf law professors from around the country with expertise in administrative and regulatory law. They teach at accredited law schools and have published extensively on the topics of government regulation and administrative law for several decades in the leading law reviews and journals and with leading law and university presses.  *Amici* have an interest the proper administration of statutory duties by the executive branch and its agencies. They write to support the Plaintiffs' arguments, but also to advise the court on fundamental principles of administrative law and policy.

## ARGUMENT

### Introduction

ROPER: *So now you'd give the Devil benefit of law?*

MORE:  *Yes. What would you do? Cut a great road through the law to get after the Devil?*

ROPER: *I'd cut down every law in England to do that!*

MORE:  *And when the last law was down, and the Devil turned round on you – where would you hide, Roper, the laws all being flat? This country's planted thick with laws from coast to coast . . . and if you cut them down . . . d'you really think you could stand upright in the winds that would blow then?*

ROBERT BOLT, A MAN FOR ALL SEASONS 37-38 (1962), *quoted in Tenn. Valley Auth. v. Hill*, 437 U.S. 153, 195 (1978) (Burger, C.J.).

On January 30, 2017, President Trump signed Executive Order 13,771, stating that an agency may issue a new regulation only if it rescinds two existing regulations that offset the costs of the new regulation. Unquestionably, wasteful, redundant, or otherwise ineffective regulations should be eliminated. Effective regulations, however, confer demonstrable, and often vital, benefits on society and, therefore, should be sustained as a matter of U.S. history, law, and policy.

The Executive Order ignores regulatory benefits and therefore fails to distinguish between effective and ineffective regulations. Accordingly, it will deprive those living in the United States of many benefits that they now enjoy and would enjoy in the future. Simply put, the Order aims to thwart implementation of many federal statutes, "cut[ting] down" and "flat[tening]" laws to the disadvantage of the public interest.

Of course, a new Administration is constitutionally empowered to advance its own agenda. However, the Executive Branch cannot flout the will of Congress and undermine the constitutional purpose of creating a government that works to benefit society. The Executive Order is fatally flawed because it violates established law and principles of our constitutional order and because it violates basic policies and practices of our modern government. These legal infirmities all have one costly consequence: regulations that Congress has directed agencies to promulgate to safeguard public health, safety, and the environment will be delayed, weakened, or withheld entirely, and citizens, consumers, and the economy as a whole will thereby suffer.

By way of three introductory examples, regulations requiring seat belts saved 12,802 lives in 2014 (airbags saved additional lives);[1] Clean Air Act rules saved over 164,000 lives in 2010 and are estimated to save over 237,000 lives annually by 2020;[2] and, Occupational Safety and Health Administration workplace regulations have reduced worker fatality rates from 18 per

---

[1] Centers for Disease Control and Prevention, *Injury Prevention & Control: Motor Vehicle Safety,* (July 5, 2016), https://www.cdc.gov/motorvehiclesafety/seatbelts/facts.html (then select the tab titled "Effectiveness"); *see also* Donna Glassbrenner, *Estimating the Lives Saved by Seat Belts and Air Bags* 1-3 (Nat'l Highway Traffic Safety Admin.: Nat'l Ctr. for Statistics and Analysis, Paper No. 500), https://www-nrd.nhtsa.dot.gov/pdf/esv/esv18/cd/files/18esv-000500.pdf.

[2] U.S. Envtl. Prot. Agency, *The Benefits and Costs of the Clean Air Act from 1990 to 2020,* 5-25 (Table 5-6) (Mar. 2011), https://www.epa.gov/sites/production/files/2015-07/documents/fullreport_rev_a.pdf.

100,000 in 1970 to 4 deaths per 100,000 in 2006.[3] Because the challenged Executive Order is silent on regulatory benefits, such benefits may well be lost in pursuit of cost savings. However, as demonstrated, benefits matter greatly.

Regulatory benefits matter because they have been a consistent part of the country's regulatory history, constitutional and statutory law, and established and reliable practices and policies of government administration. Although regulatory design may be debated, the *need* for regulation to protect the public interest has never been seriously or responsibly questioned.

## I. From the Founding to the New Deal and Great Society: <u>Regulating for Public Benefit</u>

As Yale legal historian Jerry Mashaw has amply demonstrated, the United States has always had regulatory functions implemented by administrative agencies, and those functions have always been exercised for the public good. *See generally* JERRY L. MASHAW, CREATING THE ADMINISTRATIVE CONSTITUTION: THE LOST ONE HUNDRED YEARS OF AMERICAN ADMINISTRATIVE LAW (2012). In 1789, the first Congress of the United States passed 26 statutes that were signed into law by President Washington. 1 Stat. 23-98 (1856 Ed.) Of those 26 laws, 20 dealt with the establishment of the executive branch, which then went on to adopt myriad government regulations regarding such things as import duties, lighthouses, vessels and pensions. The remaining laws dealt with governance issues such as treaties with Native Americans, the Northwest Territories, and payments to the states. *See generally* FERGUS M. BORDEWICH, THE FIRST CONGRESS: HOW JAMES MADISON, GEORGE WASHINGTON, AND A GROUP OF EXTRAORDINARY MEN INVENTED THE GOVERNMENT (2016).

