# EXHIBIT A

**BRIEF OF *AMICUS CURIAE* THE UNION OF CONCERNED SCIENTISTS
IN SUPPORT OF PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT**

## IN THE UNITED STATES DISTRICT COURT FOR
## THE DISTRICT OF COLUMBIA

|  |  |  |
|---|---|---|
| PUBLIC CITIZEN, INC., et al., | ) | |
| | ) | |
| *Plaintiffs*, | ) | |
| | ) | |
| v. | ) | Civil Action No. 17-253 (RDM) |
| | ) | |
| DONALD TRUMP, et al., | ) | |
| | ) | |
| *Defendants*. | ) | |
| | ) | |

## BRIEF OF *AMICUS CURIAE* THE UNION OF CONCERNED SCIENTISTS
## IN SUPPORT OF PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT

Respectfully submitted,

/s/ *Clara Brillembourg*
Clara Brillembourg (D.C. Bar No. 974377)
FOLEY HOAG LLP
1717 K Street, N.W.
Washington, D.C. 20006
Tel: 202-261-7334
Fax: 202-467-9634
cbrillembourg@foleyhoag.com

Seth D. Jaffe (MA Bar. No. 548217)
Cicely O. Parseghian (MA Bar. No. 673847)
*pro hac vice admissions pending*
FOLEY HOAG LLP
155 Seaport Boulevard
Boston, MA 02210
Tel: 617-832-1203
Fax: 617-832-7000
sjaffe@foleyhoag.com
cparseghian@foleyhoag.com

Counsel for the Union of Concerned Scientists

DATED: June 5, 2017

# Table of Contents

Corporate and Financial Disclosure Statement ............................................................... iii

Statement of Counsel ...................................................................................................... iii

Table of Authorities ....................................................................................................... iv

Statement of Identity and Interest of *Amicus Curiae* ...................................................... 1

Summary of the Argument ................................................................................................ 3

Argument ......................................................................................................................... 5

I.      Executive Order 13,771 is invalid on its face. .................................................... 5

        A.      The Executive Order requires federal agencies to ignore the fundamental
                beneficial purposes of the substantive statutes from which they derive their
                rulemaking authority. .................................................................................. 5

        B.      The Executive Order mandates unreasoned decisionmaking in violation of the
                fundamental principles of administrative law established in the
                Administrative Procedure Act. ..................................................................... 7

        C.      The Executive Order prohibits federal agencies from undertaking the
                systematic, evidence-based balancing analysis that is required under the
                National Environmental Policy Act. ........................................................... 11

II.     Executive Order 13,771 and its implementation are contrary to the public interest ......... 15

        A.      Implementation of the Executive Order will result in an unjustified reduction
                of net social benefits. ................................................................................. 15

        B.      The Executive Order imposes an unnecessary burden on federal agencies, to
                the detriment of the public they serve. ....................................................... 19

III.    The Executive Order is unprecedented. .............................................................. 21

Conclusion ...................................................................................................................... 24

## **Corporate and Financial Disclosure Statement**

The Union of Concerned Scientists is a 501c3 nonprofit organization. It has no parent corporation and is not publicly traded.

## **Statement of Counsel**

None of the parties to the above-captioned dispute, and none of their counsel, authored this brief in whole or in part or contributed money that was intended to fund preparing or submitting this brief. No person—other than the Union of Concerned Scientists, its members, and its counsel—contributed money that was intended to fund preparing or submitting this brief.

## **Table of Authorities**

**Cases**

*Advanced Micro Devices v. Civil Aeronautics Bd.*, 742 F.2d 1520 (D.C. Cir. 1984) .................. 17

*Allentown Mack Sales & Service v. NLRB*, 522 U.S. 359 (1998)................................... 7

*Anglers Conservation Network v. Pritzker*, 139 F. Supp. 3d 102 (D.D.C. 2015).......................... 9

*Calvert Cliffs' Coordinating Comm., Inc. v. United States Atomic Energy Comm'n*,
    449 F.2d 1109 (D.C. Cir. 1971) ...................................................................... *passim*

*Ctr. for Biological Diversity v. Nat'l Highway Traffic Safety Admin.*,
    538 F.3d 1172 (9th Cir. 2008) .................................................................. 6

*Envtl. Def. Fund v. Hardin*, 325 F. Supp. 1401 (D.D.C. 1971) ................................... 12

*Envtl. Integrity Project v. McCarthy*, 139 F. Supp. 3d 25 (D.D.C. 2015) ...................................... 8

*Michigan v. EPA*, 135 S. Ct. 2699 (2015) ................................................. 8, 9

*Mingo Logan Coal Co. v. EPA*, 829 F.3d 710 (D.C. Cir. 2016)..................................... 10

*Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29 (1983) ............. 7, 9, 11

*Muwekma Ohlone Tribe v. Salazar*, 708 F.3d 209 (D.C. Cir. 2013) ........................................... 17

*NRDC v. SEC*, 606 F.2d 1031 (D.C. Cir. 1979) ................................................. 13

*NRDC, Inc. v. Rauch*, No. 15-198 (RDM), 2017 U.S. Dist. LEXIS 43730
    (D.D.C. Mar. 25, 2017)................................................................... 9

*Pharm. Research & Mfrs. of Am. v. FTC*, 790 F.3d 198 (D.C. Cir. 2015) .................................... 8

*Pub. Citizen, Inc. v. Mineta*, 340 F.3d 39 (2d Cir. 2003)............................................ 11

*Scientists' Inst. for Public Info., Inc. v. Atomic Energy Comm'n*,
    481 F.2d 1079 (D.C. Cir. 1973) ........................................................... 12

*Shays v. FEC*, 528 F.3d 914 (D.C. Cir. 2008) ............................................. 17

*Sullivan v. Everhart*, 494 U.S. 83 (1990)................................................... 17

*Tenn. Valley Auth. v. Hill*, 437 U.S. 153 (1978) ........................................................... 6

*Venetian Casino Resort, L.L.C. v. EEOC*, 530 F.3d 925 (D.C. Cir. 2008) .................................. 17

**Statutory Authorities**

5 U.S.C. § 706(2)(D) ................................................................................................. 15

16 U.S.C. § 1531-1544 ................................................................................................. 6

33 U.S.C. § 1251(a) ..................................................................................................... 6

42 U.S.C. § 4332(2)(A)–(B) ........................................................................................ 12

42 U.S.C. § 7401(b)(1) ................................................................................................ 5

49 U.S.C. § 32901-32919 ............................................................................................. 6

**Rules and Regulations**

40 C.F.R. § 1508.18(a) ............................................................................................... 12

**Legislative Materials**

S. Rep. No. 91-296, 91st Cong., 1st Sess., 20 (1969) ................................................... 13

S. Rep. No. 94-516 (1975) ............................................................................................ 6

**Additional Authorities**

Andrew Rosenberg et al., *Congress's Attacks on Science-Based Rules: Proposed Laws Based on False Premises Could Undermine Science for the Public Interest*, 348 Science 964 (2015) ................................................................................................................. 1, 18

Andrew Rafferty, *Trump Signs Executive Order to Curtail Regulations*, NBC News (Jan. 30, 2017) ......................................................................................................... 15, 22

Cheryl Bolen, *Under Trump, Agency Rulemaking Grinds to a Halt*, Bloomberg BNA: Daily Environmental Report (May 22, 2017) (attached hereto as Appendix C) .............................. 21

Center for Science and Democracy, *UCS Report: Preserving Scientific Integrity in Federal Policymaking: Lessons from the Past Two Administrations and What's at Stake under the Trump Administration* (Jan. 2017) ........................................................................... 2

Center for Science and Democracy, *UCS Report: Strengthening Federal Science for the Public Good: A Blueprint for the Next Administration* (Oct. 2016) ...................................................... 2

Executive Order 12,866 (1993)....................................................................... 15, 16, 23

Executive Order 13,563 (2011)..................................................................................... 16

Frederick R. Anderson, N*EPA and Federal Decision Making*, 3 E.L.R. 50099 (Aug. 1973) ............................................................................................................. 12, 15

Gretchen T. Goldman et al., *Ensuring Scientific Integrity in the Age of Trump: Policies to Protect Government Scientists Must Be Defended*, 355 Science 696 (2017) ...................... 1, 12

Interview of Mike Pence by Emily Schilling, editor of Electric Consumer, and Scott Bowers, Vice President of Government Relations at Indiana Statewide Association of Rural Electric Cooperatives, Inc. (May 2012) ............................................................................... 10

James E. McCarthy & Claudia Copeland, Cong. Research Serv., R41561, *EPA Regulations: Too Much, Too Little, or On Track?* (Dec. 30, 2016).................................................... 17

Jamison E. Colburn, *Administering the National Environmental Policy Act*, 45 E.L.R. 10287 (Apr. 2015)....................................................................................................................... 12

Letter to OMB Director Mulvaney et al., Economists and Legal Scholars address Executive Order 13771" (May 22, 2017) (attached hereto as Appendix B)................ 16, 22, 24

OMB, "2016 Draft Report to Congress on the Benefits and Costs of Federal Regulations and Agency Compliance with the Unfunded Mandates Reform Act" (2016)................................ 17

Office of Management Budget, *February Interim Guidance* (Feb. 2, 2017) ........................ 18, 20

Office of Management Budget, *April Guidance* (Apr. 5, 2017)........................................... *passim*

UCS Comment to OIRA and OMB, "Interim Guidance Implementing Section 2 of the Executive Order of January 30, 2017, Titled 'Reducing Regulation and Controlling Regulatory Costs,'" (Feb. 10, 2017) (attached hereto as Appendix A) ........................................................ 2, 19, 20

Written Testimony of Andrew A. Rosenberg, U.S. Senate Subcommittee on Regulatory Affairs and Federal Management, "Agency Use of Science in the Rulemaking Process: Proposals for Improving Transparency and Accountability" (Mar. 9, 2017) ........................................... 1, 11

## Statement of Identity and Interest of *Amicus Curiae*

The Union of Concerned Scientists ("UCS"), an organization of more than a half-million citizens and scientists, is the leading non-profit group in the United States dedicated to putting rigorous, independent science into action for a healthier planet and a safer world. For its nearly 50-year history, UCS has worked to promote and uphold scientific integrity in public policymaking, and it engages in all aspects of the regulatory process to further this goal.

