# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

|  |  |
|---|---|
| PUBLIC CITIZEN, INC., *et al.*, | ) |
|  | ) |
| Plaintiffs, | ) |
|  | ) |
| v. | )    Civil Action No. 1:17-cv-00253 RDM |
|  | ) |
| DONALD J. TRUMP, in his official capacity | ) |
| as President of the United States, *et al.*, | ) |
|  | ) |
| Defendants. | ) |

**BRIEF OF THE CHAMBER OF COMMERCE OF THE UNITED STATES OF AMERICA, AMERICAN FUEL & PETROCHEMICAL MANUFACTURERS, AMERICAN PETROLEUM INSTITUTE, THE ASSOCIATION OF AMERICAN RAILROADS, THE NATIONAL ASSOCIATION OF MANUFACTURERS, AND NATIONAL FEDERATION OF INDEPENDENT BUSINESS AS AMICI CURIAE IN SUPPORT OF DEFENDANTS' MOTION TO DISMISS AMENDED COMPLAINT**

C. Frederick Beckner III (D.C. Bar No. 451193)
Samuel B. Boxerman (D.C. Bar No. 435903)*
Ryan C. Morris (D.C. Bar No. 980347)
SIDLEY AUSTIN LLP
1501 K Street, NW
Washington, DC  20005
(202) 736-8000

*Counsel for Amici Chamber of Commerce of the United States Of America, American Fuel & Petrochemical Manufacturers, American Petroleum Institute, Association of American Railroads, National Association of Manufacturers, and National Federation of Independent Business*

*\* Application for Pro Hac Vice Admission Pending*

(Additional Counsel listed below)

Dated: July 12, 2017

## CORPORATE AND FINANCIAL DISCLOSURE STATEMENT

Pursuant to D.C. District Court Rule 7(o)(5) and Fed. R. App. P. 26.1, the Chamber of Commerce of the United States of America, American Fuel & Petrochemical Manufacturers, American Petroleum Institute, the Association of American Railroads, the National Association of Manufacturers, and National Federation of Independent Business each respectfully states that none has a parent corporation and no publicly held company has 10% or greater ownership stake.


## STATEMENT OF COUNSEL

None of the parties to the above-captioned dispute, and none of their counsel, authored this brief in whole or in part or contributed money that was intended to fund preparing or submitting this brief. No person—other than the Chamber of Commerce of the United States of America, American Fuel & Petrochemical Manufacturers, American Petroleum Institute, the Association of American Railroads, the National Association of Manufacturers, and National Federation of Independent Business—contributed money that was intended to fund preparing or submitting this brief.

# TABLE OF CONTENTS

CORPORATE AND FINANCIAL DISCLOSURE STATEMENT ................................................ i

STATEMENT OF COUNSEL ............................................................................................. i

Table of Authorities ..................................................................................................... ii

INTERESTS OF AMICI ................................................................................................... 1

INTRODUCTION .......................................................................................................... 3

ARGUMENT ................................................................................................................ 9

I.      Cost-Benefit Analysis And Regulatory Budgeting Are Well-Recognized Methods Of Improving The Efficiency Of Federal Regulations. ........................................... 9

II.     Executive Order 13771 Is An Appropriate Extension Of Previous Executive Orders That Will Provide Necessary Improvements To The Regulatory Process. ................................. 14

III.    International Examples Demonstrate The Regulatory Budgeting In Executive Order 13771 Has A Sound Basis. ..................................................................................... 18

CONCLUSION ............................................................................................................. 20

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Dillmon v. NTSB*,
  588 F.3d 1085 (D.C. Cir. 2009) ............................................................................17

*FCC v. Fox Television Stations, Inc.*,
  556 U.S. 502 (2009) ...............................................................................................17

*Michigan v. EPA*,
  135 S. Ct. 2699 (2015) .............................................................................................9

*Nat'l Cable & Telecomms. Ass'n v. Brand X Internet Servs.*,
  545 U.S. 967 (2005) ...............................................................................................18

**Statutes**

Red Tape Reduction Act,
  S.C. 2015, c 12 (Can.) ...........................................................................................20

**Executive Orders**

Executive Order 12291, Federal Regulation,
  46 Fed. Reg. 13,193 (Feb. 19, 1981) .....................................................................14

Executive Order 12498, Regulatory Planning Process,
  50 Fed. Reg. 1036 (Jan. 8, 1985) ...........................................................................15

Executive Order 12866, Regulatory Planning and Review,
  58 Fed. Reg. 51,735 (Oct. 4, 1993) ........................................................................15

Executive Order 13563, Improving Regulation and Regulatory Review,
  76 Fed. Reg. 3821 (Jan. 21, 2011) .........................................................................15

Executive Order 13579, Regulation and Independent Regulatory Agencies,
  76 Fed. Reg. 41,587 (July 14, 2011) ......................................................................15

Executive Order 13610, Identifying and Reducing Regulatory Burdens,
  77 Fed. Reg. 28,469 (May 14, 2012) ......................................................................15

Executive Order 13771, Reducing Regulation and Controlling Regulatory Costs,
  82 Fed. Reg. 9,339 (Feb. 3, 2017) ....................................................................3, 17

## Other Authorities

Commonwealth of Australia, Department of the Prime Minister and Cabinet,
*Australian Government Guide to Regulation* (2014), *available at* http://
http://cuttingredtape.gov.au/sites/default/files/files/Australian_Government_
Guide_to_Regulation.pdf ...................................................................................20

H. Bader, *Trump's "2-for-1" Executive Order Could Save* Lives (Jan. 30, 2017),
*available at* https://cei.org/blog/trump-2-1-executive-order-could-save-lives .........................8

Sam Batkins, *A Reply: The Regulatory Budget Takes Form*, 67 Administrative
Law Review Accord 115 (2016)..........................................................5, 11, 12, 13, 15, 19, 20

Reeve T. Bull, *Controlling the Cumulative Costs of Regulation:  Exploring
Potential Solutions* (2015), *available at* http://www.thecre.com/forum2/wp-
content/uploads/2015/10/Bull-Article.pdf .................................................................10, 13, 18

