UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

PUBLIC CITIZEN, INC., et al.,

        Plaintiffs,

v.

DONALD TRUMP, President of the United
States, et al.,

        Defendants.

Civil Action No. 17-253 (RDM)

**PLAINTIFFS' REPLY MEMORANDUM
IN SUPPORT OF
MOTION FOR SUMMARY JUDGMENT**

Michael E. Wall
(CA Bar No. 170238)
Cecilia D. Segal
(CA Bar No. 310935)
NATURAL RESOURCES DEFENSE
COUNCIL, INC.
111 Sutter Street, Floor 21
San Francisco, CA  94104
(415) 875-6100

Counsel for Natural Resources Defense
Council, Inc.

Guerino J. Calemine, III
(DC Bar No. 465413)
COMMUNICATIONS WORKERS OF
AMERICA
501 3rd Street NW
Washington, DC  20001
(202) 434-1100

Counsel for Communications Workers
of America

Allison M. Zieve
(DC Bar No. 424786)
Scott L. Nelson
(DC Bar No. 413548)
Sean M. Sherman
(DC Bar No. 1046357)
PUBLIC CITIZEN LITIGATION
GROUP
1600 20th Street NW
Washington, DC  20009
(202) 588-1000

Counsel for all Plaintiffs

Patti A. Goldman
(DC Bar No. 398565)
EARTHJUSTICE
705 2nd Avenue, #203
Seattle, WA  98104
(206) 343-7340

Counsel for all Plaintiffs

July 21, 2017

# TABLE OF CONTENTS

INTRODUCTION ...................................................................................................................1

ARGUMENT ........................................................................................................................2

I.      Executive Order 13771 exceeds the President's powers and violates the Take Care
        Clause..........................................................................................................................2

        A.      Prior executive orders do not support the constitutionality of Executive Order
                13771..............................................................................................................3

        B.      Presidential authority to supervise the Executive Branch does not justify
                Executive Order 13771. ..................................................................................8

II.     Plaintiffs' claim based on violation of the Take Care Clause is actionable......................10

III.    Imposing and implementing the requirements of Executive Order 13771 is *ultra
        vires* conduct subject to non-statutory judicial review. ....................................................11

        A.      Defendants' *ultra vires* conduct is reviewable under Supreme Court and
                D.C. Circuit precedent. ..................................................................................11

        B.      Implementation by agency officials of a presidential order that unconstitutionally
                imposes substantive rulemaking requirements unauthorized by statute is
                *ultra vires*. ....................................................................................................15

        C.      OMB lacks authority to implement an unlawful executive order............................17

IV.     The OMB Guidances violate the APA..............................................................................17

V.      Plaintiffs have standing to challenge the facial illegality of Executive Order 13771........20

        A.      The Executive Order imposes the kind of injury to advocacy efforts that is
                cognizable under D.C. Circuit law...................................................................20

        B.      The Executive Order's ongoing effect on regulation threatens imminent harm to
                plaintiffs and their members. .........................................................................22

VI.     This challenge to Executive Order 13771 is ripe for review. ...........................................26

VII.    Defendants' request to delay resolution of this case through discovery should be
        denied..........................................................................................................................27

CONCLUSION.....................................................................................................................30

# TABLE OF AUTHORITIES

**Pages**

**Cases**

*Abbott Laboratories v. Gardner,*
  387 U.S. 136 (1967) ........................................................................................13

*Alexander v. Sandoval,*
  532 U.S. 275 (2001) ..........................................................................................2

\* *America Society for Prevention of Cruelty to Animals v. Feld Entertainment, Inc.,*
  659 F.3d 13 (D.C. Cir. 2011) ....................................................................21, 22

*America Textile Manufacturers Institute v. Donovan,*
  452 U.S. 490 (1981) ..........................................................................................5

\* *American School of Magnetic Healing v. McAnnulty,*
  187 U.S. 94 (1902) ..........................................................................................11

*Batterton v. Marshall,*
  648 F.2d 694 (D.C. Cir. 1980) ..........................................................................8

*BE & K Construction Co. v. NLRB,*
  536 U.S. 516 (2002) ........................................................................................21

*Brown & Williamson v. FDA,*
  529 U.S. 120 (2000) ........................................................................................16

*Building & Construction Trades Department v. Allbaugh,*
  295 F.3d 28 (D.C. Cir. 2002) .........................................................................8, 9

*Carpenters Industrial Council v. Zinke,*
  854 F.3d 1 (D.C. Cir. 2017) ......................................................................25, 26

*Center for Law & Education v. Department of Education,*
  396 F.3d 1152 (D.C. Cir. 2005) ......................................................................21

*Center for Science in the Public Interest v. Department of the Treasury,*
  573 F. Supp. 1168 (D.D.C. 1983), *vacated in part as moot sub nom.*
  *Center for Science in the Public Interest v. Regan,*
  727 F.2d 1161 (D.C. Cir. 1984) ........................................................................5

*Chamber of Commerce v. Reich,*
  57 F.3d 1099 (D.C. Cir. 1995) ........................................................................11

* *Chamber of Commerce v. Reich,*
    74 F.3d 1322 (D.C. Cir. 1996) ....................................................................11, 14, 15, 17

*Chrysler Corp. v. Brown,*
    441 U.S. 281 (1979) ..........................................................................................................8

*Clean Air Council v. Pruitt,*
    __ F.3d __, 2017 WL 2838112 (D.C. Cir. July 3, 2017) ..................................16

*County of Santa Clara v. Trump,*
    __ F. Supp. 3d __, 2017 WL 1459081 (N.D. Cal. Apr. 25, 2017)................................9, 11

*Dalton v. Specter,*
    511 U.S. 462 (1994) ........................................................................................................10

*Dart v. United States,*
    848 F.2d 217 (D.C. Cir. 1988) ...............................................................................11, 17

*Defenders of Wildlife v. Perciasepe,*
    714 F.3d 1317 (D.C. Cir. 2013) ....................................................................................21

*Dunning v. Quander,*
    508 F.3d 8 (D.C. Cir. 2007) ..........................................................................................27

*Dunning v. Ware,*
    __ F. Supp. 3d __, 2017 WL 2257330 (D.D.C. May 22, 2017) ...............................29

*Entergy Corp. v. Riverkeeper, Inc.,*
    556 U.S. 208 (2009) ..........................................................................................................5

*Environmental Defense Fund v. Thomas,*
    627 F. Supp. 566 (D.D.C. 1986) ..............................................................................7, 17

*Estate of Parsons v. Palestinian Authority,*
    715 F.Supp.2d 27 (D.D.C. 2010) ................................................................................27

*FCC v. Fox Television Stations, Inc.,*
    556 U.S. 502 (2009) ..........................................................................................................8

*Graham v. Mukasey,*
    608 F. Supp. 2d 50 (D.D.C. 2009) ..............................................................................28

*Hawai'i v. Trump,*
    859 F.3d 741 (9th Cir. 2017)
    *cert. granted,* 137 S. Ct. 2080 (2017) ........................................................................25

*Hawai'i v. Trump*,
__ F. Supp. 3d __, 2017 WL 1011673 (D. Haw. Mar. 15, 2017),
*aff'd on other grounds*, 859 F.3d 741 (9th Cir.),
*cert. granted*, 137 S. Ct. 2080 (2017) ...........................................................................11

*Heckler v. Chaney*,
470 U.S. 821 (1985) ............................................................................................10

*Jeffries v. Lynch*,
217 F. Supp. 3d 214 (D.D.C. 2016) ....................................................................27

*Kendall v. U.S. ex rel. Stokes*,
37 U.S. (12 Pet.) 524 (1838) ...............................................................................11

*Leedom v. Kyne*,
358 U.S. 184 (1958) ............................................................................................12

*Liberty Mutual Insurance Co. v. Friedman*,
639 F.2d 164 (4th Cir. 1981) ................................................................................8

*Little v. Commercial Audio Associates*,
81 F. Supp. 3d 58 (D.D.C. 2015) ........................................................................28

*Local 2677, America Federation of Government Employees v. Phillips*,
358 F. Supp. 60 (D.D.C. 1973) .............................................................................8

*Massachusetts v. EPA*,
549 U.S. 497 (2007) ............................................................................................25

*McBryde v. Committee to Review Circuit Council Conduct & Disability Orders*,
264 F.3d 52 (2001) ..............................................................................................13

*Medellin v. Texas*,
552 U.S. 491 (2008) ..............................................................................................3

*Mississippi v. Johnson*,
71 U.S. (4 Wall.) 475 (1867) ..............................................................................10

*Myers v. United States*,
272 U.S. 52 (1926) ................................................................................................2

*National Air Traffic Controllers Ass'n v. Federal Service Impasses Panel*,
437 F.3d 1256 (D.C. Cir. 2006) .....................................................................13, 14

*National Federation of Federal Employees. v. United States*,
905 F.2d 400 (D.C. Cir. 1990) ............................................................................29

*National Parks Conservation Ass'n v. Manson,*
    414 F.3d 1 (D.C. Cir. 2005) ................................................................................25

