**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| PUBLIC CITIZEN, INC., *et al.*, | |
| Plaintiffs, | |
| v. | Civil Action No. 1:17-cv-00253 RDM |
| DONALD J. TRUMP, in his official capacity as President of the United States, *et al.*, | |
| Defendants. | |

**REPLY IN SUPPORT OF DEFENDANTS' MOTION TO DISMISS**

DATED:  July 21, 2017

CHAD A. READLER
*Acting Assistant Attorney General*
Civil Division

CHANNING D. PHILLIPS
*United States Attorney*

BRETT A. SHUMATE
*Deputy Assistant Attorney General*
Civil Division, Federal Programs Branch

ERIC R. WOMACK
*Assistant Branch Director*
Civil Division, Federal Programs Branch

*/s/ Daniel Bensing*
DANIEL BENSING (D.C. Bar No. 334268)
*Senior Trial Counsel*

MICHAEL DREZNER (VA Bar No. 83836)
*Trial Attorney*
U.S. Department of Justice
Civil Division, Federal Programs Branch
20 Massachusetts Ave, NW
Washington, DC 20530
Telephone: (202) 305-0693
Email: Daniel.Bensing@usdoj.gov

*Counsel for Defendants*

## <u>TABLE OF CONTENTS</u>

INTRODUCTION ..................................................................................................................1

ARGUMENT ......................................................................................................................3

    I.     Plaintiffs Have Failed to Establish Standing to Sue on their Own Behalf or
on Behalf of their Members ......................................................................................3

          A.     Plaintiffs Have Failed to Properly Allege Standing as Organizations ..............3

          B.     Plaintiffs Have Failed to Show Standing on Behalf of their Members ..............6

                 1.     Plaintiffs' Members Have Not Shown Imminent Injury ......................6

                 2.     Plaintiffs Have Not Shown that their Injury Would be Traceable
to Executive Order 13,771 .................................................................10

                 3.     Plaintiffs Concede that their Injuries May Not Be Redressed
by the Relief Sought ...........................................................................13

          C.     Plaintiffs' Suit is Not Ripe ...............................................................................14

    II.     Plaintiffs Have Failed to State a Claim ..................................................................17

          A.     Plaintiffs Have Failed to State a Claim for Violation of the
Separation of Powers .......................................................................................17

          B.     Plaintiffs Have Not Stated a Claim Under the "Take Care" Clause
of Article II .....................................................................................................22

          C.     Plaintiffs Have Not Established the Basis for an *Ultra Vires* Claim
Against Defendants ..........................................................................................24

          D.     OMB's Guidance Does Not Constitute Final Agency Action Under
the APA ...........................................................................................................28

CONCLUSION ................................................................................................................30

## TABLE OF AUTHORITIES

<u>**CASES**</u>                                                                                                                     <u>**PAGE(S)**</u>

*Am. Fed'n of Gov't Emps. v. Sec'y of Air Force,*
    716 F.3d 633 (D.C. Cir. 2013) ............................................................................... 26

*Am. Portland Cement All. v. EPA,*
    101 F.3d 772 (D.C. Cir. 1996) ............................................................................... 10

*Am. Soc'y for Prevention of Cruelty to Animals v. Feld Entm't, Inc.,*
    659 F.3d 13 (D.C. Cir. 2011) ................................................................................... 4

*Appalachian Power Co. v. EPA,*
    208 F.3d 1015 (D.C. Cir. 2000) ............................................................................. 16

*Ariz. Dream Act Coal. v. Brewer,*
    855 F.3d 957 (9th Cir. 2017) ................................................................................. 23

*Armstrong v. Exceptional Child Ctr.,*
    135 S. Ct. 1378 (2015) ........................................................................................... 12

*Arpaio v. Obama,*
    797 F.3d 11 (D.C. Cir. 2015) ................................................................................. 14

*Ass'n of Flight Attendants-CWA v. U.S. Dep't of Transp.,*
    564 F.3d 462 (D.C. Cir. 2009) ......................................................................... 12, 13

*Autor v. Blank,*
    892 F. Supp. 2d 264 (D.D.C. 2012) ........................................................................ 4

*Baltimore Gas & Elec. Co. v. FERC,*
    252 F.3d 456 (D.C. Cir. 2001) ............................................................................... 23

*Bd. of Governors of the Fed. Reserve Sys. v. MCorp Fin., Inc.,*
    502 U.S. 32 (1991) ................................................................................................. 25

*Bennett v. Spear,*
    520 U.S. 154 (199) ........................................................................................... 28, 29

*\*Bldg. & Constr. Trades Dep't v. Allbaugh,*
    295 F.3d 28 (D.C. Cir. 2002) ........................................................................... 21, 22

*Bristol-Myers Co. v. F.T.C.,*
    424 F.2d 935 (D.C. Cir. 1970) ............................................................................... 16

*Carpenters Indus. Council v. Zinke*,
   854 F.3d 1 (D.C. Cir. 2017) ............................................................................ 13

*Chamber of Commerce v. Reich*,
   74 F.3d 1322 (D.C. Cir. 1996) ............................................................. 17, 24, 25

*Chamber of Commerce v. Reich*,
   57 F.3d 1099 (D.C. Cir. 1995) ...................................................................... 16

*Clapper v. Amnesty Int'l*,
   568 U.S. 398 (2013) ...................................................................................... 10

*Coal. for Mercury-Free Drugs v. Sebelius*,
   671 F.3d 1275 (D.C. Cir. 2012) ..................................................................... 9

*Ctr. for Auto Safety v. Peck*,
   751 F.2d 1336 (D.C. Cir. 1985) .................................................................... 20

*Ctr. for Biological Diversity v. Dep't of Interior*,
   563 F.3d 466 (D.C. Cir. 2009) ..................................................................... 13

*\*Ctr. for Law & Educ. v. Dep't of Educ.*,
   396 F.3d 1152 (D.C. Cir. 2005) ..................................................................... 5

*Cty. of Santa Clara v. Trump*,
   2017 WL 1459081 (N.D. Cal. Apr. 25, 2017) ......................................... 23, 24

*Duke Power Co. v. Carolina Envtl. Study Grp., Inc.*,
   438 U.S. 59 (1978) ........................................................................................ 16

*Entergy Corp. v. Riverkeeper, Inc.*,
   556 U.S. 208 (2009) ...................................................................................... 20

*\*Food & Water Watch, Inc. v. Vilsack*,
   808 F.3d 905 (D.C. Cir. 2015) ........................................................... 3, 4, 5, 10

*Griffith v. FLRA*,
   842 F.2d 487 (D.C. Cir. 1988) ........................................................... 25, 26, 27

*Heckler v. Chaney*,
   470 U.S. 821 (1985) ...................................................................................... 19

*In re Barr Labs., Inc.*,
   930 F.2d 72 (D.C. Cir. 1991) ........................................................................ 18

iii

*Lujan v. Nat'l Wildlife Fed'n,*
    497 U.S. 871 (1990) ............................................................................... 27

*Massachusetts v. EPA,*
    549 U.S. 497 (2007) ......................................................... 12, 13, 14, 19

*\*Michigan v. EPA,*
    135 S. Ct. 2699 (2015) ......................................................................... 20

*Mississippi v. Johnson,*
    71 U.S. (4 Wall.) 475 (1867) ............................................................... 23

*Monsanto Co. v. Geertson Seed Farms,*
    561 U.S. 139 (2010) .............................................................................. 10

*Munsell v. Dep't of Agric.,*
    509 F.3d 572 (D.C. Cir. 2007) ............................................................ 15

*Nat'l Fed'n of the Blind v. Spellings,*
    562 F. Supp. 2d 74 (D.D.C. 2008) ...................................................... 13

*Nat'l Treasury Employees Union v. United States,*
    101 F.3d 1423 (D.C. Cir. 1996) ............................................................ 5

*Nat'l Mining Ass'n v. Jackson,*
    768 F. Supp. 2d 34 (D.D.C. 2011) ...................................................... 16

*Nat'l Park Hosp. Ass'n v. Dep't of Interior,*
    538 U.S. 803 (2003) ........................................................................ 15, 16

*Nixon v. United States,*
    506 U.S. 224 (1993) .............................................................................. 23

*Norfolk S. Ry. Co. v. Solis,*
    915 F. Supp. 2d 32 (D.D.C. 2013) ...................................................... 26

*Norton v. S. Utah Wilderness All.,*
    542 U.S. 55 (2004) ................................................................................ 27

*\*Nyunt v. Chairman, Broad. Bd. of Governors,*
    589 F.3d 445 (D.C. Cir. 2009) ....................................................... 24, 26

