**UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

| |
|---|
| PUBLIC CITIZEN, INC., *et al.*, |
| *Plaintiffs*, |
| v. |
| DONALD J. TRUMP, President of the United States, *et al.*, |
| *Defendants.* |

Civil Action No. 17-253 (RDM)

## MEMORANDUM OPINION AND ORDER

In this action, Plaintiffs Public Citizen, Inc., Natural Resources Defense Council, Inc. ("NRDC"), and Communication Workers of America, AFL-CIO ("CWA") challenge the lawfulness of Executive Order 13771, issued by President Trump on January 30, 2017, and two guidance documents issued by the Office of Management and Budget ("OMB") implementing the Executive Order.  Pending before the Court are the government's motion to dismiss, Dkt. 15, and Plaintiffs' cross-motion for summary judgment, Dkt. 16.

The Executive Order imposes three new restrictions on the administrative process.  It requires Executive Branch agencies to identify two existing regulations to be repealed for every new regulation, requires agencies to offset the private costs of compliance posed by new regulations by eliminating the costs associated with existing regulations, and imposes an annual regulatory cap (set at zero for 2017) on incremental regulatory costs that each agency may introduce.  According to Plaintiffs, these requirements trammel on an array of federal statutes, all of which require federal agencies to consider statute-specific factors in deciding whether to promulgate or to repeal regulations, and none of which permits the implementing agencies—or

the President—to premise those decisions on the adoption or repeal of other, unrelated

regulations.

Before reaching the merits of Plaintiffs' challenge, however, the Court must first satisfy

itself that it has Article III jurisdiction.  *See Steel Co. v. Citizens for a Better Env't*, 523 U.S. 83,

94–95 (1998).  As explained below, the Court concludes that Plaintiffs have failed to meet their

burden of plausibly alleging or proffering facts that, if accepted as true, would establish that they

have standing to sue.  Plaintiffs approach the standing requirement from multiple tacks.  They

seek to establish "associational standing" by identifying an array of regulatory actions that, they

contend, the Executive Order will likely delay or preclude and by arguing that their members

will suffer harm as a result.  But, as to some of those regulatory actions, they fail to identify

particular members who will be harmed.  As to others, they fail to allege facts sufficient to show

that the relevant agency would have issued the rule absent the Executive Order.  And, as to yet

others, they fail plausibly to allege or otherwise to show that any delay of the regulatory action

attributable to the Executive Order will *substantially increase* the risk that any of their members

will be harmed or that any of their members will face a *substantial probability* of harm once such

an increase in risk is taken into account.  *See Pub. Citizen, Inc. v. Nat'l Highway Traffic Safety

Admin.*, 489 F.3d 1279, 1295 (D.C. Cir. 2007).

Alternatively, Plaintiffs contend that they have "organizational standing" to sue—that is,

that they have standing to sue in their own right.  They allege, in particular, that Executive Order

13771 has a chilling effect on their missions to encourage agencies to adopt regulations designed

to protect public health and safety (Public Citizen), to protect the environment (NRDC), and to

protect workers' rights (CWA).  Plaintiffs assert that, as things now stand, if they contemplate

proposing a new rule, they must evaluate whether the cost of the new rule—the loss of two or

more unknown existing rules—is worth the benefit of the new rule.  The burden of merely

considering the issue, however, is insufficient to establish organizational standing.  And

Plaintiffs do not assert that they have actually declined—or will actually decline—to pursue a

new rule out of concern that the Executive Order will require the relevant agency to rescind two

existing rules.

This is not to say that a plaintiff—or, indeed, that the present Plaintiffs—will never be

able to establish standing to challenge the Executive Order.  On the present record, however, the

Court must conclude that it lacks jurisdiction.  The Court, accordingly, will grant the

government's motion to dismiss, Dkt. 15, and will deny Plaintiffs' motion for summary

judgment, Dkt. 16.

## I. BACKGROUND

### A.    Executive Order 13771

On January 30, 2017, the President issued Executive Order 13771, entitled "Reducing

Regulation and Controlling Regulatory Costs."  Exec. Order No. 13771, 82 Fed. Reg. 9339.  The

Executive Order imposes three new restrictions on the authority of agencies to adopt or to

propose new regulations: the "two for one" requirement, an "offset" requirement, and an "annual

cap" on the net costs of private compliance with covered regulations.  Each of these requirements

is discussed only briefly in the Executive Order, leaving it to the Director of OMB to flesh out

the requirements—and exceptions—in guidance and in the course of implementing the Executive

Order.

Under the "two for one" requirement, "whenever an executive department or agency . . .

publicly proposes for notice and comment or otherwise promulgates a new regulation," the

agency must "identify at least two existing regulations to be repealed."  Exec. Order No. 13771

§ 2(a).  This requirement works in tandem with the "offset" requirement, which requires agencies

to offset "any new incremental cost associated with new regulations" by eliminating "existing costs associated with at least two prior regulations." *Id.* § 2(c). Finally, the "annual cap" provision works in the aggregate and prohibits agencies from adopting new regulations that exceed their "total incremental cost allowance" for the year. *Id.* § 3(d). This cap, or total incremental cost allowance, is based on the costs of any new regulations adopted in the relevant year, less any cost savings achieved through the repeal of existing regulations. *Id.* The cap was set at zero for fiscal year 2017, *id.* § 2(b), and must be reset every year by the Director of OMB, *id.* § 3(d). The total cost allowance for the fiscal year may be zero, positive (i.e., permitting a net increase in total regulatory costs), or negative (i.e., requiring a net reduction in overall regulatory costs). *Id.* For 2018, the caps vary by agency from zero to negative $196 million in annualized costs. Office of Mgmt. & Budget, *Regulatory Reform: Two-for-One Status Report and Regulatory Cost Caps* 1–2 (2017) [hereinafter *Two-for-One Report*].[1]

The Executive Order states that it "shall be implemented consistent with applicable law" and that "[n]othing in th[e] [O]rder shall be construed to impair or otherwise affect . . . the authority granted by law to an executive department or agency." Exec. Order No. 13771 § 5. Similar provisos appear within particular provisions. *See id.* § 2(a) (two-for-one requirement applies "[u]nless prohibited by law"); *id.* § 2(c) (offset requirement applies "to the extent permitted by law" and any elimination of costs must comport "with the Administrative Procedure Act and other applicable law"). The Executive Order also exempts certain types of regulations and authorizes the OMB Director to exempt other "categor[ies] of regulations." *Id.* § 4.

---

[1]  Available at https://www.reginfo.gov/public/pdf/eo13771/FINAL_TOPLINE_All_ 20171207.pdf.

B.     **OMB Guidance**

OMB issued interim guidance on February 2, 2017, and followed up with final guidance

on April 5, 2017.  *See* Office of Mgmt. & Budget, Interim Guidance Implementing Section 2 of

the Executive Order of January 30, 2017 (2017) [hereinafter Interim Guidance]; Office of Mgmt.

& Budget, Guidance Implementing Executive Order 13771 (2017) [hereinafter Final Guidance].

Several important clarifications and refinements are set forth in these guidance documents.

First, the Executive Order does not apply to all regulatory actions, but only to "significant

regulatory action[s]" and "significant guidance document[s]."  Final Guidance, Q&A 2.  A

regulatory action or guidance document is "significant" if it is likely to "[h]ave an annual effect

on the economy of $100 million or more" or to meet other criteria.[2]  Exec. Order No. 12866

§ 3(f), 3 C.F.R. 638 (1994).  A "deregulatory action," in contrast, is "an action" that "has been

finalized" and the "total costs" of which are "less than zero."  Final Guidance, Q&A 4.

Deregulatory actions need not qualify as "significant" and thus take a "wide[r] range" of forms

than regulatory actions.  *Id.*

Second, unlike prior executive orders, *cf.* Exec. Order No. 12866, Executive Order 13771

focuses only on compliance costs borne by regulated parties, without regard to the public benefit

---

[2]  In full, a "significant regulatory action" is an action likely (1) to "[h]ave an annual effect on
the economy of $100 million or more" or to "adversely affect in a material way the economy, . . .
the environment, public health or safety, or [s]tate, local, or tribal governments or communities;"
(2) to "[c]reate a serious inconsistency or otherwise interfere with an action taken or planned by
another agency;" (3) to "[m]aterially alter the budgetary impact of entitlements, grants, user fees,
or loan programs or the rights and obligations of recipients thereof;" or (4) to "[r]aise novel legal
or policy issues arising out of legal mandates, the President's priorities, or the principles set forth
in [Executive Order 12866]."  Exec. Order No. 12866 § 3(f), 3 C.F.R. 638 (1994).  The OMB
guidance incorporates the definition of "significant regulatory action" set forth in Executive
Order 12866 and the definition of "significant guidance document" from OMB's Final Bulletin
for Agency Good Guidance Practices.  *See* Final Guidance, Q&A 2–3.  There are no material
differences between these definitions.

of the existing or proposed rule. Accordingly, a regulation that imposes $100 million in costs, but that saves $1 billion in losses, is not treated as generating a net savings of $900 million; rather, its adoption would be treated as a $100 million cost, and its repeal would count as $100 million in savings. *See* Final Guidance, Q&A 21, 32; Interim Guidance at 4. The guidance provides additional details on accounting. In calculating costs and savings for purposes of the Executive Order, agencies are required to determine the present value of the costs or savings of the regulatory action (or deregulatory action) "over the full duration of the expected effects of the action." Final Guidance, Q&A 25. An agency's "total incremental cost" for a fiscal year "means the sum of all costs from" significant regulatory actions and guidance documents "minus the cost savings from . . . deregulatory actions." Final Guidance, Q&A 8.

Third, the Executive Order recognizes that certain federal statutes prohibit agencies from considering costs in determining whether a significant regulatory action is warranted. With respect to those regulatory actions, the OMB guidance acknowledges that the Executive Order cannot—and does not—"change the agency's obligations under [such a] statute." Final Guidance, Q&A 18. But, even though agencies are not permitted to consider costs in deciding whether to promulgate these regulations, they are still "generally . . . required to offset the costs of such regulatory actions through other deregulatory actions taken pursuant to statutes that do not prohibit consideration of costs." *Id.* Likewise, if an agency faces an imminent statutory or judicial deadline for taking a regulatory action, the Executive Order "does not prevent" the agency from taking the regulatory action in a timely manner, even if it cannot first satisfy the requirements of the Executive Order. Final Guidance, Q&A 33. The agency must, however, "offset [the] regulatory action[] as soon as practicable thereafter." *Id.*

6

Fourth, agencies are permitted to "bank" cost savings and deregulatory actions "for use in the same or a subsequent fiscal year" to offset significant regulatory actions or guidance documents and to meet their "total incremental cost allowance[s]."  Final Guidance, Q&A 29. An agency that, for example, takes four deregulatory actions in fiscal year 1 may take two covered regulatory actions in year 1 or in future fiscal years.  *Id.*  "Similarly, if an agency issues two . . . deregulatory actions with total cost savings of $200 million," and issues a "regulatory action with a cost of $150 million" in fiscal year 1, "the agency may bank the surplus cost savings of $50 million to offset the costs of another . . . regulatory action" in a future fiscal year. *Id.*  "To the extent practicable," however, agencies must take any required offsetting "deregulatory actions before or concurrently with the . . . regulatory actions they are intended to offset."  Final Guidance, Q&A 38.

Finally, as counsel for the government acknowledged at oral argument, neither the Executive Order nor the OMB guidance provides a clear mechanism for notifying members of the public whether and when a proposed (or possible) regulatory action might be delayed or abandoned due to the requirements of the Executive Order.  *See* Dkt. 56 at 64 (Tr. Oral Arg. 64:7–22) ("I suspect [that information on delayed or abandoned regulatory actions] will not be public.").  With respect to deregulatory actions, the Unified Agenda of Regulatory and Deregulatory Actions should "include, to the extent practicable, . . . deregulatory actions that . . . are sufficient to offset [any] regulatory actions" subject to the Executive Order.  Final Guidance, Q&A 37.  And when a regulatory action is allowed under the Executive Order, the Federal Register notice must indicate that the action is subject to the Executive Order.  *Id.*  But that Federal Register notice need not identify the required "offsetting . . . deregulatory actions."  *Id.* Furthermore, although the Executive Order requires that agencies identify offsetting deregulatory

actions as a condition of taking new regulatory actions, the OMB guidance precludes agencies

from relying on the Executive Order "as the basis or rationale, in whole or in part, for" taking the

deregulatory action.  *Id.*  As a result, neither the Executive Order nor the OMB guidance

provides a mechanism for notifying interested parties that an otherwise desirable regulation is

being delayed or withheld in order to comply with the Executive Order or that a deregulatory

action was initiated in order to comply with the Executive Order.