To be sure, the United States has gone through several regulatory cycles, from mercantilism

---

[3] Rena Steinzor & Sidney Shapiro, *The People's Agents and the Battle to Protect the Public: Special Interests, Government, and Threats to Health, Safety, and the Environment* 18 (2010).

to laissez-faire and from progressivism to deregulation. During each of these historical cycles, however, the issue has never been about the presence or absence of regulation. Instead, the central issue has been how to use government regulation to maximize the common good, to maximize social benefits.

Indeed, even the early debate between the Hamiltonians and the Jeffersonians about the proper role of government was not a disagreement about the presence or absence of government regulation; rather, it was an argument about its proper locus. Hamilton believed in the central government; Jefferson believed in a decentralized agrarian society. Both, however, were committed to using regulation for the commonweal. This commitment was later dubbed the American System by Henry Clay; a system that established a three-pronged national economic policy based upon government support for infrastructure, nascent industries, and fiscal controls. In short, the American System was a system based on government regulation. SIDNEY A. SHAPIRO & JOSEPH P. TOMAIN, ACHIEVING DEMOCRACY: THE FUTURE OF PROGRESSIVE REGULATION Ch. 2 (2014).

Political and legal scholars, as well as economists, have for centuries debated the wisdom of one form of regulation or another. But it has never been disputed that regulation is based upon and grounded in the public interest as a matter of constitutional law—whether that regulation involves protecting corporate charters, *see Tr. of Dartmouth Coll. v. Woodward*, 17 U.S. 518 (1819), or granting or withholding monopolies, *see Charles River Bridge v. Warren Bridge*, 36 U.S. 420 (1837). In *Dartmouth College*, Chief Justice Marshall noted that the corporate charter involved in that case was deemed "beneficial to the country[.]" 17 U.S. at 637. Similarly, in *Charles River Bridge*, Chief Justice Taney established a rule of construction that required statutes to be construed "in favor of the public." 36 U.S. at 544.

As legal historian Herbert Hovenkamp has written: "American governments have always been involved in economic development and the creation of infrastructure, although both the amount and nature of the involvement changed over time." Herbert Hovenkamp, *Inventing the Classical Constitution*, 101 IOWA L. REV. 1, 11 (2015). Of particular note is the fact that with Andrew Jackson's election, government economic policy and regulation shifted from mercantilism to laissez-faire. That shift, however, did not eliminate government intervention into markets. Jacksonian populism was aimed at federal corruption and, therefore, looked to the states to protect economic liberty. In response to those Jacksonian concerns, to ensure against cronyism and legislative capture, the Supreme Court articulated a public use test for regulatory activity. *Loan Ass'n v. Topek*a, 87 U.S. 655 (1874) (taxation); *United States v. Gettysburg Elec. Ry. Co*., 160 U.S. 668 (1896) (takings). The public use test is consistent with the Constitution because the purpose of government action is to generate public benefits.

By the mid-nineteenth century, the U.S. economy was evolving rapidly through northern migration, immigration, urbanization, and, most important, industrialization. The Industrial Revolution brought with it corporate concentration that began to have harmful effects on the economy and presented risks to public health and safety and to the environment. Federal and state legislatures responded by enacting laws designed to balance that power and to protect markets from abuse and citizens from suffering.

*Munn v. Illinois,* 94 U.S. 113 (1876), is generally considered to be the first modern administrative law case. In that case, the Supreme Court upheld Illinois legislation regulating grain elevators that, at the time, were exercising both monopoly and monopsony power. Farmers who sold grain to the elevators were underpaid, and consumers overpaid for the grain because of the market power exercised by the elevators. In reviewing the constitutionality of the Illinois

legislation, the Supreme Court established two principles for modern regulation. First, the Court recognized that governments have long regulated industries to correct for market failures that result in monopolistic power. Second, the Court determined that a regulation had to be based in the public interest.  In *Munn*, then, the Court acknowledged that setting fair and reasonable grain prices in the country's breadbasket was clearly in the public interest and that regulation, therefore, was warranted. 94 U.S. at 136.

Shortly after the Supreme Court decided *Munn*, Congress created numerous agencies to protect the public against economic inefficiencies caused by monopolies and by health and safety threats presented by industrialization.  The Interstate Commerce Commission (ICC), the first modern administrative agency, was created to monitor abuses of railroad rates. The agency was seen as an institution that was nonpolitical, expert, technically proficient and able to correct economic dislocations.  Similarly, Congress passed legislation to correct for abuses of monopoly power (Sherman Anti-Trust Act, 26 Stat. 209 and the Federal Trade Commission Act, 38 Stat. 717); coordinate the development of hydropower projects (the Federal Power Act, 41 Stat. 1063); ensure airline safety (the Air Commerce Act of 1926, 44 Stat. 568); and the like.  These laws established administrative agencies, including the Federal Trade Commission and the Federal Power Commission. Congress created these agencies, like the ICC before them, so that technically proficient expert administrators could address complex, ongoing social and economic problems for the benefit of all.  In addition to market corrections, Congress created agencies to protect citizens from health and safety harms. For example, Congress created the Food and Drug Administration to implement regulations addressing such identified problems as tainted meat (the Federal Meat Inspection Act of 1906, 34 Stat. 1260) and adulterated food and drugs (the Pure Food and Drug Act of 1096, 34 Stat. 768).