UCS promotes the essential role of science in government decisionmaking by submitting comments on proposed agency rulemaking,[1] testifying before Congress on issues relating to science and good governance,[2] publishing articles on the need for science-based evidence in rulemaking,[3] and participating in litigation in cases implicating the impact of science on lawmaking.[4]

---

[1] *E.g.*, Comment to EPA and NHTSA, "Comments Concerning the Draft Technical Assessment Report for the Mid-term Evaluation of Model Year 2022-2025 Light-Duty Vehicle Greenhouse Gas Emissions and Fuel Economy Standards," Prepared on Behalf of UCS by David W. Cooke; Comment to FDA, "Use of the Term 'Healthy' in the Labeling of Human Food Products; Request for Information and Comments" (Apr. 26, 2017).

[2] *E.g.*, Written Testimony of Andrew A. Rosenberg, U.S. Senate Subcommittee on Regulatory Affairs and Federal Management, "Agency Use of Science in the Rulemaking Process: Proposals for Improving Transparency and Accountability" (Mar. 9, 2017); Testimony of Dr. Edwin Lyman of UCS on "HR ___, The Nuclear Waste Policy Amendments Act of 2017" Before U.S. House Comm. on Energy and Commerce, Subcommittee on Environment (Apr. 26, 2017).

[3] *E.g.*, Gretchen T. Goldman et al., *Ensuring Scientific Integrity in the Age of Trump: Policies to Protect Government Scientists Must Be Defended*, 355 Science 696 (2017); Andrew Rosenberg et al., *Congress's Attacks on Science-Based Rules: Proposed Laws Based on False Premises Could Undermine Science for the Public Interest*, 348 Science 964 (2015).

[4] *E.g.*, Brief of *Amicus Curiae* Union of Concerned Scientists, *Michigan v. EPA*, 135 S. Ct. 2699 (2015); Brief of *Amici Curiae* Union of Concerned Scientists et al., *Monsanto v. Geertson Seed*

In 2012, UCS established the Center for Science and Democracy to strengthen and advance the role of science in public policy and to combat the increased politicization of science in government decisionmaking. The Center is dedicated to restoring public confidence in, and support for, the use of independent science in developing public policy. It has published reports warning that the expanding authority of the Office of Management and Budget ("OMB") to review and alter science-based rules has resulted in inappropriate interference in the scientific work of agencies, and recommending the reorientation of the Office of Information and Regulatory Affairs ("OIRA") regulatory review process so that "agencies' statutory standards, and not an OIRA-defined economic test, are the criteria for review."[5]

UCS has a particular interest in this case, and submitted comments on OMB's February Interim Guidance,[6] because Executive Order 13,771 directly conflicts with UCS's fundamental positions and undermines its efforts to carry out its mission. UCS believes that using the best scientific information available allows agencies to develop rational regulations that generate the greatest societal benefits while minimizing costs, consistent with statutory mandates. By

---

*Farms,* 561 U.S. 139 (2010); Brief of *Amicus Curiae* Union of Concerned Scientists, *West Virginia v. EPA*, No. 15-1363 (D.C. Cir. filed Oct. 23, 2015).

[5] Center for Science and Democracy, *UCS Report: Strengthening Federal Science for the Public Good: A Blueprint for the Next Administration*, at 5 (Oct. 2016); *see also* Center for Science and Democracy, *UCS Report: Preserving Scientific Integrity in Federal Policymaking: Lessons from the Past Two Administrations and What's at Stake under the Trump Administration* (Jan. 2017).

[6] UCS Comment to OIRA and OMB, "Interim Guidance Implementing Section 2 of the Executive Order of January 30, 2017, Titled 'Reducing Regulation and Controlling Regulatory Costs'" (Feb. 10, 2017) (hereinafter "UCS Comments"), attached hereto as Appendix A. These comments discussed, among other things, the conflict between the Executive Order and agencies' statutory directives, and the Order's impact on scientific integrity.

precluding meaningful consideration of anything besides costs and the raw number of regulations on the books, the Executive Order undercuts the role of science in shaping public policy and impairs UCS's ability to utilize scientific research and related advocacy to work for the safeguarding of public health, safety, and the environment.

## **Summary of the Argument**

Executive Order 13,771 is invalid on its face. It requires federal agencies to repeal two existing rules in order to promulgate a new rule, even if the benefits to society of the two existing rules, or the new rule, or all three, outweigh their respective costs. Agencies cannot comply with such a directive without acting in derogation of the statutes that delegate rulemaking authority to them. By mandating that agencies make regulatory decisions without regard to the beneficial purposes of their authorizing statutes, the Executive Order also requires them to violate the fundamental principle of administrative law, embodied in the Administrative Procedure Act, that agencies must engage in "reasoned decisionmaking," including consideration of all relevant factors. It further requires a violation of the procedural requirements established in the National Environmental Policy Act, which obligates agencies to systematically consider and balance benefits alongside costs, based on diligent and good-faith research reflecting current, objective science and an integrated approach. In short, it is not possible for agencies to comply with the Executive Order without violating congressional mandates regarding intended benefits and the need for the reasoned, evidence-based consideration and balancing of those benefits with costs.

Implementation of this unlawful Executive Order is contrary to the public interest. By forcing agencies to choose between cost-justified new regulations and cost-justified existing regulations without regard to the benefits of either, it will result in an unjustifiable reduction in

3

net social benefits. Moreover, it imposes an unnecessary and onerous burden on federal agencies, to the detriment of the public they serve.

It is important to note, as Executive Order 13,771 acknowledges, that agencies are already required, where not prohibited by law, to ensure that the benefits of regulations exceed their costs. Thus, ***the only impact of the Executive Order is to prohibit agencies from promulgating regulations whose benefits exceed their costs, unless they eliminate two other regulations whose benefits also exceed their costs.*** This is the definition of unreasoned decisionmaking. It is also a thumb in the eye of Congress, which enacted public health and environmental statutes in order to benefit the public.

When President Trump signed Executive Order 13,771 on January 30, 2017, he voiced his belief that he was doing something unprecedented. He was correct. This Executive Order is a fundamental departure, not only from the long list of prior executive orders that required agencies to consider costs alongside benefits when Congress had not disallowed such an analysis, but also from the basic foundations of federal administrative law in the United States.

4

## Argument

**I.**    **Executive Order 13,771 is invalid on its face.**

Executive Order 13,771 ***requires*** arbitrary and capricious decisionmaking by regulatory agencies. It violates multiple manifestations of Congressional intent, contained in the substantive authorizing statutes from which federal agencies derive their rulemaking authority, the Administrative Procedure Act, and the National Environmental Policy Act, discussed in turn below. As a result, there is no way for agencies to implement the Executive Order without violating the law, and its so-called "savings clause" is meaningless.[7]

> **A.**    **The Executive Order requires federal agencies to ignore the fundamental beneficial purposes of the substantive statutes from which they derive their rulemaking authority.**

The substantive statutes authorizing rulemaking by federal agencies exist for a reason. Congress's goal in enacting those environmental, public health, consumer protection, and safety statutes was to achieve benefits for society, not to save costs. If saving costs was the only relevant factor, Congress could simply have chosen not to legislate.

Plaintiffs' Amended Complaint highlights the beneficial purposes of various statutes, including the Motor Vehicle Safety Act and the Occupational Health and Safety Act. Other examples include: the Clean Air Act, which Congress enacted "to protect and enhance the quality of the Nation's air resources so as to promote the public health and welfare and the productive capacity of its population," 42 U.S.C. § 7401(b)(1); the Energy Policy and

---

[7] The same is true for OMB's Guidance that "Agencies should continue to comply with all applicable laws and requirements." OMB's April 5, 2017 Guidance (hereinafter "April Guidance"), at 1.

Conservation Act, 49 U.S.C. §§ 32901-32919, which is aimed at energy conservation in order to "decrease dependence on foreign imports, enhance national security, achieve the efficient utilization of scarce resources, and guarantee the availability of domestic energy supplies at prices consumers can afford," *Ctr. for Biological Diversity v. Nat'l Highway Traffic Safety Admin.*, 538 F.3d 1172, 1182 (9th Cir. 2008) (quoting S. Rep. No. 94-516 (1975)); the Clean Water Act, which Congress enacted to "restore and maintain the chemical, physical, and biological integrity of the Nation's waters," 33 U.S.C. § 1251(a); and the Endangered Species Act, 16 U.S.C. §§ 1531–1544, which Congress enacted with "[t]he plain intent … to halt and reverse the trend toward species extinction, whatever the cost," *Tenn. Valley Auth. v. Hill*, 437 U.S. 153, 184 (1978). But, as Plaintiffs say, "[t]hese examples are representative of regulatory statutes as a whole," all of which evince Congress's determination that at least some costs need to be imposed through regulations in order to achieve certain important social benefits. Agencies cannot attain those intended benefits if they are precluded from considering those benefits and what will be required to attain them. And that is what the Executive Order requires, by prohibiting agencies from issuing rules—no matter how beneficial—if they cannot zero out costs and find other rules to eliminate.