W. Mark Crain and Nicole V. Crain, *A Report for the National Association of
Manufacturers: The Cost of Federal Regulation to the U.S. Economy,
Manufacturing, and Small Business* (2014), *available at*
http://www.nam.org/Data-and-Reports/Cost-of-Federal-Regulations/Federal-
Regulation-Full-Study.pdf ...................................................................................................6

Clyde Wayne Crews, Jr., *Tip of the Costberg, On the Invalidity of All Cost of
Regulation Estimates And the Need to Compile Them Anyway* (Competitive
Enterprise Institute Working Paper, 2017) ...............................................................................5

Susan E. Dudley, *Can Fiscal Budget Concepts Improve Regulation?*, 19
Legislation and Public Policy 259 (2016)............................................................3, 5, 10, 12, 20

Dep't for Bus., Innovation & Skills, URN 11/P96A, One-in, One-out: Statement
of New Regulation (2011), *available at*
https://www.gov.uk/government/uploads/system/uploads/attachment_data/file
/31617/11-p96a-one-in-one-out-new-regulation.pdf .................................................................18

Dep't for Bus., Innovation & Skills, The Seventh Statement of New Regulation 7
(2013), *available at*
https://www.gov.uk/government/uploads/system/uploads/attachment_data/file
/271446/bis-13-p96b-seventh-statement-of-new-regulation.pdf ......................................18, 19

Dep't for Bus., Innovation & Skills, The Ninth Statement of New Regulation 13
(2014), *Available at* https://www.gov.uk/government/publications/one-in-two-
out-ninth-statement-of-new-regulations ..................................................................................19

Michael Greenstone, *Improving Regulatory Performance: Lessons from the
United Kingdom: Hearing Before the Task Force on Government
Performance of the S. Budget Comm.*, 112th Cong. (2011) ...................................................10

Michael Greenstone, "Toward a Culture of Persistent Regulatory Experimentation
  and Evaluation," in *New Perspectives on Regulation*, ed. David Moss and
  John Cisternino (Cambridge, MA: Tobin Project, 2009) ......................................11

J.D. Harrison, U.S. Chamber of Commerce, *In Their Own Words: How D.C.'s
  Regulatory Machine Steamrolled 36 Small Businesses* (2017), *available at*
  https://www.uschamber.com/above-the-fold/their-own-words-how-dcs-
  regulatory-machine-steamrolled-36-small-businesses...............................................7

Laura Jones, *Cutting the Red Tape in Canada: A Regulatory Reform Model for
  the United States?*, Mercatus Research, Mercatus Center at George Mason
  University (Nov. 2015) ............................................................................................5

Randall Lutter, *The Role of Retrospective Analysis and Review in Regulatory
  Policy* 5 (Mercatus Center Working Paper No. 12-14, 2012)........................3, 10, 11

Michael Mandel and Diana G. Carew, *Regulatory Improvement Commission: A
  Politically Viable Approach to U.S. Regulatory Reform* (Progressive Policy
  Institute Policy Memo, 2013) ..................................................................................5

Patrick A. McLaughlin and Richard Williams, *The Consequences of Regulatory
  Accumulation and a Proposed Solution* 8 (Mercatus Center Working Paper
  No. 14-03, 2014).................................................................................5, 11, 12, 13, 15

Patrick A. McLaughlin, Jerry Ellig, and Michael Wilt, Comprehensive Regulatory
  Reform (Mercatus Working Paper, 2017) .............................................................19

J. Christopher Mihm, "Prior Reviews of Federal Regulatory Process Initiatives
  Reveal Opportunities for Improvements" (testimony before the Subcommittee
  on Regulatory Affairs, Committee on Government Reform, House of
  Representatives, Washington, DC, July 27, 2005), *available at*
  http://www.gao.gov/new.items/d05939t.pdf..........................................................11

Office for National Statistics, Statistical Bulletin: UK Labour Market (Aug.
  2015), *available at* http://www.ons.gov.uk/ons/dcp171778_412021.pdf.................19

Office of Information and Regulatory Affairs, Office of Management and Budget,
  *Memorandum:  Guidance Implementing Executive Order 13771, Titled
  "Reducing Regulation and Controlling Regulatory Costs"* (Apr. 5, 2017) ...........17

Pareto Policy Solutions, LLC, *Report to the National Association of
  Manufacturers: Holding U.S. Back:  Regulation of the U.S. Manufacturing
  Sector* (2017), *Available at* http://www.nam.org/Data-and-
  Reports/Reports/NAM-Belton-Regulatory-Study/ .................................................6

Jeffrey A. Rosen and Brian Callanan, *The Regulatory Budget Revisited*, 66
  Administrative Law Review 835 (2014)...................................................10, 12, 13

iv

Sean Spear, Regulatory Budgeting Lessons from Canada (R Street Policy Study
    No. 54, 2016) ....................................................................................................20

Cass R. Sunstein, *Cost Benefit Analysis and the Knowledge Problem* (Regulatory
    Policy Program Working Paper RPP-2015-03, 2015) ............................................10

Cass R. Sunstein, *The Cost-Benefit State* (Coase-Sandor Working Paper Series in
    Law and Economics 1996)................................................................................5, 10

Cass R. Sunstein, *Financial Regulation and Cost-Benefit Analysis*, 124 Yale
    L.J.F. 263 (2015)................................................................................................9

Cass R. Sunstein, *Public Choice, Endogenous Preferences*, 12 Int'l Rev. of Law
    and Econ. 289 (1992)........................................................................................12

U.S. Chamber of Commerce, *Taming the Administrative State:  Identifying
    Regulations That Impact Jobs and the Economy* (Mar. 2017), *available at*
    https://www.uschamber.com/report/taming-the-administrative-state-
    identifying-regulations-impact-jobs-and-the-economy .........................................4

U.S. Chamber of Commerce Foundation, *The Regulatory Impact on Small
    Business: Complex. Cumbersome. Costly.* (Mar. 2017), *available at*
    https://www.uschamberfoundation.org/smallbizregs/assets/files/Small
    _Business_Regulation_Study.pdf .......................................................................6

Holly Wade, NFIB Research Foundation, *Small Business Problems and
    Priorities* (2016)................................................................................................7

**INTERESTS OF AMICI**

Amici Curiae represent the nation's leading commercial, energy and manufacturing sectors. Our members are the engine of commerce that drives the U.S. economy and creates jobs for millions of Americans.