*Nyunt v. Chairman, Broadcasting of Governors,*
    589 F.3d 445 (D.C. Cir. 2009) .......................................................................12, 13

*Oceana v. Locke,*
    670 F.3d 1238 (D.C. Cir. 2011) ..........................................................................18

*Public Interest Research Group of N.J., Inc. v. Powell Duffryn Terminals Inc.,*
    913 F.2d 64 (3d Cir. 1990) ..................................................................................25

*R.I.L-R v. Johnson,*
    80 F. Supp. 3d 164 (D.D.C. 2015) ......................................................................25

*Sherley v. Sebelius,*
    689 F.3d 776 (D.C. Cir. 2012) .......................................................................17, 18

*Sierra Club v. EPA,*
    755 F.3d 968 (D.C. Cir. 2014) ............................................................................25

*Turlock Irrigation District v. FERC,*
    786 F.3d 18 (D.C. Cir. 2015) ..............................................................................21

*In re United Mine Workers of America International Union,*
    190 F.3d 545 (D.C. Cir. 1999) ..............................................................................7

*United States v. Texas,*
    136 S. Ct. 906 (2016) ..........................................................................................10

*U.S. ex rel. Folliard v. Government Acquisitions, Inc.,*
    764 F.3d 19 (D.C. Cir. 2014) .........................................................................27, 29

*U.S. Telecom Ass'n v. FCC,*
    855 F.3d 381 (D.C. Cir. 2017) ............................................................................10

*Whitman v. America Trucking Ass'ns,*
    531 U.S. 457 (2001) ............................................................................................16

*Youngstown Sheet & Tube v. Sawyer,*
    343 U.S. 579 (1952) .........................................................................................7, 11

**Statutes**

29 U.S.C. § 655(b)(5) .................................................................................................5

**Rules and Regulatory Materials**

39 Fed. Reg. 41501 (1974) ..........................................................................................4

43 Fed. Reg. 12611 (1978) ..........................................................................................3

46 Fed. Reg. 13193 (1981) ..........................................................................................4

50 Fed. Reg. 1036 (1985) ............................................................................................3

58 Fed. Reg. 51735 (1993) ..........................................................................................4

62 Fed. Reg. 19885 (1997) ..........................................................................................4

66 Fed. Reg. 28355 (2001) ..........................................................................................4

67 Fed. Reg. 9385 (2002) ............................................................................................4

75 Fed. Reg. 28862 (2010) ..........................................................................................5

76 Fed. Reg. 3821 (2011) .......................................................................................3, 4

81 Fed. Reg. 94496 (2016) ....................................................................................23, 24

82 Fed. Reg. 3854 (2017) ..........................................................................................29

82 Fed. Reg. 7464 (2017) ..........................................................................................29

82 Fed. Reg. 31576 (2017) ........................................................................................22

Dep't of Transportation, Department Regulatory Agenda; Semiannual Summary, at
   https://www.reginfo.gov/public/jsp/eAgenda/StaticContent/201704/
   Preamble_2100.html (July 20, 2017) ...................................................................22

Federal Rule of Civil Procedure 56(d) ........................................................................27

Federal Rule of Civil Procedure 56(e) ........................................................................23

OLC, Memorandum on Proposed Executive Order Entitled "Federal Regulation"
   (Feb. 13, 1981), available at https://www.justice.gov/file/22586/download ....................6

OMB, *Current Unified Agenda of Regulatory and Deregulatory Actions*, at
https://www.reginfo.gov/public/do/eAgendaMain (July 20, 2017) ..............................1, 22

**Miscellaneous**

Aaron Blake, *Stephen Bannon's nationalist call to arms, annotated*,
Wash. Post, Feb. 23, 2017 (quoting President's Chief of Staff and President's Chief
Strategist), at https://www.washingtonpost.com/news/the-fix/wp/2017/02/23/stephen-
bannons-nationalist-call-to-arms-annotated.........................................................................1

David Friedman, *Two for One: A Very Bad Deal for Our Nation*,
Appendix 4 Union of Concerned Scientists Blog, Apr. 10, 2017, at http://blog.
ucsusa.org/guest-commentary/two-for-one-a-very-bad-deal-for-our-nation....................14

Jacob Pramuk, *Trump signs executive order aiming to slash regulations*,
CNBC, Jan. 30, 2017, at http://www.cnbc.com/2017/01/30/trump-set-to-
sign-executive-order-aiming-to-slash-regulations.html......................................................1

\* Asterisks indicate authorities on which plaintiffs chiefly rely.

# INTRODUCTION

Executive Order 13771 is not business as usual. The President himself has described the Executive Order as effecting "the largest ever cut by far in terms of regulation."[1] And belying any notion that the Order simply "guide[s]" officials in their construction of statutes, Defs. SJ Resp. 25, the President's chief advisors have explained that it "puts in place a constant deregulatory" regime for the purpose of "deconstruction of the administrative state."[2] Reflecting this new regime, the Current Unified Agenda of Regulatory and Deregulatory Actions boasts that "[a]gencies withdrew 469 actions proposed in the Fall 2016 Agenda" and moved 391 previously active actions to "long-term" or "inactive" categories, as a step toward complying with Executive Order 13771.[3]

The Executive Order achieves its deregulatory purpose by purporting fundamentally to change laws governing agency rulemaking. Under the Order, the President and the Office of Management and Budget (OMB) require an agency, as a condition of issuing one new rule, to repeal two or more rules, and to offset the new rule's costs by eliminating existing costs through repeals. These requirements have no basis, express or implied, in any statute delegating rulemaking authority to federal agencies. Congress could enact statutes reflecting the policy arguments submitted by defendants' amici, but Congress has not done so, and the question here is not about policy. The question here is whether the President has authority unilaterally to

---

[1] Jacob Pramuk, *Trump signs executive order aiming to slash regulations*, CNBC, Jan. 30, 2017, at http://www.cnbc.com/2017/01/30/trump-set-to-sign-executive-order-aiming-to-slash -regulations.html (Ex. D to Zieve Decl.).

[2] Aaron Blake, *Stephen Bannon's nationalist call to arms, annotated*, Wash. Post, Feb. 23, 2017), at https://www.washingtonpost.com/news/the-fix/wp/2017/02/23/stephen-bannons-nationalist-call-to-arms-annotated (Ex. B to Zieve Decl.).

[3] OMB, Current Unified Agenda of Regulatory and Deregulatory Actions, at https://www.reginfo.gov/public/do/eAgendaMain (July 20, 2017).

impose on federal agencies the new rulemaking criteria embodied in the Executive Order's 1-in, 2-out and cost-offset requirements. He does not. Executive Order 13771 is unconstitutional and must be set aside.

## ARGUMENT

### I.     Executive Order 13771 exceeds the President's powers and violates the Take Care Clause.

Executive Order 13771 superimposes deregulatory mandates on statutes delegating authority to agencies to adopt regulations to provide public benefits, such as clean air, auto safety, and workplace safety. Plaintiffs' summary judgment memorandum explains that the Executive Order violates the doctrine of separation of powers and the Take Care Clause because it lacks statutory authorization, was not issued pursuant to an express or implied delegation from Congress, and imposes requirements inconsistent with laws enacted by Congress. Defendants respond by asking for "judicial restraint" and arguing that the Court should deny summary judgment to plaintiffs because the Executive Order falls within the President's "inherent power." Defs. SJ Resp. 25. The inherent power they invoke, however—the power "to manage and guide Executive Branch agencies"—cannot save Executive Order 13771, because the Order does not guide agencies "in their 'construction of the statutes under which they act.'" *Id*. (citing *Myers v. United States*, 272 U.S. 52, 135 (1926) (discussing presidential removal power)). It is a mandate to take action unauthorized by those statutes. The Executive Branch "may play the sorcerer's apprentice but not the sorcerer himself." *Alexander v. Sandoval*, 532 U.S. 275, 292 (2001). This Executive Order violates that constitutional principle.

Defendants' defense of the Executive Order relies heavily on a discussion of prior executive orders. Defendants fail, however, to identify even one statute under which the

requirements of Executive Order 13771 are permissible, and they do not refute plaintiffs' showing that Executive Order 13771 is unconstitutional.

### A. Prior executive orders do not support the constitutionality of Executive Order 13771.

Defendants suggest that Executive Order 13771 is merely the latest link in a chain of executive orders "directing agencies to consider factors, such as cost, that are not expressly forbidden by Congress in a governing statute." Defs. SJ Resp. 1. Seeking support in historical practice, they assert that Executive Order 13771 and prior executive orders on regulation all flow from the President's authority to supervise federal agency rulemakings. That assertion is wrong. Not only have previous executive orders been neither tested nor upheld in court, *cf. Medellin v. Texas*, 552 U.S. 491, 532 (2008) ("[p]ast practice does not, by itself, create power") (citation omitted), but Executive Order 13771 is fundamentally different. Executive Order 13771 is revolutionary because it does not just instruct agencies to "consider factors" that may be consistent with statutes granting them rulemaking power; it imposes a sweeping prohibition on rulemaking absent compliance with repeal and cost-offset obligations that cannot be squared with any extant statutory authority.