*R.J. Reynolds Tobacco Co. v. U.S. Food & Drug Admin.,*
    810 F.3d 827 (D.C. Cir. 2016) ............................................................ 10

iv

*Royster-Clark Agribusiness, Inc. v. Johnson*,
  391 F. Supp. 2d 21 (D.D.C. 2005) ...................................................................... 26

*Sherley v. Sebelius*,
  689 F.3d 776 (D.C. Cir. 2012) ........................................................................... 20

*Sierra Club v. Costle*,
  657 F.2d 298 (D.C. Cir. 1981) ........................................................................... 20

*Sierra Club v. Morton*,
  405 U.S. 727 (1972) ............................................................................................. 5

*Simon v. E. Ky. Welfare Rights Org.*,
  426 U.S. 26 (1976) ............................................................................................... 5

*Texas v. United States*,
  523 U.S. 296 (1998) ........................................................................................... 15

*Toilet Goods Ass'n v. Gardner*,
  387 U.S. 158 (1967) ..................................................................................... 14, 15

*\*Turlock Irrigation Dist. v. FERC*,
  786 F.3d 18 (D.C. Cir. 2015) ................................................................. 4, 5, 9, 10

*United Transp. Union v. ICC*,
  891 F.2d 908 (D.C. Cir. 1989) ....................................................................... 9, 10

*West v. Lynch*,
  845 F.3d 1228 (D.C. Cir. 2017) ......................................................................... 13

*WildEarth Guardians v. EPA*,
  751 F.3d 649 (D.C. Cir. 2014) ........................................................................... 12

*WWHT, Inc. v. F.C.C.*,
  656 F.2d 807 (D.C. Cir. 1981) ........................................................................... 18

## CONSTITUTIONAL PROVISIONS

U.S. Const. Art. II, § 3 ............................................................................................ 1

## STATUTES

5 U.S.C. § 701.......................................................................................................... 19
5 U.S.C. § 706.......................................................................................................... 27
25 U.S.C. § 1406....................................................................................................... 18

42 U.S.C. § 1395hh..........................................................................................................18
42 U.S.C. § 4128.............................................................................................................18

**EXECUTIVE MATERIALS**

*Regulatory Planning and Review*,
    Exec. Order No. 12,866 (1993)..............................................................1, 19, 20, 29

*Consultation and Coordination with Indian Tribal Governments*,
    Exec. Order No. 13,175 (2000)................................................................................20

*Improving Regulation and Regulatory Review*,
    Exec. Order No. 13,563 (2011)..................................................................................1

*Regulatory Regulation and Controlling Regulatory Costs*,
    Exec. Order No. 13,771 (2017).......................................................................*passim*

*Enforcing the Regulatory Reform Agenda*,
    Exec. Order No. 13,777 (2017)................................................................................22

**LEGISLATIVE MATERIALS**

*Effluent Limitations Guidelines*,
    82 Fed. Reg. 27,154 (June 14, 2017) .........................................................................6

*Electronic Stability Control Systems for Heavy Vehicles*,
    80 Fed. Reg. 36,050 (June 23, 2015) .......................................................................19

*Introduction to the Unified Agenda of Federal Regulatory & Deregulatory Actions*,
    81 Fed. Reg. 94,496 (Dec. 23, 2016) .........................................................................7

*Semiannual Agenda of Regulations*,
    81 Fed. Reg. 37,334 (June 9, 2016) ...........................................................................8

*Unified Agenda of Regulatory and Deregulatory Actions*,
    80 Fed. Reg. 35,048 (June 18, 2015) .........................................................................8

## INTRODUCTION

As Plaintiffs concede, "'every administration since President Carter' has asked agencies to repeal 'outdated, unnecessary, or ineffective rules . . . .'"  Plaintiffs' Opposition to Defendants' Motion to Dismiss ("Opp.") at 18 (quoting Motion to Dismiss ("MTD") at 10); *see also* Exec. Order No. 13,563, § 6.  Indeed, Presidential administrations have for decades sought to control the manner in which agencies carry out the legal authority that has been granted them by Congress.  *E.g.,* Exec. Order No. 12,866, § 1(b).  Before this lawsuit, no one would have thought to challenge those actions as unconstitutional, let alone facially unconstitutional, as the Constitution expressly vests the President with the power to guide the actions of the Branch of government that he oversees.  *See* U.S. Const., art. II, § 3 (President "shall take Care that the Laws be faithfully executed").  Yet that is exactly what Plaintiffs seek to do in this case when they assert that Executive Order 13,771 "cannot lawfully be implemented in *any* rulemaking."  Opp. at 21.  As longstanding precedent confirms, that challenge is wholly lacking in merit.  The President may properly act to direct agency rulemaking within the boundaries set by Congress, as Executive Order 13,771 expressly provides.

However, this Court should not even reach these basic tenets of constitutional and administrative law here, as Plaintiffs lack standing to sue.  Plaintiffs' alleged organizational harm arises from a basis for injury that has been soundly rejected in this Circuit, as impediments to lobbying and advocacy alone do not establish Article III injury.  And their assertion of standing on behalf of their members is based on possible future harm arising from rules that have not even been finalized or, in some cases, not even proposed.

Indeed, Plaintiffs' facial challenge is wholly premature.  Plaintiffs identify no final agency action taken in reliance on the Executive Order that has harmed, or will imminently

harm, any of Plaintiffs' members.  Instead, Plaintiffs invite this Court to predict potential future applications of the Executive Order and deem every such action unlawful.  That invitation ignores the extraordinary relief they request from this Court – declaring an act of the President unconstitutional.  Plaintiffs should instead await final agency action, in accordance with longstanding precepts of administrative law.  A court would undoubtedly benefit from deciding a challenge to the application of the Executive Order in the context of precise facts and law rather than declaring the actions of a coordinate Branch unconstitutional based solely on speculation.

Even if this Court were to reach the merits of Plaintiffs' challenge, dismissal would still be warranted.  With respect to their separation of powers claim, Plaintiffs have reaffirmed their contention that "[n]o statute authorizes or allows rulemaking authority to be constrained" by the Executive Order.  Opp. at 29.  Yet that assertion ignores the plain language of the Order, which only applies to the extent permitted by law, and hornbook administrative law establishing that agencies often have substantial discretion as to when and how to issue regulations – discretion that the President is free to guide.  Absent a statutory requirement to the contrary, the President and Defendant agencies are well within their rights to determine whether and when regulations should be promulgated, revised, or repealed.  As Plaintiffs' opposition makes clear, Executive Order 13,771 does not purport to provide agencies with rulemaking authority but rather guides them in the exercise of the authority they already possess.

Plaintiffs' remaining causes of action similarly fail to state a claim upon which relief can be granted.  As to their Take Care claim, Plaintiffs again fail to cite a single case in this Circuit, or indeed any other, where a plaintiff has successfully asserted a violation of the Take Care clause.  Plaintiffs also fail to cite applicable law with regard to their third and fourth causes of action, claiming that the actions at issue in this case are *ultra vires*.  Plaintiffs have not satisfied

2

the requirements to bring such an exceptional cause of action, and their invitation to create an

Executive Order exception to the narrow *ultra vires* doctrine would greatly expand the scope of

the doctrine in this Circuit.  Finally, Plaintiffs fail to establish that Guidance issued by the Office

of Management and Budget ("OMB") is final agency action that can be challenged under the

Administrative Procedure Act ("APA"), as the Guidance does not itself determine the rights or

obligations of any individual or regulated entity.

     For the foregoing reasons, this Court should dismiss Plaintiffs' Amended Complaint.

## ARGUMENT

### I.    Plaintiffs Have Failed to Establish Standing to Sue on their Own Behalf or on Behalf of their Members

### A.    Plaintiffs Have Failed to Properly Allege Standing as Organizations

     As Defendants noted in their Motion to Dismiss, the test to determine an organization's

standing is a straightforward two-part inquiry, requiring proof that (1) an organization's interest

has been injured, such that its "daily operations" have been inhibited and their ability to provide

services thereby impaired, and (2) the organization has needed to "use[] its resources to

counteract that harm." *Food & Water Watch, Inc. v. Vilsack*, 808 F.3d 905, 919 (D.C. Cir. 2015)

(citations omitted).  Nowhere in their Amended Complaint or any of the extensive briefs filed in

this case do Plaintiffs claim that the Executive Order will impair either their services or their

daily operations.  Further, Plaintiffs have never once alleged that the purported harm to their

advocacy will require the use of "resources to counteract that harm."  *Id.*[1]  As Plaintiffs have

---

[1] The sole possible exception to this point is the Declaration of David LeGrande ("LeGrande Decl."), ECF No. 16-2.  However, Plaintiffs never cite the LeGrande Declaration for the proposition that Plaintiff organizations will need to expend resources as a result of the Order, and Mr. LeGrande's vague allegation of resource expenditure is speculative and generalized.  *See* Defs.' Resp. to Pls.' Mot. for Summ. J. ("Defs.' Resp.") at 21 n.13, ECF No. 46.

failed to satisfy either prong of the required test for organizational standing, they have not

properly alleged Article III injury.