## C.     **Procedural History**

On February 8, 2017, Plaintiffs filed this action against the President, the Director of

OMB, the heads of thirteen federal agencies, and the United States.  Dkt. 1.  Plaintiffs are Public

Citizen, which is a national consumer advocacy group, NRDC, which is a national environmental

and public health organization, and the CWA, which is an international labor union.  Dkt. 14 at

4–7 (Am. Compl. ¶¶ 12–14).  Each of these organizations has hundreds of thousands of members

and seeks to advance its members' interests by, among other things, securing legal and

regulatory protections through litigation and advocacy before federal agencies.  *Id.* (Am. Compl.

¶¶ 12–14).

Two months after Plaintiffs filed suit, the government moved to dismiss the complaint for

lack of standing and for failure to state a claim, Dkt. 9, and fourteen states filed an amicus brief

in support of the government addressing the merits of the dispute, Dkt. 12.  In response,

Plaintiffs filed an amended complaint as of right that, among other things, added further

allegations relating to their standing to sue.[3]  Dkt. 14 (Am. Compl.).  The government has now

renewed its motion to dismiss, Dkt. 15, and Plaintiffs have moved for summary judgment, Dkt.

16.  The fourteen states have also renewed their amicus filing, Dkt. 19, and other amici have

---

[3]  For concision, the Court will refer to Plaintiffs' amended complaint as "the complaint."

filed in support of the government, Dkt. 39, and in support of Plaintiffs, Dkt. 25; Dkt. 26; Dkt. 31; Dkt. 40.

The centerpiece of Plaintiffs' case—and the foundation for their five claims—is their contention that Executive Order 13771 necessarily "impose[s] rulemaking requirements beyond and in conflict with the requirements of the" Administrative Procedure Act ("APA") and "the statutes from which . . . federal agencies derive their rulemaking authority."  Dkt. 14 at 4 (Am. Compl. ¶ 8); *see id.* at 17–43 (Am. Compl. ¶¶ 63–124) (describing potential applications of the Executive Order that demonstrate "how the . . . Order directs agencies to act unlawfully and why it is unconstitutional").  As a result, Plaintiffs allege, the Executive Order (1) exceeds the President's authority under Article II and usurps Congress's power to legislate; (2) conflicts with the President's duty to execute legislation under the Take Care Clause; and (3) directs federal agencies to take action that is ultra vires.  *Id.* at 43–46 (Am. Compl. ¶¶ 125–51).  Plaintiffs further allege (4) that the OMB guidance documents are also ultra vires and (5) that the guidance documents violate the APA.  *Id.* at 47–49 (Am. Compl. ¶¶ 152–65).  Plaintiffs seek a declaration that the Executive Order is unconstitutional and that it and the OMB guidance are invalid, and they seek an injunction barring the OMB Director and various agencies from implementing the Executive Order.  *Id.* at 49 (Am. Compl. Prayer).

## II.  LEGAL STANDARD

"The party invoking federal jurisdiction bears the burden of establishing" each of the elements of Article III standing, although "the manner and degree of evidence required" varies with "the successive stages of the litigation."  *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 561 (1992).  "At the pleading stage, general factual allegations of injury resulting from the defendant's conduct" will often suffice.  *Id.*; *see also Owner-Operator Indep. Drivers Ass'n v.*

*Dep't of Transp.*, 879 F.3d 339, 346–47 (D.C. Cir. 2018).  But, "[w]here a motion to dismiss a complaint present[s] a dispute over the factual basis of the court's subject matter jurisdiction[,] . . . the court may not deny the motion to dismiss merely by assuming the truth of the facts alleged by the plaintiff and disputed by the defendant."  *Feldman v. FDIC*, 879 F.3d 347, 351 (D.C. Cir. 2018) (internal quotation marks and citation omitted).  Rather, the Court "must go beyond the pleadings and resolve any disputed issues of fact . . . necessary to a ruling []on the motion to dismiss;" in doing so, however, the Court must also ensure that Plaintiffs have been accorded "ample opportunity to secure and [to] present evidence relevant to the existence of jurisdiction."  *Id.* (internal quotation marks and citations omitted).  Prior to discovery, the Court must accord Plaintiffs "the benefit of all reasonable inferences," and, in the absence of "evidentiary offerings," the Court must avoid "assessing the credibility of [their] allegations." *Id.*

### III.  ANALYSIS

"Because Article III limits federal judicial jurisdiction to cases and controversies, *see* U.S. Const. art. III, § 2, federal courts are without authority" to decide disputes unless the plaintiff has standing—that is, "'a personal stake in the outcome of the controversy [sufficient] to warrant *his* invocation of federal-court jurisdiction.'"  *Chamber of Commerce v. EPA*, 642 F.3d 192, 199 (D.C. Cir. 2011) (quoting *Summers v. Earth Island Inst.*, 555 U.S. 488, 493 (2009)).  As the Court will discuss below, standing doctrine includes various permutations.  Across all contexts, however, "the irreducible constitutional minimum of standing contains three elements." *Lujan*, 504 U.S. at 560.  First, the plaintiff must allege (and must eventually prove) that she has suffered, or faces an imminent threat of suffering, an "injury in fact."  *Id.*  Conjectural or hypothetical threats of injury will not suffice.  *Id.*  Second, the plaintiff must allege (and must

eventually prove) facts sufficient to establish a "causal connection between [that] injury and the conduct complained of." *Id.* In other words, the injury must "be fairly traceable to the challenged action of the defendant, and not the result of the independent action of some third party." *Id.* (internal quotation marks, alterations, and citation omitted). Third, the injury must be redressable "by a favorable decision." *Id.* at 561. Again, speculation will not suffice; rather, the plaintiff must allege (and must eventually prove) that it is "likely" that judicial intervention will rectify or prevent the asserted wrong. *Id.*

When an association seeks to invoke the jurisdiction of a federal court, it can establish standing in one of two ways. It can assert "associational standing" to sue on behalf of its members. *See Hunt v. Wash. State Apple Advert. Comm'n*, 432 U.S. 333, 343 (1977). Or it can assert "organizational standing" to sue on its own behalf. *See People for the Ethical Treatment of Animals v. USDA*, 797 F.3d 1087, 1093 (D.C. Cir. 2015) [hereinafter *PETA*]. Here, Plaintiffs attempt to satisfy both of these standards. The Court will first address Plaintiffs' array of arguments for associational standing and will then turn to their single theory of organizational standing.

## A.    Associational Standing

"Even in the absence of injury to itself, an association may have standing solely as the representative of its members." *Warth v. Seldin*, 422 U.S. 490, 511 (1975). In *Hunt v. Washington State Apple Advertising Commission*, the Supreme Court set forth the criteria for associational standing. 432 U.S. 333. Under the so-called *Hunt* test, a plaintiff at the motion to dismiss stage must plausibly allege or otherwise offer facts sufficient to permit the reasonable inference (1) that the plaintiff has at least one member who "would otherwise have standing to sue in [her] own right;" (2) that "the interests" the association "seeks to protect are germane to [its] purpose;" and (3) that "neither the claim asserted nor the relief requested requires the

11

participation of [the] individual members in the lawsuit." *Id.* at 343. The government does not dispute that Plaintiffs' allegations satisfy the second and third elements of the *Hunt* test, and the Court (which must satisfy itself that it has jurisdiction) agrees that neither factor poses a hurdle.

In contrast, the first element—the requirement that at least one member of the association have standing to sue in her own right—is not so easily satisfied. In an impressive effort to do so, Plaintiffs point to over a dozen putative regulatory actions that they contend would benefit their members and that, they further assert, have been or will be delayed, weakened, or barred as a result of Executive Order 13771 and the OMB guidance. For ease of discussion, the Court will consider these putative regulatory actions in categories corresponding to the reasons why Plaintiffs fail to meet the first element of the *Hunt* test.

### 1. *Regulatory Actions Affecting Unidentified Members*

At the threshold, the first element of the *Hunt* test requires that the plaintiff-association identify at least one *specific* member who has suffered, or is likely to suffer, an injury in fact. *Summers*, 555 U.S. at 498; *see also Sierra Club v. Morton*, 405 U.S. 727, 735 (1972). "[I]t is not enough" for the association "to aver that unidentified members have been injured." *Chamber of Commerce*, 642 F.3d at 199.

With respect to several of the putative regulatory actions Plaintiffs identify, they have made no effort—either in their complaint or in the multiple declarations they have submitted—to identify a specific member who has suffered, or who is likely to suffer, an injury in fact due to the Executive Order's effect on the regulatory action.[4] As to some of these putative regulatory

---

[4] These include (1) two Environmental Protection Agency ("EPA") proposed rules that would "phase out trichloroethylene . . . for use in vapor degreasing, aerosol degreasing, and spot cleaning in dry cleaning facilities," Dkt. 14 at 28 (Am. Compl. ¶ 90); (2) "critical life-saving and environment-protecting air pollution limits" from the EPA, *id.* at 42–43 (Am. Compl. ¶ 124); (3)

actions, Plaintiffs might nonetheless contend that the consequences are so sweeping that "there is a substantial likelihood that at least one member may have suffered an injury-in-fact." *Am. Chemistry Council v. Dep't of Transp.*, 468 F.3d 810, 820 (D.C. Cir. 2006). But, as the Court of Appeals has cautioned, "[i]t is not enough to show . . . that there is a substantial likelihood that at least one member [of the association] has standing." *Id.* Instead, "[a]t the very least, the identity of the party suffering an injury in fact must be firmly established." *Id.* As a result, Plaintiffs cannot rely on these putative regulatory actions to satisfy the first element of the *Hunt* test.

2.      *Unspecified Regulatory and Deregulatory Actions*

Plaintiffs also assert that their members will be injured by agencies' decisions to forgo or weaken potential regulatory actions and by the repeal of existing regulations. With respect to foregone or weakened regulatory actions, Plaintiffs have not alleged or otherwise proffered any facts identifying specific regulatory initiatives that have been, or are likely to be, discarded or weakened as a result of Executive Order 13771. Quoting a former Environmental Protection Agency ("EPA") Administrator, Plaintiffs do contend that it is "likely" that "the EPA and other agencies will stop seeking new regulations so they can protect existing rules." Dkt. 47 at 23.

---

a possible "occupational health standard for styrene, an industrial chemical that can harm workers[,]" from the Occupational Safety and Health Administration, *id.* at 23 (Am. Compl. ¶ 77); (4) a Mine Safety and Health Administration ("MSHA") proposed rule "requiring underground coal mine operators to equip [certain mobile] equipment with proximity detection systems" designed to "reduce mining deaths from pinning, crushing, or striking injuries," *id.* at 26 (Am. Compl. ¶ 84); (5) "potential" MSHA rules that would "protect miners against diesel exhaust emissions and silicosis," Dkt. 16-17 at 8 (Wagner Decl. ¶ 20); (6) a citizen petition filed with the Food and Drug Administration relating to the tracking of tobacco sales, Dkt. 16-3 at 5–6 (R. Weissman Decl. ¶ 12); (7) a Department of Transportation withdrawn proposal "to require air carriers and ticket agents to clearly disclose to consumers certain information about fees for checked bags," Dkt. 61 at 2, and other unspecified Department of Transportation rules, Dkt. 16 at 27; and, finally, (8) five Department of Housing and Urban Development withdrawn proposals, "including one entitled 'Floodplain Management Protection of Wetlands Minimum Property Standards for Flood Hazard Exposure; Building to the Federal Flood Risk Management Standard,'" Dkt. 61 at 2–3.

The Court must, of course, accept well-pleaded factual allegations as true.  *Arpaio v. Obama*, 797 F.3d 11, 19 (D.C. Cir. 2015).  It may not, however, assume the truth of "mere conclusory statements," *Williams v. Lew*, 819 F.3d 466, 472 (D.C. Cir. 2016), and it must reject vague and "overly speculative" predictions about "future events," *Arpaio*, 797 F.3d at 21.  The former EPA Administrator's expectation and the other assertions that Plaintiffs offer are both speculative and conclusory.  In the absence of some greater specificity, predictions that agencies are likely to stop issuing new regulations in order to comply with the Executive Order's requirements are inadequate to establish associational standing.