All of this legislative and administrative activity took place before the proliferation of New Deal and Great Society agencies. But both sets of agencies expanded the scope and reach of government in response to the need for greater public protections. And, although directed at different problems, both sets of agencies were created in the public interest and for the public benefit.

New Deal economic legislation was intended to accomplish three things: develop a national infrastructure, particularly in energy (the Federal Power Act, 41 Stat. 1063, and the Natural Gas Act, 52 Stat. 821); regulate and stabilize markets (Securities Act of 1933, 48 Stat. 74, and the Securities Exchange Act of 1934, 48 Stat. 881); and promote and support a middle class (Social Security Act of 1935, 49 Stat. 620, and the National Labor Relations Act, 49 Stat. 449).

Several decades later, the Great Society legislation aimed at solving various social problems—from racial discrimination to threats to public health and safety. Most notably, Great Society legislation provided much-needed federal protection of civil rights (Civil Rights Act of 1964, 78 Stat. 241, and the Voting Rights Act of 1965, 79 Stat. 437). Legislation of that period also addressed environmental threats (National Environmental Policy Act of 1969, 83 Stat. 852), worker safety (Occupational Safety and Health Act of 1970, 84 Stat. 1590), consumer protection (Consumer Product Safety Act, 86 Stat. 1207), and poverty (Economic Opportunity Act of 1964, 78 Stat. 508) among other concerns.

Thus, in both the New Deal and Great Society eras, Congress created new agencies deemed necessary to implement legislation to ameliorate complex and ongoing economic and social harms. In each case, the legislation was expressly directed to serving the "public interest" in general or to serving identified specific public interests such as preventing racial discrimination, fighting poverty, or protecting workers.

7

As Justice Holmes recognized in *Pa. Coal Co. v. Mahon*, 260 U.S. 393, 413 (1922), regulation in the public interest can impose costs on select private individuals in exchange for overall benefits to society. ("Government hardly could go on if to some extent values incident to property could not be diminished without paying for every such change in the general law.").

President Trump's Executive Order does exactly the opposite. The first section of the Order is directed to protecting "private expenditures" at the expense of public benefits. That directive is not only at odds with two-plus centuries of regulatory history in this country, it also violates constitutional and statutory law.

## II. The Great Society to the Present: The Paramount Importance of Regulatory Benefits

During and following World War II, the pace of industrialization quickened, bringing with it new comforts and conveniences, but also introducing new hazards and exacerbating existing ones. Toxic wastes leaked into homes and schools, rivers caught fire; car gas tanks exploded on impact; smog darkened the sky. In response, in the 1960s and 1970s Congress enacted, through bipartisan efforts, a series of laws to protect American workers, consumers, and the general public from toxic pollutants in the air and water, dangerous consumer goods, and other widespread dangers. *See, e.g.,* National Environmental Policy Act of 1969, 83 Stat. 852, Occupational Safety and Health Act of 1970, 84 Stat. 1590, Consumer Product Safety Act, 86 Stat. 1207; Clean Air Amendments of 1970, 84 Stat. 1676; Federal Water Pollution Control Act, 62 Stat. 1155. Consistent with the two centuries of historical precedent outlined above, Congress routinely delegated to executive branch agencies the task of crafting specific regulations to achieve these public benefits.

In the wake of this new legislation, industries that had not previously been made responsible for the harms they inflicted on others through pollution, unsafe consumer products,

or hazardous industrial processes inevitably chafed at the new restrictions imposed on them. In their efforts to push for less stringent regulation, they frequently lobbied agencies to take more account of costs or argued in the courts that agencies were giving insufficient consideration to the costs these new regulations imposed on them. *See generally* RICHARD L. REVESZ & MICHAEL A. LIVERMORE, RETAKING RATIONALITY: HOW COST-BENEFIT ANALYSIS CAN BETTER PROTECT THE ENVIRONMENT AND OUR HEALTH 21-29 (2008).

Indeed, a long line of Supreme Court cases considering such arguments stretches back to the 1970s. While a number of these cases have approved of agencies considering costs in various ways, a common thread throughout has been the bedrock notion that the Court recognized since the Founding; namely, that agencies must in some way take account of *benefits* as well as costs. That notion has been accompanied by a longstanding vigilance to ensure that costs, which are typically so much more amenable to measurement and quantification, not be allowed to overshadow or even "cancel[]" out regulatory benefits. *See Whitman v. Am. Trucking Assn's*, 531 U.S. 457, 469 (2001).