OMB's April Guidance specifically states that benefits from consumer, environmental, or safety protections—in other words, protections of the public interest—are ***not*** to be counted for calculating offsets:

> For example, if medical cost savings due to safety regulations have historically been categorized as benefits rather than reduced costs, they should continue to be categorized as benefits for EO 13771 regulatory actions. Identifying cost savings, such as fuel savings associated with energy efficiency investments, as benefits is a common accounting convention followed in OIRA's reports to Congress on the benefits and costs of Federal regulations. Cost savings estimates for EO 13771

> deregulatory actions should follow the same conventions, but in reverse. Only those impacts that have been traditionally estimated as costs when taking a regulatory action should be counted as cost savings when taking an EO 13771 deregulatory action. For example, the medical cost savings described above as historically being counted as benefits when regulating should not then be counted as "negative cost savings" when deregulating.

April Guidance, at 9, Q21. To simplify, if a company has to spend $100 in manufacturing a washer-dryer in order to add energy-efficient controls, and those controls save the purchaser $1,000 in energy costs over the life of the appliance, the OMB sees that regulation as "costing" $100, and the Department of Energy would have to cut a regulation that costs $100 to offset it, regardless of the $1,000 in energy savings, which are not to be considered.

As the Appeals Court in this Circuit has indicated, federal agencies must "live up to their mandates to consider the public interest" and must not be allowed to "avoid or dilute their statutorily imposed role as protectors of the public interest values beyond the narrow concerns of industries being regulated." *See Calvert Cliffs' Coordinating Comm., Inc. v. United States Atomic Energy Comm'n*, 449 F.2d 1109, 1119 n.21 (D.C. Cir. 1971) and cases cited therein. The President has no authority to require agencies to ignore the benefits of either existing or potential future regulations and instead substitute his own cost-cutting priorities for those established in the congressional design.

**B.      The Executive Order mandates unreasoned decisionmaking in violation of the fundamental principles of administrative law established in the Administrative Procedure Act.**

The very purpose of the Administrative Procedure Act ("APA") is to prevent arbitrary and capricious agency action. It does so by "establish[ing] a scheme of 'reasoned decisionmaking.'" *Allentown Mack Sales & Serv. v. NLRB*, 522 U.S. 359, 374 (1998) (quoting *Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 52 (1983)). Indeed, it

7

is a fundamental principle of administrative law that federal "administrative agencies are *required* to engage in reasoned decisionmaking." *Michigan v. EPA*, 135 S. Ct. 2699, 2706 (2015) (emphasis added).

Decisions that are not the product of such "reasoned decisionmaking" are, by definition, arbitrary and capricious, and must be set aside by reviewing courts. *Pharm. Research & Mfrs. of Am. v. FTC*, 790 F.3d 198, 209 (D.C. Cir. 2015) ("The touchstone of arbitrary and capricious review is reasoned decisionmaking."). The requirement of reasoned decisionmaking applies to the making of new rules and to the repeal of existing ones. *See, e.g.*, *Envtl. Integrity Project v. McCarthy*, 139 F. Supp. 3d 25, 39 (D.D.C. 2015) (even "the decision to withdraw a proposed rule is subject to the same underlying requirement of 'reasoned decisionmaking'").

As the Supreme Court has explained, an agency decision is inadequately reasoned and therefore fails the arbitrary and capricious test "if the agency has [1] relied on factors which Congress has not intended it to consider,[8] [2] entirely failed to consider an important aspect of

---

[8] Certainly, when Congress has stipulated in a particular statute that costs are ***not*** to be considered, the Executive Order cannot properly serve as a basis for an agency to consider costs when engaging in rulemaking pursuant to that statute. OMB recognizes this, agreeing that "if a statute prohibits consideration of cost in taking a particular regulatory action, EO 13771 does not change the agency's obligations under that statute." April Guidance, at 8, Q18. However, even in such an instance, OMB interprets the Executive Order as requiring agencies to "offset the costs of such regulatory actions through other deregulatory actions pursuant to statutes that do not prohibit consideration of costs." *Id.* The April Guidance thus takes away with one hand what it acknowledges with the other. If an agency must still zero out the costs of regulatory action pursuant to a statute that forbids consideration of costs, then the savings language is worse than a fig leaf; it is a subterfuge whose sole purpose is to escape the prohibition on consideration of costs.

the problem, [or] [3] offered an explanation for its decision that runs counter to the evidence before the agency." *State Farm*, 463 U.S. at 43 (numbering added).

The second prong of the *State Farm* test for reasoned decisionmaking is not optional. As this Court has said, "[i]t is black letter law that an agency acts arbitrarily and capriciously when it entirely fails to consider an important aspect of the problem." *Anglers Conservation Network v. Pritzker*, 139 F. Supp. 3d 102, 112 (D.D.C. 2015) (internal citation to *State Farm* omitted); *see also NRDC, Inc. v. Rauch*, No. 15-198 (RDM), 2017 U.S. Dist. LEXIS 43730, at *33 (D.D.C. Mar. 25, 2017) ("where the agency 'entirely fail[s] to consider an important aspect of the problem' at issue, the Court must set the agency's action aside as 'arbitrary and capricious.'" (quoting *State Farm*, 463 U.S. at 43)).

Any agency complying with the Executive Order will necessarily fail this test. This is because, in the context of rulemaking, "consider[ing] an important aspect of the problem" requires an agency to consider not only the costs of a proposed rule, but also the beneficial results that will stem from it, and whether those benefits will help to solve "the problem" the agency is trying to address, pursuant to the Congressional mandate that it do so. That the benefits of proposed regulations are a fundamental part of the equation is so obvious that, until now, the idea was taken for granted. The many prior court cases and executive orders cited by the Defendants in this case all focused on adding a requirement that costs be considered, or analyzing whether and how costs can be considered. None of them addressed whether costs could be considered *in isolation*, with no consideration of benefits, because the relevance of the fundamentally beneficial purposes of the underlying statutes was always assumed. *E.g.*, *Michigan v. EPA*, 135 S. Ct. at 2707 ("Agencies have long treated costs as a centrally relevant

9

factor when deciding whether to regulate," which "reflects the understanding that reasonable regulation ordinarily requires paying attention to the advantages *and* the disadvantages of agency decisions." (emphasis in original)); *see also Mingo Logan Coal Co. v. EPA*, 829 F.3d 710, 723 (D.C. Cir. 2016) ("not quibbl[ing]" with the "general premise … that an agency should generally weigh the costs of its actions against its benefits").

Indeed, arguments in favor of cost-benefit analysis are built on the assumption that "reasoned decisionmaking requires assessing whether a proposed action would do more good than harm." *Mingo Logan Coal*, 829 F.3d at 732 (Kavanaugh, J., dissenting); *see also id.* at 733 ("[C]ommon administrative practice and common sense require an agency to consider the costs and benefits of its proposed actions, and to reasonably decide and explain whether the benefits outweigh the costs.").[9] The "good" to the public that will be done by a proposed regulation—or that is already being done by an existing regulation—is no less "an integral part of that calculus" than the costs imposed on the regulated community. *See id.* at 733. In fact, some statutes require agencies not only to weigh benefits against economic costs, but also to "place a thumb on the

---

[9] Even Vice President Pence has acknowledged the importance of analyzing both costs ***and*** benefits. Interview of Gov. Mike Pence by Emily Schilling, editor of Electric Consumer, and Scott Bowers, Vice President of Government Relations at Indiana Statewide Association of Rural Electric Cooperatives, Inc. (May 2012), *available at* http://jcremc.com/wp-content/themes/jcremc/Grassroots%20Articles/Pence.pdf (emphasizing the need for "a careful cost benefit analysis at the federal level" and that "[c]ommon sense and a cost benefit analysis ought to always inform regulatory policy, be it at the state level or the federal level. We don't operate in a vacuum and understanding that—while we are all committed to clean air, clean water and a clean environment—we always want to weigh the marginal advances of additional regulation against the potential cost to … jobs and economic growth.").

[benefits] side of the scale." *Pub. Citizen, Inc. v. Mineta*, 340 F.3d 39, 58 (2d Cir. 2003) (citing *State Farm*, 463 U.S. 29).

By requiring federal agencies to zero out costs by cutting two existing regulations for every new one—no matter what this means for the benefits that are currently being done by regulations or that would be done by a new regulation—Executive Order 13,771 requires agencies to regulate in a way that fails to consider the most important aspect of the problem: the beneficial purposes for which Congress delegated rulemaking authority to them in the first place. Thus, the Executive Order—on its face and ineluctably—forces agencies to violate the second prong of the *State Farm* test.

Because the Executive Order precludes agencies from meaningfully considering benefits or weighing them against costs in the final determination of whether and how to regulate, it orders agencies to engage in unreasoned decisionmaking—*i.e.*, to act arbitrarily and capriciously—in contravention of the APA.

### C.    The Executive Order prohibits federal agencies from undertaking the systematic, evidence-based balancing analysis that is required under the National Environmental Policy Act.

As discussed above, "[f]or nearly 50 years, UCS has championed and continues to advocate for the need to base our governmental decisions on the best scientific and technical information available."[10] UCS's mission aligns squarely with Sections 102(2)(A)–(B) of

---

[10] Written Testimony of Andrew A. Rosenberg, *supra* note 2. UCS has worked to ensure the robustness of science-based policymaking, including by "develop[ing] detailed policy recommendations to guide and protect the use of science at federal agencies, including increasing transparency, protecting government scientists from political interference in their work, and

National Environmental Policy Act ("NEPA"), in which Congress directed that federal agencies

engaged in decisionmaking with any potential impacts on the human environment must "utilize a

systematic, interdisciplinary approach which will insure the integrated use of the natural and

social sciences,"[11] as well as working to "insure that presently unqualified environmental

amenities and values may be given appropriate consideration in decisionmaking along with

economic and technical considerations." 42 U.S.C. § 4332(2)(A)–(B).

 As Judge Skelly Wright explained in his landmark opinion in *Calvert Cliffs'*

*Coordinating Comm., Inc. v. United States Atomic Energy Comm'n*, 449 F.2d 1109 (D.C. Cir.

1971),[12] these two sections of NEPA—which apply to rulemaking[13] even when no environmental

---

improving scientific advice to governments (such as managing external peer review and conflicts of interest on federal advisory committees)." Goldman et al., *supra* note 3, at 696.