The Chamber of Commerce of the United States of America (the "Chamber") is the world's largest business federation. The Chamber represents 300,000 direct members and indirectly represents the interests of more than 3 million companies, state and local chambers, and trade associations of every size, in every industry sector, and from every region of the country.

The American Fuel & Petrochemical Manufacturers ("AFPM") is a national trade association whose members comprise virtually all United States refiners and petrochemical manufacturers. AFPM's members supply consumers with a wide variety of products that are used daily in homes and businesses.

The American Petroleum Institute ("API") represents over 625 oil and natural gas companies, leaders of a technology-driven industry that supplies most of America's energy, supports more than 9.8 million jobs and 8 percent of the U.S. economy, and, since 2000, has invested nearly $2 trillion in U.S. capital projects to advance all forms of energy, including alternatives. API and its members are dedicated to meeting environmental requirements, while economically developing and supplying energy resources to meet consumer needs.

The Association of American Railroads ("AAR") is a national, non-profit trade association that represents the nation's major freight railroads, as well as Amtrak and some commuter railroads. AAR's membership includes freight railroads that operate 83 percent of the line-haul mileage, employ 95 percent of the workers, and account for 97 percent of the freight revenues of all railroads in the United States. AAR is the Nation's leading railroad policy,

research, standard setting, and technology organization. AAR and its members are committed to operating the safest, most efficient, cost-effective, and environmentally sound rail transportation system in the world.

The National Association of Manufacturers ("NAM") is the largest manufacturing association in the United States, representing small and large manufacturers in every industrial sector and in all 50 states. Manufacturing employs more than 12 million men and women, contributes $2.17 trillion to the U.S. economy annually, has the largest economic impact of any major sector, and accounts for more than three-quarters of private-sector research and development in the nation. The NAM is the powerful voice of the manufacturing community and the leading advocate for a policy agenda that helps manufacturers compete in the global economy and create jobs across the United States.

The National Federation of Independent Business Small Business Legal Center ("NFIB Legal Center") is a nonprofit, public interest law firm established to provide legal resources and be the voice for small businesses in the nation's courts through representation on issues of public interest affecting small businesses. The National Federation of Independent Business ("NFIB") is the nation's leading small business association, representing members in Washington, D.C., and all 50 state capitals. Founded in 1943 as a nonprofit, nonpartisan organization, NFIB's mission is to promote and protect the right of its members to own, operate and grow their businesses. NFIB represents small businesses nationwide, and its membership spans the spectrum of business operations, ranging from sole proprietor enterprises to firms with hundreds of employees. While there is no standard definition of a "small business," the typical NFIB member employs 10 people and reports gross sales of about $500,000 a year. The NFIB membership is a reflection of

American small business. To fulfill its role as the voice for small business, the NFIB Legal

Center frequently files amicus briefs in cases that will impact small businesses.

Amici's members are among the nation's most heavily regulated entities, subject to a

wide range of federal regulations that are intended to protect our employees and the public.

However, the rapid and unchecked proliferation of regulations over several decades has also left

regulations that are outdated and ineffective and that cumulatively impose significant costs that

are not commensurate with their benefits. Executive Order 13771, 82 Fed. Reg. 9,339 (Feb. 3,

2017), is a critically important initiative that will improve the efficiency of federal regulatory

programs by ensuring that the cost of any new regulations that affect Amici's members will be

offset by the repeal of existing outdated or ineffective regulations. Amici have a strong interest in

ensuring that Executive Order 13771 is implemented in order to provide regulatory relief to

Amici's members.

Amici agree with the Government that this lawsuit is clearly premature and should be

dismissed, and do not seek to retread those grounds. Amici instead submit this brief to emphasize

the important policies embodied in Executive Order 13771, and to address some of the

speculative concerns raised by amici in support of the Plaintiffs, in the event that the Court

reaches the merits.

## INTRODUCTION

Over the past several decades, the federal government has increasingly relied upon

administrative regulations to advance its agenda. The Code of Federal Regulations is now more

than 175,000 pages long and has grown at a rate of 2.8 percent per year. Susan E. Dudley, *Can

Fiscal Budget Concepts Improve Regulation?*, 19 Legislation and Public Policy 259, 262 (2016)

(size of Code of Federal Regulation); Randall Lutter, *The Role of Retrospective Analysis and

Review in Regulatory Policy* 5 (Mercatus Center Working Paper No. 12-14, 2012) (rate of

growth). Since 1976 alone, federal agencies have issued almost 200,000 new regulations, along with countless related guidance documents, opinion letters, and orders. U.S. Chamber of Commerce, *Taming the Administrative State: Identifying Regulations That Impact Jobs and the Economy* at 1 (Mar. 2017).[1]  As this chart illustrates, across administrations, both Democrat and Republican, the cumulative growth in new federal regulations has been dramatic:



*Id.* at 5.

_____

[1] *Available at*  https://www.uschamber.com/report/taming-the-administrative-state-identifying-regulations-impact-jobs-and-the-economy.

The costs of implementing these regulations are extraordinary. In 1996, Cass Sunstein[2] found that "[a]s much as $500 billion may be spent each year on regulation." Cass R. Sunstein, *The Cost-Benefit State* 9 (Coase-Sandor Working Paper Series in Law and Economics, 1996). Since then, the overall costs of regulations have exploded, reaching $1.75 trillion in 2008 and $1.9 trillion in 2017. *See* Laura Jones, *Cutting the Red Tape in Canada: A Regulatory Reform Model for the United States?* 11, Mercatus Research, Mercatus Center at George Mason University (Nov. 2015) (citing Nicole V. Crain and W. Mark Crain, *The Impact of Regulatory Costs on Small Firms* (Washington US Small Business Administration, Office of Advocacy, September 2010)) (2008 figures); Clyde Wayne Crews, Jr., *Tip of the Costberg, On the Invalidity of All Cost of Regulation Estimates And the Need to Compile Them Anyway* 9–10 (Competitive Enterprise Institute Working Paper, 2017) (2017 figures).