Most prior executive orders on regulation have been directed at the rulemaking process. For instance, several executive orders have required agencies to develop rulemaking agendas or to identify outmoded, ineffective, or duplicative rules. *See, e.g.,* Exec. Order 12044, 43 Fed. Reg. 12611 (1978) (requiring semi-annual regulatory agenda and periodic review of existing regulations); Exec. Order 12498, 50 Fed. Reg. 1036 (1985) (requiring agencies to prepare annual statements of regulatory policies, goals, and objectives and to identify significant regulatory actions underway or planned); Exec. Order 13563, 76 Fed. Reg. 3821 (2011) (requiring retrospective analysis of existing rules). Other executive orders "require[d] agencies to *consider*

specific issues and factors," Defs. SJ Resp. 28 (emphasis added), such as the impact of a rule on inflation, the energy supply, or children's environmental health or safety, without dictating the effect of the consideration on the content of or issuance of the rule. *See, e.g.,* Exec. Order 11821, 39 Fed. Reg. 41501 (1974) (requiring inflation impact statements); Exec. Order 13045, 62 Fed. Reg. 19885 (1997) (requiring evaluation of environmental health or safety effects on children); Exec. Order 13211, 66 Fed. Reg. 28355 (2001) (requiring statement of effects on energy supply, distribution, or use). Through such executive orders, presidents, via OMB, have exercised oversight of the regulatory process. The orders did not, however, prevent agencies from complying with substantive statutory requirements or make issuance of a rule that met statutory requirements contingent on unrelated (de)regulatory actions.

The executive order on cost-benefit analysis, Executive Order 12866, is likewise different in kind than Executive Order 13771. Executive Order 12866 requires submission of annual regulatory plans to OMB and OMB review of "significant" regulations, including those expected to have an annual impact of more than $100 million. 58 Fed. Reg. 51735, §§ 3(f)(1), 6(a)(3)(B)–(C) (1993). It also requires agencies to assess both costs and benefits of intended regulations, *id.* § 1(b)(6), and to "design [their] regulations in the most cost-effective manner *to achieve the regulatory objective,*" *id.* § 1(b)(5) (emphasis added). In addition, Executive Order 12866 requires that the benefits of a proposed rule justify its costs, § (1)(b)(6), "to the extent permitted by law," *id.* § 1(b).[4] In contrast to the deregulatory requirements imposed by Executive Order 13771, the cost considerations addressed by Executive Order 12866 are permissible under many

---

[4] Executive Order 12866 replaced Executive Order 12291, 46 Fed. Reg. 13193 (1981), which included many of the same provisions. Subsequent administrations have largely retained the regulatory review process established in Executive Order 12866. *See* Exec. Order 13563, § 1(b), 76 Fed. Reg. 3821 (2011); Exec. Order 13258, 67 Fed. Reg. 9385 (2002).

statutes that authorize agency rulemaking. *See, e.g., Entergy Corp. v. Riverkeeper, Inc.*, 556 U.S. 208, 226 (2009) (holding that agency "permissibly relied on cost-benefit analysis" in promulgating regulations under the Clean Water Act). To the extent that an agency's governing statute does not allow costs, or a weighing of costs and benefits, to factor into the regulatory decision, the requirements otherwise imposed by Executive Order 12866 do not apply. For example, under the Endangered Species Act, costs cannot be considered in listing determinations, and the Department of the Interior therefore does not prepare a cost-benefit analysis of its listing rules. Hayes Decl. ¶¶ 5–6 (citing statute). Similarly, although the Occupational Health and Safety Administration (OSHA) calculates costs and benefits as directed by Executive Order 12866, it cannot, in light of its governing statute, allow its rulemaking decisions to turn on cost-benefit analysis. *See* 29 U.S.C. § 655(b)(5); *Am. Textile Mfrs. Inst. v. Donovan*, 452 U.S. 490, 509 (1981); *see, e.g.*, OSHA, Notice of Proposed Rule, 75 Fed. Reg. 28862, 28864 (2010) ("Executive Order 12866 requires that OSHA estimate the benefits, costs, and net benefits of proposed standards. … However, it should be noted that under the OSH Act, OSHA does not use the magnitude of net benefits as the decisionmaking criterion in determining what standards to promulgate."); *see also Ctr. for Sci. in the Pub. Interest v. Dep't of the Treasury*, 573 F. Supp. 1168, 1174 (D.D.C. 1983) (invalidating decision to rescind regulations in light of cost-benefit analysis performed pursuant to Executive Order 12291 (the precursor to 12866) because an executive order "provides an insufficient basis for the defendants to disregard their statutory duties"), *vacated in part as moot sub nom. Ctr. for Sci. in the Pub. Interest v. Regan*, 727 F.2d 1161 (D.C. Cir. 1984).

In contrast, the 1-in, 2-out and cost-offset conditions of Executive Order 13771 cannot be lawfully implemented in any rulemaking. *See* Pltfs. SJ Memo at 18–38. In 90 pages of briefing,

defendants have not pointed to any statute that allows an agency's rulemaking authority to be held hostage to the agency's ability to repeal existing rules or to offset the costs of a new rule by eliminating existing requirements.

The fundamental difference between Executive Order 13771 and earlier orders is no accident. As amici Chamber of Commerce, et al. explain, Executive Order 13771 reflects the view that earlier orders operating within the framework of statutory rulemaking authorizations were ineffective to achieve deregulatory objectives, prompting the new approach of imposing extra-statutory limits on agencies' rulemaking authority. *See* Chamber Amicus Br. 15-16. Unlike previous executive orders, Executive Order 13771 "add[s] a direct obligation on federal agencies not only to review existing regulations, but also to repeal" them. *Id*. at 16. This "direct obligation" is a new substantive requirement that is unrelated to the policies of any specific statute authorizing rulemaking and completely untethered from whether issuance of a new rule is justified under applicable statutory criteria.[5]

The new obligation imposed by Executive Order 13771 poses a constitutional affront that the previous executive orders sought to avoid. Although the President and OMB may properly play an oversight role in agency decisionmaking, the Constitution imposes important constraints. As the Department of Justice's Office of Legal Counsel (OLC) advised President Reagan with respect to Executive Order 12291, the precursor to Executive Order 12866, "it is clear that the President's exercise of supervisory powers must conform to legislation enacted by Congress. In issuing directives to govern the Executive Branch, the President may not, as a general proposition, require or permit agencies to transgress boundaries set by Congress." OLC, Memo.

---

[5] Arguing that agencies have discretion to repeal discretionary rules, amicus Chamber of Commerce (at 17) misses the point. The issue here is not whether any given rule may be repealed, but whether extra-statutory conditions may be imposed on issuance of a new rule.

on Proposed Executive Order Entitled "Federal Regulation" at 61 (Feb. 13, 1981), available at https://www.justice.gov/file/22586/download (citing *Youngstown Sheet & Tube v. Sawyer*, 343 U.S. 579 (1952)) (footnote omitted); *id*. at 62 ("the President may consult with those having statutory decisionmaking responsibilities, and may require them to consider *statutorily relevant* matters that he deems appropriate") (emphasis added).

Courts have recognized and enforced this constitutional constraint. When the D.C. Circuit found the Mine Safety and Health Administration in violation of statutory deadlines for issuance of final regulations controlling diesel emissions in underground coal mines, it rejected the agency's argument that an executive order's requirement of OMB review excused compliance with the deadlines: "Needless to say, the President is without authority to set aside congressional legislation by executive order[.]" *In re United Mine Workers of America Int'l Union*, 190 F.3d 545, 551 (D.C. Cir. 1999). Similarly, in *Environmental Defense Fund v. Thomas*, 627 F. Supp. 566 (D.D.C. 1986), the court stated that, to the extent that an executive order purported to authorize OMB to delay a new rule beyond a statutory deadline, the order was "incompatible with the will of Congress and cannot be sustained as a valid exercise of the President's Article II powers." *Id*. at 570.

In short, the history of executive orders on regulation does not assist defendants here. Regardless of the constitutionality of any prior executive order—a question this Court need not reach—Executive Order 13771 imposes a substantive requirement inconsistent with statutes enacted by Congress and in excess of Congress's authorization to agencies to issue rules with the force of law. In so doing, it violates the principle of separation of powers and the Take Care Clause of Article II, section 3. *See* Pltfs. SJ Memo at II.