Plaintiffs claim in their opposition that they have standing because the Order and

Guidance "adversely affect plaintiffs' ability to advocate on behalf of their members . . . ."  Opp.

at 6.  That is, Plaintiffs claim only that the Order will make internal decisions concerning their

advocacy efforts more challenging.  *Id.*  The cases that Plaintiffs cite as support for standing

based on this allegation simply reiterate the unremarkable proposition that "injury in fact exists

when a plaintiff alleges that the government has directly impacted the exercise of his First

Amendment rights or where he has shown a threat of specific future harm."  *Autor v. Blank*, 892

F. Supp. 2d 264, 271 (D.D.C. 2012), *rev'd sub nom. Autor v. Pritzker*, 740 F.3d 176 (D.C. Cir.

2014).  Yet Plaintiffs allege no First Amendment violation here, as Executive Order 13,771 does

not regulate Plaintiffs' advocacy efforts.

Even if Plaintiffs could show that the Order has some effect on their lobbying or

commenting activities, such injuries are not cognizable under D.C. Circuit precedent.  MTD at

24-25.  In response to this longstanding case law, Plaintiffs cite primarily *American Society for*

*Prevention of Cruelty to Animals v. Feld Entertainment, Inc.*, 659 F.3d 13, 27 (D.C. Cir. 2011),

in which the court expressly declined to answer the question of whether harm to advocacy alone

can establish injury.  *Id.*  ("Ultimately, whether injury to an organization's advocacy supports

*Havens* standing remains an open question that we have no need to resolve here.").  More recent

D.C. Circuit decisions, however, have answered the question by concluding consistently that

"impairment" of an organization's advocacy efforts "will not suffice" for Article III injury.

*Turlock Irrigation Dist. v. F.E.R.C.*, 786 F.3d 18, 24 (D.C. Cir. 2015); *see also Food & Water*

*Watch, Inc.* 808 F.3d at 919 ("Our precedent makes clear that an organization's use of resources

4

for litigation, investigation in anticipation of litigation, or advocacy is not sufficient to give rise to an Article III injury.").

Plaintiffs argue that the present case is distinguishable from such precedent because they have shown a direct "conflict" between Executive Order 13,771 and Plaintiffs' "missions of advancing health, safety, worker, and environmental protections," and such purported injury "flows necessarily from the 1-in, 2-out and cost-offset requirements of the Executive Order." Opp. at 8-9.  Of course, merely because Plaintiffs say that the injury is more direct here does not make it so.  In both *Food & Water Watch* and *Turlock Irrigation District*, the plaintiffs also claimed a direct impact on their resources as organizations, but that assertion was still deemed insufficient to establish standing.  808 F.3d at 920; 786 F.3d at 24.  Here, Plaintiffs do not even claim an impact on organizational resources, presumably because the Executive Order is "not necessarily inconsistent with" the missions of the plaintiff organizations.  *See Nat'l Treasury Emps. Union v. United States*, 101 F.3d 1423, 1430 (D.C. Cir. 1996).

Plaintiffs' claim of organizational injury, if upheld, "would eviscerate standing doctrine's actual injury requirement."  *Ctr. for Law & Educ. v. Dep't of Educ.*, 396 F.3d 1152, 1162 n.4 (D.C. Cir. 2005).  The Supreme Court has long held that a "special interest" in a subject does not permit a plaintiff to file suit as "there would appear to be no objective basis upon which to disallow a suit by any other bona fide 'special interest' organization however small or short-lived."  *Sierra Club v. Morton*, 405 U.S. 727, 739-40 (1972).  Plaintiffs' unbounded claim of "harm" cannot suffice to establish injury-in-fact under Article III.  *See Simon v. E. Ky. Welfare Rights Org.*, 426 U.S. 26, 40 (1976) ("[A]n organization's abstract concern with a subject that could be affected by an adjudication does not substitute for the concrete injury required by Art. III.").

5

**B.** **Plaintiffs Have Failed to Show Standing on Behalf of their Members**

**1.** **Plaintiffs' Members Have Not Shown Imminent Injury**

In responding to Defendants' Motion to Dismiss, Plaintiffs abandon any claim of injury

on behalf of their members from the potential future repeal of regulations pursuant to Executive

Order 13,771. *Compare* Am. Compl. ¶ 12, ECF No. 14, *with* Opp. at 9. They now argue only

that their members will be harmed by the purported delay in the issuance of certain rules caused

by the Executive Order. *See* Opp. at 10. But, as the declarations submitted by Plaintiffs

demonstrate, that prediction of delay is no less speculative than Plaintiffs' prior predictions about

the potential repeal of regulations. *See* MTD at 19-20.

In their Opposition, Plaintiffs point to three regulations (or categories of regulations) that,

if delayed by the Executive Order, would purportedly cause their members harm: (1) energy

efficiency standards for appliances that may be issued by DOE, (2) an OSHA standard for

exposure to infectious diseases, and (3) an EPA rule concerning chemicals in paint removers.[2]

Opp. at 10-13. However, the imminence of the purported harm from each regulatory action (or

inaction) is inherently speculative.

---

[2] In conjunction with their Opposition, Plaintiffs have submitted yet another declaration, this one
claiming injury from delay in issuing an EPA rule regulating the emissions of mercury from
dental offices, a rule which was promulgated on June 14, 2017. *See* Effluent Limitations
Guidelines, 82 Fed. Reg. 27,154 (June 14, 2017); Opp. at 14; Declaration of Michael Heimbinder
("Heimbinder Decl."), ECF No. 47-3. Plaintiffs failed to cite to this rulemaking in their
Amended Complaint as a source of injury to one of their members. Yet even if Plaintiffs had
timely alleged this rulemaking as a source of harm, the newly submitted declaration again fails to
properly allege any Article III injury. Michael Heimbinder never shows that he was harmed by
any past delay, and instead avers only that he is "concerned that mercury from dental-office
waste *may* contaminate the fish that my children and I eat." Heimbinder Decl. ¶ 9 (emphasis
added). Any such "fear" has now been resolved by the promulgation of the rule.

For example, with respect to the allegation that they desire to buy more energy efficient appliances, Plaintiffs' declarants are unable to state that Executive Order 13,771 *will* cause imminent injury through a delay in the issuance of energy efficiency standards.  Instead, they claim that "if" the issuance of the standard is delayed, they will be harmed.  *See* Declaration of Eileen Quigley ("Quigley Decl.") ¶ 9, ECF No. 16-12 (noting that she is "concerned that this executive order will prevent or delay" regulations, and that "*[i]f* the federal government does not timely issue improved energy efficiency standards, NRDC will be directly harmed . . . .") (emphasis added); Declaration of Robert Weissman ("R. Weissman Decl.") ¶ 17, ECF No. 16-3 (alleging only that "Public Citizen and its members . . . will be harmed *if* Executive Order 13771 delays energy efficiency regulations . . . .") (emphasis added).  In addition, Plaintiffs' declarants do not allege that they are currently unable to purchase equipment that would ameliorate their purported injuries.

Plaintiffs' allegations about a purported injury from an alleged delay to OSHA rules concerning pathogens in the workplace are similarly speculative.  Plaintiffs note that "OSHA plans to issue a proposed standard in October 2017."  Opp. at 12.  However, OSHA and other Defendant agencies routinely modify projected publication dates, given the fact that rulemakings can often take years to complete, and numerous factors, including shifting agency priorities, limited agency resources, and OMB review, can all impact the regulatory timeline.  Indeed, for the Infectious Diseases rulemaking itself, OSHA previously changed the anticipated date of a proposed rule from December 2016 to March 2017, and then again to October 2017, all during the prior administration and well before Executive Order 13,771 was signed.[3]  And the current

---

[3] *Compare* Introduction to the Unified Agenda of Federal Regulatory and Deregulatory Actions, 81 Fed. Reg. 94,496, 94,602 (Dec. 23, 2016) (predicting publication in October 2017), *with*

request for information in the Federal Register suggests that such a rule would, if promulgated, apply to certain employers only (i.e., only certain employees would be protected by such a rule) and would set forth minimum control measures that these employers would be required to follow. As no rule has yet been proposed by OSHA, neither cited member declarant alleges (or can state definitively) whether his or her specific employer would be included within the scope of the standard, or whether his or her employer already follows procedures which meet or exceed the hypothetical final standard, such that an eventual OSHA standard would in fact lower their risk of disease transmission. Declaration of Denise Abbott ("Abbott Decl."), ECF No. 16-5; *see also* Declaration of Jonathan Soverow ("Soverow Decl."), ECF No. 16-9.