Plaintiffs also allege that members of Public Citizen (including two identified members) will suffer injury because the Executive Order will cause agencies to "repeal regulations that protect their concrete interests," Dkt. 14 at 4–5 (Am. Compl. ¶ 12), and that members of the CWA (including two identified members) will suffer injury because the Executive Order will "caus[e] agencies" to "repeal regulations that protect the members' health and safety at work" or that otherwise protect "workplace rights," *id.* at 7 (Am. Compl. ¶ 14).  *See also id.* at 5–6 (Am. Compl. ¶ 13) (alleging that agencies will "repeal . . . important health [and] environmental regulations" due to the Executive Order).  Neither the complaint nor the declarations offered by the two members of Public Citizen and the two members of the CWA, however, identify any specific regulations that have been repealed, or are likely to be repealed, as a result of the Executive Order.  *See* Dkt. 16-7 at 2–3 (Fleming Decl. ¶¶ 4–6) (Public Citizen member asserting only that the Executive Order will likely cause agencies "to delay, weaken, or forgo" regulations); Dkt. 16-10 at 2–3 (T. Weissman Decl. ¶¶ 4–6) (same); Dkt. 16-5 at 2 (Abbott Decl. ¶ 7) (CWA member asserting only that the Executive Order may cause agencies to delay, weaken, or forgo "a new standard for workplace exposure to infectious diseases"); Dkt. 16-6 at

2–5 (Bauer Decl. ¶¶ 6–8) (CWA member asserting only that various workplace protections would not have been obtained "without the existence of the [Occupational Health and Safety Administration's] Lead Standard and CWA making sure Verizon was complying with the law"); *see also* Dkt. 16-2 at 3 (LeGrande Decl. ¶ 8) (noting that Bauer "would be harmed by the repeal of such an existing standard" but failing to aver that such a repeal was likely to occur).  Absent greater specificity, such predictions are too abstract and too speculative to support standing.  *See Arpaio*, 797 F.3d at 21.

In any event, it appears that Plaintiffs have abandoned their contention that their members will be injured by the repeal of beneficial regulations pursuant to the Executive Order.  The government's motion to dismiss argues, for example, that Plaintiffs' asserted concern about the repeal of favorable regulations "is entirely speculative."  Dkt. 15-1 at 28.  Plaintiffs, in turn, offer no response to this argument, and, indeed, make no mention of their allegation that specific members will be harmed by the repeal of regulations.  *See* Dkt. 47 at 19–30 (omitting mention of injury due to repeal); *see also* Dkt. 16 at 26–30 (same).  The government, in reply, concludes that "Plaintiffs [have] abandon[ed] any claim of injury on behalf of their members from the potential future repeal of regulations."  Dkt. 51 at 13.  The Court agrees.  *See* Local Civil Rule 7(b); *see also Sandoval v. U.S. Dep't of Justice*, --- F. Supp. 3d ---, 2017 WL 5075821, at *6 (D.D.C. Nov. 2, 2017).

3.     *Delay of Regulatory Actions*

The lion's share of Plaintiffs' efforts is directed at showing that Executive Order 13771 has already delayed—and will continue to delay—the issuance of new regulatory actions.

Plaintiffs offer eight examples of putative regulatory actions that, they say, have been or will be delayed due to the Executive Order:[5]

(1)     An unspecified regulation on greenhouse gas emissions.  *See* Dkt. 47 at 25; Dkt. 16-13 at 9 (Winegrad Decl. ¶ 18).

(2)     A citizen petition filed by Public Citizen requesting that the Food and Drug Administration ("FDA") "withdraw approval of the use of medically important antibiotics in livestock and poultry."  Dkt. 16-3 at 5–6 (R. Weissman Decl. ¶¶ 12–13).

(3)     A request for information on occupational exposure to infectious diseases in healthcare settings from the Occupational Safety and Health Administration ("OSHA").  *See* Dkt. 14 at 23–25 (Am. Compl. ¶¶ 78, 81); Dkt. 16 at 28; Dkt. 47 at 21–22.

(4)     A proposed rule banning the use of certain chemicals in paint remover from the EPA.  *See* Dkt. 14 at 28–30 (Am. Compl. ¶¶ 91, 95); Dkt. 47 at 22–23.

---

[5] Two other proposed rules on which Plaintiffs rely cannot support standing because those rules are now final.  According to Plaintiffs, an EPA rule regulating mercury discharges from dental offices was delayed due to the Executive Order.  Dkt. 47 at 24; *see* Dkt. 16 at 27; Dkt. 16-4 at 6–7 (Wetzler Decl. ¶¶ 13–14); Dkt. 47-3 at 2 (Heimbinder Decl. ¶ 8).  As Plaintiffs concede, however, "delay of this rule is no longer ongoing."  Dkt. 47 at 24 n.7.  Plaintiffs also claim standing based on the delay of a rule from the National Marine Fisheries Service designating certain areas along the East Coast as critical habitat for the Atlantic sturgeon.  *See* Dkt. 14 at 38–40 (Am. Compl. ¶¶ 113–17); Dkt. 47 at 25; Dkt. 16-4 at 9 (Wetzler Decl. ¶ 17); Dkt. 16-13 at 9–11 (Winegrad Decl. ¶¶ 19–23).  That rule, however, is also now final.  *See* Endangered and Threatened Species; Designation of Critical Habitat for the Endangered New York Bight, Chesapeake Bay, Carolina and South Atlantic Distinct Population Segments of Atlantic Sturgeon, 82 Fed. Reg. 39,160 (Aug. 17, 2017) (to be codified at 50 C.F.R. pt. 226).  As a result, the declaratory and injunctive relief Plaintiffs seek would not affect the risk of the underlying harms—physical injury due to mercury and diminished odds of observing Atlantic sturgeon in their natural habitat—that these rules address.  "[P]ast harm" does not establish standing to seek "forward-looking relief."  *Morgan Drexen, Inc. v. Consumer Fin. Prot. Bureau*, 785 F.3d 684, 689 (D.C. Cir. 2015); *see also City of Los Angeles v. Lyons*, 461 U.S. 95, 102 (1983) ("[P]ast exposure to illegal conduct does not in itself show a present case or controversy regarding injunctive relief . . . if unaccompanied by any continuing, present adverse effects." (internal quotation marks and citation omitted)).  Plaintiffs have not argued, moreover, that this case falls within the exception to the mootness doctrine for "disputes capable of repetition, yet evading review."  *FEC v. Wis. Right to Life, Inc.*, 551 U.S. 449, 462 (2007).

(5)     A proposed rule setting energy efficiency standards for residential conventional cooking products from the Department of Energy. *See* Dkt. 14 at 34–36 (Am. Compl. ¶¶ 106, 109); Dkt. 47 at 20–21, 25.

(6)     A proposed rule mandating vehicle-to-vehicle ("V2V") communications technology on light vehicles from the National Highway Traffic Safety Administration ("NHTSA"). *See* Dkt. 14 at 19–20 (Am. Compl. ¶¶ 68, 69); Dkt. 47 at 25.

(7)     A proposed rule mandating speed-limiting devices on certain commercial vehicles from NHTSA. *See* Dkt. 14 at 18–20 (Am. Compl. ¶¶ 67, 69); Dkt. 47 at 25.

(8)     A proposed rule requiring certain railroads that transport petroleum oil to develop oil spill response plans from the Pipeline and Hazardous Materials Safety Administration ("PHMSA"). *See* Dkt. 14 at 31–33 (Am. Compl. ¶¶ 98, 102); Dkt. 47 at 25.

Plaintiffs contend that the delay of each of these potential or proposed rules will prolong their members' exposure to the risks the putative rules are designed to mitigate, such as death, bodily injury, or financial loss. Dkt. 47 at 24–25. And they argue that these risks would likely be redressed by a favorable decision. *Id.* at 29–30.

Plaintiffs are correct that injuries that have not yet occurred, but that are "threatened," may at times satisfy the injury-in-fact requirement. *Warth*, 422 U.S. at 499. A threatened injury "may suffice" if it "is 'certainly impending,' or [if] there is a 'substantial risk' that the harm will occur." *Susan B. Anthony List v. Driehaus*, 134 S. Ct. 2334, 2341 (2014) (quoting *Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 409, 414 n.5 (2013)); *see also Attias v. Carefirst, Inc.*, 865 F.3d 620, 626–27 (D.C. Cir. 2017) ("[T]he [Supreme] Court [has] clarified that a plaintiff can establish standing by satisfying *either* the 'certainly impending' test *or* the 'substantial risk' test."). But "[a]llegations of *possible* future injury" premised on "attenuated chain[s] of inferences" will not suffice. *Clapper*, 568 U.S. at 409, 414 n.5 (internal quotation marks and citation omitted); *see also Sierra Club v. EPA*, 755 F.3d 968, 973 (D.C. Cir. 2014) ("[Plaintiffs] claiming increased health risks [must] demonstrate a substantial probability that they will be

17

injured." (internal quotation marks, alterations, and citations omitted)).  The key to shifting an alleged "injury from 'conjectural' to 'imminent,'" is the ability plausibly to aver or show that "there is a substantial probability of injury."  *Chamber of Commerce*, 642 F.3d at 200 (internal quotation marks, alterations, and citations omitted).

Plaintiffs cannot plausibly allege that the delay in finalizing the regulatory actions at issue here will *certainly* cause their members injury; instead the delay will, at most, *increase the risk* that the identified individuals might someday suffer an injury.  Although the D.C. Circuit has recognized that "increases in risk can at times be 'injuries in fact' sufficient to confer standing," *Nat. Res. Def. Council v. EPA*, 464 F.3d 1, 6 (D.C. Cir. 2006), the governing standard is not easily met.  In evaluating a claim of standing based on an increased risk of harm, the Court must begin by "consider[ing] the ultimate alleged harm"—such as death, bodily injury, or financial loss—as the "concrete and particularized injury," and must then "determine whether the increased risk of such harm makes injury to an individual citizen sufficiently imminent for standing purposes."  *Attias*, 865 F.3d at 627 (quoting *Food & Water Watch, Inc. v. Vilsack*, 808 F.3d 905, 915 (D.C. Cir. 2015)).  To satisfy this test, Plaintiffs must aver facts or proffer evidence sufficient to show both a "*substantially* increased risk of harm" and a "*substantial* probability of harm with that increase taken into account."  *See Food & Water Watch*, 808 F.3d at 914 (quoting *Pub. Citizen*, 489 F.3d at 1295).  Moreover, because increased-risk-of-harm cases often depend on the government's regulation of someone else, *see Pub. Citizen*, 489 F.3d at 1295, they implicate a further level of uncertainty: the asserted injury "hinge[s] on the response of the regulated . . . third party . . . and perhaps on the response of others as well," *Lujan*, 504 U.S. at 562.  To demonstrate that "the [government's] actual action has caused the substantial risk of harm," *Clapper*, 568 U.S. at 414 n.5, the plaintiff must, therefore, allege or

show that the relevant third parties will react to the challenged action in such manner as to create that substantial risk, *Lujan*, 504 U.S. at 562.  In considering such a causal chain, the Court must reject as overly speculative "predictions of future injury that are not normally susceptible of labelling as 'true' or 'false.'"  *Arpaio*, 797 F.3d at 21 (internal quotation marks and citations omitted).