Particularly in the environmental, health, and safety area, Congress has demonstrated a similar concern about costs eclipsing benefits, and, as a result, has only rarely directed agencies to set standards through an actual cost-benefit analysis that directly compares costs to benefits. Indeed, Congress' concern about costs overshadowing benefits has led it in several statutes to direct agencies to set public health and environmental standards based solely on consideration of benefits, prohibiting consideration of costs altogether. *See* 42 U.S.C. § 7409(b) (National Ambient Air Quality Standards); 42 U.S.C. § 7410(a)(2) & (k)(3) (EPA approval of state implementation plans); 16 U.S.C. § 1536(a)(2) (federal duties to protect endangered species); Food Additives Amendment of 1958, 72 Stat. 1784 (Delaney Clause). And the Supreme Court

has endorsed this approach. *Whitman*, 531 U.S. at 468-69; *Union Elec. Co. v. EPA*, 427 U.S. 246, 268-69 (1976); *Tenn. Valley Auth. v. Hill*, 437 U.S. 153, 194-95 (1978).

Thus, even when the Supreme Court has approved an agency's consideration of costs, or actually directed an agency to consider costs, it has done so in instances where no one questioned that the agency was also giving serious consideration to the benefits Congress sought to promote through the relevant statute. The Court has never suggested that it would be appropriate for an agency to weigh regulatory costs in a vacuum without a countervailing consideration of regulatory benefits. Indeed, while we have not combed through all the briefs in all of these cases, there is no indication from the Court's opinions that such an argument has ever even been made to the Court.

In the first of this line of cases, *Citizens to Pres. Overton Park v. Volpe,* 401 U.S. 402 (1971) *(Overton Park)*, the Court reversed the Department of Transportation's decision to approve a federal highway through a public park despite statutory language prohibiting the agency from doing so unless there was "no feasible and prudent alternative." The phrase "feasible and prudent" clearly contemplated the consideration of costs, but not in a vacuum; the agency could consider these costs only against the backdrop of the regulatory benefits identified by Congress—"protection of parkland"—which were, according to a unanimous Court, "to be given paramount importance." *Id.* at 412-13.

Even in that early case, the Court was already demonstrating a concern that would arise repeatedly in subsequent opinions penned by both liberal and conservative justices. This was the worry that, without vigilance by Congress and the courts, regulatory benefits—such as saving lives or reducing illnesses and injuries, which are often so much less susceptible to dollars-and-cents accountings—might get short shrift:

10

It is obvious that in most cases considerations of cost, directness of route, and community disruption will indicate that parkland should be used for highway construction whenever possible. . . . Thus, if Congress [had] intended [the costs and benefits of preserving park land] to be on an equal footing, there would have been no need for the statutes. . . . But the very existence of the statutes indicates that protection of parkland was to be given paramount importance.

*Overton Park*, 401 U.S. 402, 411-13. Thus, while the agency was to consider regulatory costs, it was only allowed to do so in a context in which benefits were also accounted for, and, indeed, given "paramount importance." *Id.*

Five years later, in *Union Elec. Co. v. EPA*, 427 U.S. 246 (1976), the question of agency consideration of costs came before the Court again. There, electric utilities subject to restrictions in Missouri's state implementation plan (SIP) on their ability to emit harmful air pollutants, challenged EPA's approval of that plan for the agency's failure to consider the costs it would impose on industry—specifically, whether the plan was technologically and economically infeasible. A unanimous Supreme Court rejected the claim, noting that "the 1970 Amendments to the Clean Air Act were a drastic remedy to what was perceived as a serious and otherwise uncheckable problem of air pollution[,]" and concluded that this was one of those instances in which Congress had decided to exclude cost considerations from an agency's decision making altogether in order to ensure that regulatory benefits got their due. *Id.* at 256-57. In particular, by excluding cost considerations in this instance, Congress sought to promote the important public benefit of spurring private innovation in pollution control technology. *Id.* at 257 ("These requirements are of a 'technology-forcing character' [] and are expressly designed to force regulated sources to develop pollution control devices that might at the time appear to be economically or technologically infeasible."(citations omitted)); *see also id*. at 257, n. 5 ("Where Congress intended the Administrator to be concerned about economic and technological infeasibility, it expressly so provided.").

Just two years later, in its famous decision in *Tennessee Valley Authority v. Hill*, 437 U.S. 153 (1978), the Supreme Court read another statute to prohibit agency cost considerations. The Court held that the provision of the Endangered Species Act requiring federal agencies "to insure that [their] actions . . . do not jeopardize the continued existence" of any endangered species, 16 U.S.C. § 1536, "admits of no exception," and "shows clearly that Congress viewed the value of endangered species as 'incalculable,'" thus precluding any balancing of costs against the paramount value of species protection. 437 U.S. at 173, 187.