[11] This Court has described Section 102(2)(A) of NEPA as making "the completion of an adequate research program a prerequisite to agency action," going on to state that NEPA "envisions that program formulation will be directed by research results rather than that research programs will be designed to substantiate programs already decided upon." *Envtl. Def. Fund v. Hardin*, 325 F. Supp. 1401, 1403 (D.D.C. 1971). The decision concludes that Section 102(2)(A) "requires a diligent research effort, undertaken in good faith, which utilizes effective methods and reflects the current state of the art of relevant scientific discipline." *Id.*

[12] The *Calvert Cliffs* decision has been called NEPA's "first comprehensive judicial analysis by a circuit court," whose interpretation "has been accepted as the definitive judicial gloss on NEPA." Frederick R. Anderson, *NEPA and Federal Decision Making*, 3 E.L.R. 50099 (Aug. 1973). *See also* Jamison E. Colburn, *Administering the National Environmental Policy Act*, 45 E.L.R. 10287, 10306 (Apr. 2015) ("Judge Skelly Wright's opinion in *Calvert Cliffs* is a landmark—the beginning of the NEPA canon—and is thought by some to have played a pivotal role in creating modern environmental law.").

[13] *See* 40 C.F.R. § 1508.18(a) (relevant actions under NEPA include "new or revised agency rules, regulations, policies, or procedures."); *Scientists' Inst. for Public Info., Inc. v. Atomic Energy Comm'n*, 481 F.2d 1079, 1088 (D.C. Cir. 1973) (NEPA's legislative history reveals that its mandate extends "not only to construction of particular facilities, but includes '… regulations,

impact statement is required[14]—are "very important 'procedural' provisions … designed to see that all federal agencies do in fact exercise the substantive discretion given to them" to weigh "environmental costs and benefits … along with other considerations." *Id*. at 1112. They "establish a strict standard of compliance," and clarify "[t]he sort of consideration of environmental values which NEPA compels." *Id.* at 1112–13.

Sections 102(2)(A)–(B) of NEPA reflect the reality that "'[e]nvironmental amenities' will often be in conflict with 'economic and technical considerations.'" *Id.* at 1113. Congress understood this tension. Far from allowing agencies to make decisions solely on the basis of economic considerations, Congress did the opposite, expressly requiring agencies "to 'consider' [environmental amenities] 'along with' [economic and technical considerations.]" *Id.* As Judge Skelly Wright explained, this "must involve a balancing process. In some instances environmental costs may outweigh economic and technical benefits and in other instances they may not. But ***NEPA mandates a rather finely tuned and 'systematic' balancing analysis in***

---

policy statements, or expansion or revision of ongoing programs'" (quoting S. Rep. No. 91-296, 91st Cong., 1st Sess., at 20 (1969)).

[14] *NRDC v. SEC*, 606 F.2d 1031, 1048 (D.C. Cir. 1979) (unlike the "often-litigated environmental impact statement provision [of section 102(2)(C), these] other relatively uncharted provisions of NEPA section 102 … are not limited to 'major' federal actions that 'significantly affect the quality of the human environment,' [and therefore] are of far broader applicability than the impact statement requirement."); *see also* F. Anderson, *supra* note 12, at 50104–05 (the "seven other action-forcing provisions [of Section 102] besides § 102(2)(C) … have their own distinct, additional roles to play. This is especially true of §§ 102(2)(A) and (B), which specify that agency planning and decision-making processes, and the methods and procedures used in them, must be systematic and interdisciplinary and must take unquantified amenities into account." These sections "are exempt" from the "'major federal action' requirement in § 102(2)(C) [which] applies only to the preparation of impact statements.").

*each instance*." *Id.* (emphasis added); *see also id.* at 1115 ("[I]f the decision was reached procedurally without the individualized consideration and balancing of environmental factors—conducted fully and in good faith—it is the responsibility of the courts to reverse.").

Executive Order 13,771 is fundamentally inconsistent with these requirements of NEPA. The Executive Order does not allow agencies to systematically consider and balance the need for environmental protections against the economic costs of those benefits, based on diligent and good-faith research reflecting current, objective science and an integrated approach. It orders agencies to focus only on costs to the regulated community, which is a violation of NEPA's fundamental purpose. *See Calvert Cliffs*, 449 F.2d at 1122 (NEPA's "very purpose … was to tell federal agencies that environmental protection is as much a part of their responsibility as is protection and promotion of the industries they regulate.").

*Calvert Cliffs* also clarifies that NEPA's integrated, evidence-based weighing of not only economic factors, but also the need for environmental benefits, is mandatory unless *Congress* has stipulated otherwise. The President lacks the power to eliminate that "fundamental" requirement, including in the name of saving costs. *Id.* at 1115 ("[T]he Section 102 duties are not inherently flexible. They must be complied with to the fullest extent, unless there is a clear conflict of *statutory* authority. Considerations of … economic cost will not suffice to strip the section of its fundamental importance.") (emphasis in original).

14

In order to comply with Executive Order 13,771, agencies will be forced to forego the "finely tuned and 'systematic' balancing analysis" that is a mandatory requirement under Sections 102(2)(A)–(B) of NEPA, in direct violation of the statute.[15]

## II.     Executive Order 13,771 and its implementation are contrary to the public interest.

### A.     Implementation of the Executive Order will result in an unjustified reduction of net social benefits.

Moments before signing Executive Order 13,771, President Trump explained his rationale as follows: "If you have a regulation you want, number one, we're not going to approve it because it's already been approved probably in 17 different forms. But if we do, the only way you have a chance is we have to knock out two regulations for every new regulation. So if there's a new regulation, they have to knock out two."[16] This justification highlights that the Executive Order is built on two flawed assumptions: (a) that any new regulation is likely to be unnecessary and wasteful; and (b) that there is a vast reservoir of unnecessary, costly regulations just waiting to be "knock[ed] out." Both of these assumptions are false.

First, there are already rules in place requiring that new discretionary regulations must be cost-justified on their own terms. In particular, President Clinton's Executive Order 12,866

---

[15] Because these are procedures required by law, compliance with the Executive Order will also constitute a reversible violation of the APA on the separate ground that it is agency action "without observance of procedure required by law." 5 U.S.C. § 706(2)(D).

[16] *See* Andrew Rafferty, "Trump Signs Executive Order to Curtail Regulations," *NBC News* (Jan. 30, 2017), *available at* http://www.nbcnews.com/politics/politics-news/trump-signs-executive-order-reduce-regulations-n714151 and video provided therein. It should go without saying that there is nothing to support this revealing rhetoric. Executive Order 13,771 is an order based on a fictional premise.

15

requires an agency—if it has first determined that "a regulation is the best available method of achieving the regulatory objective"—to "design its regulations in the most cost-effective manner to achieve the regulatory objective" (§ 1(b)(5)), and to "propose or adopt a regulation *only* upon a reasoned determination that the benefits of the intended regulation justify its costs" (§ 1(b)(6), emphasis added). OMB has repeatedly stressed that this is still required. Indeed, as recently noted by ninety-five economists and legal scholars who specialize in regulatory issues, the principles reflected in Executive Order 12,866 "have disciplined federal regulation since the 1980s."[17] Thus, agencies have already determined through notice-and-comment rulemaking that their regulations advance the purposes of their underlying statutes with benefits that sufficiently outweighed and therefore justified their costs.

In addition, federal agencies have long had the authority and been required under prior executive orders to review existing regulations in order to identify for revision or repeal any that are unnecessary, outmoded, ineffective, excessively burdensome, or otherwise unjustified. *See* Executive Order 12,866, § 5 (1993); Executive Order 13,563, § 6 (2011). Indeed, Defendants admit that such rules "have been targeted for repeal or revision by every administration since President Carter." Memorandum of Points and Authorities in Support of Defendants' Motion to Dismiss Amended Complaint, at 10 (May 12, 2017) (hereinafter "Government's Brief"). The Court should presume that agencies have been complying with those existing orders in good

---

[17] Letter to OMB Director Mulvaney et al., "Economists and Legal Scholars address Executive Order 13771," at 1 (May 22, 2017) (hereinafter "Regulatory Experts Letter"), *available at* https://www.eenews.net/assets/2017/05/24/document_gw_07.pdf and attached hereto as Appendix B.

faith. *See, e.g.*, *Muwekma Ohlone Tribe v. Salazar*, 708 F.3d 209, 221 (D.C. Cir. 2013); *Shays v.*

*FEC*, 528 F.3d 914, 930 (D.C. Cir. 2008) (citing *Sullivan v. Everhart*, 494 U.S. 83, 94 (1990));

*Venetian Casino Resort*, *L.L.C. v. EEOC*, 530 F.3d 925, 932 (D.C. Cir. 2008); *Advanced Micro*

*Devices v. Civil Aeronautics Bd.*, 742 F.2d 1520, 1546 (D.C. Cir. 1984). The Court should thus

presume that existing regulations have benefits that exceed their costs.[18]

This presumption is supported by the evidence. A draft OMB report from December 2016

estimated that all major regulations from the past ten years led to annual benefits of \$269–\$872

billion, with costs between \$74–\$110 billion.[19] Thus, the net benefit of all major regulations

issued in the past ten years ranges from \$159 billion to \$798 billion. As UCS explained in 2015:

> [J]ust 10 rules proposed in the last 5 years are estimated to result in saving more
> than 10,000 lives and preventing 300,000 cases of disease, illness, or injury
> annually. Nine of the 10 rules—including actions on protecting workers from
> silica exposure, controlling mercury pollution, and preventing salmonella
> contamination in eggs—are estimated to have monetized social benefits that
> substantially exceeded monetized compliance costs even though many benefits

---

[18] The arguments to the contrary put forward by the fourteen attorneys general who have filed a brief of *amici curiae* in the present case are unpersuasive. *See* Brief of *Amici Curiae* the States of West Virginia, Wisconsin, and 12 Other States, at 1, 11–12 (May 19, 2017) (hereinafter the "Attorneys General *Amici* Brief"). Regulations are not "unnecessary" because they exist and impose costs on the regulated community; the raw number of regulations, and the fact that regulations have costs, does not prove that any existing regulations are "unnecessary." Determining whether a regulation is "unnecessary" requires considering not only its costs, but also its benefits—precisely what is omitted from the Executive Order.