This rapid, cumulative growth of regulations broadly affects society as a whole and "threatens economic growth and well-being." Dudley (2016), *supra* at 260; *see also* Michael Mandel and Diana G. Carew, *Regulatory Improvement Commission: A Politically Viable Approach to U.S. Regulatory Reform* 10 (Progressive Policy Institute Policy Memo, 2013). Scholars estimate the ongoing accumulation of regulations at the federal level has slowed economic growth by as much as two percent per year. *See* Patrick A. McLaughlin and Richard Williams, *The Consequences of Regulatory Accumulation and a Proposed Solution* 8 (Mercatus Center Working Paper No. 14-03, 2014). Economists have estimated that between 1949 and 2011, the net effect of federal regulation has reduced the anticipated annual U.S. gross domestic product by $38.8 trillion. Sam Batkins, *A Reply: The Regulatory Budget Takes Form*, 67

---

[2] Cass Sunstein was the Administrator of the Office of Information and Regulatory Affairs ("OIRA") from 2009 to 2012.

Administrative Law Review Accord 115, 134-35 (2016) (citing John W. Dawson & John J. Sutter, *Federal Regulation and Aggregate Economic Growth*, 18 J. Econ. Growth 137, 138 (2013)).

The effect of these regulations on Amici's members is significant. For example, federal regulations impose 297,696 separate restrictions on manufacturers' operations. Pareto Policy Solutions, LLC, *Report to the National Association of Manufacturers: Holding U.S. Back: Regulation of the U.S. Manufacturing Sector* 9, 40 (2017).[3] In 2012, compliance with these restrictions cost manufacturers an average of $19,564 per employee, nearly double the average cost imposed on U.S. businesses. W. Mark Crain and Nicole V. Crain, *A Report for the National Association of Manufacturers: The Cost of Federal Regulation to the U.S. Economy, Manufacturing, and Small Business* 2 (2014).[4]

Small businesses are especially burdened. Researchers for Amici the Chamber conducted a comprehensive study of the effects of regulations on small business, which are key drivers of innovation and job growth in this country. U.S. Chamber of Commerce Foundation, *The Regulatory Impact on Small Business: Complex. Cumbersome. Costly.* (Mar. 2017).[5] The report found the costs and burdens of federal regulations disproportionately impact small businesses, costing millions of lost jobs and undermining small business competitiveness. *Id.* at 8-10. For small manufacturers with less than 50 employees that do not have the economies of scale to spread fixed compliance costs, researchers for Amici the NAM found the compliance costs were $34,671 per employee. Crain and Crain (2014), *supra* at 2. Indeed, researchers for Amici NFIB

---

[3] *Available at* http://www.nam.org/Data-and-Reports/Reports/NAM-Belton-Regulatory-Study/.

[4] *Available at* http://www.nam.org/Data-and-Reports/Cost-of-Federal-Regulations/Federal-Regulation-Full-Study.pdf.

[5] *Available at* https://www.uschamberfoundation.org/smallbizregs/assets/files/Small _Business_Regulation_Study.pdf.

found that the accumulation of federal regulations particularly harm "small business owners by creating a complicated, ever changing matrix of regulations, programs, incentives and deterrents that make business decisions more difficult and time consuming." Holly Wade, NFIB Research Foundation, *Small Business Problems and Priorities* 7 (2016).  The result is that in case after case, individual business owners report how burdensome federal rules negatively affect their companies.  J.D. Harrison, U.S. Chamber of Commerce, *In Their Own Words: How D.C.'s Regulatory Machine Steamrolled 36 Small Businesses* (2017).[6]

Executive Order 13771 seeks to address the problem of ever-growing government regulations by imposing a regulatory budget that directs federal agencies to eliminate outdated and ineffective regulations when issuing new regulations that impose significant compliance costs on regulated entities. In doing so, the Order merely builds on a long and bipartisan history of executive orders that direct agencies to carefully consider the costs of new regulations and to review the effectiveness of existing regulations. Critically, however, Executive Order 13771 takes the next logical step and creates an incentive for federal agencies to not only review, but also eliminate ineffective regulations.

Plaintiffs' speculate that Executive Order 13771 might be implemented in some future rulemaking in ways that may result in some social harms. Preliminarily, should an agency actually implement Executive Order 13771 in a way that violates the law, Plaintiffs would be able to challenge that action under the Administrative Procedure Act ("APA") at that time. But more fundamentally, Plaintiffs' speculation about future harms is unwarranted and based on a mischaracterization of Executive Order 13771. That order establishes regulatory budgets that

---

[6] *Available at*  https://www.uschamber.com/above-the-fold/their-own-words-how-dcs-regulatory-machine-steamrolled-36-small-businesses.

will promote overall societal benefits by providing federal agencies with incentive to target

outdated and ineffective regulations and replace them with more effective alternatives. *E.g.,* H.

Bader, *Trump's "2-for-1" Executive Order Could Save Lives* (Jan. 30, 2017).[7] As a result, the

elimination of existing regulations will not be arbitrary, but will focus instead on low-yield

regulations that fail to provide sufficient societal benefits when compared to their compliance

costs and the benefits offered by competing regulatory programs. As such, the Order is a sensible

and reasonable approach to improving the overall efficiency of federal regulations. Moreover,

Executive Order 13771 has mandatory exemptions for regulations required by law and authorizes

the Director of the Office of Management and Budget ("OMB") to issue discretionary

exemptions on a case-by-case basis for highly beneficial regulations. These safety valves ensure

that agencies will not forego necessary regulations that protect public health, safety, and the

environment.

Finally, Executive Order 13771 is consistent with regulatory budgets imposed in other

countries. As those countries' experience demonstrates, regulatory budgets can reduce overall

regulatory costs without sacrificing public health, safety, and environmental objectives.