**B.      Presidential authority to supervise the Executive Branch does not justify Executive Order 13771.**

Building on their discussion of prior executive orders, defendants incorrectly characterize Executive Order 13771 as an exercise of presidential authority to guide discretionary aspects of agency rulemaking authority. *See* Defs. SJ Resp. 25–28; *see also* Defs. MTD Memo. 33–34. Whatever authority the President has to guide an agency's exercise of discretion in rulemaking must operate within the bounds delegated by Congress. *See Chrysler Corp. v. Brown*, 441 U.S. 281, 304 (1979); *Liberty Mut. Ins. Co. v. Friedman*, 639 F.2d 164, 171–72 (4th Cir. 1981); *Batterton v. Marshall*, 648 F.2d 694, 701 (D.C. Cir. 1980); *see FCC v. Fox Television Stations, Inc.*, 556 U.S. 502, 536 (2009) (Kennedy, J., concurring) ("Congress must 'lay down by legislative act an intelligible principle,' and the agency must follow it." (quoting *J.W. Hampton, Jr., & Co. v. United States*, 276 U.S. 394, 409 (1928))). "[D]iscretion in the implementation of a program is not the freedom to ignore the standards for its implementation." *Local 2677, Am. Fed'n of Gov't Emps. v. Phillips*, 358 F. Supp. 60, 77 (D.D.C. 1973) (citing *Citizens to Preserve Overton Park v. Volpe*, 401 U.S. 402, 411 (1971)). By directing agencies to time, avoid, and shape rulemakings for reasons outside of and at odds with their statutory authority, Executive Order 13771 fails this test. *See* Pltfs. SJ Memo. 22–35.

*Building & Construction Trades Department v. Allbaugh*, 295 F.3d 28 (D.C. Cir. 2002), on which defendants so heavily rely, does not support their position. In *Allbaugh*, the challenged executive order barred agencies from requiring (or prohibiting) bidders for government contracts to enter into project labor agreements. The court held that, even assuming the bar might be impermissible in some instances, the executive order stated "a policy that, so far as the [then-] present record reveal[ed], [was] above suspicion in the ordinary course of administration." *Id.* at 33. Because the court thought that the order could be applied consistent with law in most

circumstances, the facial challenge failed. *See id*.; *see also id*. at 35–36 (rejecting argument that executive order was impermissible under the National Labor Relations Act).

Here, OMB's implementation of Executive Order 13771 makes plain that the Order cannot be saved on the theory that it can be implemented without overstepping agencies' substantive statutory authorizations. The OMB Guidances state that Executive Order 13771's repeal and offset requirements apply broadly, even where a statute prohibits any consideration of costs by an agency or imposes a mandatory obligation to issue a particular rule: Even in such instances, the agency is required to repeal and offset if it issues a new rule. *See* Guidance Q18. And the problem is not only that OMB requires application of the Executive Order in such instances, where its unlawfulness is most obvious. It is that even statutes that allow consideration of costs, or under which rulemaking is discretionary, do not authorize the President to bar new rules unless and until two or more existing rules can be repealed and the costs offset. The category of rulemakings to which the requirements can lawfully be applied is a null set.

Although plaintiffs have argued at length that Executive Order 13771 cannot be lawfully implemented under any regulatory statute, *see* Pltfs. SJ Memo. 25–30, defendants have *not identified a single statute* providing (explicitly or implicitly) otherwise. Because no statute allows the President or OMB to make an agency's rulemaking authority contingent on the agency's ability to offset a rule's costs through repeal of existing rules, the "consistent with law" provision only serves to emphasize that the Order is, legally, a nullity. *See Cty. of Santa Clara v. Trump*, __ F. Supp. 3d __, 2017 WL 1459081, at *26 (N.D. Cal. Apr. 25, 2017) (stating that the government's "attempt to resolve all of the Order's constitutional infirmities with a 'consistent with law' bandage is not convincing").

II.     **Plaintiffs' claim based on violation of the Take Care Clause is actionable.**

Defendants do not contest that a president's usurpation of authority properly belonging to another branch can be litigated, and that proposition itself is enough to sustain plaintiffs' claims in this case. Although defendants quixotically insist that a president's obligations to respect congressional authority under the Take Care Clause cannot be invoked in support of such claims, their theory relies on cases addressing the reviewability of a president's purely discretionary acts. *See* Defs. SJ Resp. 32 (citing, e.g., *Mississippi v. Johnson*, 71 U.S. (4 Wall.) 475, 501 (1867); *Dalton v. Specter*, 511 U.S. 462, 474–75 (1994); *Heckler v. Chaney*, 470 U.S. 821, 830 (1985)). That issue is not pertinent here. Although "the Court cannot issue an order directing the President's 'exercise of judgment' in law enforcement[,] [w]hat is within this Court's determination, … is whether the *Order* at issue faithfully executes existing law. It does not." *U.S. Telecom Ass'n v. FCC*, 855 F.3d 381, 415 n.8 (D.C. Cir. 2017) (Brown, J., dissenting from denial of rehearing en banc (citing *Mississippi v. Johnson*, 71 U.S. at 499)).

Defendants' effort to dismiss plaintiffs' citations showing that a Take Care Clause claim is actionable is unconvincing. Defs. SJ Resp. 32 (addressing Pltfs. SJ Mem. at 22). At a minimum, those citations demonstrate that defendants are wrong to assert that the Supreme Court has already resolved the question in their favor. Defendants make no attempt to explain, for example, why the Supreme Court would order the parties in a recent case to brief the question whether an executive order violated the Take Care Clause if the Court's case law established that the question was not actionable. *See United States v. Texas*, 136 S. Ct. 906 (2016) (order granting certiorari and asking parties to brief the additional question "Whether the Guidance [at issue] violates the Take Care Clause of the Constitution, Art. II, § 3"). Moreover, defendants have no answer to the point that courts can and do consider whether a President's actions can be

10

justified under the Take Care Clause in the course of adjudicating claims that those actions violate separation of powers. *See Youngstown*, 343 U.S. at 587–88 (opinion of the Court); *id*. at 610 (Frankfurter, J., concurring); *id*. at 660 (Clark, J., concurring in the judgment); *see also Kendall v. U.S. ex rel. Stokes*, 37 U.S. (12 Pet.) 524, 613 (1838).

Defendants also err in arguing that a Take Care Clause violation cannot serve as the basis for review of the actions of agency officials. The courts have repeatedly made clear that constitutional challenges to executive orders exceeding presidential authority are justiciable and that the unconstitutionality of an executive order can serve as the basis for holding agency action unlawful. *See, e.g.*, *Chamber of Commerce v. Reich*, 57 F.3d 1099 (D.C. Cir. 1995); *Cty. of Santa Clara*, 2017 WL 1459081; *Hawai'i v. Trump*, __ F. Supp. 3d __, 2017 WL 1011673 (D. Haw. Mar. 15, 2017), *aff'd on other grounds*, 859 F.3d 741 (9th Cir.), *cert. granted*, 137 S. Ct. 2080 (2017).

## III.   Imposing and implementing the requirements of Executive Order 13771 is *ultra vires* conduct subject to non-statutory judicial review.

### A.   Defendants' *ultra vires* action is reviewable under Supreme Court and D.C. Circuit precedent.

Addressing the causes of action alleging *ultra vires* action, defendants continue to ignore *American School of Magnetic Healing v. McAnnulty*, 187 U.S. 94 (1902), and to give short shrift to *Chamber of Commerce v. Reich*, 74 F.3d 1322 (D.C. Cir. 1996) (*Reich II*). As *McAnnulty* and its progeny recognize, "[w]hen an executive acts *ultra vires*, courts are normally available to reestablish the limits on his authority." *Dart v. United States*, 848 F.2d 217, 224 (D.C. Cir. 1988). "[C]ourts will 'ordinarily presume that Congress intends the executive to obey its statutory commands and, accordingly, that it expects the courts to grant relief when an executive agency violates such a command.'" *Reich II*, 74 F.3d at 1328 (collecting cases) (citation

11

omitted). *See* Pltfs. SJ Memo. at 11 (citing cases). In this case, plaintiffs' first four causes of action all fit within the *McAnnulty* framework; all four are premised on the Executive Order's unconstitutional directives compelling federal agencies to take action unauthorized by the statutes from which they derive their authority.

Defendants focus instead on *Leedom v. Kyne*, 358 U.S. 184 (1958), and on D.C. Circuit cases discussing the circumstances in which *Leedom* permits adjudication of claims that an agency has committed a statutory violation when the statute impliedly or expressly precludes review. In *Leedom*, the Supreme Court allowed a challenge to a National Labor Relations Board (NLRB) decision that violated a specific statutory prohibition, although review of NLRB actions outside of the National Labor Relations Act's exclusive review provisions (which did not allow review in the circumstances of the case) is generally precluded. The Court, citing *McAnnulty*, held that non-statutory review was available: "This Court cannot lightly infer that Congress does not intend judicial protection of rights it confers against agency action taken in excess of delegated powers." *Leedom*, 358 U.S. at 190.

Although *Leedom* itself exercised non-statutory review to confine agency action within the bounds of the law, defendants cite *Nyunt v. Chairman, Broadcasting of Governors*, 589 F.3d 445, 449 (D.C. Cir. 2009), as holding that *Leedom* limits non-statutory review to circumstances where a statutory claim is impliedly rather than expressly precluded, the underlying statutory violation is clear, and "there is no alternative procedure for review of the statutory claim." Defs. SJ Resp. 35. According to defendants, *Nyunt* forecloses a non-statutory review action here because the Administrative Procedure Act (APA) supplies an alternative procedure for review. As *Nyunt* makes clear, however, *Leedom*'s limitations on review apply only where a plaintiff seeks "judicial review of agency action for alleged statutory violations … when a statute

precludes review." 589 F.3d at 449.[6] Because allowing review of *statutory* violations in the face of a *statute precluding review* is "extraordinary," *Nat'l Air Traffic Controllers Ass'n v. Fed. Serv. Impasses Panel*, 437 F.3d 1256, 1263 (D.C. Cir. 2006) (citation omitted), *Leedom*'s exception to such preclusion is "limited." *Nyunt*, 589 F.3d at 449.