Plaintiffs also fail to properly allege a claim of injury with respect to a proposed EPA rule to regulate certain chemicals in paint remover. The sole member declaration cited in support of this injury is that of Amanda Fleming, who vaguely asserts that she "use[s] paint remover in connection with" her oil painting hobby, and that she is "hoping to buy a fixer-upper in the next year or two," and that such a purchase will "likely require" her to use paint thinner. Declaration of Amanda Fleming ("Fleming Decl.") ¶ 6, ECF No. 16-7. Putting aside the contingent nature of her allegations, Ms. Fleming never once claims that she actually has used or will use paint remover with the chemicals addressed in EPA's proposed regulation, such that she does not allege that she would actually be affected by any final regulation on this subject. *Id*. Further, even assuming that Ms. Fleming seeks to use paint remover without the chemicals cited in the proposed regulation, Plaintiffs put forth no allegation that acceptable paint remover alternatives

Dep't of Labor Semiannual Regulatory Agenda, 81 Fed. Reg. 37,334, 37,338 (Jun. 9, 2016) (predicting publication in March 2017), *and* Dep't of Labor Semiannual Regulatory Agenda, 80 Fed. Reg. 35,048, 35,052 (Jun. 18, 2015) (predicting publication in December 2016).

are "not readily available at a reasonable price," as required to establish injury through deprivation of a desired product.  *Coal. for Mercury-Free Drugs v. Sebelius*, 671 F.3d 1275, 1281 (D.C. Cir. 2012) (citation omitted).[4]

Plaintiffs even acknowledge that their allegations of injury are based on speculation about the impacts of Executive Order 13,771 on various regulations and their members.  *See* Opp. at 10 ("[N]ot every agency will necessarily volunteer that the Executive Order is causing delay . . . ."); *id*. at 39 ("[I]dentifying a discrete agency inaction that is attributable to the Executive Order and is reviewable under the APA is likely to be exceedingly difficult.'").  To Plaintiffs, such speculation is "sufficient to survive a motion to dismiss" because there is at least a chance that some rule will be delayed by the Executive Order and Plaintiffs will be negatively impacted thereby.  *Id*. at 10.  But Plaintiffs cannot demonstrate standing by simply aggregating speculation about the impact of Executive Order 13,771 on their members.  Numerous speculative impacts do not render a purported injury concrete.  *Turlock Irrigation Dist.*, 786 F.3d at 25 (holding that "unsupported presumptions . . . and guesswork" would be "insufficient to support a claim of standing"); *United Transp. Union v. ICC*, 891 F.2d 908, 912 (D.C. Cir. 1989) ("Our authority to reject as speculative allegations of future injuries is well-established.").  And no matter how much Plaintiffs speculate about the potential impact of the Executive Order, the fact remains that the regulations they point to remain in flux, meaning that the particular agency responsible for the rule could amend, delay, or withdraw the potential rule altogether, where allowed by law, for

---

[4] Indeed, Plaintiffs make no such showing for any of their claimed injuries based on the inability to purchase a desired product, such as more efficient appliances or vehicles equipped with certain technology.  For instance, Gerald Winegrad asserts that he "expect[s]" that he will need to "very soon" replace his heat pump, which is "over 15 years old."  Declaration of Gerald Winegrad ("Winegrad Decl") ¶ 24, ECF No. 16-13.  Mr. Winegrad makes no allegation that currently-available products could not ameliorate his need for a more efficient heat pump.

numerous potential reasons that have nothing to do with Executive Order 13,771. *See, e.g., R.J. Reynolds Tobacco Co. v. U.S. Food & Drug Admin.*, 810 F.3d 827, 830 (D.C. Cir. 2016) (rejecting standing based on potential future agency action and holding that concrete challenges were required, such that "[r]eview of any claims that the (still hypothetical) rule was in excess of statutory authority or arbitrary and capricious would proceed along conventional lines"); *Am. Portland Cement All. v. E.P.A.*, 101 F.3d 772, 777 (D.C. Cir. 1996) ("[A] proposed regulation is still in flux," so "review is premature.") (citation omitted).

Thus, while Plaintiffs attempt to allege harm from delay in the promulgation of new rules, their own declarations refute any such claim as contingent and speculative. And where an allegation is "wholly speculative," a court "need not accept [Plaintiffs'] assertion." *Turlock Irrigation Dist.*, 786 F.3d at 25; *United Transp. Union*, 891 F.2d at 912. Absent an imminent and certainly impending injury to any of their members, Plaintiffs lack standing to bring suit on behalf of their membership. *See Food & Water Watch, Inc.*, 808 F.3d at 914.[5]

## 2. Plaintiffs Have Not Shown that their Injury Would be Traceable to Executive Order 13,771

In addition to failing to show injury, Plaintiffs have also not sufficiently alleged that Executive Order 13,771 is the source of such purported injury. In attempting to show causation,

---

[5] Plaintiffs argue that they need only show a "substantial risk" that the harm to their members will occur. Opp. at 14. This standard is generally applied in the context of environmental law, involving the potential for injury that prompts "plaintiffs to reasonably incur costs to mitigate or avoid that harm." *Clapper v. Amnesty Int'l*, 568 U.S. 398, 415 n.5; (2013); *see also Monsanto Co. v. Geertson Seed Farms*, 561 U.S. 139 (2010). But this standard is also highly demanding, as the Supreme Court in *Clapper* noted that it requires more than even an "objectively reasonable likelihood" of harm, as such a standard would be "inconsistent with our requirement that threatened injury must be certainly impending to constitute injury in fact." *Clapper*, 568 U.S. at 410 (citation omitted). As Plaintiffs' cited member declarations are replete with speculation, they have not shown that any injury is "certainly impending."

Plaintiffs cite the declaration of certain former government officials for their prediction that the Executive Order will cause delay in the issuance of certain regulations.  For instance, Plaintiffs cite the declaration of Dan Reicher as supporting the claim that the Executive Order "necessarily impairs DOE's ability to issue improved [energy] standards."  Opp. at 11 (citing Declaration of Dan Reicher ("Reicher Decl.") ¶ 14, ECF No. 16-18).  But the mere fact that Mr. Reicher has experience with the agency does not make his speculation any more concrete.  *Id*. ¶ 2.  Mr. Reicher has no experience implementing the Executive Order in question; he has no understanding of the current administration's intent regarding energy efficiency standards to support his statement that the Executive Order will necessarily be a cause of any "delay"; and he has no understanding of how the agency will approach compliance with the Executive Order in the context of energy efficiency standards rulemaking, including whether the agency may seek an exemption for any rules or whether the agency has already identified deregulatory (or other) actions such that no delay would be necessary.  Indeed, the entire support for Mr. Reicher's causation claim is contained in his assertion that "[c]onducting analyses of the costs of rules is a complex undertaking, demanding time, staff, and other resources."  *Id*. ¶ 14.  Thus, by his own logic, if the agency had already identified particular offsets, the agency had received an exemption from the Order, the agency's cost analysis simply took less time than expected, or indeed any one of a multitude of possibilities that arise in the rulemaking context—then a delay cannot be expected.[6]

---

[6] The other declarations cited by Plaintiffs on causation are similarly deficient.  David Michaels, for instance, also does not claim any direct experience in implementing Executive Order 13,771.  Yet he appears to adopt Mr. Reicher's prediction that the Executive Order 13,771 could cause delays because "[p]erforming new cost estimates for each existing rule considered for elimination would be extremely time-consuming."  Declaration of David Michaels ("Michaels Decl.") ¶ 36, ECF No. 16-16.  Plaintiffs also cite the declaration of James Jones as supporting

The declarations of the former agency officials cannot remedy the inherently speculative nature of Plaintiffs' allegations about the causal link between Executive Order 13,771 and the injuries alleged to Plaintiffs' members.  There could be myriad reasons why an agency may choose to postpone the issuance of a rule or, indeed, not to issue a rule altogether.  Agencies generally hold "broad discretionary authority to decide when and how to exercise or to enforce statutes and rules."  *Armstrong v. Exceptional Child Ctr., Inc.*, 135 S. Ct. 1378, 1390 (2015) (Breyer, J., concurring in part); *see also Massachusetts v. E.P.A.*, 549 U.S. 497, 533 (2007) (stating that the "EPA no doubt has significant latitude as to the manner, timing, content, and coordination of its regulations with those of other agencies"); *WildEarth Guardians v. E.P.A.*, 751 F.3d 649, 651 (D.C. Cir. 2014) (noting that the EPA had "discretion to determine the timing and priorities of its regulatory agenda").  Plaintiffs offer no response to this basic reality of agency rulemaking.  "Without some underlying factual basis for attributing" Plaintiffs' injury to the Executive Order, "rather than to other factors," this Court "cannot accept [Plaintiffs' declarations on causation] as anything other than conclusory and therefore inadequate . . . ."  *See Ass'n of Flight Attendants-CWA, v. U.S. Dep't of Transp.*, 564 F.3d 462, 469 (D.C. Cir. 2009); *see also Nat'l Fed'n of the Blind v. Spellings*, 562 F. Supp. 2d 74, 80 (D.D.C. 2008) (no causation alleged where plaintiffs had not shown that challenged staffing levels, "as opposed to . . . any number of other reasons," caused their injuries).[7]

---

their claim of causation, though he avers only that delay would occur "[i]f EPA had to repeal two other rules before finalizing the proposed rules . . . ."  Declaration of James Jones ("Jones Decl.") ¶ 14, ECF No. 16-15.  Yet, the Executive Order does not require agencies in every instance to repeal two rules or conduct new cost estimates prior to promulgating a new regulation, so the declarants' claims to the contrary are unfounded speculation.  Guidance, ¶ Q38.