In the present context, these requirements mean that Plaintiffs must plausibly allege or show, *first*, that the relevant agency intended to issue the regulation in question; *second*, that Executive Order 13771 will likely cause the agency to delay issuance of the regulation; *third*, that—with the relevant period of delay taken into account—an identified member of one of the associations will face a substantial probability of a concrete injury; and, *finally*, that the period of delay attributable to the Executive Order will substantially increase that risk of harm.  As explained below, the Court concludes that Plaintiffs have not plausibly alleged that the relevant agencies otherwise intended to issue two of the eight regulatory actions they identify, and their allegations regarding a third putative regulatory action only barely, if at all, clear this first hurdle. With respect to the remaining five putative regulatory actions, however, Plaintiffs have met that burden, and have also plausibly alleged that the Executive Order has delayed, or is likely to delay, the regulatory action.  They have not, however, plausibly alleged that at least one of their members faces a substantial risk of a concrete harm due to the delay in finalizing any of the identified regulatory actions.

a.   <u>Whether the Agency Otherwise Intended To Take the Regulatory Action</u>

Plaintiffs must first plausibly allege or show that the putative regulatory actions that they have identified would have been taken in the absence of Executive Order 13771.  That is a difficult task because it implicates "how independent decisionmakers"—here, executive

agencies—"will exercise their judgment." *Clapper*, 568 U.S. at 413.  The task is not impossible,

however.  Although mere speculation will not suffice, *id*. at 414, a plaintiff can establish the

requisite likelihood of third-party action by relying on (1) the third party's past practices, *see*

*Susan B. Anthony*, 134 S. Ct. at 2345; (2) the third party's representations concerning its future

conduct, *id.*; and (3) "experience and common sense," *Attias*, 865 F.3d at 628 (quoting *Ashcroft*

*v. Iqbal*, 556 U.S. 662, 679 (2009)).  In considering any such evidence or allegations, however,

the Court must take care not to place itself in the role of policymaker or to second-guess the

"broad and legitimate discretion" of the other branches of government.  *DaimlerChrysler Corp.*

*v. Cuno*, 547 U.S. 332, 345 (2006) (quoting *ASARCO Inc. v. Kadish*, 490 U.S. 605, 615 (1989)

(opinion of Kennedy, J.)).  Accordingly, in the absence of clear markers—such as proposed rules

or agency pronouncements—the Court should avoid speculating about how governmental

entities "will exercise their discretion." *Clapper*, 568 U.S. at 412; *see id.* at 410–12 (injury

depended in part on whether the Attorney General and Director of National Intelligence would

decide to surveil plaintiffs' foreign contacts); *DaimlerChrysler*, 547 U.S. at 344 (injury depended

in part on "how [state] legislators [would] respond to a reduction in revenue"); *R.J. Reynolds*

*Tobacco Co. v. FDA*, 810 F.3d 827, 830 (D.C. Cir. 2016) (injury depended on whether the FDA

would propose and issue a rule adverse to plaintiffs' economic interests).  Applying these

standards, the Court will consider, in turn, each of the specific regulatory actions Plaintiffs have

identified.

     *First*, Plaintiffs contend that at least one member of NRDC is suffering a harm due to the

delay of "rules to curb climate change."  Dkt. 47 at 25.  NRDC member Gerald Winegrad avers

that "global warming and [the] consequent sea level rise could deprive [him] of water supply, use

of [his] land and home, and recreational opportunities."  Dkt. 16-13 at 8–9 (Winegrad Decl.

¶ 17).  He "believe[s] that regulation of greenhouse gas emissions is important to . . . prevent exacerbating the global warming problem and its effects on [him] and [his] property."  *Id.* at 9 (Winegrad Decl. ¶ 18).  Finally, he expresses concern that the Executive Order "will reverse, halt or delay these crucial regulations, to [his] detriment."  *Id.* (Winegrad Decl. ¶ 18).  Plaintiffs, however, have not identified any proposed rule or other specific putative regulatory action that might address Winegrad's concerns.  As a result, the Court cannot determine whether any identifiable regulatory action has been—or likely will be—delayed due to the Executive Order and, if so, how that delay might have affected Winegrad.  Any injury allegedly stemming from the prospect that the Executive Order has delayed the issuance of unspecified regulations relating to a broadly defined area of concern is too abstract and speculative to support standing.

*Second*, Plaintiffs rely on a citizen petition in which Public Citizen asked the FDA to "withdraw approval of the use of medically important antibiotics in livestock and poultry."  Dkt. 16-3 at 5–6 (R. Weissman Decl. ¶ 12).  Public Citizen member Dr. Anthony So, a physician, attests that "the use of antibiotics in animal feed increases [his] risk of infection and lowers the effectiveness of available treatments for infections from antibiotic-resistant bacteria."  Dkt. 16-8 at 2–3 (So Decl. ¶ 7).  Public Citizen member Terri Weissman shares that concern, averring that she and her children "would benefit directly" if the FDA granted Public Citizen's petition.  Dkt. 16-10 at 2–3 (T. Weissman Decl. ¶ 6).  Plaintiffs, however, have not alleged or provided any evidence that the FDA ever intended to grant or seriously considered granting the petition.  Plaintiffs jump over this antecedent question, arguing instead that delay is inevitable.  Delay, however, is possible only if the FDA was otherwise inclined to withdraw its approval for the use of medically important antibiotics in livestock and poultry.

*Third*, Plaintiffs contend that OSHA "is developing a standard to protect healthcare employees and employees in other high-risk environments from exposure to dangerous pathogens" and that the Executive Order "will necessarily delay issuance of [any such] new health or safety standards." Dkt. 47 at 21–22.  Unlike the prior two examples, Plaintiffs' complaint and other submissions suggest that OSHA was poised to take this regulatory action prior to issuance of the Executive Order.  Their complaint alleges that OSHA was in the process of developing the infectious disease standard and that the agency anticipated issuing a proposed rule in October 2017.  Dkt. 14 at 23 (Am. Compl. ¶ 78).  Public records, moreover, support that allegation.[6]  In May 2010, OSHA issued a request for information "on occupational exposure to infectious agents in settings where healthcare is provided . . . and [in other] healthcare-related settings."  Request for Information on Infectious Diseases, 75 Fed. Reg. 24,835, 24,835 (May 6, 2010).  After reviewing the comments, meeting with stakeholders, and completing a Small Business Regulatory Enforcement Fairness Act review, OSHA announced in the spring of 2016 that it was "developing a standard to ensure that employers establish . . . comprehensive infection

---

[6]  The Unified Agenda of Regulatory and Deregulatory Actions, issued in the spring and fall of each year, provides information on the status of "regulatory and deregulatory activities under development throughout the Federal Government."  Office of Mgmt. & Budget, *About the Unified Agenda*, https://www.reginfo.gov/public/jsp/eAgenda/StaticContent/UA_About.jsp.  The various editions of the Unified Agenda illuminate the progress of a potential rule over time and are available online.  *See* Office of Mgmt. & Budget, *Reginfo.gov*, https://www.reginfo.gov/public/jsp/Utilities/index.jsp.  The status of a particular rulemaking at a certain point in time can be ascertained by searching OMB's website using the Regulatory Identification Number ("RIN") corresponding to the rulemaking and then selecting the appropriate edition of the Unified Agenda.  *See* Office of Mgmt. & Budget, *Search of Agenda/Regulatory Plan*, https://www.reginfo.gov/public/do/eAgendaSimpleSearch.  For concision, when discussing the regulatory history of a particular rulemaking, the Court will provide the RIN in a footnote and cite the relevant version of the Unified Agenda (e.g., "Fall 2017 Agenda") in the text.  The Court may take judicial notice of Executive Branch statements and reports pursuant to Federal Rule of Evidence 201.  *See Abhe & Svoboda, Inc. v. Chao*, 508 F.3d 1052, 1059 (D.C. Cir. 2007).

control program[s] and control measures to protect employees from . . . exposure[] to pathogens that can cause significant disease."[7]  Spring 2016 Agenda.  At that time, OSHA anticipated that it would issue a Notice of Proposed Rulemaking ("NPRM") in March 2017, *id.*, although the agency subsequently pushed this date back to October 2017, Fall 2016 Agenda.  After Executive Order 13771 issued, however, the infectious disease standard was moved to the "Long-Term Actions" section of the Unified Agenda, Spring 2017 Agenda, where it remains, Fall 2017 Agenda.

It is not obvious what follows from these facts and allegations, and neither party has briefed the issue.  On one hand, there is evidence that OSHA intended to issue an NPRM (and, presumably, eventually a final rule) before the Executive Order was issued.  On the other hand, the rulemaking process is inherently inchoate until an agency issues an NPRM, which then serves as a benchmark for agency action and triggers the requirement that the agency offer a reasoned explanation if it ultimately decides not to go forward as proposed.  *See Williams Nat'l Gas Co. v. FERC*, 872 F.2d 438, 450 (D.C. Cir. 1989).  The decision whether to issue an NPRM, moreover, is often policy-laden and, in that respect, beyond the judicial ken.

Because the parties have not addressed this issue, the Court will assume (without deciding) for present purposes that the infectious disease standard would have issued but for the Executive Order.  As explained below, however, that assumption will prove insufficient to permit Plaintiffs to establish standing using the infectious disease standard as their hook.[8]

---

[7] RIN: 1218–AC46.

[8] Plaintiffs have offered even less with respect to a potential rule "amend[ing] energy efficiency standards for consumer refrigerators and freezers."  Dkt. 16-12 at 3 (Quigley Decl. ¶ 10).  They aver that the Department of Energy was "expected to issue a notice of proposed rulemaking in 2017."  *Id.* (Quigley Decl. ¶ 10).  They offer no basis to conclude, however, that the Department intended to amend the relevant standards.  The Spring 2017 edition of the Unified Agenda stated

*Finally*, the remaining five potential regulatory actions more easily clear this first hurdle. Each involves a proposed rule, and the NPRMs shed significant light on "whether the [agencies] [intended to] issue . . . final rule[s]." *R.J. Reynolds*, 810 F.3d at 830. An NPRM typically reflects an agency's preliminary assessment that the proposed rule—or some "logical outgrowth" of it—should be adopted. *Envtl. Integrity Project v. EPA*, 425 F.3d 992, 996 (D.C. Cir. 2005). To be sure, an NPRM "in no way [binds] the agency to promulgate a final rule if further reflection, or changed circumstances," persuade the agency "that no regulatory change [is] warranted." *Williams Nat'l Gas*, 872 F.2d at 450. But, as noted above, any such withdrawal is subject to judicial review and must be supported by "a reasoned explanation." *Id*. Moreover, because the NPRM must include "the terms or substance of the proposed rule or a description of the subjects and issues involved," 5 U.S.C. § 553(b)(3), it also provides the Court—and the public—information on "what [such a rule] would say," *R.J. Reynolds*, 810 F.3d at 830. There is, accordingly, at least a plausible basis to conclude that the relevant agencies actually intended to finalize the five rules that they proposed.

b.    Whether Executive Order 13771 Has Caused Delay

Plaintiffs devote most of their attention to the next question: whether the delay in finalizing the OSHA infectious disease standard and the five proposed rules was caused by Executive Order 13771. *See* Dkt. 47 at 19–30. The Court must, of course, avoid any undue intrusion on the discretion of the Executive Branch to set policy priorities, *see Allen v. Wright*,

---

that the Department "*may* propose and adopt more stringent standards" or, alternatively, that it "*may* . . . issue a determination that no amendments to the current standards are required." Spring 2017 Agenda (RIN: 1904–AD80) (emphasis added). And the most recent edition indicates that the Department intends to issue a request for information at an undetermined date. Fall 2017 Agenda. Plaintiffs, accordingly, have not plausibly alleged that the Department planned to issue a final rule "amend[ing] [the relevant] energy efficiency standards." Dkt. 16-12 at 3 (Quigley Decl. ¶ 10).

468 U.S. 737, 759–61 (1984); *Pub. Citizen*, 489 F.3d at 1291–92, and "may not assume a particular exercise of [an agency's] discretion in establishing standing," *DaimlerChrysler*, 547 U.S. at 346.  That does not mean, however, that the Court must disregard evidence or plausible allegations that the Executive Order has caused delay.

With respect to the OSHA standard and the five proposed rules, there is some rule-specific evidence that Executive Order 13771 has contributed to delay.  As to the OSHA standard, prior to issuance of the Executive Order, OSHA indicated that it was developing a standard and that it anticipated issuing an NPRM in October 2017.[9]  Fall 2016 Agenda.  After the Executive Order issued, however, the standard was moved to the "Long-Term Actions" section of the Unified Agenda.  Spring 2017 Agenda.  Similarly, after the Executive Order issued, three of the proposed rules Plaintiffs have identified were moved from the "Final Rule Stage" to the "Long-Term Actions" section of the Unified Agenda.[10]  Fall 2017 Agenda.  A fourth rule was scheduled for final action in December 2016,[11] Fall 2016 Agenda, but, after the Executive Order issued, the window for final action was pushed back to September 2017, Spring 2017 Agenda, and then pushed back further to accommodate the anticipated issuance of a Supplemental NPRM in October 2018, Fall 2017 Agenda.  Finalization of the fifth proposed rule

---

[9]  RIN: 1218–AC46.

[10]  RINs: 2070–AK07 (proposed EPA rule banning the use of certain chemicals in paint remover); 2127–AK92 (proposed NHTSA rule mandating speed-limiting devices on certain commercial vehicles); 2127–AL55 (proposed NHTSA rule mandating V2V communications technology on light vehicles).

[11]  RIN: 1904–AD15 (proposed Department of Energy rule setting energy efficiency standards for residential conventional cooking products).

has been successively postponed from July 2017 to December 2017 to July 2018.[12]  Fall 2016

Agenda; Spring 2017 Agenda; Fall 2017 Agenda.