In 1981, the Supreme Court revisited the subject of agency cost considerations in a case involving the regulation of cotton dust in textile mills, prolonged exposure to which causes byssinosis, or "brown lung disease." *Am. Textile Mfrs. Inst., Inc. v. Donovan*, 452 U.S. 490 (1981). Like the statutes at issue in *Overton Park*, the Occupational Safety and Health Act employs a "feasibility" standard. It directs the Occupational Safety and Health Administration (OSHA) to establish standards for toxic materials "which most adequately assure[], to the extent feasible . . . that no employee will suffer material impairment of health or functional capacity." 29 U.S.C. § 655(b)(5). The notion of feasibility clearly encompasses consideration of economic feasibility, i.e., costs. Nonetheless, as it did in *Overton Park*, the Court made clear that the agency's cost consideration was to be performed against the backdrop of an overarching consideration of regulatory benefits, and that those benefits were paramount:

> [C]ongress itself defined the basic relationship between costs and benefits, by *placing the "benefit" of worker health above all other considerations* save those making the attainment of this "benefit" unachievable. Any standard based on a balancing of costs and benefits by the Secretary that strikes a different balance than that struck by Congress is inconsistent with the command set forth in §6(b)(5).

*Am. Textile,* 452 U.S. at 509 (emphasis added).

12

Thus, to ensure that benefits were not eclipsed by costs, Congress did not allow the agency to balance costs directly against benefits. Instead, the statute placed "the 'benefit' of worker health above all other considerations," allowing a standard less stringent than that required to protect every last worker only where such complete protection was so exorbitantly costly as to be infeasible. *Id.* Indeed, the Court made clear that it did not ordinarily expect Congress to permit agencies to directly balance costs against benefits, and would only interpret it as doing so where Congress "has clearly indicated such intent on the face of the statute." Id. at 510. Also, of particular relevance here, the Court went on to note that "Congress was fully aware that the Act would impose real and substantial costs of compliance on industry, and believed that such costs were part of the cost of doing business." *Id.* at 514. Once again, Congress viewed regulatory benefits as paramount.

A full two decades passed before the Supreme Court again took up the subject of agency cost considerations in *Whitman v. American Trucking Associations*, 531 U.S. 457 (2001). There, in an opinion authored by Justice Scalia, the Court read another provision of the Clean Air Act to prohibit cost considerations altogether. At issue was what is in many ways the centerpiece of the statute—the provision directing the EPA to set National Ambient Air Quality Standards (NAAQS). The Act directs EPA to set these standards at the level "requisite to protect the public health." 42 U.S.C. § 7409(b)(1). The Court read this language to say that the Clean Air Act "unambiguously bars cost considerations from the NAAQS-setting process." *Whitman,* 531 U.S. at 471; *see also id.* at 467-78 ("We have . . . refused to find implicit in ambiguous sections of the CAA an authorization to consider costs . . . [such authorization requires a] "textual commitment" that is "clear."). And Justice Scalia grounded the Court's rationale squarely in the concern that a direct balancing of costs against benefits might give benefits short shrift. "Cost," Justice Scalia

said, "is *both* so indirectly related to public health *and* so full of potential for canceling the conclusions drawn from direct health effects that it would surely have been expressly mentioned in §§ 108 and 109 had Congress meant it to be considered." 531 U.S. at 469. Once again, and explicitly, the Court made clear the paramount importance of regulatory benefits.

In its 2009 case, *Entergy Corp. v. Riverkeeper*, 556 U.S. 208 (2009), the Court affirmed a decision by EPA to consider costs in the context of a relatively obscure provision of the Clean Water Act, but once again, it was not in a vacuum, but in conjunction with the consideration of regulatory benefits. There the Court read the statute to allow the agency to do the kind of direct balancing of costs against benefits that the Court had held Congress to have precluded in all of its previous cases. But it did so based on an understanding that the agency had conducted only an informal, qualitative cost-benefit analysis, in which concerns about difficult-to-quantify benefits being eclipsed by costs might well be lessened. Indeed, in his opinion for the Court, Justice Scalia went out of his way to make clear that the Justices might well take a different view were the agency to engage in a more formal cost benefit analysis, noting that more "rigorous form[s] of cost-benefit analysis" might be "preclude[d]." 556 U.S. 223; *see also id.* at 235 (Breyer, J., concurring) ("The EPA's reading of the statute would seem to permit it to describe environmental benefits in non-monetized terms and to evaluate both costs and benefits in accordance with its expert judgment and scientific knowledge. The Agency can thereby avoid lengthy formal cost-benefit proceedings and futile attempts at comprehensive monetization [and] take account of Congress' technology-forcing objectives.") (citation omitted).

Five years later, in *EPA v. EME Homer City Generator, L.P.*, 134 S. Ct. 1584 (2014), the Court again upheld EPA's discretion to consider costs, this time in the context of a complicated provision of the Clean Air Act aimed at reducing interstate air pollution. The agency's

consideration of cost essentially took the form of a feasibility analysis.[4]   As with the feasibility

analyses approved by the Court in *Overton Park* and *American Textile*, there was no question

that the agency's paramount consideration was benefits, and that the cost consideration took

place against that backdrop.  The statutory purpose at issue there was to tackle the persistent and

growing problem of smog in the Northeast by ensuring that upwind states were preventing

sources from emitting air pollution that would "*contribute significantly*" to downwind states'

nonattainment of air quality standards. 42 U.S.C. § 7410(a)(2)(D)(i). Thus, the agency's

feasibility analysis made air pollution control benefits paramount, identifying for each upwind

state the most stringent level of pollution control that would be economically feasible. 134 S. Ct.

at 1589-90.