[19] OMB, "2016 Draft Report to Congress on the Benefits and Costs of Federal Regulations and Agency Compliance with the Unfunded Mandates Reform Act," at 2 (2016), *available at* https://obamawhitehouse.archives.gov/sites/default/files/omb/assets/legislative_reports/draft_2016_cost_benefit_report_12_14_2016_2.pdf. *See also* James E. McCarthy & Claudia Copeland, Cong. Research Serv., R41561: "EPA Regulations: Too Much, Too Little, or On Track?" (Dec. 30, 2016), *available at* http://fas.org/sgp/crs/misc/R41561.pdf (summarizing 46 major EPA rulemakings during the Obama administration and finding that, where data is available, benefits of the rules have far exceeded their costs).

cannot be monetized. Further, it is important to recognize that risk-mitigation
costs not borne by industry will not evaporate but will become a public burden.

Andrew Rosenberg et al., *Congress's Attacks on Science-Based Rules: Proposed Laws Based on*

*False Premises Could Undermine Science for the Public Interest*, 348 Science 964, 966 (2015).

Furthermore, many existing regulations required the incurrence of significant costs

promptly following implementation. Such early implementation costs are now "sunk costs"

which need no longer be incurred. For example, compliance with acid rain or toxics regulations

for power plants requires the installation of expensive scrubbers or similar equipment. Once

installed, however, the ongoing costs involve only the operation and maintenance of such

equipment. This means that the benefits of many existing rules currently outweigh their costs

even more than they did previously, at the time initial costs were incurred.

This is another element of the OMB's Guidance that is irrational. It directs agencies not

to consider sunk costs in calculating offsets. *See* April Guidance, at 10, Q21 ("agencies should

not count sunk costs"); February Interim Guidance, at 5 (same). The result is that the cost-

justification of existing rules is not properly accounted for, and each repeal provides a much

smaller offset than the rule's actual total costs over time.

Executive Order 13,771 requires agencies to ignore these realities and to forego and/or

eliminate regulations that would provide or are already providing cost-justified benefits in

furtherance of beneficial statutory purposes, all to comply with the arbitrary $0 cost cap and 2-

for-1 requirements. This will result in the reduction of net benefits, to the detriment of the public.

As UCS noted in its February 2017 comments on OMB's February Interim Guidance:

Regulations are in place because agencies are fulfilling their statutory missions to
best protect the public from the myriad threats to public health, safety, and the
environment. Such threats do not simply disappear over time. If a product was

18

found to be dangerous or a chemical hazardous in the past, that product and that chemical are still public health threats today. Revoking such rules would reintroduce a public health, safety, or environmental threat. Limiting the total number of regulations that agencies may issue will force them to make subjective choices between protecting Americans from one health threat versus another, effectively choosing who will be harmed. Nowhere in any statute does Congress direct agencies to sacrifice some threats while addressing others, nor does it mandate spending caps for regulations. The executive order effectively directs agencies to make these decisions without a legal, moral, or scientific basis.

UCS Comments, at 2 (Appendix A). This is an unacceptable outcome.

**B.    The Executive Order imposes an unnecessary burden on federal agencies, to the detriment of the public they serve.**

The notion that the Executive Order 13,771 embodies an "easy-to-administer principle" that will further "efficiency goals"[20] is absurd. Rulemaking in the United States requires elaborate, expensive, and time-consuming procedures. Under the Executive Order and OMB's related Guidance, federal agencies will be required to undertake that process and incur those costs three times—at least—each time they seek to promulgate a new regulation to benefit the public: once for the new regulation, and once for each of the existing regulations that is to be repealed.[21] In addition, agencies will be required to constantly reevaluate the costs of existing regulations, because they must calculate offsets using "the most current information available"

---

[20] Attorneys General *Amici* Brief, at 1, 13.

[21] *See* Section 2(c) of the Executive Order itself, which establishes: "Any agency eliminating existing costs associated with prior regulations under this subsection shall do so in accordance with the Administrative Procedure Act and other applicable law."

rather than relying on previously estimated costs from original regulatory impact analyses. *See*

OMB's February Interim Guidance, at 4.[22]

This is a major diversion of resources, which will reduce agencies' ability to achieve their

beneficial purposes as required by statute. As UCS noted in its comments to OMB in February

2017:

> [R]equiring the withdrawal of two rules for every one enacted is both illogical and
> so dramatically increases agency workloads that it cannot be sensibly
> implemented. If an agency is obligated to address a newly identified threat to
> public health and safety based on new scientific evidence, then this order requires
> they do new analyses of many other rules to presumably determine if they can be
> withdrawn. Withdrawing a rule must have as strong a scientific basis as
> implementing a new one. So the order creates a workload trap that agencies
> cannot possibly manage. … In most cases the end result is more likely to be the
> halt of all rulemaking regardless of the need because the workload is impossible
> to meet.

UCS Comments, at 3 (Appendix A). An agency's failure to promulgate discretionary

rules as a result of these pressures imposed by the Executive Order will never be

reviewable under the APA.

For these reasons, the Executive Order may very well be quite effective at achieving its

goal: "reducing regulation" as well as the "private expenditures required to comply with Federal

---

[22] OMB's April Guidance reiterates that older regulatory impact analyses "may need revision to
reflect, among other things, the fact that only costs occurring after the effective date of the
regulatory repeal should be the basis for the cost savings estimate"—which, as discussed above,
leads to a lower offsetting value—while simultaneously establishing a presumption against
allowing agencies that are revising or repealing recently issued rules to re-estimate their costs if
doing so would lead to cost savings that are higher than the costs previously projected for those
rules. *See* April Guidance, at 9–10, Q21.

regulations" (*i.e.*, costs to the regulated community).[23] Indeed, according to panelists at a recent American Bar Association conference, "[a]gency rulemaking has essentially ground to a halt" and the Executive Order "could result in near gridlock for the next four years."[24] However, the President has no authority to direct federal agencies to pursue only reduced regulation and reduced costs to regulated industries, particularly when doing so requires agencies to ignore the beneficial purposes of their authorizing statutes and the fundamental procedural requirements of the APA and NEPA.

## III.   The Executive Order is unprecedented.

Defendants argue that "the focus on rules that impose costs that exceed benefits is a familiar concept. And the same could be said for 'outdated, unnecessary, or ineffective rules,' which have been targeted for repeal or revision by every administration since President Carter."[25] Government's Brief, at 10. Defendants are correct. Prior executive orders over many years did focus on the topic of cost-benefit analysis and the need for agencies to eliminate rules that no longer appropriately serve their purpose. However, as discussed above, such executive orders, as well as judicial decisions on cost-benefit analysis, presumed that the benefits of regulations

---

[23] These purposes are reflected in the title of the Executive Order, as well as its statement of purpose (Section 1).

[24] Cheryl Bolen, *Under Trump, Agency Rulemaking Grinds to a Halt*, Bloomberg BNA: Daily Environmental Report (May 22, 2017), attached hereto as Appendix C.

[25] *See also* Attorneys General *Amici* Brief, at 2 (characterizing the historic practice of past presidents "since the dawn of the modern administrative state" as having sought to review executive action "holistically … in order to better achieve the public policy aims imbedded in legislation," including by ordering agencies to "consider a variety of factors in exercising their discretion as to whether and how to regulate—including the cumulative costs of regulations").

(whether existing or proposed) were a necessary element of the conversation. They were built on the fundamental assumption that costs would be *one* of the considerations being weighed, together with the benefits, but not that they would ever be the sole or overriding consideration.[26]

Executive Order 13,771 is fundamentally different. It does not "build" on those prior orders, and it is not "similar" to them, as Defendants claim. Government's Brief, at 4. President Trump knew this when he signed the Executive Order. Moments before doing so, on January 30, 2017, he stated: "This will be the largest ever cut, by far, in terms of regulation" and "the biggest such act that our country has ever seen." He also explained that he intended to create an environment "like we haven't had in many decades. This isn't a knock on President Obama. This is a knock on everybody."[27]

About this, at least, President Trump was right. Executive Order 13,771 is a radical departure, with massive implications for federal agencies and the public they exist to serve. This Executive Order does not order agencies to determine whether proposed or existing rules either would or already "impose costs that exceed benefits." It does not ask agencies to investigate whether existing regulations are "outdated, unnecessary, or ineffective." To the contrary, it makes those determinations—which were already required and continue to be required under

---

[26] *See* Regulatory Experts Letter, at 1 (Appendix B) ("For nearly 40 years, both Democratic and Republican administrations have called upon regulatory agencies to identify improvements to existing regulations, including through the rescission of regulations that are no longer necessary or net-beneficial. In doing so, each administration has emphasized that consideration of both costs and benefits should guide such retrospective reviews of existing regulations.").

[27] *See* Andrew Rafferty, *supra* note 16, and video provided therein.

22

other executive orders—irrelevant in the final decision whether or not to regulate. ___**This Executive Order is, at its core, a rejection of cost-benefit analysis. It is a cost-only analysis**___.