Executive Order 13771 merely follows these examples. Hence, far from being arbitrary, as

Plaintiffs and their amici allege, Executive Order 13771 reflects a sound policy decision by the

Executive. Plaintiffs may disagree with that policy, but their disagreement does not render the

general regulatory policy set by the President unlawful or otherwise arbitrary or capricious.

Moreover, any rule selected for elimination would still be subject to the rulemaking process—

and, as noted, any particular final agency action taken by a federal agency to implement

Executive Order 13771 should be subject to review under the APA at the time the agency takes

---

[7] *Available at* https://cei.org/blog/trump-2-1-executive-order-could-save-lives.

action.

For these reasons, Amici support Defendants' Motion to Dismiss Plaintiffs' Amended Complaint and urge this Court to allow federal agencies to implement Executive Order 13771.

## ARGUMENT

### I.   Cost-Benefit Analysis And Regulatory Budgeting Are Well-Recognized Methods Of Improving The Efficiency Of Federal Regulations.

Understanding and appropriately accounting for the costs of regulations is a critical and essential part of informed regulatory decision-making. The importance of accounting for costs— as a fundamental principle of agency decision-making—was recently affirmed by the Supreme Court in *Michigan v. EPA*, 135 S. Ct. 2699 (2015). There, the Supreme Court held that an agency must evaluate the costs of a proposed regulation to determine whether it is "appropriate and necessary." *Id.* at 2707 ("One would not say that it is even rational, never mind 'appropriate,' to impose billions of dollars in economic costs in return for a few dollars in health or environmental benefits."). Cost-benefit analyses have long been recognized as an important tool to evaluate the efficiency of proposed regulations. However, to ensure the efficiency and effectiveness of the regulatory system as a whole, cost-benefit analyses should be employed within the context of a regulatory budget that compares the costs and benefits of new and existing regulations in a holistic manner.

"Cost-benefit analysis is best understood as a way for agencies to ensure that their decisions are informed—that they are based on knowledge about likely consequences, rather than dogmas, institutions, hunches, or interest-group pressures." Cass R. Sunstein, *Financial Regulation and Cost-Benefit Analysis*, 124 Yale L.J.F. 263, 263 (2015). In this way, it provides an objective approach to evaluating the effectiveness of a regulation. Accordingly, it should come as no surprise that presidential administrations have embraced cost-benefit analysis on a

bipartisan basis for more than 40 years. *See* Dudley (2016), *supra* at 261–62; Reeve T. Bull,

*Controlling the Cumulative Costs of Regulation: Exploring Potential Solutions* 1 (2015).[8]

Indeed, federal agencies must prepare a Regulatory Impact Analysis—which includes a full

comparison of projected costs and benefits—for all major rules, even if an agency is prohibited

by law from considering costs when issuing regulations.

To be fully effective, however, regulatory cost-benefit analysis cannot be merely

prospective. As scholars have noted, when agencies conduct cost-benefit analyses during the

initial rulemaking process, they must base them entirely on projections, when both cost and

benefit assumptions are necessarily uncertain. Sunstein (1996), *supra* at 23; Jeffrey A. Rosen and

Brian Callanan, *The Regulatory Budget Revisited*, 66 Administrative Law Review 835, 845

(2014); Lutter (2012), *supra* at 5, 15; *Improving Regulatory Performance: Lessons from the

United Kingdom: Hearing Before the Task Force on Government Performance of the S. Budget

Comm*., 112th Cong. 4–6 (2011) (statement of Michael Greenstone, Professor, Massachusetts

Institute of Technology).

Such *ex ante* cost-benefit analyses are valuable and can identify regulatory proposals that

are not justified on cost-effectiveness grounds, but they are limited: they do nothing to address

the existing body of federal regulations, which would require a *retrospective* analysis. *See, e.g.*,

Cass R. Sunstein, *Cost Benefit Analysis and the Knowledge Problem* 11 (Regulatory Policy

Program Working Paper RPP-2015-03, 2015) ("A sensible regulatory system gives continuing

scrutiny to regulatory requirements to test whether they are working as anticipated. A central

question is whether the ex ante estimates square with what is known ex post. If they do not,

regulation can be changed."). Nor does prospective cost-benefit analysis account for how the

---

[8] *Available at* http://www.thecre.com/forum2/wp-content/uploads/2015/10/Bull-Article.pdf.

regulations actually impacted regulated entities. By requiring a retrospective regulatory review, regulators can better evaluate the effectiveness of their initiatives and make necessary changes and revisions to ensure that regulations provide benefits in a cost-effective manner. Batkins (2016), *supra* at 134 ("A robust retrospective review component could also give policymakers the knowledge of how past regulatory programs performed and what can be amended to produce good policy in the future.").

Unfortunately, however, ad hoc attempts to use cost-benefit analyses or comparative-cost analyses to evaluate the performance of regulations *after* they have been issued are less common and have not been successful in practice. Lutter (2012), *supra* at 6 (noting the "dearth of evidence about the actual effects of regulations"); McLaughlin & Williams (2014), *supra* at 3 ("[N]o president has successfully reexamined the enormous stock of previously existing regulations that he inherited."). In fact, a former chief economist of the Council of Economic Advisers has declared that "[t]he single greatest problem with the current system is that most regulations are subject to cost-benefit analysis only in advance of their implementation." Michael Greenstone, "Toward a Culture of Persistent Regulatory Experimentation and Evaluation," in *New Perspectives on Regulation*, ed. David Moss and John Cisternino (Cambridge, MA: Tobin Project, 2009), 113. Likewise, the U.S. Government Accountability Office ("GAO") has previously testified that "the regulatory process could benefit from more attention to evaluations of existing regulations." J. Christopher Mihm, "Prior Reviews of Federal Regulatory Process Initiatives Reveal Opportunities for Improvements" (testimony before the Subcommittee on Regulatory Affairs, Committee on Government Reform, House of Representatives, Washington, DC, July 27, 2005).[9] Even in the handful of instances when administrations have attempted such

---

[9] *Available at* http://www.gao.gov/new.items/d05939t.pdf.

retrospective reviews, the results have been limited, at best. For instance, the retrospective review reports required by President Obama's Executive Order 13610 "rarely look[ed] at existing laws to modify or streamline rules." Batkins (2016), *supra* at 120.