Those limitations do not apply here, for two reasons. First, defendants concededly can neither point to a statutory provision that expressly precludes review here, nor to the sort of comprehensive, specialized review provisions that, in cases such as *Nyunt*, the courts found indicated the requisite clear congressional intent to preclude review impliedly. *See* Defs. SJ Resp. 35 ("Here, of course, there is no statute that precludes judicial review[.]"). Thus, *Leedom*'s "exception" for cases in which a statute precludes review is inapposite. Second, the violations claimed here are not statutory violations: Plaintiffs state a facial constitutional challenge to separation-of-powers violations. As the D.C. Circuit held in *McBryde v. Committee to Review Circuit Council Conduct & Disability Orders*, 264 F.3d 52, 58 (2001), such claims are permissible even where a statute precludes other claims.

Ignoring the latter point altogether, defendants appear to assert that *Leedom* and *Nyunt*'s limits on judicial review apply here because the APA functions as both a review-preclusion statute and as the available alternative procedure for review that, under *Nyunt*, bars non-statutory review. They cite no authority, however, treating the APA—which embodies a broad presumption in favor of judicial review, *see Abbott Labs. v. Gardner*, 387 U.S. 136, 141 (1967)—as a review-preclusion statute within the meaning of these precedents. Moreover, *Reich II* is fatal to defendants' unsupported assertion that the possibility of future challenges under the

---

[6] In *Nyunt*, for example, review was impliedly precluded by the comprehensive remedial provisions of the Civil Service Reform Act, which generally preclude other avenues of review of agency personnel actions. *See* 589 F.3d at 448–49.

APA precludes *McAnnulty* non-statutory review. As defendants recognize, the plaintiffs in *Reich II* had declined to *allege* an APA claim, although such a claim "appear[ed] … to be an available statutory cause of action." Defs. SJ Resp. 36 (quoting *Reich II*, 74 F.3d at 1327). And future agency actions implementing the executive order at issue would have been subject to APA review. Nonetheless, the court entertained the plaintiffs' non-statutory cause of action to vindicate what defendants here concede were "judicially enforceable limitations on presidential action." *Id.* (quoting *Reich II*, 74 F.3d at 1332). If, as defendants argue, the APA precluded non-statutory review, *Reich II* would be inexplicable.

Furthermore, here, even more than in *Reich II*, "any relief short of a declaration that the Executive Order is illegal would be inadequate," 74 F.3d at 1326, because the challenge is to requirements that distort the rulemaking process itself. Even where *Leedom* applies, an alternative avenue of review must be "meaningful and adequate" to bar a claim. *Nat'l Air Traffic Controllers*, 437 F.3d at 412 (quoting *Bd. of Govs., Fed. Reserve Sys. v. MCorp Fin., Inc.* 502 U.S. 32, 43 (1991)). Challenges to any particular rulemaking under Executive Order 13771 would not be a meaningful or adequate means of remedying the pervasive distortion of the administrative process wrought by the Order. Such APA challenges could not address, for example, rules never issued because of an agency's inability to offset costs. And delays caused by the Executive Order cannot be cured after the fact. *See also* Jones Decl. ¶ 14 (former Assistant Administrator for EPA's Office of Chemical Safety & Pollution Prevention discussing impact of the Executive Order's requirements on rulemaking); Michaels Decl. ¶¶ 17–23 (former Assistant Secretary of Labor for Occupational Safety and Health, discussing same); Wagner Decl. ¶ 7 (former Deputy Assistant Secretary of Labor for Mine Safety and Health, discussing same); David Friedman, *Two for One: A Very Bad Deal for Our Nation*, Appendix 4, Union of

Concerned Scientists Blog, Apr. 10, 2017, at http://blog.ucsusa.org/guest-commentary/two-for-one-a-very-bad-deal-for-our-nation (former Acting Administrator at National Highway Traffic Safety Administration, discussing same). As defendants recognize, the D.C. Circuit has held that it is "untenable to conclude that there are no judicially enforceable limitations on presidential actions." Defs. SJ Resp. 36 (quoting *Reich II*, 74 F.3d at 1332). Yet that would be the result of withholding judicial review here.

### B.   Implementation by agency officials of a presidential order that unconstitutionally imposes substantive rulemaking requirements unauthorized by statute is ultra vires.

Defendants' assertion that consideration of costs by a regulatory agency is not *ultra vires*, Def. SJ Resp. 36, misses the point. Plaintiffs do not claim that "consideration of costs" is generally *ultra vires*. The issue here is the President's substitution of an entirely new regulatory paradigm for the statutory authority that governs rulemaking. Executive Order 13771 allows agencies to issue rules only if they repeal two or more existing rules and offset the costs of the new rule by eliminating existing regulatory requirements. That fundamental alteration of the requirements for rulemaking goes far beyond requiring that the costs of a new rule be "considered" within the framework of the statutory authorization for the rule. Under Executive Order 13771, cost offsets and the repeal of two or more separate rules are "required."[7]

---

[7] *See* Exec. Order 13771, § 2(a) (requiring that an agency "shall identify at least two existing regulations to be repealed" whenever proposing or adopting a new rule); *id*. § 2(c) (requiring any costs of new rule "shall" be offset by eliminating existing costs of at least two existing rules); Interim Guidance 1 ("Specifically, the guidance explains, for purposes of implementing Section 2 in Fiscal Year 2017, the following requirements …"); Guidance 1 ("The guidance explains, for purposes of implementing Section 2, the following requirements: …"); *id*. at 2 ("The incremental costs associated with EO 13771 regulatory actions must be fully offset by the savings of EO 13771 deregulatory actions.").

Although again insisting that these requirements are within the scope of existing statutory delegations of rulemaking authority, defendants identify no statute to support that assertion. Instead, defendants suggest that Executive Branch agencies can invent new rulemaking criteria and requirements, as long as doing so is not expressly prohibited by statute. *See* Defs. SJ Resp. 37. Defendants have it exactly backward. "[I]t is 'axiomatic' that 'administrative agencies may act only pursuant to authority delegated to them by Congress.'" *Clean Air Council v. Pruitt*, __ F.3d __, 2017 WL 2838112, *4 (D.C. Cir. July 3, 2017) (quoting *Verizon v. FCC*, 740 F.3d 623, 632 (D.C. Cir. 2014)); *see* Pltfs. SJ Memo. 21 (citing cases); Pltfs. MTD Opp. 33 (citing additional cases). The Executive Branch thus lacks authority to fundamentally reshape the substantive bounds of regulatory programs. "Regardless of how serious the problem an administrative agency seeks to address, … it may not exercise its authority in a manner that is inconsistent with the administrative structure that Congress enacted into law." *Brown & Williamson v. FDA*, 529 U.S. 120, 125–26 (2000) (citation and internal quotation marks omitted). For example, in *Whitman v. Am. Trucking Ass'ns*, 531 U.S. 457 (2001), the Supreme Court held that the substantive requirements governing rulemaking under section 7409 of Clean Air Act depended on an evaluation of whether the statute could reasonably be construed to incorporate particular criteria—not evaluating whether the Act specifically prohibited them. *See id.* at 468 ("Accordingly, to prevail in their present challenge, respondents must show a textual commitment of authority to the EPA to consider costs in setting [national air quality standards]."); *see also* Pltfs. MTD Opp. 31 (addressing defendants' argument on this point). Defendants' failure to identify any statute that permits issuance of a rule to be conditioned on repeal of two or more unrelated rules and offset of the new rule's cost is thus fatal to their defense of the Executive Order.

16

**C.    OMB lacks authority to implement an unlawful executive order.**

Defendants also argue that OMB's implementation of Executive Order 13771 is not *ultra vires* because OMB is "authorized to administer a valid Executive Order." *See* Defs. SJ Resp. 38. This response begs the question whether Executive Order 13771 is "valid." Defendants do not argue that OMB has authority to administer an *invalid* executive order. Thus, their argument effectively concedes plaintiffs' point that, if Executive Order 13771 is unlawful, OMB's implementation of it is as well.

More generally, defendants argue that OMB properly may "oversee[] the rulemaking of federal agencies on behalf of the President." *Id*. at 39. Plaintiffs agree insofar as the President has such authority. OMB, like any agency, "must implement the President's policy directives to the extent permitted by law." *Sherley v. Sebellius*, 689 F.3d 776, 784 (D.C. Cir. 2012). Where, as here, the President's directive exceeds his legal authority, however, OMB, like any other agency, lacks authority to implement it. *See Dart*, 848 F.2d at 224; *see also Reich II*, 74 F.3d at 1339; *Environmental Defense Fund*, 627 F. Supp. at 571 (executive order does not justify OMB delay of new rule past statutory deadline).