[7] While *Ass'n of Flight Attendants* concerned the summary judgment standard, the D.C. Circuit explicitly held that a conclusory "affidavit's assertion of causation has no more force under the summary judgment standard we apply than if it were alleged in a complaint."  564 F.3d at 466.

###    3.    Plaintiffs Concede that their Injuries May Not be Redressed by the Relief Sought

Plaintiffs lack standing to sue on behalf of their members for the final reason that they cannot show that any injury would be remedied by the relief they request.  Plaintiffs concede in their Opposition that "even without Executive Order 13771 and the OMB Guidances, new regulations might be delayed for other reasons."  Opp. at 19.  But, primarily citing *Massachusetts v. EPA*, 549 U.S. 497, 523 (2007), Opp. at 19, Plaintiffs argue that they are not required to establish that the Executive Order is the cause of their injury, such that the relief they request would redress that injury, because the requirements of the Order "contribute to and exacerbate plaintiffs' injuries."  Opp. at 19.  Plaintiffs' reference to *Massachusetts* is misguided.[8]

First, the D.C. Circuit has squarely held that the *Massachusetts* test for standing is inapplicable absent a state plaintiff.  *See Ctr. for Biological Diversity v. U.S. Dep't of Interior*, 563 F.3d 466, 476 (D.C. Cir. 2009) ("*Massachusetts* stands only for the limited proposition that, where a harm is widely shared, a sovereign, suing in its individual interest, has standing to sue where that sovereign's individual interests are harmed, wholly apart from the alleged general harm."); *see also Arpaio v. Obama*, 797 F.3d 11, 27 (D.C. Cir. 2015) (Brown, J., concurring) (noting that the "'loosened standard' under which 'any contribution of any size to a cognizable injury'" was deemed sufficient, "likely does not extend to non-state litigants . . . who must clear the ordinary hurdles to standing.").

---

[8] In attempting to argue redressability despite admitting its absence, Plaintiffs also misunderstand and misapply their cited case law.  Plaintiffs initially contend that their "showing of causation establishes redressability."  Opp. at 19 (citing *Carpenters Indus. Council v. Zinke*, 854 F.3d 1, 6 n.1 (D.C. Cir. 2017)).  The D.C. Circuit has held that this is "[n]ot so. . . .  the two concepts are distinct."  *West v. Lynch*, 845 F.3d 1228, 1235-36 (D.C. Cir. 2017).  Indeed, the court has stated that "[i]f the challenged conduct is at best an indirect or contributing cause of the plaintiff's injury . . . the plaintiff faces an uphill climb in pleading and proving redressability."  *Id*. at 1236.

Second, even were this framework applicable to Plaintiffs, it would not succeed in establishing standing.  Unlike situations where the reversal of the government action would necessarily reduce the purported injury, even if only by a small amount, *Massachusetts*, 549 U.S. at 523, the purported delay that is the source of the alleged injury here would not necessarily be diminished at all in the absence of the Order.  In other words, Plaintiffs cannot allege that the invalidation of Executive Order 13,771 will result in the redress of their alleged injuries.  Indeed, as Plaintiffs appear to acknowledge, an agency may simply decide that the issuance of a particular rule is no longer an agency priority, which would mean that Executive Order 13,771 is altogether irrelevant to the source of delay.  For these reasons, Plaintiffs concede that invalidation of the Executive Order will not likely remedy their claimed injuries.  Opp. at 19. Absent a showing of redressability, Plaintiffs cannot establish standing to sue.

**C.      Plaintiffs' Suit is Not Ripe**

Plaintiffs provide two main arguments why the present case is fit for judicial review despite the sprawling and unfocused nature of their claims: (1) the issue presented to the Court is purely legal, and (2) the Executive Order is having current, ongoing effects because it "corrupts agency decisionmaking across the board."  Opp. at 21-23.

As to Plaintiffs' first contention, it is incorrect that the legal nature of a claim decides the inquiry.  As both the Supreme Court and the D.C. Circuit have regularly held, even where the issue presented to the court is purely legal, a suit is unripe where its resolution depends on speculation as to the future action of an agency.  As far back as *Toilet Goods Ass'n v. Gardner*, 387 U.S. 158, 163 (1967), for instance, the Supreme Court noted that petitioners' challenge posed a "purely legal question: whether the regulation is totally beyond the agency's power under the statute."  The Court held nonetheless that the case was unripe because the Court "ha[d]

14

no idea" as to the particular manner in which the regulation might be implemented, and whether

the regulation might be justified pursuant to the relevant statute and the "statutory scheme as a

whole."  *Id.*   The Court concluded that "judicial appraisal of these factors is likely to stand on a

much surer footing in the context of a specific application of this regulation than could be the

case in the framework of the generalized challenge made here."  *Id.* at 164; *see also Nat'l Park*

*Hosp. Ass'n v. Dep't of Interior*, 538 U.S. 803, 812 (2003) (finding unripe facial challenge to

final agency action); *Texas v. United States*, 523 U.S. 296, 301 (1998) ("Texas asks us to hold

that under no circumstances can the imposition of these sanctions constitute a change affecting

voting.  We do not have sufficient confidence in our powers of imagination to affirm such a

negative.").

Plaintiffs next contend that their suit must be adjudicated now because the Executive

Order "corrupts agency decisionmaking across the board."  Opp. at 23.  In other words, Plaintiffs

see the sprawling nature of their challenge to every conceivable action by an agency pursuant to

the Executive Order as support for, not a hindrance to, immediate review.  But in asking this

Court to engage in an impossible "pseudo-rulemaking proceeding," *Munsell v. Dep't of*

*Agriculture*, 509 F.3d 572, 586-87 (D.C. Cir. 2007), to evaluate every conceivable regulatory

statute to which Executive Order 13,771 may apply, and every conceivable rulemaking that may

occur thereunder, Plaintiffs' claims become ungrounded from any specific factual context.

Given the countless potential variables that may affect the implementation of the

Executive Order, such a forecasting exercise is untenable.  *Cf.  Bristol-Myers Co. v. F.T.C.*, 424

F.2d 935, 940 (D.C. Cir. 1970) ("The rulemaking authority of an agency cannot usually be fairly

tested in the absence of a specific legal and factual setting.").  There can be no doubt that

"further factual development would 'significantly advance [the Court's] ability to deal with the

legal issues presented.'"  *See Nat'l Park Hosp. Ass'n*, 538 U.S. at 812 (quoting *Duke Power Co.*

*v. Carolina Envtl. Study Grp., Inc.*, 438 U.S. 59, 82 (1978)).[9]

As a final point, Plaintiffs have not shown that they would suffer any hardship were this

case to be dismissed.  Instead, they simply repeat their standing allegations as purported evidence

that they are suffering continuous and ongoing injury. Opp. at 24.  However, Plaintiffs are

incorrect in suggesting that their allegations of injury, even if sufficient to satisfy Article III,

demonstrate that they would suffer hardship from postponing review.  Indeed, putting aside the

self-inflicted advocacy harms to the Plaintiff organizations which founder as a matter of law, the

individual member declarants all point to future regulatory actions that they fear will be delayed

as a result of the Executive Order.  *See, e.g.,* Abbott Decl. ¶¶ 6-7 (OSHA disease standard);

Soverow Decl. ¶¶ 4-5 (same); Fleming Decl. ¶¶ 4-7 (NHTSA speed limiting technology, vehicle-

to-vehicle technology and EPA regulation of paint remover).  These future allegations do not

establish that Plaintiffs are currently suffering hardship as a result of the operation of the

Executive Order.  As a result, this Court should find Plaintiffs' challenge unripe.