To be sure, these delays might be attributed to a change in administration and a shift in

policy priorities, without regard to the Executive Order.  The government's own statements,

however, arguably undercut this theory.  Three of the NPRMs that Plaintiffs identify, for

example, were proposed by the Department of Transportation.  *See* Federal Motor Vehicle Safety

Standards; V2V Communications, 82 Fed. Reg. 3854 (proposed Jan. 12, 2017) [hereinafter V2V

Rule]; Federal Motor Vehicle Safety Standards; Federal Motor Carrier Safety Regulations; Parts

and Accessories Necessary for Safe Operation; Speed Limiting Devices, 81 Fed. Reg. 61,942

(proposed Sept. 7, 2016) [hereinafter Speed-Limiting Device Rule]; Hazardous Materials: Oil

Spill Response Plans and Information Sharing for High-Hazard Flammable Trains, 81 Fed. Reg.

50,068 (proposed July 29, 2016) [hereinafter Oil Spill Response Plan Rule].  As is typical when

a change in administration occurs, the Department announced in January 2017 that "many rule

schedules [would] need to be revised" to permit review "by new [Department] leadership."  U.S.

Dep't of Transp., *Significant Rulemaking Report Archive* (Feb. 9, 2018).[13]  The next month,

however, the Department offered a different explanation for suspending the rulemaking

schedules: to permit "evaluat[ion] in accordance with" Executive Order 13771.  *Id.*  The

Department issued similar notices every month for the next five months.  *Id.*  Currently, the

"[n]ext [a]ction[s]" on two of the proposed rules (the V2V communications technology rule and

---

[12]  RIN: 2137–AF08 (proposed PHMSA rule requiring certain railroads that transport petroleum
oil to develop oil spill response plans).

[13]  Available at https://cms.dot.gov/regulations/significant-rulemaking-report-archive.

the speed-limiting device rule) are listed as "[u]ndetermined," and the third rule has been pushed

back to July 2018 (the railroad oil spill response plan rule).[14]  Fall 2017 Agenda.

The likelihood that the Executive Order will cause delay, moreover, is highlighted by

information provided by the White House regarding implementation of the Executive Order.  In

fiscal year 2017, 635 planned regulatory actions were "withdrawn," 244 were "made inactive,"

and 700 were "delayed."  White House, *Fact Sheet: President Donald J. Trump Is Delivering on*

*Deregulation* (Dec. 14, 2017) [hereinafter *Deregulation Fact Sheet*].[15]  Over that same period,

federal "[a]gencies issued 67 deregulatory actions and only 3 regulatory actions," yielding a ratio

of 22 deregulatory actions for each regulatory action.  *Two-for-One Report* at 1.  The 67

deregulatory actions taken in 2017 yielded regulatory cost savings of $570 million per year ($8.1

billion in lifetime cost savings) across all agencies.  *Id.*  For fiscal year 2018, the Executive

Branch has "committed to cutting" $686.6 million per year ($9.8 billion in lifetime cost savings)

across all agencies.  *Deregulation Fact Sheet.*

Although these statistics would appear to leave room for new regulatory actions, the

numbers must be considered in light of the fact that the Executive Order requires an offset for the

*costs* of a new rule, without regard to the *benefits* of that rule.  Although undoubtedly costly,

NHTSA's proposed rule on V2V communications technology illustrates the obstacle posed by

the Executive Order.  The proposed rule would "require all new light vehicles to be capable of

[V2V] communications, such that they [can] send and receive Basic Safety Messages to and

---

[14]  RINs: 2127–AL55 (proposed NHTSA rule mandating V2V communications technology on
light vehicles); 2127–AK92 (proposed NHTSA rule mandating speed-limiting devices on certain
commercial vehicles); 2137–AF08 (proposed PHMSA rule requiring certain railroads that
transport petroleum oil to develop oil spill response plans).

[15]  Available at https://www.whitehouse.gov/briefings-statements/president-donald-j-trump-
delivering-deregulation.

from other vehicles." V2V Rule, 82 Fed. Reg. at 3854. When it proposed the rule, NHTSA

asserted that V2V technology "has the potential to revolutionize motor vehicle safety . . . [and to]

reduce the number and severity of motor vehicle crashes." *Id.* at 3855. The agency estimated

that the proposed rule would, on an annual basis, save \$54.7 to \$73.9 billion, *id.* at 3996, while

costing \$2.2 to \$5 billion, *id.* at 3981. Under the Executive Order, however, only the costs are

relevant. As noted above, the sum of the annual cost savings generated by *all* deregulatory

actions across *all* agencies in the eight months from the end of January (when the Executive

Order issued) through the end of September (when the fiscal year ended) tallied only \$570

million. *See Two-for-One Report* at 1. At that rate, agencies would have achieved \$855 million

in cost savings had the Executive Order been in effect for a full year. Comparing the estimated

costs of the V2V rule (\$2.2 to \$5 billion annually) with the estimated cost savings from *all*

deregulatory actions taken in one fiscal year (\$855 million annually) suggests that it would take

the Executive Branch as a whole *two or three years* to accumulate cost savings sufficient to

offset even the most conservative estimated cost of the V2V rule.[16] The time needed to

accumulate the necessary cost savings would grow by an order of magnitude, moreover, if the

Department of Transportation were left to fend for itself: at its current rate of cutting costs, the

Department would need almost seven decades to offset the costs of the V2V rule. *See Two-for-*

*One Report* at 2 (noting that the Department generated \$21.8 million in annual cost savings in

---

[16] The actual calculations are more complicated than this. *See, e.g.*, Final Guidance, Q&A 25 (requiring agencies to calculate the present value of regulatory and deregulatory actions "over the full duration of [their] expected effects" using appropriate discount rates). These estimates, however, are close enough to illustrate that the Executive Order curtails the ability of agencies to adopt significant new rules, even when the benefits of the new rules would vastly outweigh the costs.

the final eight months of fiscal year 2017, which equates to $32.7 million if the Executive Order had been in effect for a full fiscal year).

Although this may be an extreme example, it shows that the Executive Order meaningfully restricts agencies' latitude to issue rules and, absent waivers, is likely to delay "significant regulatory actions."  Nor is the Court convinced that the authority of the Director of OMB to grant waivers adequately answers this concern.  To be sure, that authority does introduce some uncertainty, but, at least to date, there is no indication that the Director has exercised his waiver authority with respect to the six regulatory actions Plaintiffs have identified, none of which has moved forward since the Executive Order took effect.

One might reasonably argue that Plaintiffs can only speculate that the delay in issuance of the identified rules has been caused by the Executive Order.  It is conceivable, for example, that the delay stems from greater scrutiny of regulatory action or skepticism that the federal government should try to fix every problem.  That, however, is not what the government has said.  No one has said, for example, that the V2V rule is a bad idea or that it is too costly. Executive Order 13771, in contrast, speaks directly to the issue and says that agencies may not take new regulatory actions without first identifying deregulatory actions sufficient to offset the relevant cost.  Exec. Order No. 13771 § 2(c).  And "experience and common sense" suggest that compliance with that mandate will, in fact, cause delay.  *Attias*, 865 F.3d at 628 (quoting *Iqbal*, 556 U.S. at 679).

Finally, statements from Executive Branch officials corroborate Plaintiffs' theory that the offset requirement will likely cause delay.  After the Executive Branch released statistics on the Executive Order's implementation in fiscal year 2017, the Administrator of the Office of Information and Regulatory Affairs delivered a press briefing on the results.  *See* White House,

*Press Briefing by Office of Information and Regulatory Affairs Administrator Neomi Rao on the Unified Agenda of Regulatory and Deregulatory Actions* (Dec. 14, 2017).[17]  When asked why the number of deregulatory actions (67) was "so small," the Administrator replied:

> [D]eregulation . . . takes time . . . .  [I]f we're doing things in a way that is careful and consistent with law, it takes time to undo the [existing regulations].  Because for many rules that are undone, you need a new rule, and then you need a new regulatory impact assessment, and you need to create a rule that then can pass through the [procedural] standards.

*Id.*  In other words, identifying offsetting deregulatory actions and executing those actions "takes time."

This combination of factors—Executive Branch statements regarding the Executive Order, a common-sense understanding of the effect of the offset requirement, *see Iqbal*, 556 U.S. at 679, and the actual delay of the six regulatory actions at issue here—belie the government's suggestion that Plaintiffs' concerns about delay are too speculative to survive a motion to dismiss, *see* Dkt. 15-1 at 30.  It is at least plausible to conclude that the Executive Order has resulted in *some* measure of delay with respect to the six regulatory actions that Plaintiffs have identified.

   c.   Whether Plaintiffs' Members Face a Substantial—and Substantially Increased—Risk of Harm

Although Plaintiffs have plausibly alleged delay, they devote scant attention to the core of the injury-in-fact requirement: actual or imminent harm.  *See Lujan*, 504 U.S. at 560. Plaintiffs do not allege that any of their members have suffered an actual injury but, instead, premise their claim of associational standing on the theory that at least one member faces an

---

[17]  Available at https://www.whitehouse.gov/briefings-statements/press-briefing-office-information-regulatory-affairs-administrator-neomi-rao-unified-agenda-regulatory-deregulatory-actions.

increased risk of harm—such as death, bodily injury, or financial loss—due to the delay caused

by the Executive Order.  Increased-risk-of-harm theories are often difficult to substantiate, given

uncertainty about future events and uncertainty about the "degree" of risk the law demands.  *Va.*

*State Corp. Comm'n v. FERC*, 468 F.3d 845, 848 (D.C. Cir. 2006).  Here, the challenge that

Plaintiffs face is particularly daunting because they seek to set aside the Executive Order to

facilitate the adoption of regulations by agencies in the hopes of compelling third parties to act in

a manner that might mitigate risks posed to their members.  *Cf. Lujan*, 504 U.S. at 562.

Although the standard is a demanding one, the D.C. Circuit "has not closed the door to all

increased-risk-of-harm cases."  *Pub. Citizen*, 489 F.3d at 1295.  As noted above, the Court of

Appeals "ha[s] allowed standing when there was at least *both* (i) a *substantially* increased risk of

harm and (ii) a *substantial* probability of harm with that increase taken into account."  *Id.*

Precedent provides no definitive guidance about the meaning of "substantial" in this context.

*Food & Water Watch*, 808 F.3d at 914–15.  "In applying the . . . standard," however, courts must

remain "mindful . . . that the constitutional requirement of imminence . . . necessarily compels a

very strict understanding of what increases in risk and overall risk levels can count as

'substantial.'"  *Pub. Citizen*, 489 F.3d at 1296.  As explained below, the Court concludes that

Plaintiffs have not plausibly alleged or shown that the government's delay in finalizing the six

regulatory actions has given, or is likely to give, rise to the type of injury required to satisfy the

increased-risk-of-harm standard.  The Court will address each of the six putative regulatory

actions in turn.

OSHA Infectious Disease Standard

The Occupational Safety and Health Act of 1970, 29 U.S.C. § 651 *et seq.*, authorizes the

Secretary of Labor to issue occupational safety or health standards.  29 U.S.C. § 655(b).  Once

the Secretary has identified a "significant risk," he has a "duty to . . . add[] measures so long as

they afford [a] benefit and are feasible." *Bldg. & Constr. Trades Dep't, AFL-CIO v. Brock*, 838
F.2d 1258, 1269 (D.C. Cir. 1988).   In light of this responsibility, OSHA requested information in
May 2010 regarding "occupational exposure to infectious agents in settings where healthcare is
provided . . . and [in other] healthcare-related settings."   Request for Information on Infectious
Diseases, 75 Fed. Reg. at 24,835.   By Spring 2016, OSHA announced that it was "developing a
standard to ensure that employers establish . . . comprehensive infection control program[s] and
control measures to protect employees from . . . exposure[] to pathogens that can cause
significant disease."[18]   Spring 2016 Agenda.   The agency specified that it anticipated issuing an
NPRM in March 2017, *id.*, although that date was later pushed back to October 2017, Fall 2016
Agenda.   After the Executive Order issued, however, the proposed regulatory action was
reclassified from the "Proposed Rule Stage" to "Long-Term Actions," and issuance of the
NPRM was postponed indefinitely.   Spring 2017 Agenda; Fall 2017 Agenda.