Finally, and most recently, in *Michigan v. EPA*, 135 S. Ct. 2699 (2015), the Supreme

Court held that the EPA must consider costs in connection with its finding that regulation of

mercury and other air toxics from power plants is "appropriate and necessary." 135 S. Ct. at

2711;  42 U.S.C. § 7412(n)(1)(A).  As in all of the Court's previous forays into this subject, it

was clear that the agency's consideration of costs would be conducted not in a vacuum, but in

conjunction with a thorough and detailed consideration of the public benefits that formed the

purpose and *raison d'etre* of the statute.  Indeed, Congress had specifically directed EPA to base

its "appropriate and necessary" finding on the results of a study EPA was directed to perform on

"the hazards to public health reasonably anticipated to occur as a result of emissions by [power

plants] of [hazardous air] pollutants . . . after imposition of [other requirements in the Act]," i.e.,

the potential benefits of regulation.  135 S.Ct. at 2716; 42 U.S.C. § 7412(n)(1)(A).  And EPA had

---

[4] *See* Amy Sinden, *A "Cost-Benefit State?" Reports of Its Birth have been Greatly Exaggerated*, 46 ENVTL. L. REP. 10933, 10950 (2016).

15

done just that, detailing in an 800-page report the myriad public health harms caused by power plant emissions of mercury and other toxic air pollutants. 135 S. Ct. at 2706. Once again, benefits were paramount.

It is also worth noting that, echoing concerns about costs eclipsing hard-to-quantify benefits that he had previously expressed in *Whitman* and *Riverkeeper*, Justice Scalia went to significant pains in this opinion to clarify that, while the agency had to account for costs in some way, "a formal cost-benefit analysis in which each advantage and disadvantage is assigned a monetary value" was not required—a point on which the dissent agreed. 135 S. Ct. at 2711; *id.* at 2717 (Kagan, J., dissenting).

In short, the long history of regulation in this country demonstrates that regulatory benefits are and always have been Congress' (and therefore agencies') paramount concern. And this is an ordering of priorities that the Supreme Court has long required. Agencies may in many instances consider costs in deciding whether and how to regulate, but only in conjunction with the consideration of benefits, which are, after all, the *raison d'etre* of agency regulation and the statutes that authorize it.

### III. The Executive Order Represents an Abrupt About-Face from Decades of Academic and Public Policy Literature on Regulatory Reform.

The idea that wasteful or inefficient regulations need to be eliminated is by no means new. Ideas for streamlining and improving regulation stretch back decades. But previous efforts at regulatory reform have centered primarily around the idea of cost-benefit analysis—requiring an agency before promulgating a regulation to show that its benefits exceed its costs, or, more ambitiously, that it maximizes net social benefits. A large and well-established body of literature justifies the use of cost-benefit analysis on the basis of long-standing and extensively elaborated tenets of welfare economics, defending it as a means for achieving or approximating Kaldor-

16

Hicks efficiency, or welfare maximization. *See, e.g.*, ANTHONY E. BOARDMAN ET AL., COST-BENEFIT ANALYSIS: CONCEPTS AND PRACTICE 32 (4th ed. 2011); MATTHEW D. ADLER & ERIC A. POSNER, NEW FOUNDATIONS OF COST-BENEFIT ANALYSIS (2006). From the outset, these ideas have sparked significant controversy, and a heated debate continues over whether cost-benefit analysis is actually an effective tool for achieving these goals. *See, e.g.*, FRANK ACKERMAN & LISA HEINZERLING, PRICELESS: ON KNOWING THE PRICE OF EVERYTHING AND THE VALUE OF NOTHING (2004); RICHARD L. REVESZ & MICHAEL A. LIVERMORE, RETAKING RATIONALITY: HOW COST-BENEFIT ANALYSIS CAN BETTER PROTECT THE ENVIRONMENT AND OUR HEALTH 13–16 (2008). Nonetheless, the underlying notion that increasing net social benefits is a laudable goal and should be considered in evaluating the effectiveness of regulation is relatively uncontroversial.