The fundamental purposes of Executive Order 13,771 are different from those of the executive orders that went before it. Yes, the prior orders emphasized the need to consider costs when doing so was not prohibited by statute. Nonetheless, the point of every prior executive order was to ensure that the statutory objectives were attained as cost-effectively as possible. The radical departure of the current Executive Order is simply this: ___**the statutory objectives are now irrelevant**___. The present Executive Order is expressly focused only on managing "the costs associated with the governmental imposition of private expenditures required to comply with Federal regulations" (§ 1). This is a fundamental difference, and one that matters, as it is impermissible for agencies to focus exclusively on costs to the regulated community because they also have "statutorily imposed role as protectors of the public interest values beyond the narrow concerns of industries being regulated." *See Calvert Cliffs*, 449 F.2d at 1119 n.21 and cases cited therein. Not once does Executive Order 13,771 acknowledge those public interest values or the beneficial purposes of the statutes through which Congress delegated rulemaking authority to federal agencies.

The regulation-specific cost-benefit analysis that agencies are separately required to conduct under Executive Order 12,866 does not remedy the fundamental defect of Executive Order 13,771. To the contrary, because agencies are already required to justify regulations

23

through cost-benefit analysis where not precluded by statute,[28] Executive Order 13,771 makes the cost-benefit requirement irrelevant, because, even if the benefits of a regulation would exceed its costs, the agency may not promulgate the regulations unless it eliminates two other regulations—whose benefits also exceed their costs.[29] The new Executive Order thus "retreats from the long-accepted principle of maximizing net benefits" and, "[b]y tying new regulations to the elimination of existing regulations, and by not requiring consideration of the foregone benefits of the eliminated regulations, [it] opens the door to arbitrary and haphazard regulation that could harm the public." Regulatory Experts Letter, at 2 (Appendix B).

## Conclusion

This case presents a simple question: May the President lawfully order agencies engaged in rulemaking to consider costs without reference to benefits? The answer is clearly no. The law requires reasoned decisionmaking, a systematic and evidence-based analysis which must necessarily include consideration and balancing of the beneficial purposes of the authorizing statutes. These are not optional requirements; they are fundamental principles of administrative law in this country.

---

[28] OMB's April Guidance notes this at 2 ("EO 12866 remains the primary governing EO regarding regulatory planning and review" and agencies must "issue regulations only upon a reasoned determination that benefits justify costs.").

[29] The only exception is new regulations that are required by statute or promulgated pursuant to a statute that precludes the consideration of costs. However, as noted above, OMB indicates that the costs of even these new regulations will need to be offset through the repeal or revision of other regulations whose authorizing statutes do not prohibit the consideration of costs. April Guidance, at 8, Q18.

While the President has the authority to guide agencies in implementing the laws in the ways he sees fit, he does not have any authority to order agencies to violate the law, whether the particular substantive statutes authorizing agency rulemaking or, even more fundamentally, the APA and NEPA, which place general procedural constraints on all agency action. That is what Executive Order 13,771 does, unlike all the orders that came before it, and it is impossible for any federal agency to comply with it "to the extent permitted by law." This unprecedented Executive Order, which is contrary to the public interest, should be declared invalid on its face, and agencies should be enjoined from complying with or enforcing it.

Respectfully submitted,

/s/ *Clara Brillembourg*
Clara Brillembourg (D.C. Bar No. 974377)
FOLEY HOAG LLP
1717 K Street, N.W.
Washington, D.C. 20006
Tel: 202-261-7334
Fax: 202-467-9634
cbrillembourg@foleyhoag.com

Seth D. Jaffe (MA Bar. No. 548217)
Cicely O. Parseghian (MA Bar. No. 673847)
*pro hac vice admissions pending*
FOLEY HOAG LLP
155 Seaport Boulevard
Boston, MA 02210
Tel: 617-832-1203
Fax: 617-832-7000
sjaffe@foleyhoag.com
cparseghian@foleyhoag.com

Counsel for the Union of Concerned Scientists

DATED: June 5, 2017

25

**IN THE UNITED STATES DISTRICT COURT FOR
THE DISTRICT OF COLUMBIA**

_____
                                        )
PUBLIC CITIZEN, INC., et al.,           )
                                        )
          *Plaintiffs*,                 )
                                        )
v.                                      )          Civil Action No. 17-253 (RDM)
                                        )
DONALD TRUMP, et al.,                   )
                                        )
          *Defendants*.                 )
_____)

## APPENDIX

A.  Union of Concerned Scientists Comment to OIRA and OMB, "Interim Guidance Implementing Section 2 of the Executive Order of January 30, 2017, Titled 'Reducing Regulation and Controlling Regulatory Costs'" (Feb. 7, 2017).

B.  Letter to OMB Director Mulvaney et al., "Economists and Legal Scholars address Executive Order 13771" (May 22, 2017).

C.  Cheryl Bolen, *Under Trump, Agency Rulemaking Grinds to a Halt*, Bloomberg BNA: Daily Environmental Report (May 22, 2017).

# Appendix A

**Union of Concerned Scientists**

ucsusa.org Two Brattle Square, Cambridge, MA 02138-3780  t 617.547.5552  f 617.864.9405
1825 K Street NW, Suite 800, Washington, DC 20006-1232  t 202.223.6133  f 202.223.6162
500 12th Street, Suite 340, Oakland, CA 94607-4087  t 510.843.1872  f 510.843.3785
One North LaSalle Street, Suite 1904, Chicago, IL 60602-4064  t 312.578.1750  f 312.578.1751

Dominic J. Mancini, Acting Administrator
Office of Information and Regulatory Affairs
Office of Management and Budget
725 17th Street NW
Washington, DC 20503

Sent by email to reducingregulation@omb.eop.gov

February 10, 2017

**Re: Interim Guidance Implementing Section 2 of the Executive Order of January 30, 2017, Titled "Reducing Regulation and Controlling Regulatory Costs"**

Dear Acting Administrator:

On behalf of the Center for Science and Democracy at the Union of Concerned Scientists, I am writing to the Office of Management and Budget's (OMB's) Office of Information and Regulatory Affairs (OIRA) in response to its guidance on President Donald Trump's Executive Order, "Reducing Regulation and Controlling Regulatory Costs." The executive order not only calls on federal agencies to repeal two rules for every one new rule issued, but it creates an unprecedented regulatory budget that would severely limit the federal government's ability to issue science-based safeguards.

First, we must address the fact that the president's executive order and the foundation for this interim guidance is inherently flawed and lacks legal authority. The notion that federal agencies should identify two regulations for every new regulation issued fundamentally misunderstands how science-based public health protections work. The President's executive order directs the OMB to impose a regulatory budget on federal agencies, even though Congress has not passed legislation to require that action. On the contrary, Congress *has* granted agencies statutory authority to promulgate science-based safeguards consistent with their  missions. The OMB's guidance even recognizes the fact that in many cases agencies are legally required to issue regulations to meet public health, safety and other objectives. Those legal obligations will not go away just because of this executive order, and in fact will create an additional legal dilemma for agencies and the OMB as they attempt to

implement this order. In many cases these types of situations will be impossible to resolve in practice, which highlights why this executive order should be revoked.

Regulations are in place because agencies are fulfilling their statutory missions to best protect the public from the myriad threats to public health, safety, and the environment. Such threats do not simply disappear over time. If a product was found to be dangerous or a chemical hazardous in the past, that product and that chemical are still public health threats today. Revoking such rules would reintroduce a public health, safety, or environmental threat. Limiting the total number of regulations that agencies may issue will force them to make subjective choices between protecting Americans from one health threat versus another, effectively choosing who will be harmed. Nowhere in any statute does Congress direct agencies to sacrifice some threats while addressing others, nor does it mandate spending caps for regulations. The executive order effectively directs agencies to make these decisions without a legal, moral, or scientific basis.

Additionally, the executive order may encourage OMB interference in the scientific work of agencies. OMB should respect the technical expertise at regulatory agencies and refrain from influencing what should be purely scientific determinations beyond transparent interagency coordination. The guidance's provision allowing for agencies to ask that savings from a *different agency* be transferred before submitting a regulatory action for review, reveals exactly how arbitrary this deregulatory process would be. It is concerning to think that agencies might be engaged in trading off costs between agencies, especially considering that if a safeguard at the Environmental Protection Agency is sacrificed for one at the Food and Drug Administration, agencies would be making impossible decisions between two equally pressing health threats in two different sectors. Setting aside the impracticality and lack of legal authority of that scenario, and given that agencies should be guided by statute and not on arbitrary regulatory spending caps, the prospect that the OMB director would be responsible for approving certain agencies' rules over others based on costs without appropriate consideration of benefits of such safeguards is alarming. In effect, this scenario would politicize what should be science-based determinations.

Regulations based on the best available science serve to protect the health and safety of Americans and the attendant transparency requirements play a necessary role in ensuring that members of the public can better use and trust in government services and tools. The Administrative Procedure Act requires that transparency and public input are included in rulemaking in order to lead to sensible policymaking. OIRA's interim guidance, however, gives agencies the option to repeal important transparency, monitoring, and reporting requirements to offset the costs of new rules.

The removal of these requirements will erode transparent and democratic decision-making processes, potentially leading to a loss of access to government information that the public relies on. It could also make it far more difficult to hold the private sector accountable for noncompliance, which could rapidly lead to illegal industry activity running rampant at the expense of taxpayers' wallets and health.

Further, requiring the withdrawal of two rules for every one enacted is both illogical and so dramatically increases agency workloads that it cannot be sensibly implemented. If an agency is obligated to address a newly identified threat to public health and safety based on new scientific evidence, then this order requires they do new analyses of many other rules to presumably determine if they can be withdrawn. Withdrawing a rule must have as strong a scientific basis as implementing a new one. So the order creates a workload trap that agencies cannot possibly manage. This also may be interpreted to apply to rule amendments intended to improve regulatory efficiency or even reduce costs. Such new rules must also be offset, according to the order. In most cases the end result is more likely to be the halt of all rulemaking regardless of the need because the workload is impossible to meet.