Regardless, a retrospective cost-benefit analysis alone has limited utility, because it does not require regulators to compare regulations and their relative effectiveness or to take action to address ineffective or inefficient regulations. "As important as [cost-benefit analysis] is for developing regulations, it may not provide sufficient discipline for ensuring that tradeoffs are realistically considered." Dudley (2016), *supra* at 265. Further, federal agencies are likely to have an inherent bias in favor of finding that their existing regulations are cost-justified (and thereby permitting the agency simply to maintain them in place as drafted). *See* McLaughlin & Williams (2014), *supra* at 5 (noting that agencies that originally issued rules "have no incentive or inclination to remove them"). Finally, there is also a real risk that a federal agency may simply not undertake the required retrospective analysis, or drag its feet in doing so.

In contrast, a regulatory budget—which establishes a presumptive limit on the aggregate cost of regulations that an agency may issue—requires agencies to compare the costs of regulations not only to the benefits that they provide, but also to the relative benefits provided by other existing or proposed regulations. *See* Cass R. Sunstein, *Public Choice, Endogenous Preferences*, 12 Int'l Rev. of Law and Econ. 289, 290 (1992) (creation of a regulatory budget will "allow consideration of the effects of regulatory programs and … permit informed comparisons across programs"); Rosen & Callanan (2014), *supra* at 839. Once regulatory budgets are established, an agency cannot simply impose new costs on regulated entities when it concludes that a new regulation should be issued. Instead, an agency must compare the projected benefits against those of other existing rules and may proceed only if the projected benefits

exceed those of an existing rule (or rules) that impose similar costs. As a result, agencies will no longer accumulate more regulations, but will have a strong incentive to replace existing regulations with alternatives that are more effective in achieving the agency's Congressional mandate. Rosen & Callanan (2014), *supra* at 840 (installing a regulatory budget would "encourage[e] regulators to transfer regulatory costs from low-yield to high-yield programs.") (quoting Robert E. Litan and William D. Nordhaus, *Reforming Federal Regulation* 140 (1983)).

Scholars have repeatedly recognized that regulatory budgets can improve regulatory efficiency by forcing agencies to engage in a serious retrospective review of existing regulations to identify those that are no longer functioning as intended and to improve regulatory decision-making. For example, Batkins observed that "a functioning budget with a strong retrospective review component should value quality and use the success or failure of past regulation to inform future decisions." Batkins (2016), *supra* at 132. This necessarily requires careful analysis of both newly proposed regulations *and* existing rules. There are clear benefits to this analysis. First, a regulatory budget can "create an internal incentive for agencies to remove outdated or inefficient existing regulations in order to offset new regulatory costs." Rosen & Callanan (2014), *supra* at 842. Second, a regulatory budget requires agencies to "critically examine proposed regulations" to ensure that they will be more effective than the existing regulations that must be repealed to comply with the regulatory budget cap. Bull (2015), *supra* at 3.

Overall, an agency subject to a regulatory cap must adjust its priorities to ensure that it is effectively managing risk and providing cost-effective benefits to the public. McLaughlin and Williams (2014), *supra* at 11. Thus, a properly implemented regulatory budget benefits both the regulated community and society as a whole by ensuring that agencies become more effective over time in leveraging regulatory costs to produce societal benefits.

## II.     Executive Order 13771 Is An Appropriate Extension Of Previous Executive Orders That Will Provide Necessary Improvements To The Regulatory Process.

As noted, both Republican and Democrat presidents have issued executive orders aimed at improving agency rulemaking through cost-benefit analysis and retrospective review. Although prior executive orders directed federal agencies to consider the costs of both new and existing regulations, none has proved successful in stopping—or even slowing—the extraordinary, rapid expansion of the regulatory state as dramatically illustrated above. *See supra* pp. 3–4. In contrast, Executive Order 13771 ensures that federal agencies go beyond analyzing the costs and effectiveness of past regulations by requiring agencies to identify costly and less effective regulations that can be repealed when new costs are imposed on regulated entities. As such, Executive Order 13771 will provide federal agencies with incentives to undertake a rigorous review of the costs and benefits of existing regulations and adopt efficient regulatory programs in the future.

More specifically, cost-benefit analysis has long been a fixture of agency rulemaking as a result of executive orders issued by past presidents. In 1981, President Reagan issued Executive Order 12291, which required federal agencies to prepare a Regulatory Impact Analysis for each major rule (to the extent permitted by law) that included a description of the potential costs and benefits of the rule. 46 Fed. Reg. 13,193, 13,194 (Feb. 19, 1981). President Clinton further crystalized the focus on cost-benefit analysis in Executive Order 12866, which directed agencies to "assess both the costs and the benefits of the intended regulation" and to "propose or adopt a regulation only upon a reasoned determination that the benefits of the intended regulation justify its costs." 58 Fed. Reg. 51,735, 51,736 (Oct. 4, 1993). Thereafter, Presidents Bush and Obama affirmed Executive Order 12866 and the cost-benefit analysis it requires.

Past executive orders have also attempted to bring about regulatory reform by directing

14

agencies to engage in retrospective review of existing regulations. For example, in Executive

Order 12498, President Reagan identified the reduction of the burdens of existing and future

regulations as an administrative goal and specifically directed federal agencies to include in their

annual Draft Regulatory Program a discussion of "the significant regulatory actions of the

agency to revise or rescind existing rules." 50 Fed. Reg. 1036, 1037 (Jan. 8, 1985). Likewise,

President Clinton's Executive Order 12866 directed federal agencies to "periodically review its

existing significant regulations" to determine whether they should be modified or eliminated to

reduce burdens or better achieve the agency's goals. 58 Fed. Reg. at 51,740.

Finally, President Obama issued a series of executive orders directed at retrospective

review. Executive Order 13563 directed federal agencies to "consider how best to promote

retrospective analysis of rules that may be outmoded, ineffective, insufficient, or excessively

burdensome, and to modify, streamline, expand, or repeal them." 76 Fed. Reg. 3821, 3822 (Jan.