**III.    The OMB Guidances violate the APA.**

**A.** Responding to plaintiffs' demonstration that the OMB Guidances must be set aside under the APA, defendants argue that the OMB Guidances are not final agency action. *See* Defs. SJ Resp. 40–42. Plaintiffs have responded fully to this argument in their opposition to defendants' motion to dismiss. *See* Pltfs. MTD Opp. 42–45.

**B.** Defendants also contend that, if the OMB Guidances are final agency action, they are not arbitrary, capricious, or in excess of statutory authority. *See* Defs. SJ Resp. 42–48. They begin by defending the Guidances as good policy, but "the self-proclaimed wisdom of the

approach cannot save it because the Congress, in its more commanding wisdom, has not authorized it." *Oceana v. Locke*, 670 F.3d 1238, 1243 (D.C. Cir. 2011).

Defendants' more substantive argument rests principally on their assertion that plaintiffs misunderstand Executive Order 13771 in three ways, but defendants are wrong on each point. First, defendants assert that plaintiffs overlook the continued applicability of Executive Order 12866 and, in particular, its requirement that agencies engage in a cost-benefit analysis when issuing new rules or repealing old ones. Retention of Executive Order 12866, however, does not render lawful the new requirements of Executive Order 13771 and the OMB Guidances. Although OMB has stated that agencies must continue to consider both costs and benefits in compliance with Executive Order 12866 (where permitted by statute), *see* Guidance Q32, that consideration does not alter the requirements of Executive Order 13771 and the OMB Guidances that for each new significant regulatory action the agency must "[i]dentify two existing regulatory actions the agency plans to eliminate" and "[f]ully offset the total incremental cost of" the new rule. Guidance at 2.

Second, defendants assert that plaintiffs overlook the "unless prohibited by law" provision. As plaintiffs have explained, this boilerplate language cannot save an executive order that is fundamentally inconsistent with law. *See* Pltfs. MTD Opp. 28–30; *see also supra* p. 9. Again, defendants have identified no statute that authorizes what Executive Order 13771 commands.

Third, defendants state that plaintiffs err by assuming that only a repeal of a rule can be used to offset the costs of a new rule, when revisions of rules and modification of guidance documents or information collection requests can also supply offsets. To start, Executive Order 13771 states that, whenever an agency "publicly proposes for notice and comment or otherwise promulgates a new regulation, it shall identify at least two existing regulations to be repealed."

Sec. 2(a). The President reiterated this clearly stated requirement: "If there's a new regulation, they have to knock out two. But it goes far beyond that, we're cutting regulations massively for small business and for large business." Bourree Lam, *Trump's 'Two-for-One' Regulation Executive Order*, The Atlantic, Jan. 30, 2017, available at https://www.theatlantic.com/business/archive/2017/01/trumps-regulation-eo/515007 (Ex. C to Zieve Decl.). In any event, whether modifications of existing regulatory requirements qualify as "repeals" under the Executive Order has no bearing on the merits of plaintiffs' claims: Either action requires an agency to undertake an administrative process to change an existing requirement. It is no more lawful to make issuance of new rules contingent on "modifying" two or more existing rules and offsetting the costs of the new rule than to condition rulemaking on "repealing" existing rules.

After asserting these "three misunderstandings," defendants repeat their mantra that, in rulemaking, an agency may consider factors not enumerated in the governing statute. *See* Defs. SJ Resp. 45. As previously explained, an agency's authority to issue regulations with the force of law is defined by the statute enacted by Congress. *See supra* p. 8; Pltfs. SJ Memo. 25–30. Accordingly, defendants' response is insufficient to demonstrate that OMB is acting in accordance with law. *Sherley v. Sebelius* is not to the contrary. There, the court held that the decision of National Institutes of Health to disregard comments that ran directly contrary to the terms of an executive order was not arbitrary and capricious where the challenged agency action was for the purpose of implementing the executive order. *See* 689 F.3d at 785. Importantly, the case did not involve a claim that the executive order itself was unlawful or required agency action that contradicted or exceeded the agency's statutory authorization. Thus, the court's holding, quoted by defendants, that agencies "must implement the President's policy directives

to the extent permitted by law," *id.*, cannot assist defendants here, where the President's policy directive is *not* permitted by law.

Finally, in their opening memorandum, plaintiffs pointed to OMB's provision for trading of offsets between components of an agency or between agencies to show that the OMB Guidances are arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law. To make issuance of a new regulation on one topic contingent on repeal of regulations on unrelated topics and on offset of costs to potentially unrelated parties cannot reasonably be deemed anything but arbitrary: It is not within the criteria that govern rulemaking under any statute. Defendants respond that "flexibility" in allocating offsets will promote efficiency and maximize net benefits. Defendants' assessment of the purported policy benefits, however, is irrelevant to whether the 1-in, 2-out and cost-offset requirements of the OMB Guidances direct agency actions that are arbitrary, capricious, contrary to law, or in excess of statutory authority.

## IV. Plaintiffs have standing to challenge the facial illegality of Executive Order 13771.

### A. The Executive Order imposes the kind of injury to advocacy efforts that is cognizable under D.C. Circuit law.

As plaintiffs' declarations attest, Executive Order 13771 injures plaintiffs by putting them in the lose-lose position of either urging agencies to adopt new regulations, when adopting those regulations would depend on the repeal of existing regulatory safeguards, or refraining from advocating for new public protections to avoid triggering repeal of existing ones. *See* LeGrande Decl. ¶ 17; R. Weissman Decl. ¶ 8; Wetzler Decl. ¶ 11. As one declarant explained, the Executive Order places plaintiffs "in an untenable position, turning [their] exercise of [the] constitutionally protected right to 'petition the Government for [a] redress of grievances,' U.S. Const. amend. I, into a game of regulatory Russian roulette." Wetzler Decl. ¶ 11. Defendants battle a straw man when they recast plaintiffs' First Amendment injury as "the possibility of

adverse regulation and its effect on the ability to communicate." Def. SJ Resp. 21. The problem is not that the Executive Order "purport[s] to regulate the ability of [p]laintiffs to comment" or otherwise advocate for regulation, *id*. at 20, or that plaintiffs cannot "comment effectively," *id*. at 21 (quoting *Defs. Of Wildlife v. Perciasepe*, 714 F.3d 1317, 1324–25 (D.C. Cir. 2013)), but that the Order imposes negative consequences on plaintiffs' exercise of their advocacy rights.[8]

Defendants' assertion that injury to advocacy activity can never confer standing flies in the face of the principle that the right to petition the government is "one of 'the most precious of the liberties safeguarded by the Bill of Rights.'" *BE & K Constr. Co. v. NLRB*, 536 U.S. 516, 524–25 (2002) (quoting *United Mine Workers of Am., Dist. 12 v. Ill. State Bar Ass'n*, 389 U.S. 217, 222 (1967)). That claims of injury related to advocacy have failed on the particular facts of some cases does not mean that injuries to advocacy interests are never legally cognizable. Rather, many D.C. Circuit cases finding organizational standing involved activities that could "easily be characterized as advocacy—and, indeed, sometimes are." *Am. Soc'y for Prevention of Cruelty to Animals v. Feld Entm't, Inc*., 659 F.3d 13, 27 (D.C. Cir. 2011) (discussing examples).

The cases defendants cite, *Turlock Irrigation District v. FERC*, 786 F.3d 18, 24 (D.C. Cir. 2015), and *Center for Law & Education v. Department of Education*, 396 F.3d 1152, 1162 (D.C. Cir. 2005), hold that an entity cannot establish standing merely by asserting that an agency action caused it to expend more resources on advocacy. The cases do not speak to the injury alleged here, which is not based on the effect of the challenged action on the expenditure of

---

[8] Defendants contend that "Plaintiffs assert no First Amendment claim or injury in this case because the Executive Order does not restrict or even purport to regulate the ability of Plaintiffs or any other entity to comment, lobby or otherwise advocate for desired regulations or deregulatory efforts." Defs. SJ Resp. 20. Defendants are half right. Plaintiffs have not alleged a First Amendment claim, but they have alleged an injury to First Amendment petitioning and speech that is caused by the Executive Order and OMB Guidances and redresssable by the Court.

resources. Moreover, the D.C. Circuit has expressly rejected defendants' broad reading, holding instead that this line of cases stands for the narrower proposition "that an effect on an organization's lobbying efforts, absent direct conflict with the organization's mission, [is] insufficient to establish standing." *Am. Soc'y for Prevention of Cruelty to Animals*, 659 F.3d at 26–27. In this case, unlike in *Center for Law & Education*, the challenged conduct directly conflicts with plaintiffs' stated mission. *See* R. LeGrande Decl. ¶ 3–7; R. Weissman Decl. ¶¶ 3–6, 8–9; Wetzler Decl. ¶¶ 6–12, 14. The cases cited by defendants "say[] nothing about" this situation, "where the defendant's conduct is both clearly 'at loggerheads' with the organization[s'] mission[s], and allegedly injures the organization[s'] advocacy activities." *Am. Soc'y for Prevention of Cruelty to Animals*, 659 F.3d at 26–27 (citation omitted); *see also* Pltfs. MTD Opp. 8 (citing cases).