---

[9] The cases cited by Plaintiffs in support of their ripeness argument demonstrate why the instant case is not fit for review.  Defendants previously explained that *Chamber of Commerce v. Reich*, 57 F.3d 1099 (D.C. Cir. 1995) ("*Reich I*"), frequently cited by Plaintiffs, has no bearing on the ripeness analysis here. Defs.' Resp. at 23.  Further, Plaintiffs cite a footnote in *Appalachian Power Co. v. EPA*, 208 F.3d 1015, 1023 n.18 (D.C. Cir. 2000).  Yet Plaintiffs neglect to include the accompanying opinion text, where the Court found the challenge ripe because EPA's challenged guidance there was "final agency action, reflecting a settled agency position which has legal consequences both for State agencies . . . and for companies . . . ."  *Id*. at 1023; *see also Nat'l Mining Ass'n v. Jackson*, 768 F. Supp. 2d 34, 46 (D.D.C. 2011) (holding that challenged agency memoranda and guidance "all appear to constitute final agency actions").  Here, Plaintiffs challenge no final agency action that has any legal consequences for any entity outside of the federal government.

II.     **Plaintiffs Have Failed to State a Claim**

In their Opposition, Plaintiffs assert that all of their challenges, other than the Fifth Cause of Action brought under the APA, may proceed under an *ultra vires* theory.  This is a remarkable attempt at an expansion of the *ultra vires* doctrine that, if established, would effectively create an Executive Order exception to its limitations and permit a direct lawsuit against the President of the United States.  No case, including *Chamber of Commerce v. Reich,* 74 F.3d 1322 (D.C. Cir. 1996) ("*Reich II*"), anticipated such a result, as the Court in *Reich II* noted that it was an unusual case where no other avenue for review applied.  *Id.* at 1327.[10]  Indeed, if Plaintiffs are correct that all of their non-statutory claims, including their constitutional claims, arise under the *ultra vires* doctrine, then the limitations of this doctrine would also apply, and their claims would be barred.  In any event, whether or not their claims are viewed under the *ultra vires* doctrine, they fail for the reasons discussed more fully below.

A.     **Plaintiffs Have Failed to State a Claim for Violation of the Separation of Powers**

The essence of Plaintiffs' argument for why Executive Order 13,771 violates the constitutional separation of powers is their assertion that "[t]he President lacks authority to prohibit agencies from issuing new rules unless and until agencies repeal existing rules," Opp. at 28, and that "[n]o statute authorizes or allows rulemaking authority to be constrained by such an offset requirement," *id.* at 29.  Plaintiffs' argument displays a fundamental misunderstanding of the manner by which Congress delegates authority to administrative agencies, the requirements

---

[10] *Reich II* arose in the labor context and presented the narrow question of whether the Executive Order in question conflicted with the National Labor Relations Act, not the type of sweeping constitutional challenge at issue here.

of the APA, the authority of the President under Article II, and the text of the Executive Order itself.

In most instances, agencies have substantial discretion as to how and when to exercise regulatory authority.  Some statutes specifically direct agencies to issue rules to implement particular statutory provisions (often by a statutory deadline), *e.g.*, 25 U.S.C. § 1406(a) ("The Secretary shall promulgate rules and regulations to implement this chapter . . .").  However, many grants of rulemaking authority provide agencies with wide discretion to issue rules in the manner and to the extent that the agency believes to be necessary and appropriate.  *See, e.g.,* 42 U.S.C. § 1395hh(a)(1) ("The Secretary shall prescribe such regulations as may be necessary to carry out the administration of the insurance programs under this subchapter." [Medicare]); 42 U.S.C. § 4128(a) ("The Administrator [of FEMA] is authorized to issue such regulations as may be necessary to carry out the purpose of [the National Flood Insurance] Act.").

Agencies have considerable discretion in the way they exercise regulatory authority.  For example, they may decide to adopt a comprehensive regulation, to promulgate regulations piecemeal, or to refrain from any immediate regulation.  Neither the APA nor the Constitution require an agency to elect to exercise the full extent of its regulatory authority immediately or all at once.  *See, e.g.*, *In re Barr Labs.*, 930 F.2d 72, 76 (D.C. Cir. 1991) ("In short, [the court has] no basis for reordering agency priorities. The agency is in a unique—and authoritative—position to view its projects as a whole, estimate the prospects for each, and allocate its resources in the optimal way."); *WWHT, Inc. v. F.C.C.*, 656 F.2d 807, 818 (D.C. Cir. 1981) (noting the "discretionary powers possessed by administrative agencies to promulgate (or not promulgate) rules, and the narrow scope of review to which the exercise of that discretion is subjected").  Agency exercise of this priority-setting function is subject to the most deferential standard of

judicial review under the APA.  *See Massachusetts,* 549 U.S. at 527-28 (denial of rulemaking

petition subject to "extremely limited and highly deferential" judicial review (citation omitted)).

      Because agencies possess this discretion to issue rules or take other actions (including, at

times, actions where the delegation of authority is so broad that a court lacks authority to review

actions taken pursuant to it),[11] the President has the constitutional authority to manage the

agencies' discretion so long as agency implementation would not violate statutory commands.

Indeed, there is no dispute that the President's core Article II power authorizes the 40-year line

of regulatory policy directives that Presidents have issued to manage the Executive Branch.  But

Plaintiffs offer no justifiable explanation why Executive Order 13,771 is the first in this line to

overstep the President's authority.  Plaintiffs must concede that these prior orders, including

Executive Order 12,866, impose additional considerations for agency decisionmaking.  *See* Exec.

Order No. 12,866, § 1(b)(6) ("benefits of the intended regulation justify its costs").  Indeed,

many of these prior orders require agencies to discuss these additional factors expressly in

rulemakings, and they necessarily require the expenditure of time and resources by the agencies

that would otherwise not be spent on the promulgation of such rules.  *E.g.*, 80 Fed. Reg. 36,050,

36,097-99 (June 23, 2015) (NHTSA Electronic Stability Control Systems for Heavy Vehicles

discussing compliance with five executive orders, including Executive Order 12,866).

      Plaintiffs repeatedly state that "[n]o statute authorizes any federal agency to withhold

issuance of a new regulation unless it can repeal existing regulations to offset the new

regulation's costs," Opp. at 26, to argue that Presidential directives are *per se* invalid when

applied to a statute that does not expressly permit such considerations.  But that argument

---

[11] *See* 5 U.S.C. § 701(a)(2); *Heckler v. Chaney,* 470 U.S. 821 (1985) (agency enforcement discretion unreviewable).

19

similarly provides no basis to believe that Executive Order 13,771 is somehow unique.  Not

every statute expressly discusses whether an agency may consider the impacts of a rulemaking

on Tribes, or on whether the costs of that particular rulemaking are justified by its benefits.  *See*

Exec. Order No. 13,175; Exec. Order No. 12,866.  But that fact does not render these actions

constitutionally suspect.  In enacting a statute, Congress does not purport to direct the President's

ability to guide the Executive Branch in all respects, and indeed the modern administrative state

could not function if the rule were otherwise.

Executive Order 13,771, like its predecessors, recognizes that agencies must inherently

weigh conflicting goals, priorities, and associated costs as a necessary part of reasoned

decisionmaking under the APA.  In *Michigan v. EPA,* 135 S. Ct. 2699 (2015), the Court

recognized "the reality that 'too much wasteful expenditure devoted to one problem may well

mean considerably fewer resources available to deal effectively with other (perhaps more

serious) problems.'"  *Id.* at 2707-08 (quoting *Entergy Corp. v. Riverkeeper, Inc.,* 556 U.S. 208,

223 (2009) (Breyer, J., concurring in part and dissenting in part)).  Far from unprecedented, the

Court referred to the holistic approach to regulatory policy embodied in Executive Order 13,771

as "established administrative practice."  135 S. Ct. at 2708.

And the President may properly oversee, manage, and guide each agency's balancing of

its various regulatory activities to ensure that they are consistent with the actions of other

agencies as well as the President's policies.  *See Sierra Club v. Costle,* 657 F.2d 298, 405 (D.C.

Cir. 1981) (discussing "the basic need of the President and his White House staff to monitor the

consistency of executive agency regulations with Administration policies"); *Ctr. for Auto Safety

v. Peck*, 751 F.2d 1336, 1368 (D.C. Cir. 1985) (not "extraordinary or unlawful . . . that a federal

agency opens an inquiry into a matter which the President believes should be inquired into");

20

*Sherley v. Sebelius*, 689 F.3d 776, 784 (D.C. Cir. 2012) (agency "must implement the President's policy directives to the extent permitted by law").

If there were any doubt about these first principles of administrative law, they would be resolved by the application of *Building & Construction Trades Department v. Allbaugh*, 295 F.3d 28, 30 (D.C. Cir. 2002) ("*Allbaugh*"), to this case.  Because Executive Order 13,771, like the Executive Order at issue in *Allbaugh*, only applies to the "extent permitted by law," it only purports to operate in the realm of agency action in which agencies have discretionary authority to act.  *See generally* MTD at 31-34.