Plaintiffs contend that at least two of their members face an increased risk of harm as a
result of this delay.   Denise Abbott is a member of the CWA and is employed as a registered
nurse in an emergency department.   Dkt. 16-5 at 1–2 (Abbott Decl. ¶¶ 1, 4).   She attests that her
work "involves exposure to many and varied infectious diseases;" that adoption of "the proposed
OSHA Infectious Disease Standard" would "minimize risks associated with the introduction of
and exposure to such infectious diseases;" and, finally, that "by delaying . . . a new standard for
workplace exposure to infectious diseases, Executive Order 13771 will negatively impact [her]
ability to avoid such exposure."   *Id.* at 2 (Abbott Decl. ¶¶ 6–7).   Dr. Jonathan Soverow, in turn,
attests that he is a member of Public Citizen; that he works as a cardiologist at a hospital; that his
work exposes him "to many and varied infectious agents that can cause disease;" that adoption of

---

[18]  RIN: 1218–AC46.

"the proposed OSHA Infectious Disease Standard" would "minimize" his risk; and that the Executive Order, "by delaying . . . a new standard for workplace infectious diseases, . . . will negatively impact [his] ability to avoid such exposure."  Dkt. 16-9 at 1–2 (Soverow Decl. ¶¶ 1, 3–5).

Although "experience and common sense," *Iqbal*, 556 U.S. at 679, along with evidence cited by OSHA, 75 Fed. Reg. at 24,836, support the conclusion that hospital workers face a greater risk of exposure to infectious agents than other members of the public, that premise is insufficient to satisfy the increased-risk-of-harm test.  Plaintiffs must plausibly aver (and must eventually prove) that the delay of the OSHA standard occasioned by the Executive Order— however long that delay may last—will substantially increase the risk that Abbott or Soverow will contract an infectious disease and that, after that increased risk is taken into account, Abbott or Soverow will face a substantial probability of contracting an infectious disease.  That undertaking is never an easy one, but it borders on the impossible in the present context, where the Court does not have the text of a proposed rule before it.  The Court, as a result, does not know what the putative NPRM would say and, even if an earlier draft of the NPRM might be produced, the Court has no way of knowing whether the Department of Labor would have modified the draft before it issued.  Speculating about whether and how the draft might have been modified, moreover, constitutes the type of judicial intrusion into the policymaking process that the Supreme Court and the D.C. Circuit have counseled federal courts to avoid.  *See Allen*, 468 U.S. at 759–61; *Pub. Citizen*, 489 F.3d at 1291–92.

Even if the Court could know what the NPRM would have said, Plaintiffs' current showing still fails to meet the two-part test for increased-risk-of-harm standing.  Plaintiffs have not averred or offered any evidence about Abbott or Soverow's current risk of exposure or about

the degree to which the OSHA standard would decrease that risk.  To take just one issue, the

OSHA request for information suggested that voluntary standards currently exist and that the

problem may lie, at least in part, in noncompliance by certain hospitals with those standards.  *See*

75 Fed. Reg. at 24,837 ("The lack of adherence to voluntary infection control procedures is of

particular interest to OSHA.").  As a result, even if the Court knew what the NPRM might have

provided, and even if the Court assumed that the OSHA standard would have compelled

compliance with the existing voluntary standards, Plaintiffs would still need to aver (and

eventually to show) that the hospitals where Abbott and Soverow work do not already satisfy

those standards.  *Cf. Pub. Citizen*, 489 F.3d at 1297 n.3 ("[Plaintiffs] thus must demonstrate a

'substantial probability' . . . that (i) automakers would not adopt safety standards more stringent

than the minimum specified in the NHTSA regulation, (ii) consumers on their own would not

check their tires so as to prevent injuries to others, and (iii) consumers would pay attention to the

warning lights." (citation omitted)).

The Court, accordingly, concludes that Plaintiffs' allegations regarding the OSHA

standard are insufficient to establish associational standing.

<u>EPA Proposed Rule on Paint Removers</u>

Plaintiffs' reliance on the EPA's proposed rule on paint removers fares no better.  Under

the Toxic Substances Control Act ("TSCA"), 15 U.S.C. § 2601 *et seq.*, if the EPA determines

that a chemical substance "presents an unreasonable risk of injury to health or the environment,"

it must issue a regulation imposing appropriate restrictions relating to the manufacture,

processing, distribution, use, disposal, or marking of that substance.  15 U.S.C. § 2605(a).  In

conducting the risk evaluation, the EPA may not consider "costs or other nonrisk factors."  15

U.S.C. § 2605(b)(4).

Applying the TSCA, the EPA proposed a rule on January 19, 2017, that would prohibit or restrict the use of methylene chloride and N-methylpyrrolidone ("NMP") in paint and coating removers. *See* Methylene Chloride and N-Methylpyrrolidone; Regulation of Certain Uses Under TSCA Section 6(a), 82 Fed. Reg. 7464 [hereinafter Paint Remover Rule]. Plaintiffs allege that their members "are and will be exposed" to methylene chloride and NMP and that those chemicals pose "serious health risks." Dkt. 14 at 29–30 (Am. Compl. ¶ 95). They, however, offer a declaration from only one member, Amanda Fleming, who explains how delay of the rule might affect her:

> One of my hobbies is oil painting, and I use paint remover in connection with that work. In addition, I paint around my house, which also sometimes requires me to use paint remover. For example, I recently used paint remover to remove semi-gloss paint from a wall that needed flat paint, because painting over the semi-gloss would not work in that situation. In addition, my husband and I are hoping to buy a fixer-upper in the next year or two, which will likely require us to use a variety of painting products, including paint thinner. I am aware that, in January 2017, the [EPA] proposed a rule to regulate certain toxic chemicals in paint removers. When finalized, the rule would either prohibit those chemicals for consumer paint removal or impose a series of restrictions, such as limitations on the amount of the substances in paint removal products and a requirement of warning labels for consumers. My family and I would directly benefit from such a rule, which would help us avoid exposure to dangerous chemicals. Because of [the Executive Order], however, . . . my family and I will lose the protections proposed and be subjected to a higher risk of harm . . . .

Dkt. 16-7 at 2–3 (Fleming Decl. ¶ 6).

For present purposes, the negative health consequences of exposure to methylene chloride and NMP constitute the "the ultimate alleged harm." *Food & Water Watch*, 808 F.3d at 915 (internal quotation marks and citation omitted). The question, accordingly, is whether Plaintiffs have averred or shown that Fleming and her family face a substantially increased risk of suffering those negative health consequences and, if so, whether they face a substantial probability of suffering negative health consequences once that increased risk is taken into

account.  *See Pub. Citizen*, 489 F.3d at 1295; *Food & Water Watch*, 808 F.3d at 914.  The answer to that question is "no."

Plaintiffs make no allegations about the extent of the risk posed by occasional consumer use of paint remover containing methylene chloride or NMP.  *See Pub. Citizen*, 489 F.3d at 1296 (no estimate of how many accidents would be avoided).  They say nothing about how often Fleming uses or will use "painting products" *that contain methylene chloride or NMP* and, indeed, do not indicate whether Fleming has *ever* used such a product.  And, perhaps most significantly, they say nothing about whether consumer products are already available to Fleming that do not contain methylene chloride or NMP.  This omission is especially problematic given that, "[f]or almost every situation in which methylene chloride is used to remove paints or coatings, [the] EPA is aware of technically and economically feasible chemical substitutes or alternative methods that are reasonably available."  Paint Remover Rule, 82 Fed. Reg. at 7485.  As a result, Plaintiffs have failed to plausibly allege that Fleming satisfies the increased-risk-of-harm standard.

Department of Energy Proposed Energy Efficiency Standards for Residential Conventional Cooking Products

Plaintiffs' claim of standing based on delay in finalizing energy efficiency standards suffers from similar flaws.  The Energy Policy and Conservation Act of 1975, 42 U.S.C. § 6201 *et seq*., established energy conservation standards for various consumer products and for certain commercial products, but also authorizes the Department of Energy to impose more stringent standards that are technologically feasible and economically justified and that would result in significant energy savings.  *See, e.g.*, 42 U.S.C. § 6295.  In a Supplemental NPRM issued on September 2, 2016, the Department of Energy "propose[d] new and amended energy conservation standards for residential conventional cooking tops and conventional ovens."

Energy Conservation Program: Energy Conservation Standards for Residential Conventional Cooking Products, 81 Fed. Reg. 60,784, 60,784.

Plaintiffs allege that Public Citizen, NRDC, and their members "benefit from improved appliance energy efficiency, including improved energy efficiency for residential conventional cooking products;" that they and their "members use these products;" and that "improved energy efficiency standards will reduce [their utility bills and their] members' utility bills" and will "lessen air pollution to which [their] members are exposed and that adversely affects [their] members' health, recreation, aesthetic, and economic interests." Dkt. 14 at 35–36 (Am. Compl. ¶ 109). With respect to pollution-related or environmental harms, Plaintiffs have failed to allege any other facts or to provide any evidence regarding the nature of the harm, let alone the magnitude or imminence of the risk.

Plaintiffs do, however, offer two declarations on the risk of higher utility bills. First, NRDC Sustainability Manager Eileen Quigley attests that NRDC intends to achieve "net-zero energy use by . . . 2020" in part by "increasing [its] energy efficiency." Dkt. 16-12 at 1–2 (Quigley Decl. ¶ 4). She fears, however, that the Executive Order will "delay much-needed federal energy efficiency standards," thus "forc[ing] NRDC to purchase more renewable energy." *Id.* at 3 (Quigley Decl. ¶ 9). Similarly, Robert Weissman, the President of Public Citizen, asserts that Public Citizen has "residential conventional cooking products" at its office, which are "replaced from time to time." Dkt. 16-3 at 8–9 (R. Weissman Decl. ¶ 17). Like his counterpart from NRDC, Weissman avers that Public Citizen will be harmed by the delay of "energy efficiency regulation[s], including . . . the proposed standard for residential conventional cooking products." *Id.* (R. Weissman Decl. ¶ 17).

It makes no difference to the Court's analysis that these alleged injuries are asserted by the organizations themselves, rather than their members.  *See Warth*, 422 U.S. at 511.  For at least two reasons, Plaintiffs have failed plausibly to allege or to show that they face a substantial risk of harm.  First, neither declaration indicates that NRDC or Public Citizen plans to imminently purchase a covered appliance.  Indeed, Plaintiffs indicate only that Public Citizen "replace[s]" its "residential conventional cooking products . . . *from time to time*."  Dkt. 16-3 at 8–9 (R. Weissman Decl. ¶ 17) (emphasis added).  A "profession of an intent" to purchase new appliances *at some point*, however, "is simply not enough."  *Lujan*, 504 U.S. at 564 (internal quotation marks and alterations omitted).  As the Supreme Court has explained, "[s]uch 'some day' intentions—without any description of concrete plans, or . . . of *when* the some day will be—do not support a finding of the 'actual or imminent' injury" that Article III requires.  *Id.* Second, as with the proposed rule on paint removers, Plaintiffs say nothing about whether energy-efficient cooking products that already meet the proposed standards are currently available in the marketplace.[19]

---

[19]  NRDC member Gerald Winegrad avers that he has "several electric appliances in [his] home, including an oven, an electric water heater, and an electric heat pump" and that "[s]ome of these appliances are very old . . . and will need to be replaced soon."  Dkt. 16-13 at 11 (Winegrad Decl. ¶ 24).  "For example," he explains, he "expect[s] that [he] will need to replace [his] heat pump very soon."  *Id.* (Winegrad Decl. ¶ 24).  Heat pumps and water heaters, however, fall outside the scope of the Department's proposed rule on cooking products, and Plaintiffs have failed plausibly to allege or to show that the Department of Energy was poised to amend the energy efficiency standards applicable to heat pumps or water heaters before the Executive Order issued.  With respect to Winegrad's oven, moreover, it is unclear whether he intends to replace the appliance and, if so, whether that purchase is imminent.  It is also unclear whether ovens that would satisfy the proposed standards are already available to him.

<u>Department of Transportation Proposed Rules on V2V Communications Technology,
Speed-Limiting Devices, and Railroad Oil Spill Response Plans</u>

Finally, Plaintiffs identify three rules that the Department of Transportation proposed

prior to issuance of the Executive Order.  The first of these NPRMs was issued in January 2017

by NHTSA pursuant to the National Traffic and Motor Vehicle Safety Act, 49 U.S.C.

§ 30111(a).  The proposed rule would mandate that automobile manufacturers incorporate V2V

communications technology in new light vehicles starting two years after the rule becomes final

(and phased in over a period of three years) and would standardize the format for V2V

communications.  *See* 82 Fed. Reg. at 3856–57.  Public Citizen member Amanda Fleming asserts

that she "plan[s] to buy a new car in the next 5 years or so," and she "would like it to include

[V2V] technology."  Dkt. 16-7 at 2 (Fleming Decl. ¶ 5).  And because she believes that the

Executive Order will delay NHTSA's V2V rule, she avers that "[her] ability to purchase a new

car with this safety system" will be "negatively affect[ed]" and that, as a result, she will "be

subjected to a higher risk of injury or death from auto accidents."  *Id.* (Fleming Decl. ¶ 5).