Executive Order 13,771, however, represents a radical and dramatic change in course from these longstanding ideas about regulatory reform. It is grounded in an idea that has begun to be referred to as "regulatory budgeting," the idea being that each agency has a fixed "budget" or cap for the amount of regulatory "costs" it is allowed to impose on society each fiscal year.[5]

---

[5] Regulatory budgeting measures adopted in the United Kingdom and Canada are quite different from Executive Order 13,771. The UK counts "*net* direct costs," a number derived by subtracting direct benefits to private sector entities from the direct costs imposed on them. *See* Jeffrey A. Rosen & Brian Callanan, *The Regulatory Budget Revisited*, 66 ADMIN. L. REV. 856 (2014). Moreover, the vast bulk of regulatory costs (including all EU regulations) have been excluded from the UK's regulatory budgeting requirements. *See* National Audit Office, *The Business Impact Target: Cutting the Cost of Regulation: 2016-17*, HC 236 (UK, 2016) ("The £8.3 billion of expected costs imposed on business so far this Parliament that are not included in the scope of the [regulatory budget] greatly exceed the £0.9 billion that are."). Canada's regulatory budgeting measure only counts administrative costs, not compliance costs and its effect has been small: $23.7 million in cost savings over three years. *See*, *The 2014-15 Scorecard Report on Reducing Regulatory Red Tape*, Government of Canada (Jan. 18, 2016), https://www.canada.ca/en/treasury-board-secretariat/services/federal-regulatory-management/2014-2015-scorecard-report.html#s4.

*See* EO § 1 ("[I]t is important . . . that the cost of planned regulations be prudently managed and controlled through a budgeting process."); *id* § 2(b) (setting incremental cost "budget" at zero for F.Y. 2017); *id*. § 3(d) *(*delegating to OMB Director task of setting each agency's incremental cost "budget"—at a positive or negative number—for each subsequent fiscal year*)*.

The idea of "regulatory budgeting" strays far from the moorings of welfare economics that have grounded previous regulatory reform efforts into a new realm entirely untethered from any intellectually coherent theory about how government does or should work. While its intellectual foundations are not entirely clear, it appears to stem in part from the same impulse toward comprehensive quantification that has, as shown above, garnered such skepticism from the Supreme Court and Congress. And, indeed, "regulatory budgeting" appears to be the most extreme manifestation of exactly the danger that the Supreme Court has so often warned against—that costs, which are so much more amenable to measurement, quantification and monetization—will unjustifiably overshadow and upstage benefits. Indeed, in regulatory budgeting, benefits are not just upstaged, they are jettisoned entirely, simply because they are so difficult to quantify and therefore "speculative."[6]

The argument for regulatory budgeting appears at times to rest on an unsupported and unfounded assumption that regulations actually have no benefits—that they are nothing but senseless red tape to be eliminated at every opportunity. *See, e.g.*, Brief of Amici Curiae States, Docket No. 11, at 1 ("The Executive Order . . . will reduce the sprawl of unnecessary, costly regulations."). This is inconsistent with the empirical evidence, with decades of Supreme Court

---

[6] Marcus Peacock, *Implementing a Two-for-One Regulatory Requirement in the U.S. (Working Paper)* GEO. WASH. U. REG. STUD. CTR. 22 (2016)
https://regulatorystudies.columbian.gwu.edu/sites/regulatorystudies.columbian.gwu.edu/files/do wnloads/Peacock_Implementing-Two-For-One%2012-2016_final.pdf.

precedent, and with the Congressional findings and declarations of purpose underlying innumerable statutes.

Overwhelming evidence indicates that regulatory benefits far exceed costs. The Office of Management and Budget (OMB) reports each year on the costs and benefits of federal regulation and regularly finds the benefits to be many times bigger than the costs. OMB's 2015 report, for example, determined that, for the previous decade, the total benefits of federal regulation were $216 billion to $812 billion, while total costs were only $57 billion to $85 billion.[7] The EPA has estimated that the regulatory benefits of the Clean Air Act exceed the costs by a 25-to-1 ratio.[8] The Congressional Research Service is in accord with this assessment.[9]

On the flip side, the argument for regulatory budgeting is often accompanied by estimates of regulatory costs that are wildly overstated. For example, one oft-repeated statistic claims that regulation costs the U.S. economy $1.75 trillion per year. That figure, however, is based upon a study prepared for the National Association of Manufacturers[10] that has been widely discredited.[11]

---

[7] Office of Mgmt. & Budget, Office of Info. & Reg. Aff., *2015 Report To Congress On The Benefits And Costs Of Federal Regulations And Unfunded Mandates On State, Local, And Tribal Entities* 1-2,
https://obamawhitehouse.archives.gov/sites/default/files/omb/inforeg/2015_cb/2015-cost-benefit-report.pdf.

[8] Envtl. Prot. Agency, *The Benefits and Costs of the Clean Air Act from 1990 to 2020* 7-9 (Mar. 2011), https://www.epa.gov/sites/production/files/2015-07/documents/fullreport_rev_a.pdf.

[9] Congressional Research Service, *EPA Regulations: Too Much, Too Little, or On Track?* (Dec. 30, 2016), https://fas.org/sgp/crs/misc/R41561.pdf.