OIRA's guidance employs a broad definition of "regulatory actions" under the executive order that potentially includes agency guidance or interpretive documents. These policy documents give agencies flexibility to quickly issue science-based opinions and will be even more important as this order limits rulemaking capacity. Guidance documents are especially useful during emergency situations, allowing agencies to quickly tackle complex, emerging problems for the benefit of public health. If guidance is considered a regulatory action by OIRA, how will the Centers for Disease Control quickly inform medical practitioners how best to treat patients who might have contracted a new infectious disease? Or how will the EPA provide tools for agencies and industry to employ new technologies to mitigate the effects of a chemical disaster? OIRA should not interfere with agencies' scientific expertise in developing analyses and risk assessments and should instead focus solely on its authority to deal with matters of economic methodology and interagency regulatory coordination.

The executive order also relies heavily on using cost-benefit analysis that favors the inclusion of costs to the regulated industry without a fair consideration of the social costs of removing a particular regulation. The interim guidance makes it clear that the White House is solely interested in considering the monetized costs to business interests and neglects to consider the enormous public benefits gained as a result of regulations. OIRA fails to consider the uncertainties associated with costs and does not take into account cost savings over time due to economies of scale and

technological learning in the markets. Accounting for figures other than direct and immediate costs to industry would reveal the true value of government safeguards in improving Americans' lives. Truly balanced decisions must not consider the costs to industry at the exclusion of the costs to the public or any social, public health, and economic benefits of particular safeguards.

OIRA's interim guidance attempts to find a way to implement an unlawful order from the Trump administration that will derail much of the important work being done at our federal agencies to protect the air we breathe, water we drink, food we eat, and environment we inhabit. Allowing this order to move forward will effectively freeze the ability for agencies to operate under laws mandated by Congress, and we therefore urge the OMB to withdraw the guidance and not to enforce the executive order.

Sincerely,

Andrew A Rosenberg, Ph.D.
Director, Center for Science and Democracy

# Appendix B

May 22, 2017

**Subject: Economists and Legal Scholars address Executive Order 13771**

Dear Director Mulvaney, Director Cohn, Acting Administrator Mancini, Administrator Pruitt, Secretary Perry, Secretary Perdue, Secretary Acosta, Secretary Ross, and Secretary Chao:

We write as economists and legal scholars who have devoted our careers largely to research and public service on the effects of regulation. We share the goal of improving regulation and believe that the recent guidance from the Office of Management and Budget on implementing Executive Order 13771 substantially improves upon the administration's interim guidance. Nevertheless, we are concerned that because Executive Order 13771 focuses exclusively on the costs of regulation, while ignoring its benefits, the Order is misguided and, if not implemented properly, will likely harm the American public. We offer specific suggestions for improving regulatory review and pursuing regulatory reform.

Executive Order 13771 requires any agency imposing a new regulation to identify two existing rules for repeal for every new rule issued, and to find cost savings from eliminated rules at least equal to the costs imposed by the new regulation.
In addition, each agency will have an annual regulatory cost limit—or "budget."

Since President Reagan issued Executive Order 12291 in 1981, executive branch agencies establishing significant new regulations must show that the benefits of that regulation exceed or justify its costs and, if possible, that such regulations maximize net benefits, which are the total benefits to society minus costs. These principles, currently reflected in Executive Order 12866, have disciplined federal regulation since the 1980s. They mean that government should not regulate too much, but also not too little.

This does not mean that regulations, once issued, should endure forever. Many factors can lead to reasoned calls for change. New information or analysis often emerges that supports changing existing regulations. Over the past decade, for example, the stunning rise of natural gas production from shale formations has contributed to a cleaner electric power sector, reducing the costs of regulations helping to meet air quality goals. There may also arise reasonable disagreements about the measurement of benefits and costs.

For nearly 40 years, both Democratic and Republican administrations have called upon regulatory agencies to identify improvements to existing regulations, including through the rescission of regulations that are no longer necessary or net-beneficial. In doing so, each administration has emphasized that consideration of both costs and benefits should guide such retrospective reviews of existing regulations.

The new Administration has endorsed the requirements of Executive Order 12866 to do cost–benefit analyses on significant rules. However, Executive Order 13771 lays on top of 12866 an approach to eliminating existing regulations that emphasizes costs and retreats from the long-accepted principle of maximizing net benefits. By tying new regulations to the elimination of existing regulations, and by not requiring consideration of the foregone benefits of the eliminated regulations, Executive Order 13771 opens the door to arbitrary and haphazard regulation that could harm the public.

For example, consider the possibility that new science emerges showing that the effects of air pollution on infant health are much greater than was previously believed. The benefits of reducing air pollution would thus be much greater than had been believed. But under the principles in Executive Order 13771, the Environmental Protection Agency could issue a new regulation to reduce air pollution only if it could find offsetting regulations that were sufficiently costly—and only if the new regulation didn't exceed the agency's overall regulatory cost budget. As a second example, consider new vehicle automation technologies that are making cars safer to drive. Executive Order 13771 could be used to prevent the Department of Transportation from issuing a new regulation that reduces traffic accidents and fatalities unless it meets the terms of the order. Thus, Executive Order 13771 could stand in the way of the net public benefits of reducing air pollution or traffic fatalities, departing from the long-standing practice of adopting regulations when benefits justify the costs.

We recognize that the Administration has preserved Executive Order 12866. Further, Executive Order 13777, which focuses on modifying or eliminating existing regulations, includes net benefits as a criterion for such changes. However, without requiring the analysis of the foregone benefits from deregulatory actions called for by both 13771 and 13777, agency actions taken to comply with the order may end up harming the public on balance.

We make three suggestions for improving both new and existing regulations:

First, we urge the Administration to consider further steps that would rescind the cost-only approach contained in Executive Order 13771, such as amending or eliminating the order itself.

Second, even if Executive Order 13771 is not amended or rescinded, we urge that the Administration issue further guidance directing that all deregulatory actions taken under the order be shown to pass a benefit–cost test. This approach should also apply to Executive Order 13777, which appropriately directs agencies to eliminate "unnecessary" and "ineffective" regulations whose "costs … exceed the benefits," but also includes other criteria that could encourage agencies to eliminate net-beneficial regulations. We urge an approach to implementing these executive orders that will ensure that agencies will focus on eliminating regulations for which benefits fall short of costs and that cannot be justified on other reasonable grounds.

Third, when engaging in the retrospective review of their existing regulations, agencies should look for regulations for which costs and benefits differ substantially from what was originally expected—and then change their regulations accordingly. Such an approach will mean that, rather than focusing exclusively on eliminating a regulation or lessening its stringency as directed under Executive Order 13771, sometimes agencies should make their regulations more stringent if supported by new analysis.

Finally, we endorse the overarching objective, advanced by both the Administration and Congress, of making regulations more flexible and efficient—and more market-oriented. Such regulations can often reduce the costs without sacrificing the benefits that they deliver to the public.

Signatories to this letter are listed on the following pages.

Matthew D. Adler
Richard A. Horvitz Professor of Law;
Professor of Economics, Philosophy,
and Public Policy
Duke University

Soren Anderson
Associate Professor of Economics
Michigan State University

Alan Barreca
Associate Professor of Economics
Tulane University

Scott Barrett
Columbia University

Lori S. Bennear
Associate Professor of Environmental
Economics and Policy;
Co-Director, Rethinking Regulation
Duke University

Antonio Bento
University of Southern California;
National Bureau of Economic Research

Severin Borenstein
Professor
University of California, Berkeley

James Boyd
Senior Fellow
Resources for the Future

Daniel Brent
Assistant Professor of Economics
Louisiana State University

Stephen P.A. Brown
Professor of Economics
University of Nevada Las Vegas;
Visiting Fellow
Resources for the Future

Zachary S. Brown
Assistant Professor, Department of
Agricultural and Resource Economics
North Carolina State University

Ryan Bubb
Professor of Law
New York University School of Law

Dallas Burtraw
Darius Gaskins Senior Fellow
Resources for the Future

Meghan Busse
Associate Professor, Kellogg School
of Management
Northwestern University

Cary Coglianese
Edward B. Shils Professor of Law;
Director, Penn Program on Regulation
University of Pennsylvania

E. Mark Curtis
Assistant Professor, Department
of Economics
Wake Forest University

Joel Darmstadter
Senior Fellow (Ret.)
Resources for the Future

Lucas Davis
Associate Professor
University of California, Berkeley

Tatyana Deryugina
Assistant Professor
University of Illinois at Urbana-Champaign

J.R. DeShazo
University of California, Los Angeles

Peter Diamond
Professor Emeritus
Massachusetts Institute of Technology

Katherine L. Dickinson
Research Scientist
University of Colorado Boulder;
National Center for Atmospheric Research

Mary F. Evans
Jerrine and Thomas Mitchell '66 Associate
Professor of Environmental Economics and
George R. Roberts Fellow
Claremont McKenna College

Eli Fenichel
Assistant Professor
Yale School of Forestry and
Environmental Studies

Paul Ferraro
Bloomberg Distinguished Professor
Johns Hopkins University

Nicholas E. Flores
Professor and Chair, Department
of Economics
University of Colorado Boulder

Meredith Fowlie
Associate Professor of Agricultural and
Resource Economics; Class of 1935
Distinguished Chair in Energy
University of California, Berkeley

Matthew Gibson
Assistant Professor of Economics
Williams College

Ben Gilbert
Assistant Professor of Economics
University of Wyoming

Kenneth Gillingham
Assistant Professor
Yale University;
Former Senior Economist,
Council of Economic Advisers

Elisabeth Gilmore
Associate Professor
Clark University

Corbett Grainger
Associate Professor
University of Wisconsin–Madison

Laura Grant
Assistant Professor, Robert Day School
of Economics
Claremont McKenna College

Wayne B. Gray
Professor of Economics
Clark University

Michael Greenstone
University of Chicago;
Former Chief Economist, Council of
Economic Advisers

Therese Grijalva
Weber State University

Timothy L. Hamilton
University of Richmond

James K. Hammit
Harvard University

Merlin M. Hanauer
Associate Professor, Department
of Economics
Sonoma State University