21, 2011). Executive Order 13579 incorporated similar goals for independent agencies. 76 Fed.

Reg. 41,587 (July 14, 2011). And Executive Order 13610 incorporated public participation into

the retrospective review process for federal agencies, directing agencies to "give priority,

consistent with law, to those initiatives that will produce significant quantifiable monetary

savings or significant quantifiable reductions in paperwork burdens." 77 Fed. Reg. 28,469,

28,470 (May 14, 2012).

Despite their intentions, however, none of these executive orders achieved their ultimate

goals. "[N]o president has successfully reexamined the enormous stock of previously existing

regulations that he inherited nor materially altered the growth of the stock of regulations."

McLaughlin and Williams (2014), *supra* at 3; *see also* Batkins (2016), *supra* at 120

(retrospective review reports under Executive Order 13610 "rarely look back at existing laws to

modify or streamline rules").

Executive Order 13771 seeks to improve that record. It builds on the long history by presidents of both parties adding a direct obligation on federal agencies not only to review existing regulations, but also to repeal those regulations that are no longer cost effective. Federal agencies may no longer continue to amass new regulations upon a finding of mere prospective cost effectiveness or avoid conducting meaningful retrospective cost benefit analysis; Executive Order 13771 embraces the concept of a regulatory budget and affirmatively directs federal agencies to identify and repeal outdated or ineffective existing regulations on a dollar for dollar basis—as permitted by law—to offset any new regulatory costs imposed on the regulated community. Thus, although the concepts embodied by Executive Order 13771 are not novel and flow directly from past executive orders, the President's Order prudently includes a regulatory budget—a quantitative metric against which to judge the agencies' success in complying with the President's directive. By including this quantitative metric, Executive Order 13771 provides an incentive for federal agencies to stop merely accumulating more federal regulations and instead focus on improving the overall efficiency and cost effectiveness of the regulatory state.

Thus, contrary to the speculation of its opponents, Executive Order 13771 plainly does *not* categorically direct agencies to eliminate otherwise effective programs that benefit workers, public health and the environment. *See, e.g.*, Amici Curiae Brief of Public Health Law Center, *et al.* at 1, Dkt. 25 (arguing that Executive Order 13771 "will deter, weaken, or cause the repeal of important regulations that protect the public …"). Indeed, the Executive Order did not mandate the elimination of *any* specific regulations, and the identity of regulations that may be considered for elimination will not and cannot be known until federal agencies act pursuant to the order. *See, e.g.*, Defendants' Motion to Dismiss Amended Complaint at 17-18, Dkt. 15. Further, in guidance

on Executive Order 13771, OMB made clear that highly effective rules would not be eliminated. Rather, OMB specified the criteria that federal agencies will use to identify regulations for repeal would include, among other things, regulations that "eliminate jobs or inhibit job creation; are outdated, unnecessary, or ineffective; [or] impose costs that exceed benefits." Office of Information and Regulatory Affairs, Office of Management and Budget, *Memorandum: Guidance Implementing Executive Order 13771, Titled "Reducing Regulation and Controlling Regulatory Costs"* (Apr. 5, 2017). Consistent with this guidance, federal agencies are not required to repeal highly effective regulations that provide significant benefits at a low cost. Instead, they are directed to focus on ineffective and outdated rules that either do not provide the expected benefits or provide fewer benefits than the regulations with which they are replaced.

Moreover, Executive Order 13771 includes "safety valves" that exempt agencies from the Order when prohibited from complying by law and that allow the Director of OMB to issue case-specific exemptions. 82 Fed. Reg. at 9339. These safety valves ensure that agencies may issue new regulations and avoid elimination of existing regulations that are necessary to protect public health and the environment. Further, although Congress has mandated promulgation of some regulations, most regulations are issued at the discretion of federal agencies. It is well-established that agencies may reverse discretionary regulations, as long as they provide a reasoned basis for doing so and otherwise comply with the requirements of administrative law, including the APA. *See, e.g.*, *Dillmon v. NTSB*, 588 F.3d 1085, 1089-90 (D.C. Cir. 2009); *FCC v. Fox Television Stations, Inc.*, 556 U.S. 502, 515-16 (2009).

Thus, if an agency originally promulgated a regulation at its discretion (and not in response to a specific congressional mandate), the agency would have discretion to eliminate it based on a finding that it was outdated or ineffective. This is true even if a court has upheld the

17

agency's exercise of discretion to issue the regulation in the first instance. *See National Cable & Telecommunications Ass'n v. Brand X Internet Services*, 545 U.S. 967, 981 (2005). Far from chilling federal agencies' regulatory agendas, Executive Order 13771 should give agencies incentive to focus on meaningful regulatory initiatives that streamline and improve the effectiveness of the regulatory state by replacing costly and burdensome low-yield regulations with high-yield alternatives.

In sum, by adopting the concept of regulatory budgeting, Executive Order 13771 both affirms the importance of controlling regulatory costs in agency rulemaking and ensures that federal agencies will become more cost effective in their efforts to produce societal benefits in accordance with Congressional mandates.

## III.   International Examples Demonstrate The Regulatory Budgeting In Executive Order 13771 Has A Sound Basis.

Executive Order 13771's use of regulatory budgeting is also consistent with the actions taken by other countries. *See* Bull (2015), *supra* at 3. The success of regulatory budgeting in those jurisdictions demonstrates that it can be an effective administrative tool to improve regulatory efficiency.

The United Kingdom first adopted a regulatory budget in 2011 when it installed a "One-in, One-out" policy that required government departments to offset any increase in regulatory costs by undertaking deregulatory measures with at least equivalent costs. Dep't for Bus., Innovation & Skills, URN 11/P96A, One-in, One-out: Statement of New Regulation 3 (2011).[10] Over the first two years, the One-in, One-out policy reduced annual net costs to business by nearly £1 billion. Dep't for Bus., Innovation & Skills, The Seventh Statement of New Regulation

---

[10] *Available at* https://www.gov.uk/government/uploads/system/uploads/attachment_data/file/31617/11-p96a-one-in-one-out-new-regulation.pdf.