**B.    The Executive Order's ongoing effect on regulation threatens imminent harm to plaintiffs and their members.**

**1.** Plaintiffs' standing is also based on the ongoing effects of Executive Order 13771 and the OMB Guidances on the regulatory process, and the inevitable harm to plaintiffs and their members as agencies delay, withhold, and weaken new rules protecting public health, safety, and the environment. *See* Pltfs. MTD Opp. 9 (citing declarations). Defendants' memorandum does not argue, or even suggest, that the Executive Order and OMB Guidances do not have such effects, and they do not offer contrary evidence. Nor do defendants dispute that agencies are implementing the Executive Order and OMB Guidances.[9] Although defendants purport to

---

[9] *See* Defs. Resp. to Pltfs. Stmt. of Material Facts ¶ 87. Abundant evidence demonstrates that agencies are implementing the Executive Order. *See*, *e.g.*, OMB, Current Unified Agenda, *supra* note 3; Dep't of Transp., Department Regulatory Agenda; Semiannual Summary, at https://www.reginfo.gov/public/jsp/eAgenda/StaticContent/201704/Preamble_2100.html  (July 20, 2017) ("This Agenda was prepared in accordance with both EO 13771 and EO 13777, and

dispute plaintiffs' statements of material fact asserting that the Executive Order will cause agencies to delay, weaken, or forgo new rules, *see* Defs. Resp. to Statement ¶¶ 39, 42, 44, 48, 51, 59, the only "evidence" cited to support the existence of a dispute of facts is a declaration of litigation counsel that says nothing at all about the effect of the Executive Order. Notably, other than to say that one delay—attributed by the agency itself to the Executive Order—has ended, *see* Defs. SJ Resp. 11, defendants do not address the statements from the Department of Transportation (DOT), Internal Revenue Service, or Environmental Protection Agency that demonstrate that the Executive Order and OMB Guidances are delaying or preventing new rules. *See* Pltfs. SJ Memo. 13, 42. Particularly in light of the Current Unified Agenda, *see supra* note 3, the Court should therefore accept the well-supported facts concerning delay as stated in plaintiffs' statement of material facts as true. *See* Fed. R. Civ. P. 56(e) ("If a party fails to properly support an assertion of fact or fails to properly address another party's assertion of fact as required by Rule 56(c), the court may … consider the fact undisputed for purposes of the motion[.]").

Furthermore, plaintiffs have presented evidence that they and their members have an interest in an array of pending rulemakings concerning health, safety, worker, and environmental protections. Defendants decline to state that any one of these rules will proceed according to the timelines previously set forth by the agencies, or according to any timeline. They do not deny, for example, that the proposed speed-limiting rule for school buses—a rule that DOT had previously planned to issue in 2017, *see* 81 Fed. Reg. 94496, 94612 (2016)—will be delayed, weakened, or abandoned, but only assert that declarant Fleming, whose young children will ride

---

the Department will continue to work internally, as well as with the Office of Management and Budget, to fully implement their principles into our rulemaking processes."); Dep't of Commerce, Notice, 82 Fed. Reg. 31576 (2017) (requesting public input on rules to repeal to inform agency implementation of Executive Order 13771); *see also* Pltfs. MTD Opp. 29 (citing examples).

school buses for years to come, *see* Fleming Decl. ¶ 4, does not know with certainty otherwise. *See* Defs. SJ Resp. 15. The Current Unified Agenda evidences the delay. *See* Current Unified Agenda, *supra* note 3, at https://www.reginfo.gov/public/do/eAgendaViewRule?pubId=201704& RIN=2127-AK92 ("Next Action Undetermined;" date "To Be Determined"). Defendants do not deny that the proposed rule on safety requirements for rail transportation of crude oil—a rule previously planned for July 2017, *see* 81 Fed. Reg. at 94613—has been delayed and may be weakened, but only assert that declarant Coward, who lives near a major crude oil rail-to-barge terminal and several crude oil rail lines, *see* Coward Decl. ¶¶ 7–9, does not know with certainty otherwise. *See* Defs. SJ Resp. 15. Again, the Current Unified Agenda evidences the delay. *See* Current Unified Agenda, *supra* note 3, at https://www.reginfo.gov/public/do/eAgendaView Rule?pubId=201704&RIN=2137-AF08 (listing date of final rule as December 2017).

Defendants' challenges to the knowledge of these declarants are misdirected because their declarations are offered as evidence of injury resulting from the delay, not as evidence that the delay is ongoing. To establish that delay of these and other regulations attributable to Executive Order 13771 is inevitable and occurring, plaintiffs have presented statements from various federal agencies that defendants neither deny nor explain away. *See* Pltfs. SJ Memo. 13, 42. They have also submitted declarations of former officials with extensive knowledge of rulemaking in various agencies explaining that Executive Order 13771 necessarily will have such effects. *See* Jones Decl. ¶ 14; Michaels Decl. ¶¶ 17–23; Wagner Decl. ¶ 7; *see also* David Friedman, *supra* p. 14. This evidence, and plaintiffs' arguments based on it, is not genuinely disputed. Indeed, in light of the Current Unified Agenda, it cannot be.

**2.** Turning to causation, defendants observe that a rulemaking may be delayed, revised, or abandoned for a number of reasons, and argue that plaintiffs cannot show that Executive Order

13771, as opposed to one of those other reasons, is the cause of their injury. *See* Defs. SJ Resp. 14, 18. Although defendants are correct that a number of factors may affect the progress and completion of rulemaking, "[a]t a minimum," the requirements of the Executive Order and OMB Guidances "contribute[]" to and exacerbate plaintiffs' injuries. *Massachusetts v. EPA*, 549 U.S. 497, 523 (2007). Defendants' argument thus "rests on the erroneous assumption that a small incremental step, because it is incremental, can never be attacked in a federal judicial forum. Yet accepting that premise would doom most challenges to regulatory action." *Id*. at 524; *see also Hawai'i v. Trump*, 859 F.3d at 763, 767 n.8 (finding standing where challenged executive order posed a barrier that delayed or prevented issuance of visas, notwithstanding existence of other barriers); *Sierra Club v. EPA*, 755 F.3d 968, 973 (D.C. Cir. 2014) ("When, as here, the party seeking judicial review challenges an agency's regulatory failure, the petitioner need not establish that, but for that misstep, the alleged harm certainly would have been averted."); *Nat'l Parks Conservation Ass'n v. Manson*, 414 F.3d 1, 7 (D.C. Cir. 2005) (finding standing to challenge agency action where ruling for plaintiff would impact permitting proceedings but would not guarantee plaintiff's desired outcome); *Pub. Interest Research Grp. of N.J., Inc. v. Powell Duffryn Terminals Inc*., 913 F.2d 64, 72 & n.8 (3d Cir. 1990) (finding standing where challenged action is just one cause of plaintiff's injuries); *R.I.L-R v. Johnson*, 80 F. Supp. 3d 164, 178 (D.D.C. 2015) (finding standing to challenge one factor causing plaintiff's injury). Thus, that eliminating Executive Order 13771 would not guarantee issuance of any particular new rule "does not by itself support the notion that federal courts lack jurisdiction to determine whether that [Order] conforms to law." *Massachusetts v. EPA*, 549 U.S. at 524.

"When performing that inherently imprecise task of predicting or speculating about causal effects, common sense can be a useful tool." *Carpenters Indus. Council v. Zinke*, 854 F.3d

1, 6 (D.C. Cir. 2017); *id*. at 6–7 (crediting plaintiff's declaration as to "likely" consequence of agency action). Defendants offer no evidence to rebut the common-sense conclusion that Executive Order 13771's 1-in, 2-out and cost-offset requirements will necessarily delay, weaken, or prevent issuance of new rules. In fact, they do not even argue that the Executive Order will not do so. The declarations from plaintiffs' members and staff and the testimony of former regulators about the inevitable impact of Executive Order 13771, as well as the agencies' own statements, *see* Pltfs. MTD Opp. 10, 14, and Current Unified Agenda, are unrebutted evidence that delay will occur and will harm plaintiffs. This evidence establishes that the Order is a cause of their injury.

**3.** Defendants briefly argue that plaintiffs have failed to establish that their members' injuries are redressable. *See* Defs. SJ Resp. 19. Plaintiffs' showing of causation establishes redressability, for "[c]ausation and redressability typically 'overlap as two sides of a causation coin.' After all, if a government action causes an injury, enjoining the action usually will redress that injury." *Carpenters Indus. Council*, 854 F.3d at 6 n.1 (quoting *Dynalantic Corp. v. Dep't of Defense*, 115 F.3d 1012, 1017 (D.C. Cir. 1997)). Here, eliminating Executive Order 13771 will redress the injury by removing its barriers to issuance of new regulations. That other factors also affect the pace and content of rulemaking does not vitiate plaintiffs' standing. *See supra* p. 25 (citing cases).