Plaintiffs attempt to distinguish *Allbaugh* on the ground that the *Allbaugh* Court "thought that the executive order could be lawfully implemented in some circumstances [while Executive Order 13,771] cannot be lawfully implemented in any circumstances."  Opp. at 30.  But Plaintiffs are incorrect in asserting that the D.C. Circuit in *Allbaugh* rejected the plaintiffs' facial challenge merely because it had identified certain specific instances in which the Order could have been applied in a constitutional fashion.  Opp. at 30.  Instead, the court found the Order to be "above suspicion in the ordinary course of administration."  295 F.3d at 33.  In reaching that conclusion, the court recognized that the Order had been issued pursuant to the inherent power of the President to guide the activities of the Executive Branch, *id.* at 33; that the Order at issue expressly recognized congressionally established boundaries to an agency's authority, *id.*; and that it was therefore unwarranted to speculate about future instances in which the Order could be applied in violation of the Constitution, *id.*  Had such limiting language been included in the *Youngstown* Executive Order, that case "would have been a rather mundane dispute over whether the Secretary had statutory authority to act as he did."  *Allbaugh*, 295 F.3d at 33.  There is,

21

accordingly, no basis upon which this Court could hold that the Order is facially

unconstitutional.

But even if this Court were to somehow distinguish *Allbaugh* and instead speculate about

the potential applications of the Executive Order, it would not change the ultimate conclusion

that the Order is consistent with the constitutional separation of powers.  Plaintiffs' description

of Executive Order 13,771 and its implementation through the OMB Guidance, Opp. at 3-5,

refuses to recognize the many respects in which the Executive Order provides significant

flexibility for agencies subject to its requirements.  In particular, the OMB Guidance establishes

an exemption process for special circumstances, Guidance, ¶ Q33, provides flexibility on the

timing of when offsets must occur, *id.*, ¶ Q38, authorizes the trading of cost savings from

deregulatory actions within and between agencies, *id.*, ¶ Q30, and reflects a commitment to

implementation on a careful, case-by-case basis, *id.*, ¶¶ Q16, Q19, Q28.[12]

Plaintiffs' separation of powers challenge fails because it is foreclosed by the directly-

applicable circuit precedent in *Allbaugh*, and, more fundamentally, because it is premised on a

misunderstanding of the central role of the President, acting pursuant to his Article II powers, in

managing the regulatory activities of the Executive Branch.

**B.     Plaintiffs Have Not Stated a Claim Under the "Take Care" Clause of Article II**

Plaintiffs' Second Cause of Action, based on the "Take Care" clause of Article II, § 3,

adds nothing to the merits of their arguments about the validity of Executive Order 13,771

advanced in their separation of powers claim.  However, it does invite the Court to directly

---

[12] And the President has made clear that the focus of the deregulatory actions should include
unnecessary rules.  *See* Exec. Order No. 13,777, § 3(d) (agency focus on evaluating existing
regulations should be on, *inter alia*, rules that are "outdated, unnecessary, or ineffective").

intrude on a power specifically granted by the Constitution to the President.  As noted in

Defendants' Motion to Dismiss, where, as here, there is "a textually demonstrable constitutional

commitment of the issue to a coordinate political department" or "a lack of judicially

discoverable and manageable standards for resolving it," courts lack jurisdiction.  MTD at 35,

(quoting *Nixon v. United States,* 506 U.S. 224, 228 (1993)).  Courts simply cannot second-guess

"discretion[ary]" actions taken by the President "in the performance of his official duties."

*Mississippi v. Johnson,* 71 U.S. (4 Wall.) 475, 501 (1867);[13] *see also Balt. Gas & Elec. Co. v.*

*F.E.R.C.,* 252 F.3d 456, 459 (D.C. Cir. 2001) ("The power to take care that the laws be faithfully

executed is entrusted to the executive branch – and only to the executive branch.").  The Take

Care clause of Article II, § 3 is a crucial grant of authority to the President to administer the

Executive Branch, not an open-ended invitation to lawsuits challenging Presidential actions.

     Plaintiffs cite three cases in their Opposition in an attempt to ground their extraordinary

claim in precedent, but not even those cases expressly recognized a cause of action under the

Take Care clause.  *See* Opp. at 35 (citing *United States v. Texas,* 136 S. Ct. 906 (2016) (Supreme

Court requested briefing on the possible application of the Take Care clause); *Ariz. Dream Act*

*Coal. v. Brewer,* 855 F.3d 957, 976-77 (9th Cir. 2017) (Justice Department demonstrated in an

*amicus* filing that due to limited appropriations, the Department of Homeland Security could not

initiate greater immigration enforcement efforts regardless of any directive from the President);

*Cty. of Santa Clara v. Trump,* 2017 WL 1459081 (N.D. Cal. Apr. 25, 2017) (Court mentions,

---

[13] Plaintiffs seek to avoid the holding in *Mississippi v. Johnson* by arguing that they "do not seek an injunction against the President," Opp. at 36.  However, their prayer for relief seeks an order invalidating Executive Order 13,771.  Am. Compl. at 48.  That relief could run against no one other than the President, as the Executive Order was issued by the President himself pursuant to his authority under Article II.

without discussing, the Take Care clause in the context of a broader discussion of separation of powers)).  Thus, there is no support for Plaintiffs' claim that an alleged violation of the Take Care clause can ever state a cause of action, much less that Executive Order 13,771 is inconsistent with the Take Care clause in any manner.

**C.      Plaintiffs Have Not Established the Basis for an *Ultra Vires* Claim Against Defendants**

As in their Motion for Summary Judgment, Plaintiffs' Opposition once again attempts to skirt the binding Circuit precedent, *Nyunt v. Chairman, Broadcasting Board of Governors,* 589 F.3d 445, 449 (D.C. Cir. 2009), governing the narrow instances in which their *ultra vires* claim would be permitted.  *See* Opp. at 25.  Instead of addressing the Circuit's three-part test articulated in *Nyunt*, Plaintiffs create their own test, asserting that whenever a plaintiff alleges that an agency or the President has acted in excess of a "statutory command[]," *id.* (quoting *Reich II,* 74 F.3d at 1328), the plaintiff may ignore the many significant limitations on judicial review contained in the APA and instead proceed directly against the agency (or, indeed, the President) in district court.  Plaintiffs' argument, which would greatly expand the *ultra vires* cause of action and swallow the limitations of the APA, should be rejected.

Plaintiffs' claims do not satisfy the *Nyunt* standard because, at a minimum, Plaintiffs have not alleged that they are barred from raising an APA claim to challenge illegal agency action.  *See* MTD at 37-38.  Plaintiffs argue that the Court should ignore this binding circuit precedent based on the citation from *Reich II* that "[n]otwithstanding 'what appear[ed] to [the court] to be an available statutory cause of action,' 74 F.3d at 1327, the court entertained a non-statutory review claim."  Opp. at 38 (quoting *Reich II*).  But, in finding an *ultra vires* cause of action, the court in *Reich II* relied on the fact that the plaintiffs had failed to amend their

24

complaint to include an APA claim, which placed the court in the "anomalous situation" of "not [being] able to base judicial review on what appears . . . to be an available statutory cause of action." 74 F.3d at 1327. The court therefore proceeded "to the issue of whether appellants are entitled to bring a non-statutory cause of action." *Id.* As to that question, the court held it "untenable to conclude that there are no judicially enforceable limitations on [P]residential actions." *Id.* at 1332. That is, of course, not the present situation, as the government is not arguing that the Plaintiffs lack statutory remedies should an agency violate the dictates of a statute on an as-applied basis.

Indeed, in this respect, *Reich II* appears to be inconsistent with *Board of Governors v. MCorp Financial, Inc.,* 502 U.S. 32 (1991), where the Court held that "central to our decision in *Kyne* was the fact that the Board's interpretation of the Act would wholly deprive the union of a meaningful and adequate means of vindicating its statutory rights." *Id.* at 43. The Court then noted that the banking statute at issue "expressly provides MCorp with a meaningful and adequate opportunity for judicial review" of the challenged regulation, such that an *ultra vires* avenue was not available. *Id.* As Plaintiffs have the same opportunity for review of individual regulatory actions under the APA, their *ultra vires* claim here is similarly foreclosed.