Another member of Public Citizen, Terri Weissman, also intends to purchase a new car "in the

next 5–7 years" and shares Fleming's preference for a V2V-enabled car and concerns regarding

delay.  Dkt. 16-10 at 2 (T. Weissman Decl. ¶ 4).

The second Department of Transportation NPRM was issued by NHTSA and the Federal

Motor Carrier Safety Administration, another component of the Department, on September 7,

2016, pursuant to the National Traffic and Motor Vehicle Safety Act, 49 U.S.C. § 30111(a), the

Motor Carrier Act of 1935, 49 U.S.C. § 31502(b), and the Motor Carrier Safety Act of 1984, 49

U.S.C. § 31136(a).  The proposed rule would "require vehicles with a gross vehicle weight

rating" of more than 26,000 pounds "to be equipped with a speed limiting device initially set to a

speed no greater than a speed to be specified in a final rule."  Speed-Limiting Device Rule, 81

Fed. Reg. at 61,942.  According to Public Citizen member Amanda Fleming, the rule "would directly benefit [her] children by ensuring that their commutes to and from school were at safe speeds," and delaying the rule will cause a "greater risk [of] a motor vehicle accident."  Dkt. 16-7 at 2 (Fleming Decl. ¶ 4).

The third Department of Transportation NPRM was issued by the PHMSA on July 29, 2016, pursuant to the Clean Water Act, 33 U.S.C. § 1321(j)(1)(C).  If finalized, the proposed rule would "expand the applicability of comprehensive oil spill response plans" to "any railroad that transports a single train" carrying a certain amount of "liquid petroleum oil."  Oil Spill Response Plan Rule, 81 Fed. Reg. at 50,068.  James Coward, a member of NRDC, attests that he lives near "several crude oil rail lines," one of which "passes near [his] house."  Dkt. 16-11 at 2 (Coward Decl. ¶ 7).  He is "worried" that "disasters" involving crude oil explosions could "caus[e] a major conflagration that would harm" him and his family, *id.* at 2–3 (Coward Decl. ¶ 8), or that a train might derail where "oil rail lines run" by the shores of a nearby lake, causing an "environmental disaster" and harming his ability to recreate in the area.  *Id.* at 3 (Coward Decl. ¶ 9).

Each of these NPRMs seeks to mitigate risks to public safety, health, or the environment, and Plaintiffs plausibly aver that at least one of their members (or their children) falls within the zone of risk to which the NPRMs are directed.  But, again, establishing standing based on an increased risk of harm requires more.  The injury or loss that one might suffer in a car accident, for example, is a cognizable harm; the difficulty lies in demonstrating that the risk of such an event is sufficiently imminent to satisfy Article III and that the government's failure to regulate (or its delay in regulating) has significantly increased that risk.  *Pub. Citizen*, 489 F.3d at 1293. In making the requisite showing, Plaintiffs need not provide "a quantitative analysis" or

"statistics." *Food & Water Watch*, 808 F.3d at 917.  But they cannot rely on "vague

generalities," *Sierra Club v. EPA*, 754 F.3d 995, 1001 (D.C. Cir. 2014), or "subjective

apprehensions," *City of Los Angeles v. Lyons*, 461 U.S. 95, 107 n.8 (1983).

     Starting with the V2V rule, the Court does not doubt that this innovation offers a

promising means of reducing traffic accidents.  It is far from clear, however, how delay of the

rule is likely to affect Fleming or Weissman.  Both say that they are likely to purchase a new car

in the next 5 years (or so), and, perhaps, if the final rule was issued in 2019—as NHTSA initially

anticipated—the new technology would be available to them.  But, at least as the Court

understands it, the technology's value in reducing accidents is dependent on the number of other

cars equipped with the technology.  Plaintiffs, however, say nothing about how long it will take

before there is a "substantial" decrease in the risk of accidents, how that risk will decline over

time, "how many accidents would be avoided by" finalizing the proposed rule, *Pub. Citizen*, 489

F.3d at 1296, how V2V technology compares to other safety technologies that are likely to

develop over the next several years, and whether Fleming or Weissman face a "substantial

probability of harm" taking into account the increased risk posed by the delay in finalizing the

V2V rule, *id.* at 1295.

     The same can be said of Fleming's concern about delay of the speed-limiting device

regulation and Coward's concern about the risk of a crude oil rail accident.  Plaintiffs offer no

specific allegations or evidence addressing whether any delay caused by the Executive Order has

substantially increased or will substantially increase Fleming's or Coward's risk of harm, nor do

they address whether either Fleming or Coward ultimately faces a substantial probability of harm

when that increased risk is taken into consideration.  Plaintiffs say nothing, for example, about

the risk posed to Fleming's children and, more importantly, about the extent to which the delay

in finalizing the speed-limiting device rule might increase that risk.  Indeed, they say nothing about whether the school bus that Fleming's son currently rides weighs 26,000 pounds or more (which would trigger application of the proposed speed-limiting device requirement), or whether there is any basis to believe that without the device, her son's bus driver is likely to drive at an excessive or dangerous speed.  Similarly, Plaintiffs say nothing about how often rail-related oil spills occur, about the likelihood that Coward might be affected by such a spill, or about the extent to which delay of the oil spill response plan rule might increase the risk of harm to Coward.  *See id*. at 1296.  At most, the Coward and Fleming declarations indicate that they *might* suffer *some* increased risk of harm.  But the D.C. Circuit has routinely rejected claims of standing based on these types of "equivocal" predictions.  *See Chamber of Commerce*, 642 F.3d at 201–02; *Ctr. for Biological Diversity v. Dep't of the Interior*, 563 F.3d 466, 478 (D.C. Cir. 2009).

* * *

Having separately considered each link in Plaintiffs' theory of associational standing, it is worth stepping back to consider the ramifications of this theory as a whole.  As the D.C. Circuit observed in *Public Citizen v. National Highway Traffic Safety Administration*,

> [m]uch government regulation slightly increases a citizen's risk of injury—or insufficiently decreases the risk compared to what some citizens might prefer. Under [Plaintiffs'] theory of probabilistic injury, after an agency takes virtually *any* action, virtually *any* citizen—because of a fractional chance of benefit from alternative action—would have standing to obtain judicial review of the agency's choice.  Opening the courthouse to these kinds of increased-risk claims would drain the "actual or imminent" requirement of meaning in cases involving consumer challenges to an agency's regulation (or lack of regulation); would expand the "proper—and properly limited"—constitutional role of the Judicial Branch beyond deciding actual cases or controversies; and would entail the Judiciary exercising some part of the Executive's responsibility to take care that the law be faithfully executed.

489 F.3d at 1295 (quoting *DaimlerChrysler*, 547 U.S. at 341).  That observation is an apt one in the present context.  This does not mean that the door is "closed . . . to all increased-risk-of-harm cases," *id.* at 1295, but Article III requires more than Plaintiffs have mustered.

The Court, accordingly, concludes that Plaintiffs have failed plausibly to allege that they meet the essential elements of associational standing.

## B.    Organizational Standing

Plaintiffs also allege that they have standing to sue in their own right.  They contend, in particular, that the Executive Order is causing them harm because it chills their advocacy activities.  That is, because the Executive Order requires a trade-off—at least two offsetting deregulatory actions for every new regulatory action—it forces Plaintiffs to choose between "advocating for new regulations, at the cost of potential loss of other beneficial regulations, and refraining from advocating for necessary new public protections."  Dkt. 14 at 4–5 (Am. Compl. ¶ 12); *see also id.* at 6–7 (Am. Compl. ¶¶ 13–14).  In support of this theory of standing, Plaintiffs offer declarations from officers from each of the Plaintiffs.  Robert Weissman, the President of Public Citizen, attests that the Executive Order

> forc[es] Public Citizen to choose between urging agencies to adopt new regulations, which would trigger the requirement to repeal existing regulatory safeguards, or refraining from advocating for new public protections to avoid triggering the need to repeal existing ones.

Dkt. 16-3 at 4 (R. Weissman Decl. ¶ 8).  Andrew Wetzler, NRDC's Deputy Chief Program Officer, attests that "NRDC does not know what deregulatory actions an agency will take if NRDC's advocacy for a new rule is successful" and that, as a result, it cannot determine "whether its advocacy might end up doing more harm than good to health and the environment."  Dkt. 16-4 at 6 (Wetzler Decl. ¶ 11).  This conundrum, Wetzler adds, transforms NRDC's "constitutionally protected" right to petition the government or to sue an agency to compel action

"into a game of regulatory Russian roulette." *Id.* (Wetzler Decl. ¶ 11).  Like Weissman, he avers

that the risk posed by trade-offs embodied in the Executive Order "will require NRDC to think

twice, and even more carefully, before suing an agency for its failure to act." *Id.* at 10 (Wetzler

Decl. ¶ 19).  David LeGrande, the Occupational Safety and Health Director of CWA, sounds the

same theme, averring that "[t]he Executive Order puts CWA in a lose-lose situation, and forces it

to make an untenable choice whether to advocate in favor of a new workplace safety and health

regulation without knowing what existing protection would be revoked if the new one were

issued."[20]  Dkt. 16-2 at 6 (LeGrande Decl. ¶ 17).

Article III requires an organization, just "like an individual plaintiff, to show actual or

threatened injury in fact that is fairly traceable to the alleged illegal action and likely to be

redressed by a favorable court decision." *Equal Rights Ctr. v. Post Props., Inc.*, 633 F.3d 1136,

1138 (D.C. Cir. 2011) (internal quotation marks omitted).  As explained below, the Court

concludes that Plaintiffs have failed plausibly to allege, or otherwise to show, that they have

suffered or are likely to suffer an injury in fact and that any such injury would be fairly traceable

to the Executive Order.

1.    *Injury in Fact*

According to Plaintiffs, Executive Order 13771 not only conflicts with their missions, it

also imperils their ability to advocate on behalf of their members and chills their First

---

[20]  LeGrande also attests that CWA suffers another injury to its advocacy efforts: if a health or
safety standard "is not set by the federal rulemaking process" due to the Executive Order, "CWA
must expend its own resources" on obtaining "protections for represented workers in a particular
workplace" or on "establish[ing] violations under the Occupational Safety and Health Act's
general duty clause." Dkt. 16-2 at 5–6 (LeGrande Decl. ¶ 16).  Plaintiffs, however, do not press
(or even mention) this point in their briefs, *see* Dkt. 51 at 10 n.1, and, in any event, LeGrande's
assertion, which fails to identify any expenditures, is too abstract and too hypothetical to support
Plaintiffs' standing, *see Food & Water Watch*, 808 F.3d at 919.

Amendment right to petition the government.  Dkt. 47 at 16–19.  To satisfy the injury-in-fact requirement, an organization must establish that it "has suffered a 'concrete and demonstrable injury to [its] activities.'"  *PETA*, 797 F.3d at 1093 (quoting *Equal Rights Ctr.*, 633 F.3d at 1138).  It is not enough for the organization to show that its "mission has been compromised," *Food & Water Watch*, 808 F.3d at 919, or that it has experienced a "setback to its abstract social interests," *Equal Rights Ctr.*, 633 F.3d at 1138.

In *Havens Realty Corp. v. Coleman*, the Supreme Court held that a "concrete and demonstrable injury to [an] organization's activities"—there, providing "counseling and referral services"—can support Article III standing if the organization can show a "consequent drain on [its] resources" and "more than simply a setback to the organization's abstract social interests." 455 U.S. 363, 379 (1982).  D.C. Circuit "case law, however, establishes two important limitations on the scope of standing under *Havens*."  *Am. Soc'y for the Prevention of Cruelty to Animals v. Feld Entm't, Inc.*, 659 F.3d 13, 25 (D.C. Cir. 2011) [hereinafter *ASPCA*].  First, the plaintiff "must show a 'direct conflict between the defendant's conduct and the organization's mission.'"  *Id.* (quoting *Nat'l Treasury Emps. Union v. United States*, 101 F.3d 1423, 1430 (D.C. Cir. 1996)).  Second, the plaintiff must show that it has "used its resources to counteract [the asserted] harm."  *PETA*, 797 F.3d at 1094.  That harm, moreover, cannot be "self-inflicted" by, for example, diverting resources to the "very suit" challenging the defendant's conduct, *ASPCA*, 659 F.3d at 25, and cannot result from "expend[ing] resources to educate [the organization's] members and others unless doing so subjects the organization to operational costs beyond those normally expended," *Food & Water Watch*, 808 F.3d at 920 (internal quotation marks and citation omitted).