[10] W. Mark Crain & Nicole V. Crain, *The Impact of Regulatory Costs on Small Firms*, 6 (Sept. 1 2010),
https://www.sba.gov/sites/default/files/advocacy/The%20Impact%20of%20Regulatory%20Costs%20on%20Small%20Firms%20(Full)_0.pdf

[11] *See* Lisa Heinzerling & Frank Ackerman, *The $1.75 Trillion Lie*, 1 MICH. J. ENVTL. & ADMIN. LAW 127 (2012). Congressional Research Service, *Analysis of an Estimate of the Total Costs of Federal Regulation* Summary (April 6, 2011); U.S. Government Accountability Office, *Small Business Administration: Office of Advocacy Needs to Improve Controls Over Research,*

A small, nascent body of literature has made a few tentative efforts to defend the idea of "regulatory budgeting" on the basis of a purported analogy between regulatory costs and taxes. *See, e.g.,* Jeffrey A. Rosen & Brian Callanan, *The Regulatory Budget Revisited* 66 ADMIN. L. REV. 835 (2014). The idea is that regulatory costs are akin to a tax because, like taxes, they impose costs on the private sector. Because agencies each receive a budget capping the amount of tax revenues they can spend each year, so the argument goes, agencies should similarly have a "regulatory budget" capping the amount of regulatory cost they can impose on society each year.

Right away, the first flaw in the analogy becomes apparent. Standard government budgets, like all budgets, have two columns. One column lists tax revenues coming in; the other column lists government expenditures going out. And the government expenditures detailed in the second column are limited by the tax revenues tallied in the first. But the regulatory budget contains only one column—regulatory costs. This one-column, cost-only regulatory budget provides no logical or principled way to determine what the limit or cap on regulatory cost "expenditures" should be. This puts proponents in the awkward position of having to come up with an admittedly arbitrary number to serve as the cap on "expenditures" of regulatory costs. *See* Sam Batkins, *A Reply: The Regulatory Budget Takes Form*, 67 ADMIN. L. REV. 115, 128-30 (2016).

The second flaw in the argument becomes apparent upon closer examination of the purported analogy between regulatory costs and taxes. Taxes are aimed primarily at raising revenue while regulations, in addition to generating benefits, often aim to hold private actors accountable for harms they inflict on others. A regulation that imposes costs on a business, by, for example, forcing a power plant to install scrubbers on its smokestacks, is not so much

---

*Regulatory, and Workforce Planning Activities*, GAO-14-525 (July 2014).

imposing a tax as it is forcing the business simply to take responsibility for actions that impose harms on other people without their consent—harms like suffering from asthma, bronchitis, or heart disease just from trying to breathe the air. Internalizing externalities in this way is not government overreach; it is simply a matter of basic fairness and personal responsibility.

In sum, the Executive Order, and the idea of "regulatory budgeting" on which it is based, represents a radical departure from decades of previous thinking about regulatory reform with no coherent theoretical or empirical foundation.

## IV.  Conclusion

For more than two centuries, Congress has delegated power to agencies to issue regulations aimed at achieving public benefits.  These benefits—as defined and chosen by Congress—are of "paramount importance" and cannot be cast aside by the executive branch without running roughshod over our constitutional scheme of divided powers.  While some regulations that have become outmoded or non-beneficial should be eliminated, the effectiveness or value of a regulation cannot possibly be discerned by looking only at its costs, any more than the success of a business enterprise can be judged by looking only at the expense side of the ledger and ignoring revenues.

The Executive Order is fraught with difficulties that are fatal. Most glaringly, by failing to account for the benefits of regulation and focusing solely on the costs, it distorts the purposes of the laws underlying the regulations at issue. In short, the Executive Order ignores constitutional and statutory requirements and is contrary to centuries of good government practices and policies. Accordingly, it should be struck down.

Respectfully submitted,

\_\_\_/s/_____

Katherine A. Meyer
D.C. Bar No. 244301
Meyer Glitzenstein & Eubanks, LLP
4115 Wisconsin Ave., N.W.
Suite 210
Washington, D.C. 20016
(202) 588-5206 (phone)
(202) 588-5049 (fax)
kmeyer@meyerglitz.com
Counsel for *Amici Curiae*
Law Professors

On behalf of:

Victor B. Flatt
Tom & Elizabeth Taft Distinguished Professor of Environmental Law
University of North Carolina School of Law; and
Distinguished Scholar of Carbon Trading and Carbon Markets
Global Energy Management Institute
University of Houston Bauer College of Business

Alyson Flournoy
Professor and Alumni Research Scholar
University of Florida Levin College of Law

Robert L. Glicksman
J. B. and Maurice C. Shapiro Professor of Environmental Law
The George Washington University Law School

Thomas O. McGarity
Joe R. and Teresa Lozano Long Endowed Chair in Administrative Law
University of Texas at Austin School of Law

Sidney Shapiro
Fletcher Chair in Administrative Law
Wake Forest University School of Law

Amy Sinden
James E. Beasley Professor of Law
Temple University Beasley School of Law

Karen Sokol
Associate Professor of Law
Loyola University, New Orleans
College of Law

Rena Steinzor
Edward M. Robertson Professor of Law
University of Maryland Francis King Carey School of Law

Joseph P. Tomain
Dean Emeritus and the Wilbert and Helen Ziegler Professor of Law
The University of Cincinnati College of Law

Robert R.M. Verchick
Gauthier-St. Martin Eminent Scholar Chair in Environmental Law
Loyola University, New Orleans College of Law