Michael Hanemann
Professor and Julie A. Wrigley Chair in
Sustainability, School of Sustainability;
Director, Center for Environmental
Economics and Sustainability Policy,
W. P. Carey School of Business
Arizona State University

Garth Heutel
Assistant Professor of Economics
Georgia State University

Mun S. Ho
Visiting Fellow
Resources for the Future

Stephen P. Holland
Professor, Department of Economics
University of North Carolina at Greensboro

Richard Horan
Professor, Department of Agricultural,
Food, and Resource Economics
Michigan State University

Paul M. Jakus
Professor, Department of Applied
Economics; Director, Center for Society,
Economy, and the Environment
Utah State University

Sally Katzen
Professor of Practice and Distinguished
Scholar in Residence
New York University School of Law

Matthew Kotchen
Professor and Associate Dean
Yale University;
Former Deputy Assistant Secretary,
US Department of the Treasury

James E. Krier
Earl Warren DeLano Professor of Law
University of Michigan

Alan Krupnick
Senior Fellow
Resources for the Future;
Former Senior Economist, Council of
Economic Advisers

Benjamin Leard
Fellow
Resources for the Future

Derek Lemoine
Assistant Professor of Economics
University of Arizona

Arik Levinson
Professor of Economics
Georgetown University

Shanjun Li
Associate Professor of Applied Economics
Cornell University

Joshua Linn
Senior Fellow
Resources for the Future;
Former Senior Economist, Council of
Economic Advisers

Michael A. Livermore
Associate Professor
University of Virginia School of Law

John Loomis
Professor, Department of Agricultural
and Resource Economics
Colorado State University

Gary Marchant
Regents' Professor of Law
Arizona State University

Mywish Maredia
Professor
Michigan State University

Donald B. Marron
Urban Institute;
Former Member, Council of
Economic Advisers

Nicole M. Mason
Assistant Professor, Department of
Agricultural, Food, and Resource
Economics
Michigan State University

Jonathan Masur
University of Chicago

Gilbert E. Metcalf
Professor of Economics
Tufts University;
Former Deputy Assistant Secretary for
Environment and Energy, US Department
of the Treasury

Erich Muehlegger
Associate Professor
University of California, Davis

Nicholas Z. Muller
Associate Professor of Economics
Middlebury College;
National Bureau of Economic Research

Matthew Neidell
Associate Professor
Columbia University

Richard G. Newell
President
Resources for the Future;
Former Administrator, US Energy
Information Administration

Jennifer Nou
Neubauer Family Assistant Professor
University of Chicago Law School

Paulina Oliva
Associate Professor
University of California, Irvine

Karen Palmer
Research Director and Senior Fellow
Resources for the Future

David Popp
Syracuse University

Maria Porter
Assistant Professor
Michigan State University

Eric Posner
University of Chicago

Richard L. Revesz
Lawrence King Professor of Law and
Dean Emeritus
New York University School of Law

Heather L. Ross
Visiting Fellow
Resources for the Future;
Former Deputy Assistant Secretary, US
Department of the Interior; Former Vice
President, BP America

Arden Rowell
Professor of Law and University Scholar
University of Illinois

Ivan Rudik
Assistant Professor, Department
of Economics
Iowa State University

Richard Schmalensee
Massachusetts Institute of Technology

Howard Shelanski
Georgetown University;
Former Director, Bureau of Economics,
Federal Trade Commission;
Former Senior Economist, Council of
Economic Advisers

Hilary Sigman
Associate Professor
Rutgers University

Michael Springborn
Associate Professor
University of California, Davis

Sarah Stafford
Professor of Economics, Public Policy,
and Law
William & Mary

Robert N. Stavins
Albert Pratt Professor of Business and
Government, John F. Kennedy School
of Government
Harvard University

Betsey Stevenson
Associate Professor of Public Policy and
Economics, Gerald R. Ford School of Public
Policy and Department of Economics
University of Michigan

David Tschirley
Professor, International Development,
Department of Agricultural, Food, and
Resource Economics
Michigan State University

Arthur van Benthem
The Wharton School
University of Pennsylvania

W. Kip Viscusi
University Distinguished Professor
Vanderbilt University

Roger H. von Haefen
Associate Professor
North Carolina State University;
Co-Editor-in-Chief, *Journal of
Environmental Economics and Management*

Christian A. Vossler
Professor
University of Tennessee

Margaret Walls
Interim Vice President for Research and
Senior Fellow
Resources for the Future

Quinn Weninger
John F. Timmons Professor of
Environmental and Resource Economics
Iowa State University

Sarah E. West
Professor of Economics
Macalester College

Jonathan B. Wiener
William R. and Thomas L. Perkins Professor
of Law, Duke Law School; Professor of
Environmental Policy, Nicholas School of
the Environment; Professor of Public Policy,
Sanford School of Public Policy;
Co-Director, Rethinking Regulation
Duke University

Roberton C. Williams III
Professor
University of Maryland;
Senior Fellow and Director of
Academic Programs
Resources for the Future

Yichen Christy Zhou
Clemson University;
Resources for the Future

Joshua Graff Zivin
Associate Dean and Professor, School of
Global Policy and Strategy;
Professor, Department of Economics
University of California, San Diego

# Appendix C

# Bloomberg BNA    Daily Environment Report™

Source: Daily Environment Report: News Archive > 2017 > May > 05/22/2017 > News > Regulatory Policy: Under Trump, Agency Rulemaking Grinds to a Halt

**97 DEN A-7**

## Regulatory Policy
## Under Trump, Agency Rulemaking Grinds to a Halt



*By Cheryl Bolen*

Agency rulemaking has essentially ground to a halt under the Trump administration and the president's executive order on controlling regulatory costs could result in near gridlock for the next four years, panelists at an American Bar Association conference said.

Whether the significant slowing of the administrative state is a feared or a welcome development depends on your point of view, said several speakers at the ABA's 13th annual Administrative Law and Regulatory Practice Institute.

Since President Donald Trump was sworn into office Jan. 20, just 39 rules have been submitted for review to the Office of Information and Regulatory Affairs (OIRA), the agency that reviews all significant federal regulations. There are currently 16 pending agency actions.

By comparison, the administration of former President Barack Obama had submitted 118 rules by the same point in the president's first year, according to the RegInfo.gov database.

### Slow to Thaw

Agencies have been slow to regulate in part because of a regulatory freeze that was put in place on Trump's first day in office. But panelists also pointed to the executive order signed in January that requires agencies to take two deregulatory actions and find offsets for every one rule it wants to promulgate.

> ### Snapshot
>
> • Agencies have issued relatively few rules under President Trump
>
> • Two-for-one executive order seen as obstacle to rulemaking
>
> • Environmental agencies may end up not regulating: law professor

To date, no regulation has been submitted that has required deregulatory actions and offsets. OIRA issued guidance in April that contains exemptions and definitions of what constitutes a regulation that must adhere to the requirements of the executive order.

But Amanda Leiter, professor of law at the American University Washington College of Law, suspected that few agencies—but particularly the Environmental Protection Agency—will be inclined to regulate at all. Leiter previously served at the Department of the Interior as deputy assistant secretary for land and minerals management.

The administration is choosing to deregulate with a particularly blunt-force tool, and it has not thought through how the cost offsetting will work, Leiter said.

### Not a Two-for-One Trade at All

In particular, many environmental rules have high up-front costs, such as an expensive scrubber on a coal-fired power plant to remove air pollution, while their benefits are spread out over decades, Leiter said.

But the OIRA guidance suggests that to offset a new rule, agencies are supposed to look only at the future costs of existing rules, Leiter said. What that does is take a rule at the point where its benefits are highest, but rather than count that, the agency can only look at the costs, which are quite low because the rule has already been implemented, she said.

What this means is that many more than two existing rules will be needed to offset any new rule, which is likely to have a high up-front cost, Leiter said.

"And that's why, in my view, the two-for-one executive order really is not meant as a two-for-one trade at all, but instead just as putting the brakes on new regulations," she said.

It will be so onerous to issue any regulation for any agency that "honestly they're not going to bother," at least among environmental agencies, Leiter said.

### At Least It's Honest

Andrew Grossman, partner at Baker & Hostetler LLP and adjunct scholar at the Cato Institute, agreed that the executive order raises an expressly deregulatory agenda and is a "stunningly blunt" tool.

"But that's the point," Grossman said. "Genteel regulatory review hasn't really gotten us anywhere. So let's just be clear about what it is that we're trying to achieve. Less regulation."

The one-in, two-out policy could be arbitrary and illogical in some respects, depending on how it's implemented, Grossman said. "But it has the virtues of honesty and simplicity," he said.

**Future Predictions**

Moving forward, Grossman predicted more executive orders and OIRA guidance on agency regulation. "We should expect more top-down control," he said.

This is particularly likely to be the case after Neomi Rao is confirmed as OIRA administrator, Grossman said. Based on her research and comments, and what this administration has done so far, there are a few predictions that can be made, he said.

One is a "reality-based" review of rules that is less deferential to agencies than in the past, Grossman said. Another is increased oversight of agencies, more control over independent regulatory agencies, and greater emphasis on the Paperwork Reduction Act, he said.

The Paperwork Reduction Act is one of the few statutory levers that OIRA possesses, and it is a powerful one if the agency chooses to wield it, Grossman said.

"Finally, I think we can certainly expect increased centralization of legal analysis and implementation," he said.

To contact the reporter on this story: Cheryl Bolen in Washington at cbolen@bna.com

To contact the editor responsible for this story: Paul Hendrie at pHendrie@bna.com

Contact us at http://www.bna.com/contact-us or call 1-800-372-1033

ISSN 1521-9402

Copyright © 2017, The Bureau of National Affairs, Inc.. Reproduction or redistribution, in whole or in part, and in any form, without express written permission, is prohibited except as permitted by the BNA Copyright Policy.