7 (2013).[11] The United Kingdom then expanded the regulatory budget by adopting a "One-in, Two-out" policy that required the government to eliminate two pounds sterling of regulatory costs for each pound sterling of new costs imposed by new regulations. Dep't for Bus., Innovation & Skills, The Ninth Statement of New Regulation 13 (2014).[12] The One-in, Two-out policy was also successfully implemented, resulting in a £2.189 billion reduction in annual net regulatory costs between January 2011 and July 2015. *Id.* at 5.

Notably, the United Kingdom has implemented a regulatory budget without causing significant economic, environmental, or public health impacts. For example, the unemployment rate in the United Kingdom was 5.6 percent in 2015 and had fallen from the previous year. Batkins (2016), *supra* at 136 (citing Labour Mkt. Statistics, August 2015, Office for Nat'l Statistics 1 (2015)).[13] Likewise, environmental conditions in the United Kingdom improved while the regulatory budget was implemented. *Id.* (citing overall improvements in PM emissions and GHG emissions since the program was implemented). At a minimum, this experience demonstrates that a regulatory budget along the lines of the President's Order does not inevitably lead to economic or environmental degradation claimed by Plaintiffs here.

Experience with regulatory budgets in Canada has been similar. British Columbia first adopted a "One-in, One-out" approach with great success, as regulatory requirements—including those contained in administrative guidance documents—were reduced from 330,812 in 2001 to 173,439 in 2016, a decrease of 47.6 percent. *See* Patrick A. McLaughlin, Jerry Ellig, and Michael Wilt, Comprehensive Regulatory Reform at 21 (Mercatus Working Paper, 2017). Canada's

---

[11] *Available at* https://www.gov.uk/government/uploads/system/uploads/attachment_data/file /271446/bis-13-p96b-seventh-statement-of-new-regulation.pdf.

[12] *Available at* https://www.gov.uk/government/publications/one-in-two-out-ninth-statement-of-new-regulations.

[13] *Available at* http://www.ons.gov.uk/ons/dcp171778_412021.pdf.

federal government followed that success, as it first adopted a regulatory budget in 2012 as an executive branch initiative that required agencies to eliminate one dollar of regulatory costs for each dollar of new regulatory costs imposed. Dudley (2016), *supra* at 274. In 2015, Canada's legislature formally adopted the One-in, One-out regulatory budget, marking the first time that a country has codified a regulatory budget. Red Tape Reduction Act, S.C. 2015, c 12 (Can.); Dudley (2016), *supra* at 274. Canada has also seen favorable results from regulatory budgeting. Despite only requiring a dollar-for-dollar offset of new regulatory costs, Canada's program has resulted in regulatory cost savings of more than C$32 million and reduced paperwork burdens by 750,000 hours per year. Batkins (2016), *supra* at 136; Sean Spear, Regulatory Budgeting Lessons from Canada 7–8 (R Street Policy Study No. 54, 2016). [14]

The experiences of these other countries underscores that Executive Order 13771 is not unique and that countries with complex regulatory structures can implement regulatory budgets successfully. Indeed, rather than resulting in the elimination of critical programs that provide important societal benefits in an efficient and cost-effective manner, use of regulatory budgets has provided incentives to agencies to eliminate outdated or inefficient regulations while promoting continued economic growth, and environmental and public health improvements.

## CONCLUSION

For the foregoing reasons, Amici urge the Court to grant Defendants' Motion to Dismiss the Amended Complaint and Deny Plaintiffs' Motion for Summary Judgment.

---

[14] Australia has also adopted a comparable regulatory budgeting system. *Id.*; *see also* Commonwealth of Australia, Department of the Prime Minister and Cabinet, *Australian Government Guide to Regulation* at 2 (2014), *available at* http://cuttingredtape.gov.au/ sites/default/files/ documents/australiangovernment_guide_regulation.pdf. (requiring agencies to negate new regulatory costs by a concurrent reduction in existing regulatory costs).

Dated:  June 12, 2017                    Respectfully submitted,

                                         /s/ Ryan C. Morris
                                         C. Frederick Beckner III (D.C. Bar No. 451193)
                                         Samuel B. Boxerman (D.C. Bar No. 435903)*
                                         Ryan C. Morris (D.C. Bar No. 980347)
                                         SIDLEY AUSTIN LLP
                                         1501 K Street, NW
                                         Washington, DC  20005
                                         (202) 736-8000

                                         *Counsel for Amici Chamber of Commerce of the
                                         United States Of America, American Fuel &
                                         Petrochemical Manufacturers, American
                                         Petroleum Institute, Association of American
                                         Railroads, National Association of
                                         Manufacturers, and National Federation of
                                         Independent Business*

                                         *Application for Pro Hac Vice Admission
                                         Pending*

Of Counsel

Kate Comerford Todd
Steven P. Lehotsky
CHAMBER OF COMMERCE OF THE UNITED STATES OF AMERICA
U.S. Chamber Litigation Center
1615 H. Street, NW
Washington, DC 20062

*Counsel for the Chamber of Commerce of the United States of America*

Richard S. Moskowitz
Taylor Hoverman
AMERICAN FUEL & PETROCHEMICAL MANUFACTURERS
1667 K Street NW
Suite 700
Washington, DC 20006
(202) 457-0480

*Counsel for American Fuel & Petrochemical Manufacturers*

Linda E. Kelly
Quentin Riegel
Leland P. Frost
NATIONAL ASSOCIATION OF MANUFACTURERS
Manufacturers' Center For Legal Action
733 10th Street, NW, Suite 700
Washington, DC  20001

21

(202) 637-3000

*Counsel for the National Association of Manufacturers*


Karen R. Harned
Luke Wake
NATIONAL FEDERATION OF INDEPENDENT BUSINESS
Small Business Legal Center
1201 F Street, N.W.
Suite 200
Washington, D.C.  20004
(202) 314-2061

*Counsel for National Federation of Independent Business*