## V.     This challenge to Executive Order 13771 is ripe for review.

Plaintiffs' opening memorandum explains why this case is ripe for review, and their opposition to the motion to dismiss expands on that discussion. Those memoranda fully respond to defendants' ripeness argument. As they explain, no further factual development is needed to answer the questions whether, without congressional authorization, the President constitutionally may condition issuance of a new regulation on repeal of two or more existing ones that offset the

costs of the new regulation, or may impose an annual regulatory cost cap. These purely legal questions are fit for review; the Executive Order and OMB Guidances are final, in effect, and affecting agency decisionmaking today, and ongoing implementation is causing hardship to plaintiffs and their members. *See* Pltfs. SJ Memo. 16–17; Pltfs. MTD Opp. 20–24.

## VI.    Defendants' request to delay resolution of this case through discovery should be denied.

Through the Declaration of Daniel Bensing, defendants state that they need discovery to dispute plaintiffs' showing that the Executive Order will affect pending rulemakings and injure plaintiffs' members. The request for discovery appears to be an effort to delay the Court's consideration of the merits of this action. The scope of the pending rules, their benefits to members of the public, and the impact of Executive Order 13771 are matters known best to defendants themselves. Because Defendants have not carried their burden to show "with sufficient particularity" the necessity of discovery, *U.S. ex rel. Folliard v. Gov't Acquisitions, Inc.*, 764 F.3d 19, 26 (D.C. Cir. 2014), this Court should deny defendants' Rule 56(d) request.

**A.** A party opposing summary judgment under Federal Rule of Civil Procedure 56(d) must, through a declaration, describe "the particular facts" the non-movant intends to discover, "why those facts are necessary," and "why [the non-movant] could not produce the facts in opposition to the motion for summary judgment." *Id.* (internal quote marks omitted). The declaration "cannot be a generalized, speculative request to conduct discovery." *Estate of Parsons v. Palestinian Auth.*, 715 F. Supp. 2d 27, 35 (D.D.C. 2010) (internal quotation marks omitted). And a "vague," "boilerplate'" request does not satisfy Rule 56(d). *Jeffries v. Lynch*, 217 F. Supp. 3d 214, 227 (D.D.C. 2016) (quoting *Folliard*, 764 F.3d at 29). An inadequate Rule 56(d) request can be denied even if no discovery has yet occurred. *See, e.g., Dunning v.*

*Quander*, 508 F.3d 8, 10-11 (D.C. Cir. 2007); *Little v. Commercial Audio Assocs.*, 81 F. Supp. 3d 58, 63 (D.D.C. 2015).

Defendants' generalized request to take discovery of "facts relevant to Plaintiffs' allegations of standing," Bensing Decl. ¶ 6, fails to satisfy these requirements. Indeed, defendants acknowledge their failure specifically to identify the information they wish to obtain. *See id*. ¶ 12 (stating that "it is difficult to predict before discovery has begun" what discovery defendants will seek). By stating that they "reserve the right to take discovery on additional topics, including topics Defendants may become aware of in the course of discovery," Bensing Decl. ¶ 13, defendants make evident their desire to engage in an impermissible "fishing expedition." *Graham v. Mukasey*, 608 F. Supp. 2d 50, 54 (D.D.C. 2009).

Defendants also have not shown "with sufficient particularity" the necessity of the requested discovery. For example, defendants claim to need discovery concerning rulemaking delays caused by Executive Order 13771, *see* Bensing Decl. ¶ 9 (claiming to need discovery on the "basis for [the declarants'] claim that the Executive Order will cause OSHA to delay, weaken or forgo issuing a new standard"), but evidence as to whether Executive Order is causing delay of any particular rulemaking is information already within *defendants*' possession. Defendants do not need discovery to obtain evidence about their own conduct. Moreover, the two witnesses from whom defendants claim they wish to seek discovery about delays (declarants Bauer and Fleming) are not even witnesses on whom plaintiffs rely to establish the fact of delay.

Even as to the two declarants for whom defendants identify topics for discovery, *see id*. ¶¶ 9-10, defendants do not satisfy Rule 56(d). For instance, defendants' declarant claims a need to ask Public Citizen member Fleming how a proposed EPA rule addressing the use of the toxic chemical NMP in paint remover would benefit her. Bensing Decl. ¶ 10. But the EPA's proposed

rule makes clear how the rule would benefit the 2,002,000 consumers exposed to NMP in paint removers. 82 Fed. Reg. 7464, 7466, 7467 (2017). Given the content of the agency's proposed rule and the absence of any reason to doubt the veracity of the declarants' sworn statements, defendants' explanation of the basis for discovery regarding the declarants' statements of their own activities is insufficient under Rule 56(d).

Just as importantly, the Bensing Declaration does not identify *any* "particular facts," *Folliard*, 764 F.3d at 26, as to which defendants even claim to need discovery with respect to fifteen of plaintiffs' seventeen declarants or with respect to two of the three topics addressed by declarant Fleming. Nor does the Bensing Declaration attempt to "establish a 'reasonable basis' to suggest that the requested discovery will reveal triable issues of fact." *Dunning v. Ware*, __ F. Supp. 3d __, 2017 WL 2257330, at *2 (D.D.C. May 22, 2017) (quoting *Carpenter v. Fed. Nat'l Mortg. Ass'n*, 174 F.3d 231, 237 (D.C. Cir. 1999)). For instance, Mr. Bensing has claimed no need to question Public Citizen member Terri Weissman about her intent to purchase a car after the point in time when DOT had stated (before issuance of Executive Order 13771) that it intended to adopt a particular new federal motor vehicle safety standard. *See* 82 Fed. Reg. 3854, 3855–57 (2017). The same is true for the fourteen other declarants.

Thus, even aside from the Bensing Declaration's failure to satisfy the Rule 56(d) standard as to the particular averments in the two declarations it targets, the declaration would not justify delaying summary judgment because the sworn statements of the other fifteen declarants, as well as statements of declarant Fleming not addressed by Mr. Bensing, establish plaintiffs' standing. *See Nat'l Fed'n of Fed. Emps. v. United States*, 905 F.2d 400, 402 (D.C. Cir. 1990) ("We affirm the district court's finding that [one plaintiff] has standing to pursue its constitutional claims and consequently need not reach the question of [the other plaintiff's] standing.").

**B.** Because plaintiffs' evidence is unrebutted, the Court can grant summary judgment to plaintiffs now. If, however, the Court permits defendants to take jurisdictional discovery, such discovery should be mutual. Defendants predicate their justiciability defenses on their unsupported attempt to contest plaintiffs' factual averment that Executive Order 13771 is delaying, weakening, or preventing issuance of new rules. If defendants are permitted jurisdictional discovery, plaintiffs should be allowed discovery of OMB and the regulatory agencies to develop additional evidence that the Executive Order is delaying, weakening, and preventing new rules that impact plaintiffs and their members. The Current Unified Agenda, *see supra* note 3, states that, as a step in implementing Executive Order 13771, agencies have withdrawn 469 action proposed in 2016 and reclassified 391 actions previously listed as active to the "long-term" or "inactive"—including actions that would benefit plaintiffs' members, such as an OSHA standard for workplace exposure to infectious disease and DOT standards for speed-limiter devices for heavy vehicles and vehicle-to-vehicle technology. If the Court believes that there are genuine issue of material facts concerning the impact of the Executive Order that preclude summary judgment for plaintiffs at this time, plaintiffs would seek discovery into the agencies' implementation of the Executive Order.

## CONCLUSION

For the foregoing reasons and the reasons set forth on the memorandum in support of plaintiffs' motion for summary judgment, this Court should declare the Executive Order unlawful and set it aside, declare the OMB Guidances unlawful, and enjoin implementation of the Executive Order and the OMB Guidances.

Dated: July 21, 2017

Respectfully submitted,

    /s/                 .

Michael E. Wall

(CA Bar No. 170238)

Cecilia D. Segal

(CA Bar No. 310935)

NATURAL RESOURCES DEFENSE

COUNCIL, INC.

111 Sutter Street, Floor 21

San Francisco, CA  94104

(415) 875-6100

Allison M. Zieve

(DC Bar No. 424786)

Scott L. Nelson

(DC Bar No. 413548)

Sean M. Sherman

(DC Bar No. 1046357)

PUBLIC CITIZEN LITIGATION GROUP

1600 20th Street NW

Washington, DC  20009

(202) 588-1000

Counsel for Natural Resources Defense
Council, Inc.

Counsel for all Plaintiffs

Guerino J. Calemine, III

(DC Bar No. 465413)

COMMUNICATIONS WORKERS OF

AMERICA

501 3rd Street NW

Washington, DC  20001

(202) 434-1100

Patti A. Goldman

(DC Bar No. 398565)

EARTHJUSTICE

705 2nd Avenue, #203

Seattle, WA  98104

(206) 343-7340

Counsel for Communications Workers
of America

Counsel for all Plaintiffs