To recognize *Reich II* as permitting *ultra vires* review more broadly would be to ignore the D.C. Circuit's repeated admonition that "[t]he *Leedom v. Kyne* exception is intended to be of extremely limited scope." *Griffith v. FLRA*, 842 F.2d 487, 493 (D.C. Cir. 1988). Indeed, since the D.C. Circuit's decision in *Reich II*, thirteen years prior to its decision in *Nyunt*, the D.C. Circuit has repeatedly sought to emphasize the limited application of the *ultra vires* doctrine and the narrow circumstances in which such review is permitted. *Id.*; *see, e.g.*, *Am. Fed'n of Gov't Emps. v. Sec'y of Air Force*, 716 F.3d 633, 639 n.6 (D.C. Cir. 2013) (applying same test);

25

*Norfolk S. Ry. Co. v. Solis*, 915 F. Supp. 2d 32, 46 (D.D.C. 2013) (applying same test and noting the "stringent requirements" thereunder).  Were Plaintiffs' view of *Reich II* the law in this Circuit, then it is unclear why the APA, and its accompanying limitations, continue to provide the basis for judicial review of agency decisionmaking.  *See Royster-Clark Agribusiness, Inc. v. Johnson*, 391 F. Supp. 2d 21, 25 (D.D.C. 2005) ("were the Court to embrace plaintiffs' expansive interpretation of *ultra vires* action, administrative adjudication would effectively be precluded by artful pleading").

Plaintiffs' remaining arguments provide no additional limitations to their theory of *ultra vires* review.  According to Plaintiffs, they are permitted to proceed on an *ultra vires* theory in the absence of an adequate "alternative procedure," *Nyunt*, 589 F.3d at 449, because individual APA claims would not provide them adequate relief.  Opp. at 38-39.  But the "adequacy" of the available statutory cause of action is not a factor recognized by the D.C. Circuit in *Nyunt*, and for good reason, as these limitations are a product of express congressional design in the APA.

For example, Plaintiffs complain that "[c]hallenges to any particular rulemaking cannot remedy the across-the-board harm from" Executive Order 13,771, and that "identifying a discrete agency inaction that is attributable to the Executive Order and is reviewable under the APA is likely to be exceedingly difficult, if not impossible."  Opp. at 38-39.  However, the limitations on *ultra vires* review would be meaningless if a plaintiff were able to argue that it may proceed with a sweeping constitutional challenge to Executive action simply because that challenge would be less complicated than individual challenges under the APA.  *See Nyunt*, 589 F.3d at 449.  Certainly the same would be true for other limitations on the role of Article III courts, such as standing and ripeness, but those "difficulties," including the ones set forth by Congress in the APA, serve an important role in ensuring the existence of a manageable case-or-controversy that

26

can be resolved by a court.  *See Norton v. S. Utah Wilderness All.,* 542 U.S. 55, 64 (2004) (Plaintiffs "cannot seek *wholesale* improvement of this program by court decree rather than in the offices of the Department of the halls of Congress where programmatic improvements are normally made.") (quoting *Lujan v. Nat'l Wildlife Fed'n,* 497 U.S 871, 891 (1990)).

Plaintiffs also assert that "delays caused by the Executive Order . . . cannot be cured after the fact."  Opp. at 39.  However, Plaintiffs' brief entirely ignores the existence of a cause of action under the APA to "compel agency action unlawfully withheld or unreasonably delayed."  5 U.S.C. § 706(1).  Much of Plaintiffs' brief is devoted to the argument that various agency actions are mandated by statute which, if true, may provide a cause of action under section 706(1).  *See* Opp. at 9-15.  Although Plaintiffs may find a sweeping challenge invalidating all of Executive Order 13,771 more convenient than individual challenges concerning purported agency delay, such extraordinary relief is simply incompatible with the nature of APA review.

Finally, even if this Court were to find that Plaintiffs are entitled to pursue their *ultra vires* claims, they have still failed to properly state such a claim here.  As Defendants explained in their Motion to Dismiss, an *ultra vires* claim requires a plaintiff to demonstrate "agency error so extreme that one may view it as jurisdictional or nearly so."  *Griffith,* 842 F.2d at 493; MTD at 37–38.  Plaintiffs would have this Court instead examine the agency's action for an existence of a statutory violation, Opp. at 40-41, but that routine statutory claim is improper on *ultra vires* review.  *See* MTD at 38.  Defendant agencies' actions to comply with an Executive Order that requires the consideration of costs and Presidential priorities, or the actions of OMB to implement that Order, are clearly within the power of those agencies---a point that plaintiffs do not dispute except to repeat their allegation that no statute authorizes the Executive Order.  *See* MTD at 40.  Accordingly, Plaintiffs' *ultra vires* claims should be dismissed.

27

### D.     OMB's Guidance Does Not Constitute Final Agency Action Under the APA

Once again, as in their Motion for Summary Judgment, Plaintiffs' Opposition fails to explain why their challenge to the OMB Guidance satisfies the second, "legal effects," prong of the two-part test for finality in *Bennett v. Spear,* 520 U.S. 154, 177-78 (1997) (final agency action only where "rights or obligations have been determined, or from which legal consequences will flow"). *See* Opp. at 42-45.

After an extended discussion of why the Guidance is "not of a tentative or interlocutory nature," Opp. at 44, Plaintiffs offer only a vague suggestion of how the Guidance might determine rights and obligations.  Plaintiffs assert that the OMB Guidance "specif[ies] mandatory prerequisites for issuing new rules and, in that way, *directly control[s] actions that affect regulated entities.*"  Opp. at 43 (emphasis added).  This vague description of the operation of the Executive Order attempts to make two points, neither of which is correct.  First, the assertion that the Guidance "directly controls" agency rulemaking and other regulatory actions is incorrect, given that the Guidance frequently states that it will be applied "generally" or be subject to application on a "case-by-case" basis, or may even be subject to exemptions.  *See* MTD at 11-13, 42-43.

But second, even to the extent that the Guidance is considered by agencies in rulemaking actions, the Guidance does not "directly control actions [such as final rules] that affect regulated entities."  Opp. at 43.  Rules that impose legal rights and obligations are the product of many factors in addition to the OMB Guidance.  These include the requirements of the agency's enabling statute, the factual information relevant to the rule (both public comments and material in agency files), related rules and guidance documents, and agency and administration policy

goals.  And, to the extent that compliance with the Executive Order is prohibited by statute, the agency is required to comply with the statutory directive.

Rather than "controlling" the actions of the agency with respect to a particular rulemaking, the Executive Order follows a history of Presidential directives, such as Executive Order 12,866, that require an agency acting in its rulemaking discretion to consider the costs of rules (including the existence of outdated, unnecessary rules) on regulated entities.  Once those agencies have taken action that is final, or have refused to take action that Plaintiffs believe is required by law, it is that action that might have an appreciable impact on a regulated entity.  The existence, or non-existence, of the OMB Guidance, however, will not change that impact.  Therefore, unlike in *Bennett,* the OMB Guidance does not "alter the legal regime" to which an agency is subject, *Bennett,* 520 U.S. at 178, but merely provides guidance, subject to numerous exceptions and limitations, to assist agencies in complying with Executive Order 13,771.  Legal "rights or obligations" will only be determined by the subsequent promulgation of a final rule by an agency other than OMB.[14]

---

[14] Defendants' Motion to Dismiss pointed out that even if the Guidance were found to be final agency action and declared unlawful, Executive Order 13,771 would remain in effect, agencies would continue to be required to comply with its terms, and hence any remedy Plaintiffs might receive on this cause of action would not address the harm that they allege.  MTD at 43, n.13. Plaintiffs' Opposition never responds to this point, thus conceding Plaintiffs' lack of standing to pursue this claim.

## **CONCLUSION**

For the foregoing reasons, this Court should dismiss Plaintiffs' First Amended

Complaint.


DATED:  July 21, 2017                    Respectfully submitted,

                                         CHAD A. READLER
                                         *Acting Assistant Attorney General*
                                         Civil Division

                                         CHANNING D. PHILLIPS
                                         *United States Attorney*

                                         BRETT A. SHUMATE
                                         *Deputy Assistant Attorney General*
                                         Civil Division, Federal Programs Branch

                                         ERIC R. WOMACK
                                         *Assistant Branch Director*
                                         Civil Division, Federal Programs Branch

                                         */s/ Daniel Bensing*
                                         DANIEL BENSING (D.C. Bar No. 334268)
                                         *Senior Trial Counsel*

                                         MICHAEL DREZNER (VA Bar No. 83836)
                                         *Trial Attorney*

                                         U.S. Department of Justice
                                         Civil Division, Federal Programs Branch
                                         20 Massachusetts Ave, NW
                                         Washington, DC 20530
                                         Telephone: (202) 305-0693
                                         Email: Daniel.Bensing@usdoj.gov

                                         *Counsel for Defendants*

30

## **CERTIFICATE OF SERVICE**

I hereby certify that on July 21, 2017, a copy of the foregoing Reply in Support of Defendants' Motion to Dismiss Plaintiffs' Amended Complaint was filed electronically via the Court's ECF system, which effects service upon all counsel of record.


*/s/ Daniel Bensing*
Daniel Bensing