It is unsettled, however, how these principles apply to "issue-advocacy injuries," like the injuries that Plaintiffs assert here.  In *People for the Ethical Treatment of Animals v. U.S. Department of Agriculture*, the D.C. Circuit explained that standing is not found "when the only 'injury' arises from the effect of the [challenged act] on the organization['s] lobbying activities," 797 F.3d at 1093 (quoting *Ams. for Safe Access v. DEA*, 706 F.3d 438, 457 (D.C. Cir. 2013)), or "when the 'service impaired is pure issue-advocacy,'" *id.* at 1093–94 (quoting *Ctr. for Law & Educ. v. Dep't of Educ.*, 396 F.3d 1152, 1162 (D.C. Cir. 2005)); *see also Food & Water Watch*, 808 F.3d at 919 ("[A]n organization's use of resources . . . for advocacy is not sufficient to give rise to an Article III injury."); *id.* at 922 (Henderson, J., concurring in the judgment) (explaining that the organizational plaintiff lacked standing "because its only expenditures [were] made for 'pure issue-advocacy,' an . . . injury [insufficient] to support standing under our precedent").  As the Court of Appeals observed in *Center for Law & Education v. Department of Education*,

> [t]his Court has not found standing when the only "injury" arises from the effect of the regulations on the organization['s] lobbying activities (as opposed to the effect on non-lobbying activities): "[C]onflict between a defendant's conduct and an organization's mission . . . alone [is] insufficient to establish Article III standing. Frustration of an organization's objectives is the type of abstract concern that does not impart standing."

396 F.3d at 1161–62 (quoting *Nat'l Treasury Emps. Union*, 101 F.3d at 1429); *see also Turlock Irrigation Dist. v. FERC*, 786 F.3d 18, 24 (D.C. Cir. 2015) (noting that "impairment" of an organization's "advocacy . . .  will not suffice" and that "the expenditure of resources on advocacy is not a cognizable Article III injury").

The D.C. Circuit has acknowledged, however, that it has, at times, taken a less definitive view about whether injury to "pure issue-advocacy" can support standing.  *PETA*, 797 F.3d at 1094 & n.4.  In *American Society for the Prevention of Cruelty to Animals v. Feld Entertainment, Inc.*, the defendant relied on *Center for Law & Education* to support its contention that "injury to

an organization's 'advocacy,' as opposed to its provision of concrete services or programs, is insufficient to support [organizational] standing." 659 F.3d at 26. The Court of Appeals, however, was "unpersuaded," explaining that "in *Center for Law & Education*, . . . standing failed for lack of a conflict between the challenged conduct and the plaintiffs' stated mission." *Id.* That case, the court continued, "sa[id] nothing about the situation" the *ASPCA* court faced, in which "the defendant's conduct [was] both clearly 'at loggerheads' with the organization's mission . . . *and* allegedly injure[d] the organization's advocacy activities." *Id.* at 26–27 (emphasis added) (quoting *Nat'l Treasury Emps. Union*, 101 F.3d at 1429). The *ASPCA* court further noted that "many" D.C. Circuit cases finding organizational standing "involved activities that could . . . easily be characterized as advocacy—and, indeed, sometimes are." *Id.* at 27 (citing *Equal Rights Ctr.*, 633 F.3d at 1140; *Abigail All. for Better Access to Developmental Drugs v. Eschenbach*, 469 F.3d 129, 133 (D.C. Cir. 2006); *Spann v. Colonial Vill., Inc.*, 899 F.2d 24, 29 (D.C. Cir. 1990)). The *ASPCA* court ultimately declined to resolve the "open question" of whether "injury to an organization's advocacy" can support organizational standing and decided the issue of standing on other grounds. *Id.*

This Court, likewise, need not resolve that issue. Although Plaintiffs stress the "untenable choice" that they face in deciding whether to advocate for new regulations, they have neither alleged nor offered any evidence that any of them have, in fact, declined—or are imminently likely to decline—to advocate for a new rule out of fear that the Executive Order would compel the repeal of existing rules. Instead, they merely assert that they have been forced to consider the issue. Dkt. 14 at 4–7 (Am. Compl. ¶¶ 12–14); Dkt. 47 at 16; Dkt. 16-2 at 6 (LeGrande Decl. ¶ 17); Dkt. 16-3 at 4 (R. Weissman Decl. ¶ 8); Dkt. 16-4 at 6 (Wetzler Decl. ¶ 11). As counsel explained at oral argument, all that Plaintiffs can say at this point is that they

"discuss the [E]xecutive [O]rder and take it into account when they're thinking about what to do."  Dkt. 56 at 33 (Tr. Oral Arg. 33:12–13).  But merely having "to think twice" before engaging in advocacy, Dkt. 16-4 at 10 (Wetzler Decl. ¶ 19), does not constitute a cognizable injury in fact.

> 2.    *Causation*

Plaintiffs have also failed plausibly to allege causation.  In *Clapper v. Amnesty International USA*, the plaintiffs claimed that "the risk of surveillance" by the government "require[d] them to take costly and burdensome measures to protect the confidentiality of their communications" and that these expenditures were fairly traceable to the statute authorizing the surveillance of which they complained.  568 U.S. at 415.  The Supreme Court rejected this argument.  Emphasizing that the threat of "potential future surveillance" was not "certainly impending," *id.* at 414, the Court concluded that plaintiffs "cannot manufacture standing merely by inflicting harm on themselves based on their fears of hypothetical future harm that is not [imminent]," *id.* at 416.

For present purposes, the Court will assume that Plaintiffs have alleged that they are presently suffering an injury (namely, the chilling of their advocacy) out of the fear that, by advocating for a particular rule, they may contribute to the rescission of unidentified rules.  According to Plaintiffs, a chill of that type is distinguishable from the chill in *Clapper.*  They assert that their underlying fear, unlike the fear of surveillance in *Clapper*, is not "speculative" or subjective;" rather, they assert, their concern about causing the repeal of beneficial regulations "necessarily" flows from the Executive Order.  Dkt. 47 at 19; *see also Lyons*, 461 U.S. at 107 n.8 ("It is the *reality* of the threat of . . . injury that is relevant to the standing inquiry, not the plaintiff's subjective apprehensions.").  The Court is not convinced.

The principal takeaway from *Clapper* is that plaintiffs may not turn an unduly speculative or hypothetical injury into a concrete injury "by inflicting harm on themselves based on their fears of [the] hypothetical future harm." *Clapper*, 568 U.S. at 416.  According to *Clapper*, allowing plaintiffs to do so would nullify the causation requirement.  Yet, Plaintiffs' argument for causation tracks the theory that the Supreme Court rejected in *Clapper*.  Assuming that Plaintiffs encouraged an agency to take some regulatory action, one could only speculate about whether the relevant agency would agree to issue the rule, about which rules might be repealed in response, about whether those rules would not have otherwise been repealed, and about whether an identifiable member of one of the plaintiff-associations would suffer a cognizable injury-in-fact as a result.  And because this theory of harm is too uncertain to support standing, Plaintiffs' self-inflicted injury—sustained in order to avoid that speculative harm—must also fail.  *Clapper*'s teaching is clear: Plaintiffs cannot establish standing by chilling their own advocacy based on "their fears of [a] hypothetical future harm."  *Id.*

Finally, Plaintiffs suggest that the chill at issue here is particularly troublesome because it implicates their First Amendment right to petition government.  Dkt. 47 at 17–18.  That argument, however, carries little force in the face of the Supreme Court's decisions in *Clapper* and *Laird v. Tatum*, both of which also involved First Amendment activities.  In *Clapper*, the plaintiffs alleged that the fear of surveillance "compel[led] them to avoid certain e-mail and phone conversations" and "to tal[k] in generalities rather than specifics."  *Clapper*, 568 U.S. at 415 (internal quotation marks and citation omitted).  And in *Laird*, the plaintiffs alleged that the government's activities impermissibly burdened their "full expression and utilization of their First Amendment rights."  408 U.S. 1, 10 (1972) (internal quotation marks and citation omitted).

The two cases that Plaintiffs cite in support of their contention, moreover, involved very different circumstances. *Arizona Free Enterprise Club's Freedom Club PAC v. Bennett* considered an Arizona campaign finance system under which, if a privately financed candidate exceeded "a set spending limit," her publicly financed opponent would receive "roughly one dollar for every dollar [she] spent." 564 U.S. 721, 728 (2011). The Supreme Court struck down this scheme under the First Amendment. *Id.* at 754–55. The Court's decision addressed the merits and not standing. But, to the extent that its logic is relevant here, it cuts against Plaintiffs. In *Arizona Free Enterprise*, the privately financed candidate's decision to expend personal funds beyond a certain point would, with complete certainty, trigger an identifiable injury, the matching public funding. *Id.* at 730. Here, in contrast, no such direct causal link ties Plaintiffs' advocacy to such an identifiable injury.

Plaintiffs rely on *Virginia v. American Booksellers Association, Inc.*, 484 U.S. 383 (1988), for the proposition that "self-censorship is a harm that can support standing," Dkt. 47 at 17. The plaintiffs in *American Booksellers* challenged a Virginia law making it a crime to "knowingly display" sexually explicit materials "for [a] commercial purpose in a manner whereby juveniles may examine and peruse" the materials, "even if these materials are not actually sold to any juvenile." 484 U.S. at 386–87 (quoting Virginia statute). The plaintiffs were "organizations with memberships consisting of national and Virginia booksellers" as well as "two Virginia bookstores." *Id.* at 388 n.3. The Supreme Court explained why the plaintiffs had standing: "the law [was] aimed directly at plaintiffs, who, if their interpretation of the statute [was] correct, [would] have to take significant and costly compliance measures or risk criminal prosecution." *Id.* at 392. Unlike the plaintiffs in *American Booksellers*, Plaintiffs here are not directly regulated by the policy they wish to challenge. This is an important distinction: As the

Supreme Court explained in *Laird*, any number of cases have held that self-censorship may give rise to a constitutional violation.  408 U.S. at 10–11.  But in each of those cases, "the complainant was either presently or prospectively subject to the regulations, proscriptions, or compulsions that he was challenging."  *Id.* at 11; *cf. United Presbyterian Church in the U.S.A. v. Reagan*, 738 F.2d 1375, 1380 (D.C. Cir. 1984) (explaining that "[t]he [chilling effect] consists of present deterrence from First Amendment conduct because of the difficulty of determining the application of a regulatory provision *to that conduct*" (emphasis added)).  Plaintiffs here, in contrast, are not directly regulated by the Executive Order nor by any of the regulations they have identified.

The Court, accordingly, concludes that Plaintiffs have failed plausibly to allege or otherwise show that they meet the essential elements of organizational standing.

## C.      Disposition

Having concluded that Plaintiffs have failed to carry their burden of plausibly alleging or otherwise demonstrating that they have standing to sue, the Court must determine the proper disposition of the matter.  The Court, of course, cannot consider the merits of the dispute without first concluding that it has jurisdiction.  *Steel Co.*, 523 U.S. at 94–95.  As a result, the Court must grant the government's motion to dismiss and must deny Plaintiffs' motion for summary judgment.  "[I]n the ordinary case," moreover, "a dismissal for lack of subject-matter jurisdiction ends the litigation and leaves nothing more for the Court to do."  *Attias*, 865 F.3d at 624.  But "[w]here subject-matter jurisdiction depends on the factual allegations in the complaint," the district court may conclude "that [the] dismissal . . . is not final" and may provide the plaintiff with "leave to amend the complaint."  *Id.*  Because the parties have not addressed whether the

Court should dismiss the complaint with leave to amend or dismiss the action, the Court will allow the parties to be heard before entering the appropriate order.

**CONCLUSION**

For the foregoing reasons, Defendants' motion to dismiss, Dkt. 15, is hereby **GRANTED** for lack of jurisdiction, and Plaintiffs' motion for summary judgment, Dkt. 16, is hereby **DENIED**.  It is hereby **ORDERED** that the parties shall appear before the Court on March 1, 2018, at 10:30 a.m. in Courtroom 19 to address appropriate next steps, including whether the Court should enter final judgment.

   **SO ORDERED**.

         /s/ Randolph D. Moss
         RANDOLPH D. MOSS
         United States District Judge

Date:  February 26, 2018