# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLUMBIA

---

PUBLIC CITIZEN, INC., *et al.*,

       *Plaintiffs*,

   v.

DONALD J. TRUMP, President of the United
States, *et al.*,

      *Defendants.*

Civil Action No. 17-253 (RDM)

---

## MEMORANDUM OPINION AND ORDER

This action, brought by three organizations challenging an Executive Order and related guidance issued by the Office of Management and Budget ("OMB"), is before the Court for a second time. In a prior decision, the Court concluded that Plaintiffs had not met their threshold burden of alleging or otherwise proffering facts sufficient to establish that they have Article III standing to sue. *See Pub. Citizen, Inc. v. Trump*, 297 F. Supp. 3d 6, 40 (D.D.C. 2018) ("*Pub. Citizen I*"). The Court therefore dismissed the action. In response, and with leave of the Court, Plaintiffs filed an amended complaint, Dkt. 64, and they have now moved for partial summary judgment on the sole issue of their standing, Dkt. 71. Defendants, for their part, contend that nothing has changed, and they have renewed their motion to dismiss for lack of standing. Dkt. 70.

The Court concludes that Plaintiffs have now met their burden of plausibly alleging that they have standing to sue. That is all they need to do to survive a Rule 12(b)(1) motion to dismiss that poses a facial challenge to the Court's jurisdiction. It is not all that they need to do, however, to prevail on their motion for partial summary judgment. To carry the more onerous

burden applicable on summary judgment, Plaintiffs must show that there is no genuine dispute of material fact regarding their standing to sue.  As the Court explains below, they have not done so.

Establishing standing in a case like this one is no easy task.  *Pub. Citizen I*, 297 F. Supp. 3d at 21.  To be sure, one need only read the Executive Order to understand that it is designed to constrain the ability of federal agencies to issue new regulations and to create incentives for those agencies to rescind existing regulations.  Likewise, one need only read the Unified Agenda of Regulatory and Deregulatory Actions ("Unified Agenda") to understand that many proposed rules have failed to advance or have been withdrawn since the Executive Order was issued. What is far less clear, however, is whether the Executive Order—as opposed to a more general change in policy between administrations—is the cause of this decline in regulatory activity.

The hurdle that Plaintiffs face in attempting to establish a causal link between the Executive Order and an injury sufficient to sustain their standing is heightened, moreover, by three factors.  First, the operation of the Executive Order is not transparent.  The government has not disclosed, and there is no process for disclosing, whether the Executive Order has, in fact, precluded or delayed the finalization of any proposed rule.  To contrary, although the administration has reported, in general, on its efforts to reduce regulation, it has yet to identify any proposed regulation that would have been adopted but for the Executive Order.  Second, the Court must "avoid any undue intrusion on the discretion of the Executive Branch to set policy priorities."  *Pub. Citizen I*, 297 F. Supp. 3d at 25.  It is not the Court's role to decide which proposed regulations should, or should not, be adopted, nor is it the Court's role, absent a statutory directive, to set a timetable for an agency to act.  Third, even assuming the Executive Order has precluded or delayed the finalization of proposed regulations, Plaintiffs still bear the

burden of demonstrating that they or their members have been or will likely be injured by the government's failure to regulate.  It is relatively easy to establish standing when you are the regulated party; it is more difficult to do so when the government fails to regulate the conduct of someone else.  *See, e.g.*, *Arpaio v. Obama*, 797 F.3d 11, 20 (D.C. Cir. 2015).

But the existence of these hurdles does not mean that Plaintiffs' task is impossible.  As detailed in *Public Citizen I* and explained further below, Plaintiffs have marshalled a multitude of examples of proposed regulatory actions that have failed to move forward since the Executive Order was issued, a number of which have moved from the "Final Rule Stage" to the "Long-Term Actions" section of the Unified Agenda.  They have identified executive branch statements and logical inferences that support their claims of delay.  And, they have filed numerous declarations in an effort to demonstrate that they, or their members, have suffered redressable injuries due to those delays.  All told, they have now made out a plausible claim to standing.

There is a significant difference, however, between establishing a plausible claim to standing and showing that Plaintiffs, in fact, have standing to sue.  With respect to that more demanding burden, Plaintiffs have not cleared the substantial hurdles they face.  They have not yet met—and ultimately may be unable to meet—their burden of proving that the Executive Order, as opposed to separate policy considerations or other factors, has delayed the issuance of a specific regulation, which would have otherwise issued, and that the resulting delay has caused them, or their members, to suffer a redressable injury.  This leaves the case in an unfortunate state of incertitude: Plaintiffs have done enough to stay afloat but not enough to move forward.

 The Court must, accordingly, deny the government's motion to dismiss, Dkt. 70, but must also deny Plaintiffs' motion for partial summary judgment, Dkt. 71.  The parties may renew their motions following the development of a further factual record.  Finally, because the Court's

subject matter jurisdiction remains in doubt, the Court must deny the motion of the States of California and Oregon to intervene, Dkt. 73, as premature.

## I.  BACKGROUND

**A.     Executive Order 13771 and OMB Guidance**

The Court described Executive Order 13771 and OMB's implementing guidance in its prior opinion, *Pub. Citizen I*, 297 F. Supp. at 13–15, and will provide only a brief overview here. Executive Order 13771, entitled "Reducing Regulation and Controlling Regulatory Costs," imposes three new restrictions on the authority of agencies to adopt or to propose new regulations: a "two for one" requirement, an "offset" requirement, and an "annual cap" on the net costs of private compliance with covered regulations.  Exec. Order No. 13771, 82 Fed. Reg. 9339 (Jan. 30, 2017).  Under the "two for one" requirement, "whenever an executive department or agency . . . publicly proposes for notice and comment or otherwise promulgates a new regulation," the agency must "identify at least two existing regulations to be repealed."  *Id.* § 2(a).  This requirement works in tandem with the "offset" requirement, which requires agencies to offset "any new incremental cost associated with new regulations" by eliminating "existing costs associated with at least two prior regulations."  *Id.* § 2(c).  Finally, the "annual cap" provision works in the aggregate and prohibits agencies from adopting new regulations that exceed their "total incremental cost allowance" for the year—a cap based on the costs of any new regulations adopted in the relevant year, less any cost savings achieved through the repeal of existing regulations.  *Id.* § 3(d).  The cap must be reset every year by the Director of OMB, *id.* § 3(d), who set the total at zero for fiscal year 2017, *id.* § 2(b), and from zero to negative $196 million, depending on the agency, for fiscal year 2018.  Office of Mgmt. & Budget, *Regulatory Reform: Two-for-One Status Report and Regulatory Cost Caps* 1–2 (2017) [hereinafter *Two-for-*

*One Report*].[1]  The Executive Order further provides that it "shall be implemented consistent with applicable law" and that "[n]othing in th[e] [O]rder shall be construed to impair or otherwise affect . . . the authority granted by law to an executive department or agency."  Exec. Order No. 13771 § 5.  Similar provisos appear within particular provisions.  *See id.* § 2(a) (two-for-one requirement applies "[u]nless prohibited by law"); *id.* § 2(c) (offset requirement applies "to the extent permitted by law" and any elimination of costs must comport "with the Administrative Procedure Act and other applicable law").

The Director of OMB is charged with fleshing out the Executive Order's requirements and exceptions.  OMB issued interim guidance on February 2, 2017 and final guidance on April 5, 2017.  *See* Office of Mgmt. & Budget, Interim Guidance Implementing Section 2 of the Executive Order of January 30, 2017 (2017) ("Interim Guidance");[2] Office of Mgmt. & Budget, Guidance Implementing Executive Order 13771 (2017) ("Final Guidance").[3]  These guidance documents (collectively "OMB Guidance") clarified the Executive Order in several respects.

First, OMB explained that the Executive Order applies only to "significant regulatory action[s]" and "significant guidance document[s]," Final Guidance, Q&A 2—that is, actions or guidance documents likely to "[h]ave an annual effect on the economy of $100 million or more" or to meet other criteria.  Exec. Order No. 12866 § 3(f), 3 C.F.R. 638 (1994).  Covered

---

[1]  Available at: https://www.reginfo.gov/public/pdf/eo13771/FINAL_TOPLINE_All_20171207.pdf.

[2]  Available at: https://www.whitehouse.gov/sites/whitehouse.gov/files/briefing-room/presidential-actions/related-omb-material/eo_iterim_guidance_reducing_regulations_controlling_regulatory_costs.pdf.

[3]   Available at: https://www.whitehouse.gov/sites/whitehouse.gov/files/omb/memoranda/2017/M-17-21-OMB.pdf.

deregulatory actions, in contrast, need not qualify as "significant" and thus take a "wide[r] range" of forms than regulatory actions.  Final Guidance, Q&A 4.

Second, unlike prior executive orders, *cf.* Exec. Order No. 12866, Executive Order 13771 focuses only on compliance costs borne by regulated parties, without regard to the public benefit of the existing or proposed rule.  *See* Final Guidance, Q&A 21, 32; Interim Guidance at 4.  In calculating costs and savings for purposes of the Executive Order, agencies are required to determine the present value of the costs or savings of the regulatory or deregulatory action "over the full duration of the expected effects of the action[]."  Final Guidance, Q&A 25.  An agency's "total incremental cost" for a fiscal year "means the sum of all costs from" significant regulatory actions and guidance documents "minus the cost savings from . . . deregulatory actions."  *Id.*, Q&A 8.

Third, the Executive Order recognizes that certain federal statutes prohibit agencies from considering costs in determining whether a significant regulatory action is warranted.  With respect to those regulatory actions, the OMB Guidance acknowledges that the Executive Order cannot—and does not—"change the agency's obligations under [such a] statute." *Id.*, Q&A 18.  But, agencies implementing these statutes are still "generally . . . required to offset the costs of such regulatory actions through other deregulatory actions taken pursuant to statutes that do not prohibit consideration of costs." *Id.*  Likewise, if an agency faces an imminent statutory or judicial deadline for taking a regulatory action, the Executive Order "does not prevent" the agency from taking the regulatory action in a timely manner, even if it cannot first satisfy the requirements of the Executive Order. *Id.*, Q&A 33.  The agency must, however, "offset [the] regulatory action[] as soon as practicable thereafter." *Id.*

Fourth, agencies are permitted to "bank" cost savings and deregulatory actions "for use in the same or a subsequent fiscal year" to offset significant regulatory actions or guidance documents and to meet their "total incremental cost allowance[s]." *Id.*, Q&A 29.  This means, for example, that an agency that takes four deregulatory actions in fiscal year 1 may take two covered regulatory actions in year 1 or in future years, or that an agency that "issues two . . . deregulatory actions with total cost savings of $200 million" and a "regulatory action with a cost of $150 million" in fiscal year 1, "may bank the surplus cost savings of $50 million to offset the costs of another . . . regulatory action" in a future fiscal year.  *Id.*

Finally, neither the Executive Order nor the OMB Guidance provides a mechanism for notifying the public whether and when a proposed (or possible) regulatory action might be delayed or abandoned due to the requirements of the Executive Order.  *See* Dkt. 56 at 64 (Tr. Oral Arg. 64:7–22) (Counsel for Defendants: "I suspect [that information on delayed or abandoned regulatory actions] will not be public.").  Moreover, although the Executive Order requires that agencies identify offsetting deregulatory actions as a *condition* of taking new regulatory actions, the OMB Guidance precludes agencies from relying on the Executive Order "as the *basis or rationale*, in whole or in part, for" taking a deregulatory action, and the guidance does not require that agencies publicly identify the "offsetting . . . deregulatory actions" that allow for the regulation.  *See* Final Guidance, Q&A 37 (emphasis added).  Similarly, although the Unified Agenda[4] should "include, to the extent practicable, . . . deregulatory actions that . . .

---

[4]  The Unified Agenda of Regulatory and Deregulatory Actions, issued in the spring and fall of each year, provides information on the status of "regulatory and deregulatory activities under development throughout the Federal Government."  Office of Mgmt. & Budget, *About the Unified Agenda*, https://www.reginfo.gov/public/jsp/eAgenda/StaticContent/UA_About.jsp.  As the Court explained in its prior opinion, *see Pub. Citizen I*, 297 F. Supp. 3d at 24 n.6, the various editions of the Unified Agenda illuminate the progress of a potential rule over time and are

are sufficient to offset [any] regulatory actions," *id.*, the Unified Agenda merely designates certain actions as "deregulatory" pursuant to the Executive Order, without providing additional information about whether those actions were taken to comply with the Executive Order or for independent policy reasons.  *See* Office of Mgmt. & Budget, *Introduction to the Unified Agenda of Federal Regulatory and Deregulatory Actions-Fall 2018*.[5]  As a result, neither the Executive Order nor the OMB Guidance provides a mechanism for notifying interested parties that an otherwise desirable regulation is being delayed or withheld in order to comply with the Executive Order or that a deregulatory action was initiated in order to comply with the Executive Order.

**B.       Procedural History**

Plaintiffs Public Citizen, Inc., Natural Resources Defense Council, Inc. ("NRDC"), and the Communication Workers of America, AFL-CIO ("CWA") filed this action against the President, the Director of OMB, the heads of thirteen federal agencies, and the United States in February 2017, alleging that Executive Order 13771 "impose[s] rulemaking requirements beyond and in conflict with the requirements of the" Administrative Procedure Act ("APA") and "the statutes from which . . . federal agencies derive their rulemaking authority."  Dkt. 1 at 5–6

---

available online.  *See* Office of Mgmt. & Budget, *Reginfo.gov*, https://www.reginfo.gov/public/jsp/Utilities/index.jsp.  The status of a particular rulemaking at a certain point in time can be ascertained by searching OMB's website using the Regulatory Identification Number ("RIN") corresponding to the rulemaking and then selecting the appropriate edition of the Unified Agenda.  *See* Office of Mgmt. & Budget, *Search of Agenda/Regulatory Plan*, https://www.reginfo.gov/public/do/eAgendaSimpleSearch.  Consistent with the Court's prior practice, when discussing the regulatory history of a particular rulemaking, the Court will provide the RIN in a footnote and cite the relevant version of the Unified Agenda (*e.g.*, "Fall 2018 Agenda") in the text.  The Court may take judicial notice of Executive Branch statements and reports pursuant to Federal Rule of Evidence 201.  *See Abhe & Svoboda, Inc. v. Chao*, 508 F.3d 1052, 1059 (D.C. Cir. 2007).

[5] Available at:  https://www.reginfo.gov/public/jsp/eAgenda/StaticContent/201810/Preamble_8888.html.

(Compl. ¶ 9). Plaintiffs alleged that the Executive Order (1) exceeds the President's authority under Article II of the Constitution and usurps Congress's power to legislate; (2) conflicts with the President's duty to execute legislation under the Take Care Clause; and (3) directs federal agencies to take actions that are ultra vires. *Id.* at 43–46 (Compl. ¶¶ 121–47). They further allege that the OMB Guidance (4) is ultra vires; and (5) violates the APA. *Id.* at 46–48 (Compl. ¶¶ 148–61).

After Plaintiffs filed suit, the government moved to dismiss the complaint for lack of standing and for failure to state a claim, Dkt. 9, and fourteen states filed an amicus brief in support of the government addressing the merits of the dispute, Dkt. 12. In response, Plaintiffs filed an amended complaint as of right, which, among other things, added further allegations relating to their standing to sue. *See* Dkt. 14 (First Am. Compl.). The government then renewed its motion to dismiss, Dkt. 15, and Plaintiffs cross-moved for summary judgment, Dkt. 16. In opposing Defendants' motion to dismiss and in seeking summary judgment, Plaintiffs relied on theories of both associational and organizational standing.

The Court first addressed associational standing, which at the motion to dismiss stage requires that the plaintiff association "plausibly allege or otherwise offer facts sufficient to permit the reasonable inference (1) that the plaintiff has at least one member who 'would otherwise have standing to sue in [her] own right;' (2) that 'the interests' the association 'seeks to protect are germane to [its] purpose;' and (3) that 'neither the claim asserted not the relief requested requires the participation of [the] individual members in the lawsuit.'" *Pub. Citizen I*, 297 F. Supp. 3d at 17–18 (alterations in original) (quoting *Hunt v. Wash. State Apple Advert. Comm'n*, 432 U.S. 333, 343 (1977)). As the Court explained, because the Plaintiffs could not plausibly allege that the delay in finalizing the regulatory actions at issue would *certainly* cause

their members injury, they could plead only that that the identified individuals might someday
suffer an injury based on the *increase in risk* due to the regulatory delay.  *Id.* at 21.  In order to
satisfy *Lujan*'s requirements of causation, redressability, and injury-in-fact, Plaintiffs therefore
had to show "that the relevant agency intended to issue the regulation in question;" "that
Executive Order 13771 will likely cause the agency to delay issuance of the regulation;" "that—
with the relevant period of delay taken into account—an identified member of one of the
associations will face a substantial probability of a concrete injury;" and, finally, "that the period
of delay attributable to the Executive Order will substantially increase that risk of harm."  *Id.* at
22.  Although Plaintiffs identified "over a dozen putative regulatory actions" that might be (or
might have been) "delayed, weakened, or barred" because of the Executive Order or OMB
Guidance, *id.* at 18, the Court concluded that Plaintiffs had failed to show that at least one of
their members would otherwise have standing to sue in her own right, *id.* at 35.  With respect to
some of the identified regulatory actions, Plaintiffs failed to identify particular members who
would likely be harmed.  *Id.* at 18–19.  With respect to others, they failed to allege facts or
otherwise to show that the relevant agency was likely to have issued the particular rule absent the
Executive Order.  *Id.* at 25–28.  And, with respect to yet others, they failed "plausibly to allege
or otherwise to show that any delay in the regulatory action attributable to the Executive Order
[would] substantially increase the risk that any of their members [would] be harmed or that any
of their members [would] face a substantial probability of harm once such an increase in risk
[was] taken into account."  *Id*. at 12 (emphasis omitted).

The Court was also unconvinced by Plaintiffs' contention that they had organizational
standing, that is, standing to sue in their own right as institutions.  *Id.* at 40.  Plaintiffs argued that
the trade-off demanded by the Executive Order—requiring that agencies rescind at least two

regulations for every new regulatory action—would chill their advocacy efforts.  *Id.* at 35.  But, as the Court explained, Plaintiffs did not allege or otherwise proffer evidence showing that they had actually declined to pursue a regulatory initiative out of concern that, if successful, their effort would come at the price of rescission of some other regulation they support.  *Id.* at 38. Plaintiffs, instead, merely posited that the Executive Order had forced them to "*evaluate* whether the cost of the new rule—the loss of two or more unknown existing rules—[was] worth the benefit of the new rule."  *Id.* at 13 (emphasis added).  Because Plaintiffs did not assert "that they have actually declined—or will actually decline—to pursue a new rule," and because the "burden of merely considering the issue" is not enough, the Court rejected this theory of organizational standing.  *Id.*  Finally, the Court concluded that, even had Plaintiffs alleged or shown that they had decided to forego a regulatory initiative out of concern that, if successful, the required trade-off would be untenable, they had failed to allege or to proffer facts sufficient to show that the Executive Order was the cause of that injury.  *Id.* at 38.  As the Court explained, the Supreme Court's decision in *Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 416 (2013), teaches that a plaintiff "cannot establish standing by chilling [its] own advocacy based on" a purely speculative fear of future harm.  *Pub. Citizen I*, 297 F. Supp. 3d at 39.  And, here, Plaintiffs had not established that the relevant causal chain—that is, that (1) the Executive Order dissuaded them from pursuing a specific regulatory initiative; (2) had they pursued that initiative, the relevant agency would likely have rescinded an existing regulation (or perhaps two regulations) in order to generate the credits necessary to promulgate the new rule; (3) in the absence of Plaintiffs' advocacy for a new rule and the requirements of the Executive Order, it is unlikely that the agency would have rescinded that existing regulation (or those regulations); and (4) rescission of

that existing regulation (or those regulations) would have caused Plaintiffs or their members a cognizable injury. *Id.*

Following the Court's decision, Plaintiffs moved for leave to file a Second Amended Complaint, arguing that their proposed pleading "sets forth allegations sufficient to establish standing under the reasoning of the Court's memorandum opinion" and that they would also offer "declarations substantiat[ing] those allegations." Dkt. 64 at 10–11. In light of "the important issues presented in this litigation, and in the interest of efficiency," Defendants "elected not to oppose Plaintiffs' [m]otion" for leave to amend. Dkt. 65. At the same time, however, they emphasized that, in their view, nothing contained in the Second Amended Complaint or the accompanying declarations was sufficient to overcome the jurisdictional deficiencies identified in the Court's opinion. *Id.* The parties then jointly proposed a briefing schedule for Defendants' renewed motion to dismiss, and (although reserving Defendants' right to seek a stay of briefing on the merits) for Plaintiffs' renewed cross-motion for summary judgment. Dkt. 66. The Court adopted the proposed schedule but, on Defendants' motion, directed that the parties limit briefing to "questions going to the Court's jurisdiction." Minute Order (May 1, 2018). Defendants then moved to dismiss the Second Amended Complaint, pursuant to Rule 12(b)(1) for lack of standing, Dkt. 70, and Plaintiffs cross-moved for partial summary judgment on the issue of standing, Dkt. 71. Finally, the States of California and Oregon moved to intervene pursuant to Rule 24(a) & (b), Dkt. 73, and requested that the Court take judicial notice of certain exhibits in support of their motion, Dkt. 81.

## II. ANALYSIS

Two sets of motions are now before the Court. The first set returns to the issue of standing, and the second set relates to whether the states of California and Oregon should be

permitted to intervene in this litigation.  The Court will start, as it must, with standing.  *See Steel Co. v. Citizens for a Better Env't*, 523 U.S. 83, 94 (1998) ("The requirement that jurisdiction be established as a threshold matter 'spring[s] from the nature and limits of the judicial power of the United States' and is 'inflexible and without exception.'") (alteration in original) (citation omitted).  The Court will then address the States' motion for leave to intervene.

## A.       Plaintiffs' Standing to Challenge the Executive Order and OMB Guidance

As the parties seeking to invoke the Court's jurisdiction, Plaintiffs bear the burden of establishing that they have standing to sue.  *Sierra Club v. E.P.A.*, 292 F.3d 895, 900 (D.C. Cir. 2002).  The extent of that burden, however, varies with the "the successive stages of the litigation."  *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 561 (1992).  As explained below, Defendants' motion to dismiss, Dkt. 70, and Plaintiffs' cross-motion for partial summary judgment, Dkt. 71, highlight the differences between the burdens applicable at the motion to dismiss stage and the motion for summary judgment stage.  At least for present purposes, moreover, these differences are dispositive.

To avoid confusion regarding the applicable standard, the Court will first address whether Plaintiffs have carried their burden for purposes of Defendants' motion to dismiss and will then turn to the distinct issues posed by Plaintiffs' cross-motion for partial summary judgment.

### 1.       *Defendants' Motion to Dismiss*

At the motion to dismiss stage, a challenge to the plaintiff's standing "may take one of two forms."  *Hale v. United States*, No. 13-1390, 2015 WL 7760161 at *3 (D.D.C. Dec. 2, 2015).  First, a Rule 12(b)(1) motion "may raise a 'facial' challenge to the Court's jurisdiction."  *Id.*  A facial challenge asks whether the complaint alleges facts sufficient to establish the court's jurisdiction.  *Lujan*, 504 U.S. at 561; *see also Owner-Operator Indep. Drivers Ass'n v. Dep't of Transp.*, 879 F.3d 339, 346–47 (D.C. Cir. 2018).  "To survive a motion to dismiss for lack of

standing, a complaint must state a plausible claim that the plaintiff has suffered an injury in fact fairly traceable to the actions of the defendant that is likely to be redressed by a favorable decision on the merits." *Humane Soc'y of the U.S. v. Vilsack*, 797 F.3d 4, 8 (D.C. Cir. 2015).  In this posture, the Court must accept the factual allegations of the complaint as true, *Erby v. United States*, 424 F. Supp. 2d 180, 182 (D.D.C. 2006); *see also I.T. Consultants, Inc. v. Republic of Pakistan*, 351 F.3d 1184, 1188 (D.C. Cir. 2003)*,* but must nonetheless assess the "plausibility" of the plaintiff's standing allegations in light of the relevant context and the Court's "judicial experience and common sense,'" *Humane Soc'y of the U.S.*, 797 F.3d at 8 (quoting *Ashcroft v. Iqbal*, 556 U.S. 662, 679 (2009)).

"Alternatively, a Rule 12(b)(1) motion may raise a 'factual' challenge to the Court's jurisdiction."  *Hale*, 2015 WL 7760161, at *3.  When a Rule 12(b)(1) motion is framed in this manner, the Court "may not deny the motion . . . merely by assuming the truth of the facts alleged by the plaintiff and disputed by the defendant" but "must go beyond the pleadings and resolve any disputed issues of fact the resolution of which is necessary to a ruling upon the motion to dismiss."  *Phoenix Consulting Inc. v. Republic of Angola*, 216 F.3d 36, 40 (D.C. Cir. 2000).  Although the Court "has considerable latitude in devising the procedures it will follow to ferret out the facts pertinent to jurisdiction," it "must . . . afford the nonmoving party an ample opportunity to secure and present evidence relevant to the existence of jurisdiction."  *Prakash v. Am. Univ.*, 727 F.2d 1174, 1179–80 (D.C. Cir. 1984) (internal citations omitted).  The Court may rely on those factual allegations in the complaint that the defendant has not controverted with competent evidence, and it may also consider the "evidentiary material in the record," *Feldman v. FDIC*, 879 F.3d 347, 351 (D.C. Cir. 2018), along with any other materials that are subject to judicial notice, *Scahill v. District of Columbia*, 271 F. Supp. 3d 216, 223–24 (D.D.C. 2017).

But, "at this threshold stage," the Court is "obligated . . . to accord [Plaintiffs] the benefit of all reasonable inferences," and, "[a]bsent evidentiary offering[s]" that controvert specific jurisdictional allegations, the Court must delay "weighing the plausibility" of those allegations until "a later stage of the proceedings." *Feldman*, 879 F.3d at 351.

With minor exception discussed below, Defendants' current motion to dismiss asserts a facial challenge to Plaintiffs' Second Amended Complaint. Defendants have not offered any competent evidence, and, at least for purposes of their motion to dismiss, they do not challenge the accuracy of any specific (non-conclusory) fact set forth in the Second Amended Complaint or in Plaintiffs' declarations. As a result, there is no factual dispute for the Court to resolve in "ruling upon the motion to dismiss." *Phoenix Consulting Inc*, 216 F.3d at 40. The Court must therefore accept Plaintiffs' allegations as true and assess whether those allegations—as elucidated by Plaintiffs' declarations, the various administrative proceedings that they have identified, any matters subject to judicial notice, and "judicial experience and common sense," *Humane Soc'y of the U.S.*, 797 F.3d at 8 (quoting *Iqbal*, 556 U.S. at 679)—set forth a plausible claim to Article III standing.

In opposing the government's motion to dismiss, Plaintiffs identify five putative regulatory actions that they contend have been delayed or withdrawn as a result of Executive Order 13771, purportedly causing at least one identified member of a plaintiff-association to suffer a redressable injury in fact. Dkt. 71 at 18–19. If they are correct with respect to at least one of those putative regulatory actions, that—along with the findings of germaneness and suitability that the Court has already made, *Pub. Citizen I*, 297 F. Supp. 3d at 18—would be enough to survive Defendants' motion to dismiss. *See Hunt*, 432 U.S. at 343. Because the Court is now convinced that Plaintiffs have made a plausible showing of associational standing with

respect to one of those putative actions—the National Highway Traffic Safety Administration's proposed rule on vehicle-to-vehicle communications, Federal Motor Vehicle Safety Standard; V2V Communications, 82 Fed. Reg. 3854 (proposed Jan. 12, 2017) ("V2V Proposed Rule")— the Court need address only that proposed rule.

a. The V2V Proposed Rule and *Public Citizen I*

As explained in *Public Citizen I*, on January 12, 2017, the National Highway Traffic Safety Administration ("NHTSA") proposed a rule that would mandate that all new "light vehicles" be equipped with vehicle-to-vehicle—or "V2V"—communications technology and that would standardize the format for V2V communications.[6]  297 F. Supp. 2d at 33.  That proposal followed NHTSA's issuance of an advanced notice of proposed rulemaking on August 20, 2014, Federal Motor Vehicle Safety Standard: Vehicle-to-Vehicle (V2V) Communications, 79 Fed. Reg. 49270 (proposed Aug. 20, 2014), which generated "more than 900 comments."  V2V Proposed Rule, 82 Fed. Reg. at 3876.  As reflected in those comments, safety experts and representatives of the automotive industry "generally" supported the proposed rule; indeed, according to NHTSA, auto industry commenters stressed that "the Federal government need[ed] to assume a large role in establishing key elements of the V2V environment" and that the a regulation was "necessary" to ensure "interoperability" and thus "to realize the full potential benefits of V2V."  *Id.* at 3877.

In the notice of proposed rulemaking, NHTSA agreed with those assessments.  It explained that, "[w]ithout a mandate to require and [to] standardize V2V communications, . . . manufacturers will not be able to move forward in an efficient way."  *Id*. at 3854.  NHTSA further opined that V2V technology "has the potential to revolutionize motor vehicle safety . . .

---

[6]   RIN: 2127-AL55

[b]y providing drivers with timely warnings of impending crash situations." *Id.* at 3855. Once fully employed, according to NHTSA, the technology is estimated "to prevent hundreds of thousands of crashes and [to] prevent over one thousand fatalities annually." *Id.* at 3854. Under the proposed rule, public comments were due by April 12, 2017. *Id.*

Shortly after the last presidential election, however, the new administration hit pause on the V2V rule and other rules. The Department of Transportation, of which NHTSA is a component, announced that "'many rule schedules [would] need to be revised' to permit review 'by new [Department] leadership.'" *Pub. Citizen I*, 297 F. Supp. 3d at 26 (alterations in original). As the Court observed in its prior opinion, changes of that sort are "typical when a change in administration occurs." *Id.* The following "month, however, the Department offered a different explanation for suspending [its] rulemaking schedules: to permit 'evaluat[ion] in accordance with' Executive Order 13771." *Id.* For each of the next five months, the Department issued similar notices. *Id.* By the time OMB published its Spring 2017 Unified Agenda, the V2V Proposed Rule had been moved to the status of "[l]ong-[t]erm [a]ctions" and the "[n]ext [a]ction" was listed as "[u]ndetermined." Spring 2017 Agenda. The V2V Proposed Rule has remained in that status ever since. *See, e.g.*, Fall 2018 Agenda.

Plaintiffs argued in *Public Citizen I* that this was one of the many putative regulatory actions that Executive Order 13771 was delaying or preventing, to the detriment of many of their members. The Court agreed, up to a point, concluding that this was one of five (and possibly six) rules that cleared a number of initial hurdles. Plaintiffs had identified specific members who they alleged had been injured, *see Pub. Citizen I*, 297 F. Supp. 3d at 18–19; and had identified specific regulatory actions that were threatened by the Executive Order, *see id.* at 19–20. The five putative regulatory actions, moreover, had reached the notice-and-comment stage and thus

(1) reflected the agencies' preliminary assessment that these proposed rules—or some logical outgrowth of them—should be adopted, and (2) required the agencies "to consider the comments . . . received and to articulate a reasoned explanation for" declining to finalize the proposed rules, *Williams Nat'l Gas v. FERC*, 872 F.2d 438, 450 (D.C. Cir. 1989); *see also Pub. Citizen I*, 297 F. Supp. 3d at 22–25. The Court, accordingly, concluded that Plaintiffs had plausibly alleged that Executive Order 13771 "ha[d] resulted in some measure of delay with respect to the [five or] six regulatory actions that Plaintiffs ha[d] identified." *Id*. at 25–28 (emphasis omitted). None of these putative regulatory actions, however, cleared the final hurdle of plausibly alleging injury in fact—that is, that an actual or imminent harm was suffered or would likely be suffered by an identified member of one of the plaintiff-associations. *Id*. at 28.

As the Court explained, Plaintiffs "devote[d] scant attention" to this core requirement for establishing standing. *Id.* at 28. Because Plaintiffs challenged agency delay rather than agency action, they did "not allege that any of their members ha[d] suffered an actual injury but, instead, premised their claim of associational standing on the theory that at least one member face[d] an increased risk of harm—such as death, bodily injury, or financial loss—due to the delay caused by the Executive Order." *Id.* "Increased-risk-of-harm theories are often difficult to substantiate, given uncertainty about future events and uncertainty about the 'degree' of risk the law demands." *Id.* To establish standing in this way, a plaintiff must allege—and must eventually show—that the challenged action (or inaction) has "substantially increased" the plaintiff's "risk of harm" and that he or she faces a "substantial probability of harm with that increased [risk] taken into account." *Pub. Citizen, Inc. v. NHTSA*., 489 F.3d 1279, 1295 (D.C. Cir. 2007) (emphasis omitted). The Court concluded that none of the putative regulatory actions identified

18

in *Public Citizen I* —including the V2V rule—satisfied this demanding standard.  297 F. Supp. 3d at 29.

        b.    <u>Purchaser Standing</u>

      Responding to this difficulty, Plaintiffs' Second Amended Complaint takes a different approach. Plaintiffs now that "[t]he delay of the V2V rule is depriving" two of their members "of the opportunity to purchase vehicles with this desired feature."  Dkt. 64-2 at 24 (redlined version of Second Am. Compl. ¶ 79).  Although that addition might seem minor, it signals a significant change in Plaintiffs' theory of standing: rather than rely on an increased-risk-of-harm theory of standing, as they previously did, they now contend that two members of Public Citizen, Amanda Fleming and Terri Weissman, would have "purchaser standing" were they to sue in their right and that their interests are sufficient to sustain Public Citizen's associational standing to sue. Dkt. 71 at 27–31.

      Under the doctrine of purchaser standing, the D.C. Circuit "has permitted consumers of a product to challenge agency action that prevented the consumers from purchasing a desired product."  *Coal. for Mercury-Free Drugs v. Sebelius*, 671 F.3d 1275, 1281 (D.C. Cir. 2012).  In *Consumer Federation of America v. F.C.C.*, for example, the D.C. Circuit held that a subscriber to Comcast's cable service had standing to challenge the merger between AT&T Broadband and Comcast because the merger would affect his ability to continue to use Comcast and still select his own internet service provider—an injury in fact even if, as the defendants posited, the plaintiff could have still "obtain[ed] high-speed internet access using technologies other than cable."  348 F.3d 1009, 1012 (D.C. Cir. 2003); *see also Coal. for Mercury-Free Drugs*, 671 F.3d at 1281.  The D.C. Circuit reached a similar conclusion in *Chamber of Commerce of U.S. v. Securities & Exchange Commission*, where the court held that the Chamber of Commerce had

standing to challenge an SEC regulation permitting a mutual fund to engage in certain transactions only if its board is composed of "no less than 75% independent directors" and it has "an independent chairman."  412 F.3d 133, 136 (D.C. Cir. 2005).  As the Court of Appeals explained, the Chamber had standing because the rule limited its ability to engage in transactions with mutual funds that failed to meet those conditions.  *Id.* at 138.  The D.C. Circuit's decision in *Competitive Enterprise Institute v. NHTSA* is to like effect.  901 F.2d 107 (D.C. Cir. 1990).  In that case, the court held that a consumer group had standing to challenge NHTSA's fuel-economy standards because members of the group sought to purchase "large size" cars "in a price range they could afford," and the fuel-economy standards restricted "the production of such vehicles."  901 F.2d at 112–13.  And, most recently, in *Orangeburg, South Carolina v. Federal Energy Regulatory Commission*, the D.C. Circuit held that a city government had standing to challenge the Federal Energy Regulatory Commission's approval of an agreement between two utilities because that approval prevented the city from purchasing "a desired product (reliable and low cost wholesale power)," 862 F.3d 1071, 1074 (D.C. Cir. 2017), even though the city could and did "purchase wholesale power from another source," *id.* at 1078.

Here, Plaintiffs contend that the delay in finalizing the V2V rule has "depriv[ed]" Fleming and Weissman "of the opportunity to purchase vehicles with a particular desired feature."  Dkt. 71 at 27.  In particular, the Second Amended Complaint alleges that Fleming and Weissman "would like to purchase vehicles equipped with V2V communications when they purchase new cars in the next several years," Dkt. 67 at 23 (Second Am. Compl. ¶ 79); that "[t]he delay of the V2V rule is depriving [them] of the opportunity to purchase vehicles with this desired feature," *id.*; and that, by NHTSA's own account, "manufacturers will not be able to move forward in an efficient way and that a critical mass of equipped vehicles would take many

years to develop, if ever," *id.* at 22 (Second Am. Compl. ¶ 77) (quoting 82 Fed. Reg. at 3854).

Plaintiffs back those allegations up, moreover, with declarations from Fleming, Dkt. 16-7

(Fleming Decl.), and Weissman, Dkt. 16-10 (Weissman Decl.).  Fleming attests that she plans to

purchase a new car "in the next 5 years or so," Dkt. 16-7 at 2 (Fleming Decl. ¶ 5), and Weissman

attests that she plans to buy a new car "in the next 5–7 years," Dkt. 16-10 at 2 (Weissman Decl,

¶ 4).  Both attest that they would like their new cars to include V2V technology.  Dkt. 16-10 at 2

(Weissman Decl, ¶ 4); Dkt. 16-7 at 2 (Fleming Decl. ¶ 5).  They assert that the delay in finalizing

the rule "will negatively affect [their] ability to purchase a new car with this safety system" and

that they will "be limited in [their] ability to purchase the vehicle[s] [they] desire[s]."  Dkt. 16-7

at 2 (Fleming Decl. ¶ 5); Dkt. 16-10 at 2 (Weissman Decl. ¶ 4).

     The Court notes, at the outset, that Plaintiffs' assertion of purchaser standing differs from

*Consumer Federation of America*, *Chamber of Commerce*, *Competitive Enterprise Institute*, and

*Orangeburg, South Carolina* in an important respect—all of those cases dealt with federal

regulation that limited consumer choices that would otherwise have been available absent the

challenged agency action.  Plaintiffs, in contrast, allege an injury that is the product of agency

inaction.  They argue that the V2V regulation, if finalized, would increase consumer choices.

But, as the D.C. Circuit's decision in *Center for Auto Safety v. NHTSA*, 793 F.2d 1322 (D.C. Cir.

1986) ("*CAS I*"), demonstrates, that distinction does not compel a different result.  *See*

*Competitive Enterprise Institute v. NHTSA*, 901 F.2d at 112 (noting that the claim to standing in

that case was just "the 'opposite side of the coin' of the injury found cognizable in *CAS I*").  In

*CAS I*, a consumer organization challenged a NHTSA rule setting fuel efficiency standards on

the ground that the rule did not go far enough and that "the 1985 and 1986 model year standards

[were] too low."  793 F.2d. at 1323.  Just as Fleming and Weissman are interested in purchasing

vehicles equipped with V2V technology, the association's members in *CAS I* were "interested in purchasing the most fuel-efficient vehicle possible." *Id*. at 1332.  And, just as Fleming and Weissman allege that the V2V regulation is necessary to prod manufacturers to incorporate interoperable V2V technology in their vehicles, the association's members in *CAS I* alleged that, without "the threat of civil penalties," auto manufactures would "not be prodded to install as many fuel-saving technologies." *Id*.  Against this backdrop, the D.C. Circuit concluded that the *CAS I* plaintiff "plainly" had associational standing. *Id*. at 1324.  As the court explained, the organization's "members ha[d] suffered injury-in-fact because the vehicles available for purchase will likely be less fuel efficient than if the fuel economy standards were more demanding," and "[t]his injury can be traced to NHTSA's rulemaking and is likely to be redressed by a favorable decision." *Id*.  According to Plaintiffs, the same analysis applies here: Fleming and Weissman want to purchase V2V-equipped vehicles that are interoperable with other vehicles; the V2V regulations, if finalized, would facilitate the availability of these vehicles; and Fleming and Weissman's inability to purchase the vehicles of their choice can be traced, Plaintiffs assert, to the delay in finalizing the V2V regulation caused by the Executive Order.

   c. <u>Defendants' Contentions</u>

  Defendants disagree.  They do not take issue with the concept of purchaser standing, nor do they contend that purchaser standing is limited to cases in which the regulatory action at issue limits existing consumer choices.  Instead, they argue that (1) the law of the case doctrine precludes reconsideration of Plaintiffs' contention that the Executive Order has interfered with Fleming and Weissman's plans to purchase V2V-equipped cars; (2) the Court should reconsider its prior conclusion that Plaintiffs have plausibly alleged that the Executive Order has delayed

issuance of the final V2V rule and thus need not reach the question of purchaser standing; and

(3) in any event, neither Fleming nor Weissman has identified a sufficiently certain or imminent

injury to support a claim of purchaser standing.  Some of these contentions, as the Court will

explain below, are sufficient to defeat Plaintiffs' cross-motion for summary judgment.  None,

however, is sufficient to sustain Defendants' motion to dismiss.

(i)  <em>Law of the case</em>

First, Defendants argue that Plaintiffs offer no "new facts to cure the deficiencies

identified by the Court" and, instead, merely "reuse the same declarations from Ms. Fleming and

Ms. Weissman" and "tweak[] their legal argument about why these allegations are sufficient to

establish standing."  Dkt. 70-1 at 23; *see also* Dkt. 75 at 11–12.  According to Defendants, "this

Court's prior assessment of the Fleming and Weissman declarations still controls as the law of

this case."  Dkt. 75 at 11.  In response, Plaintiffs argue that the law of the case doctrine "presents

no impediment to consideration of standing based on . . . the V2V rule—particularly as the Court

in its earlier order did not consider the injury on which plaintiffs rely to show standing."  Dkt. 78

at 11.  Plaintiffs are correct.

Under Federal Rule of Civil Procedure 54(b), orders entered by a district court "may be

revised at any time before the entry of a judgment adjudicating all the claims and all the parties'

rights and liabilities."  Fed. R. Civ. P. 54(b).  As a result, "[i]nterlocutory orders are not subject

to the law of the case doctrine and may always be reconsidered prior to final judgment."

*Langevine v. District of Columbia*, 106 F.3d 1018, 1023 (D.C. Cir. 1997*); see also Filebark v.*

*U.S. Dep't of Transp.*, 555 F.3d 1009, 1013 (D.C. Cir. 2009); *Sloan v. Urban Title Services, Inc.*,

770 F. Supp. 2d 216, 224 (D.D.C. 2011).  To be sure, principles of judicial efficiency and

expedition counsel against revisiting prior rulings absent good case, *see* Fed. R. Civ. P. 1;

*Capitol Sprinkler Insp., Inc. v. Guest Services, Inc.*, 630 F.3d 217, 227 (D.C. Cir. 2011) (district courts have "inherent power to reconsider an interlocutory order 'as justice requires'") (citation omitted), and the Fleming and Weissman declarations previously referred to their desire to purchase new cars equipped with V2V technology.  The Court, however, did not previously consider—much less reject—Plaintiffs' contention that Fleming and Weissman would have purchaser standing to sue.  To the contrary, Plaintiffs' did not refer to purchaser standing—or cite to any of the purchaser standing cases—in the earlier round of briefing, and, understandably, the government did not address an argument that Plaintiffs did not make.  Although in retrospect Plaintiffs may wish they had done so—if for no other reason, at least to have expedited resolution of the standing issue—the government does not identify any authority that precludes Plaintiffs from advancing a new theory of standing at this stage of the litigation.

As the government acknowledged when it assented to Plaintiffs' request to file a Second Amended Complaint, the issues presented in this case are of sufficient importance that Plaintiffs should be given the opportunity to make their best case for standing.  Dkt. 65.  The Court agrees and can discern no reason to limit the scope of Plaintiffs' second effort to new factual, as opposed to new legal, theories.

                (ii)     *Whether the Executive Order has delayed issuance of the V2V rule*

Second, and arguably in some tension with its first argument, the government asks that the Court reconsider its prior conclusions that Plaintiffs have plausibly alleged that NHTSA intended to finalize the V2V rule and that Executive Order 13771 has delayed that agency action. Dkt. 70-1 at 23–24.  As the Court recognized in *Public Citizen I*, it is not easy for a plaintiff "plausibly [to] allege or show that [a] putative regulatory action[] . . . would have been taken in the absence" of some event or requirement.  297 F. Supp. 3d at 22.  That difficulty is the product

of multiple factors, not least of which is the Court's obligation to refrain from placing "itself in the role of policymaker" and to avoid "speculating about how governmental entities 'will exercise their discretion.'"  *Id.* at 22–23 (quoting *Clapper*, 568 U.S. at 412).  But, notwithstanding these hurdles, the Court concluded that Plaintiffs had plausibly alleged that NHTSA intended to finalize the V2V rule and that the Executive Order has delayed that action. In reaching that conclusion, the Court relied on a variety of factors, including NHTSA's endorsement of the rule in the notice of proposed rulemaking; statements from OMB acknowledging that identifying offsetting deregulatory actions and executing those actions "takes time;" the Department of Transportation's own assertion that it was delaying its rulemaking schedules to permit "evaluat[ion] in accordance with" Executive Order 13771; the Department's subsequent decision to move the proposed V2V rule to the "[l]ong-[t]erm [a]ction" section of the regulatory agenda and to list the date for the "[n]ext [a]ction" as "[u]ndetermined;" the lack of any suggestion by NHTSA (or any other government agency or official) that it now has doubts about the merits of the proposed rule; the requirement under the APA that, if NHTSA no longer supported the rule, it would need to provide a "reasoned explanation" for that decision; and— perhaps most significantly—the fact that because the Executive Order considers only costs, and not benefits, it would likely take *decades* for the Department of Transportation to bank sufficient cost savings to permit the rule to proceed under the Executive Order.  297 F. Supp. 3d at 25–28. "This combination of factors," along with "experience and common sense," convinced the Court that "[i]t is at least plausible . . . that the Executive Order has resulted in *some* measure of delay with respect to" the V2V rule.  *Id.* at 28.

In seeking to dismiss Plaintiffs' Second Amended Complaint, the government does not take issue with much of this.  It does not dispute, for example, that it would take decades for the

Department of Transportation to accrue sufficient cost savings to pay for the rule, and it does not

assert that it is no longer convinced, as a matter of policy, that the rule is a good idea.  Instead, it

points to a statement that the Department of Transportation issued on November 8, 2017, and

argues that, in light of that statement, "Plaintiffs cannot demonstrate that [the Department of

Transportation] intends to issue a final rule, or that such a rule is being delayed by Executive

Order 13,771."  Dkt. 70-1 at 23–24.  The statement is brief and can be quoted in full:

> The Department of Transportation and NHTSA have not made any final
> decision on the proposed rulemaking concern a V2V mandate.  Any reports
> to the contrary are mistaken.  In all events, DOT hopes to use the dedicated
> spectrum for transportation lifesaving technologies.    Safety is the
> Department's number one priority.
>
> In response to the proposal, NHTSA is still reviewing and considering more
> than 460 comments submitted and other relevant new information to inform
> its next steps.  An update on these actions will be provided when a decision
> is made at the appropriate time, taking into consideration the rich comments
> received in response to the proposed action published in December 2016.
> While [the Department of Transportation] withdrew or revised 13 rules this
> year, V2V is not one of them, and remains on [the Department of
> Transportation's] significant rulemaking report.

U.S. Dep't of Transp., *V2V Statement* (Nov. 8, 2017) (quotations in original) ("V2V

Statement").[7]  Although this statement may well create a dispute of material fact for purposes of

summary judgment, it does not undercut the Court's prior conclusion that Plaintiffs have

plausibly alleged that the Executive Order has delayed issuance of a final V2V rule.

As an initial matter, the statement confirms that neither the Department of Transportation

nor NHTSA has decided, as a matter of policy, that the proposed rule is ill-advised.  To the

contrary, the statement seeks to rebut "mistaken" reports that the Department has made a

decision to withdraw the proposed rule and emphasizes that, although the Department has

---

[7]   Available at: https://www.nhtsa.gov/press-releases/v2v-statement.

withdrawn or "revised 13 rules this year, [the] V2V [proposed rule] is not one of them." *Id.* The statement, moreover, reaffirms that the Department "hopes to use the dedicated spectrum for transportation lifesaving technologies" and that "[s]afety is the Department's number one priority." *Id.* The government, for its part, points to other portions of the statement and, in particular, to the assertion that "NHTSA is still reviewing and considering more than 460 comments submitted and other relevant new information to inform its next steps" and to NHTSA's promise to provide "[a]n update" once "a decision is made at the appropriate time, taking into consideration the rich comments received in response to the proposed" rule. Dkt. 70-1 at 23–24 (quoting V2V Statement). That language may well support the government's view that the Department is considering whether to issue the rule (and, if so, what revisions are appropriate) without regard to the limits imposed on significant, new regulatory action by the Executive Order. But it reads too much into the statement to conclude that it renders Plaintiffs' jurisdictional allegations implausible. The Department, for example, might just as well be taking its time in considering the 460 comments because it knows that the Executive Order will, in any event, preclude issuance of the rule anytime soon. Likewise, the Executive Order and the availability (or unavailability) of regulatory offsets may just as well be the "other relevant new information" that will "inform" the Department's "next steps." *See* V2V Statement. Finally, the statement was issued almost fifteen months ago, and, although the Department promised to provide an "update . . . at the appropriate time," *id.*, it did not promise to provide notice as soon as it completed the review of the comments. In short, although the government *might* be correct, the statement is not nearly as definitive as the government suggests.

It has now been almost twenty-two months since the comment period on the proposed rule closed, and the regulatory agenda continues to reflect that the rule is on the list of items for

"[l]ong-[t]erm [a]ction" with an "[u]ndetermined" date for any further action.  Fall 2018 Agenda.

Although it is possible that the Department is simply engaged in a detailed review of the

comments it has received, the Court adheres to its prior conclusion that Plaintiffs have plausibly

alleged that the delay is due, at least in part, to Executive Order 13771.  It is also possible that

the Department will engage in a massive deregulatory action, sufficient to offset the estimated

cost of $2 billion or more each year for the first several years the V2V rule is in effect or that

another agency will transfer sufficient cost savings to the Department of Transportation.  And, it

is possible that OMB will waive the regulatory cap in order to permit the rulemaking to proceed.

But, as the record now stands, it appears that the Executive Order currently precludes issuance of

the rule, raising the plausible inference that the Department is not rushing to finalize a rule that it

will not be permitted to issue.  If that inference is incorrect, the government can rebut it after the

parties are provided an opportunity for further factual development.

(iii)    <em>Adequacy of Plaintiffs' allegations of injury</em>

Finally, the government argues that Plaintiffs' allegations and declarations do not

plausibly allege or otherwise show that Fleming or Weissman are likely to suffer a non-

speculative and redressable injury due to any delay in finalizing the V2V rule.  In particular,

according to the government, Fleming and Weissman will be able to purchase V2V-equipped

vehicles even if the rule is not finalized; their plans to purchase new vehicles with V2V

technology years from now are too speculative to support standing; and that their injuries, if any,

are not redressable.  The Court is unconvinced.

The government first contends that Fleming and Weissman have not suffered, and will

not suffer, any concrete injury because they will be able to purchase V2V-equipped vehicles,

"regardless of whether DOT issues a final V2V rule."  Dkt. 70-1 at 25– 26.  For support, the

28

government points to two news stories, one from March 2017 reporting that "Cadillac [had] introduce[d] . . . V2V . . . communications . . . in [its] CTS . . . sedan," *V2V Safety Technology Now Standard on Cadillac CTS Sedans*, Cadillac (Mar. 9, 2017);[8] *see also* Dkt. 70-1 at 25–26, and another from April 2018 reporting that "Toyota [had] announced that it intends to deploy [dedicated short-range communications systems, which will enable V2V communications] on Toyota and Lexus vehicles in the US starting in 2021," Andrew Krok, *Toyota, Lexus to Launch 'Talking' Vehicles in 2021*, CNET (April 16, 2018);[9] *see also* Dkt. 70-1 at 26.

With these press reports in hand, the government invokes the D.C. Circuit's decision in *Coalition for Mercury-Free Drugs v. Sebelius*, 671 F.3d 1275 (D.C. Cir. 2012), for the proposition that there is "no injury where [the] desired product was 'readily available.'" Dkt. 70-1 at 26. In that case, the D.C. Circuit reaffirmed the concept of purchaser standing but held that the plaintiff-association had failed to allege that the agency action prevented its members from purchasing the relevant product, in that case thimerosal-free vaccines. *Coal. for Mercury-Free Drugs*, 671 F.3d at 1281. Although recognizing that the plaintiffs might have met their burden had they shown that the agency action made "thimerosal-free alternatives *difficult to obtain*," the court stressed that the plaintiffs did not even meet this modest burden; to the contrary, the plaintiffs acknowledged "that thimerosal-free vaccines [were] readily available." *Id.* at 1282. Under those circumstances, the D.C. Circuit held that the plaintiffs lacked standing. Even assuming for present purposes that the cited press reports constitute competent evidence,

---

8   Available at: https://media.cadillac.com/media/us/en/cadillac/news.detail.html/ content/Pages/news/us/en/2017/mar/0309-v2v.html.

9   Available at: https://www.cnet.com/roadshow/news/toyota-lexus-v2v-v2i-dsrc-communication-2021.

however, the Court is unconvinced that the reports or *Coalition for Mercury-Free Drugs* rebut Plaintiffs' claim to standing.

This case differs from *Coalition for Mercury-Free Drugs* in a number of important respects.  First, and foremost, the product that Plaintiffs seek here—V2V-equipped vehicles—is fundamentally different from thimerosal-free vaccines.  Unlike thimerosal-free vaccines, the value of the technology at issue here turns on its employment in as many vehicles as possible.  To be sure, there might be *some* value in a technology that prevents accidents between Cadillac CTS sedans and Toyota and Lexus vehicles.  But that limited benefit falls far short of the objective of the rule, and it renders the technology included in those vehicles far less attractive.  Significantly, the products that Fleming and Weissman would like to purchase are not simply vehicles or even vehicles equipped with V2V technology, but vehicles that are capable of communicating with most, if not all, other light vehicles on the road.  Nothing the government has offered suggests that Fleming and Weissman—or anyone else—will be able to purchase cars with that capability.

The Court, moreover, need not assess the potential availability of a desired product in a vacuum.  Under prevailing D.C. Circuit precedent, the Court must evaluate the effect of agency action (or inaction) on third party conduct based on "evidence contained in the agency's own factfinding" and "the administrative record itself."  *Competitive Enter. Inst*., 901 F.2d at 114 (citing *Animal Welfare Inst. v. Kreps*, 561 F.2d 1002, 1010 (D.C. Cir. 1977)); *see also CAS I*, 793 F.2d at 1332–34  (looking to agency's assessment of "incentives" and "disincentives" of regulation in assessing plausibility of plaintiffs' allegations of standing).  Here, although the administrative record is not yet complete, NHTSA's most recent pronouncement mirrors Plaintiffs' claims.  According to the notice of proposed rulemaking:

Despite the[] potential benefits, V2V offers challenges that are not present[ed] [by independent safety technologies such as radar and camera systems]. Without government action, these challenges could prevent this promising safety technology from achieving sufficiently widespread use *throughout the vehicle fleet* to achieve these benefits.  Most prominently, vehicles need to communicate a standard set of information to each other, using interoperable communications that all vehicles can understand. . . .  Without interoperability, manufacturers attempting to implement V2V will find that their vehicles are not necessarily able to communicate with other manufacturers' vehicles and equipment, defeating the objective of the mandate and stifling the potential for innovation that the new information environment can create.  In addition, there is the issue of achieving *critical mass*: That V2V can only begin to provide significant safety benefits when *a significant fraction of vehicles comprising the fleet* can transmit and receive the same information in an interoperable fashion.

The improvement in safety that results from enabling vehicles to communicate with one another depends directly on the fraction of the vehicle fleet that is equipped with the necessary technology, and on its ability to perform reliably. . . .  Because *the value to potential buyers of purchasing a vehicle that is equipped with V2V communications technology depends upon how many other vehicle owners have also purchased comparably-equipped models*, V2V communications has many of the same characteristics as more familiar network communications technologies.

*   *   *

. . .  Unless individual buyers believe that a significant number of other buyers will obtain V2V systems, they may conclude that the potential benefits they would receive from this system are unlikely to materialize.

82 Fed. Reg. at 3856 (emphasis added).  Based on all of this, the notice of proposed rulemaking concluded that, "[w]ithout government intervention, the resulting uncertainty could undermine manufacturer plans or weaken manufacturers' incentive to develop V2V technology to its full potential."  *Id.*  That is precisely Plaintiffs' point, and nothing contained in either of the press reports that the government now cites undermines NHTSA's prior statement.

The government's reliance on *Coalition for Mercury-Free Drugs* is unavailing for a second reason as well.  In that case, the agency's action did not limit the choices available to consumers.  There was no suggestion that, with the exception of the preservative, the vaccines on

the market differed in any material respect from one another.  Against that backdrop, the D.C.

Circuit held that the plaintiffs lacked standing to challenge the FDA's approval of thimerosal-

containing vaccines because the FDA's action did not "prevent[] [the association's members and

individual plaintiffs] from purchasing thimerosal-free vaccines altogether," and the plaintiffs did

"not allege that mercury-free vaccines [were] 'not readily available'" or that those vaccines were

"unreasonably priced."  671 F.3d at 1281–82.  That scenario bears little resemblance to the facts

of this case, at least as the record now stands.  Without the V2V rule, Fleming and Weissman

will only be able to purchase a Cadillac CTS sedan, Toyota, or Lexus.  Thus, unlike the

consumers in *Coalition for Mercury-Free- Drugs*, who were able to purchase just what they

wanted at a reasonable price, Fleming and Weissman's choices will be significantly curtailed.

      As a result, this case is more like *Consumer Federation of America*, where the D.C.

Circuit held that a consumer who was "deterred" in exercising his full range of choices of high-

speed internet services suffered an injury in fact, even though he "could obtain high-speed

internet access using technologies other than cable."  348 F.3d at 1012.  As the Court of Appeals

explained, "the inability of consumers to buy a desired product may constitute injury-in-fact

'even if they could ameliorate the injury by purchasing some alternative product.'"  *Consumer*

*Fed. of Am.*, 348 F.3d at 1012 (quoting *Cmty. Nutrition Inst. v. Block*, 698 F.2d 1239, 1247 (D.C.

Cir. 1983), *rev'd on other grounds*, 467 U.S. 340 (1984)).  That holds true here and provides a

sufficient basis to reject the government's argument that Fleming and Weissman face no threat of

injury because they can, in any event, buy a V2V-equipped Cadillac CTS sedan, Lexus, or

Toyota.[10]

---

[10]   The government also contends that purchaser standing requires that the purchaser suffer an
independent, "legally cognizable injury" as a result of the lost opportunity to purchase a desired

Next, the government contends that the timeline and relationships to the regulatory process are too attenuated to support standing. As the government notes, the proposed V2V rule included "two years of lead time" following promulgation of a final rule before the mandate would apply, followed by a three-year phase in period. 82 Fed. Reg. at 4006; *see also* Dkt. 70-1 at 26. And, even beyond that, the technology will provide its full benefit only after a sufficient number of consumers purchase new cars. Fleming, moreover, merely attests that she plans to purchase a new car "in the next five years or so," and Weissman merely says that she plans to purchase a new car "in the next 5-7 years." Dkt. 70-1 at 27 (quoting Dkt. 16-7 at 2 (Fleming Decl. ¶ 5); Dkt. 16-10 at 2 (Weissman Decl. ¶ 4)). According to the government, when all of this is taken into consideration, it shows that Plaintiffs have not alleged that they are likely to suffer a non-speculative injury that is "certainly impending." Dkt. 70-1 at 27 (quoting *Clapper*, 568 U.S. at 401). The Court is, again, unconvinced.

As an initial matter, although the government questions whether Fleming and Weissman "will end up purchasing . . . car[s]" when they say they will, *id*., the Court must, at this stage of the proceeding, accept as true Plaintiffs' allegations and Fleming and Weissman's declarations, which aver that they plan to purchase new vehicles in the next five to seven years. *See Matthew A. Goldstein, PLLC v. United States Dep't of State*, 851 F.3d 1, 4 (D.C. Cir. 2017). Nor is that timeline too long to support standing. To the contrary, "[s]tanding depends on the probability of

---

product—beyond the underlying deprivation of the good of his or her choice. Dkt. 70-1 at 28. But that argument cannot be reconciled with decisions like *Consumer Federation of America*, 348 F.3d at 1012, where the Court of Appeals did not engage in a secondary inquiry to assess whether the reduced options for purchasing high-speed internet service caused a distinct economic or other loss. As the D.C. Circuit put it in *Competitive Enterprise Institute* in responding to a similar argument: "a lost opportunity to purchase vehicles of choice is sufficiently personal and concrete to satisfy Article III requirements." 901 F.2d at 113.

harm, not its temporal proximity," *Orangeburg, South Carolina*, 862 F.3d at 1078 (alteration in

original) (quoting *520 Mich. Ave. Assocs. v. Devine*, 433 F.3d 961, 962 (7th Cir. 2006)), and the

Court has no reason to believe that Fleming and Weissman's desire to purchase V2V-equipped

vehicles will diminish over time or that the, if the V2V rule is adopted, auto manufacturers will

be unable to comply with the rule.  Moreover, even though the value of owning a V2V-equipped

vehicle will not be fully realized for years to come, the alleged harm under the purchaser theory

of standing is not the realization of the maximum safety benefit but the ability to purchase the

desired product—even before it attains its maximum utility.

The government also argues that "numerous contingencies outside of its control . . . could

delay the installation of V2V technology, such as public rejection of the product and the

possibility that a court might enjoin the rule."  Dkt. 70-1 at 27 n.9.  That argument, however,

turns the concept of undue speculation on its head.  To be sure, it is always possible that a

regulation might be enjoined or that members of the public might ask the agency to rescind a

mandate.  The question for present purposes, however, is simply whether Plaintiffs have

plausibly alleged or otherwise shown that they have standing, and they have met that burden.

Finally, the government contends that Plaintiffs have not plausibly alleged that

overturning of the Executive Order would redress Fleming and Weissman's injuries.  Dkt. 70-1

at 29–30.  As is often the case in standing analysis, this argument is simply the flip side of the

government's contention that Plaintiffs have not plausibly alleged that the Executive Order has

delayed the issuance of the V2V rule.  *See Carpenters Indus. Council v. Zinke*, 854 F.3d 1, 6 n.1

(D.C. Cir. 2017) ("Causation and redressability typically 'overlap as two sides of

a causation coin,'" because "[a]fter all, if a government action causes an injury, enjoining the

action usually will redress that injury." (quoting *Dynalantic Corp. v. Dep't of Defense*, 115 F.3d

1012, 1017 (D.C. Cir. 1997)).  Thus, to the extent that Plaintiffs have plausibly alleged that

NHTSA has not issued a final V2V rule because the Department of Transportation has yet to

accrue sufficient cost savings to offset the cost of the rule under the Executive Order, it does not

require a substantial leap to conclude that they have also plausibly alleged that invalidating the

Executive Order would redress the injuries they allege.  "Article III does not demand a

demonstration that victory in court will without doubt cure the identified injury," *Teton Historic*

*Aviation Found. v. U.S. Dep't of Def.,* 785 F.3d 719, 727 (D.C. Cir. 2015), but only that it is

likely to do so, *see Estate of Boyland v. U.S. Dep't of Agriculture*, 913 F.3d 117, 123 (D.C. Cir.

2019).  To be sure, Plaintiffs have yet to prove that the Executive Order has delayed the

finalization of the rule, and they still face substantial hurdles in their effort to do so.  But they

have at least plausibly alleged that it has done so, and, for similar reasons, they have plausibly

alleged that their purported injury is redressable.

*      *      *

Plaintiffs have therefore carried their burden of plausibly alleging or otherwise showing

that Executive Order 13771 has delayed the issuance of the V2V rule and that the resulting delay

will likely cause one or more of their members to suffer a concrete injury redressable by

invalidation of the Executive Order and OMB Guidance.  The Court will, accordingly, deny

Defendants' motion to dismiss.

    2.    *Plaintiff's Motion for Summary Judgment*

That disposes of only one of the pending motions; Plaintiffs have also cross-moved for

partial summary judgment on the question of standing.  In moving from defense to offense,

however, Plaintiffs face a far more demanding standard.  *See Nat'l Whistleblower Center v.*

*Dep't of Health and Human Servs.*, 839 F. Supp. 2d 40, 46 (D.D.C. 2012).  At this stage,

Plaintiffs "can no longer rest on . . . 'mere allegations,' but must 'set forth' by affidavit or other evidence 'specific facts,'" sufficient to carry their burden on summary judgment.  *Lujan*, 504 U.S. at 561 (citation omitted).  This means that they "must establish that there exists no genuine issue of material fact as to justiciability."  *Dep't of Commerce v. U.S. House of Representatives*, 525 U.S. 316, 329 (1999).  A fact is "material" if it is capable of affecting the outcome of the dispute, *see Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986), and a dispute is "genuine" if the evidence is such that a reasonable factfinder—here, the Court—could find in favor of the nonmoving party, *see Scott v. Harris*, 550 U.S. 372, 380 (2007); *Liberty Lobby*, 477 U.S. at 248.  "A party asserting that a fact cannot be or is genuinely disputed must support th[at] assertion by . . . citing to particular parts of materials in the record."  Fed. R. Civ. P. 56(c)(1)(A).  "The evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in his favor," *Liberty Lobby*, 477 U.S. at 255, but the non-movant must offer more than unsupported allegations or denials, Fed. R. Civ. P. 56(e); *Celotex Corp. v. Catrett*, 477 U.S. 317, 324 (1986).  As explained below, this difference in the relevant standard is dispositive.

An association "can establish standing in one of two ways.  It can assert 'associational standing' to sue on behalf of its members[,] . . . [o]r it can assert 'organizational standing; to sue on its own behalf."  *Pub. Citizen I*, 297 F. Supp. 3d at 17 (internal citations omitted).  Plaintiffs' pending motion for partial summary judgment focuses almost exclusively on associational standing, and it only briefly touches on organization standing.  The Court will follow suit and will first address "associational standing" and will then briefly address organizational standing.

      a.    <u>Associational Standing</u>

To establish association standing, an organization must satisfy three criteria.  It must show (1) that at least one of its members "would otherwise have standing to sue in [her] own

right;" (2) that "the interests" the organization "seeks to protect are germane to the organization's purpose;" and (3) that the claim is suitable for resolution in a case in which the association's members are not joined—that is, "neither the claim asserted nor the relief requested requires the participation of individual members in the lawsuit." *Hunt*, 432 U.S. at 343.  For present purposes, as in *Public Citizen I*, the government does not dispute that Plaintiffs satisfy the second and third criteria, and the Court agrees.  The question, accordingly, once again comes down to whether Plaintiffs have demonstrated that at least one of their members would have standing to sue in her own right.

To meet that burden, Plaintiffs now identify five putative regulatory measures that they contend have been delayed or withdrawn due to Executive Order 13771, to the detriment of one or more of their members.  The Court will consider each of these measures in turn and, as to each, will consider whether Plaintiffs have shown—beyond genuine dispute—(1) that at least one of their members has sustained, or faces the imminent threat of sustaining, an "injury-in-fact" that is neither "conjectural" nor "hypothetical;" (2) that a "causal connection" exists between the Executive Order and that injury, such that the injury is "fairly trace[able] to the" Executive Order or OMB Guidance "and [is] not the result of the independent action of some third party;" and (3) that the injury would "likely" be redressed "by a favorable decision." *Lujan*, 504 U.S. at 560.  A failure to satisfy any one of these "irreducible constitutional" requirements for Article III standing will preclude granting Plaintiffs' motion for partial summary judgment.  As the Court explains below, each one of the putative rules suffers from one or more deficiencies, disputes, or difficulties that precludes the entry of summary judgment on

the present record.  The Court will limit its analysis to the most evident challenges posed by each

of the putative regulatory measures Plaintiffs identify.[11]

(i)     *V2V Proposed Rule*

Plaintiffs' contention that they have established associational standing based on the

injuries that Fleming and Weissman will allegedly sustain due to the delay in finalizing the V2V

rule does not require much analysis beyond that set forth above.  As already explained, Plaintiffs

have plausibly alleged that the Executive Order has injured, and will continue to injure, Fleming

---

[11]   Under this Court's local rules, a party opposing a motion for summary judgment is required
to submit a "concise statement of genuine issues setting forth all material facts as to which it is
contended that there exists a genuine issue necessary to be litigated, which shall include
references to the parts of the record relied on to support that statement."  LRCP 7(h)(1).  The
Court, moreover, "may assume that facts identified by the moving party in its statement of facts
are admitted, unless such a fact is controverted in the genuine issues filed in opposition to the
motion."  *Id.*  Here, portions of Plaintiffs' statement of undisputed material facts at least arguably
posit that the Executive Order has caused the delay or withdrawal of the five proposed
regulations currently at issue.  *See, e.g.*, Dkt. 71-1 at 11, 12, 14, 20 (SUMF ¶¶ 58, 64, 75, 106).
And, because the government's response fails to identify any evidence that would allow a
reasonable finder of fact to reject those assertions, *see* Dkt. 75-1 at 22–23, 25, 29, 39 (Response
to SUMF ¶¶ 58, 64, 75, 106), one might conclude—as Plaintiffs contend—that causation should
be treated as undisputed.

The Court will not do so, however, for several reasons.  First, the local rule says only that the
court "may" treat an uncontroverted assertion of fact as undisputed, not that is "shall" do so.
Second, the Court has an "independent obligation" to determine whether it has Article III
jurisdiction, *Arbaugh v. Y & H Corp.*, 546 U.S. 500, 514 (2006), and it cannot satisfy that
obligation without further factual development.  Third, most of the evidence that Plaintiffs have
offered, and which they cite in their statement of undisputed material fact, is the same regulatory
materials that the government does address in its briefs.  Fourth, the government's response to
Plaintiffs' statement of undisputed material facts at least gestures at responding to that
evidence—albeit not in manner that is particularly helpful—by noting that these regulatory
materials "speak for themselves."

Although the Court, accordingly, will not accept Plaintiffs' invitation to hold that the
government has, in effect, defaulted on the question of causation, resolution of the standing issue
will require that during the next phase of the proceeding the government more directly address
Plaintiffs' factual contentions.

and Weissman by delaying issuance of a final V2V rule and thereby interfering with their plans to purchase and use V2V-equipped vehicles several years from now.  They have not, however, shown that this asserted "causal connection"—and, by extension, the redressability of their asserted injuries—is beyond genuine dispute.  To the contrary, the government plausibly contends that the delay in finalizing the rule is the product of "the kind of run-of-the-mill evaluation of a propose rule that often results in additional consideration and, at times, a decision to take a different substantive approach."  Dkt. 75 at 12.  In short, Plaintiffs have presented evidence that the Executive Order has delayed finalization of the rule, but that evidence is disputed, and the government has done more than offer an unsupported denial.  That is enough, at this stage, to preclude the entry of summary judgment in favor of Plaintiffs.  *See Celotex Corp.*, 477 U.S. at 324.

The Court, accordingly, concludes that Plaintiffs have not met their burden of demonstrating, beyond genuine dispute, that any of their members would have standing in their own right to challenge the Executive Order and OMB Guidance based on the alleged delay in finalizing the V2V rule.

(ii)     *Airline Baggage Fees Proposed Rule*

Plaintiffs also argue that the Executive Order and OMB Guidance caused the Department of Transportation to withdraw a rule governing the airline industry that would have benefitted at least one member of Public Citizen.  Dkt. 71 at 19–25.  In May 2014, the Department issued a notice of proposed rulemaking, proposing to require airlines and ticket agents "to disclose at all points of sale the fees for certain basic ancillary services associated with the air transportation consumers are buying or considering buying."  Transparency of Airline Ancillary Fees and Other

Consumer Protection Issues, 79 Fed. Reg. 29970 (proposed May 23, 2014).[12]  Based on the

comments received in response to that notice, the Department issued a supplemental notice on

January 19, 2017, proposing to "require air carriers, foreign air carriers, and ticket agents to

clearly disclose to consumers at all points of sale customer-specific fee information . . . for a first

checked bag, a second checked bag, and one carry-on bag wherever fare and schedule

information is provided to consumers."  *See* Transparency of Airline Ancillary Service Fees, 82

Fed. Reg. 7536 (proposed Jan. 19, 2017).  The comment period was scheduled to run through

March 20, 2017.

On March 14, 2017, however, the Department issued a notice suspending the comment

period indefinitely to "allow the President's appointees the opportunity to review and consider

this action."  Transparency of Airline Ancillary Service Fees, 82 Fed. Reg. 13572 (Mar. 14,

2017).  For each month from February 2017 through July 2017, the Department did not post a

public update on any of its significant rulemakings, and, instead, merely announced:  "As

[Department of Transportation] rulemakings are being evaluated in accordance with Executive

Orders 13771 and 13777, the schedules for many ongoing rulemakings are still to be determined,

so we will not post an Internet Report for the month."  *See* Significant Rulemaking Reports by

Year, 2017.[13]  Then, from August through October 2017, the Department indicated in its monthly

Significant Rulemaking Reports that the "stage" for the airline baggage fees proposed rule was

"undetermined."  *Id.*  And, finally, in December 2017, the Department published a one-page

notice in the Federal Register withdrawing the proposed rulemaking.  *See* Transparency of

---

[12]   RIN: 2105-AE56

[13]   Available at: https://www.transportation.gov/regulations/significant-rulemaking-report-archive.

Airline Ancillary Service Fees, 82 Fed. Reg. 58778 (Dec. 14, 2017).  According to that notice, "[a]fter a careful review, the Department has determined to withdraw the" proposed rule.  *Id.* at 58778.  The notice explained that "[t]he Department is committed to protecting consumers from hidden fees and to ensuring transparency" but that it did "not believe that Departmental action is necessary to meet this objective at this time" because "[t]he Department's existing regulations already provide consumers some information regarding fees for ancillary services."  *Id.*  The notice further specified that "[t]he withdrawal corresponds with the Department's and Administration's priorities and is consistent with the Executive Order 13771."  *Id.*

Plaintiffs contend that this series of actions and the Department's own statements show that the Department's decision to withdraw the proposed rule "was attributable to the Executive Order."  Dkt. 71 at 23.  That decision, they further contend, caused at least one of Public Citizen's members, Amy Allina, to suffer a cognizable and redressable injury.  *Id.* at 22–23.  In support of this contention, they offer a declaration in which Allina attests that she travels "by air an average of 6–8 times per year;" that she purchases tickets from various airlines, using various online sites; that she decides which airline tickets to purchase based, in part, on baggage fees; that searching websites for baggage-fee information is time consuming; that she has incurred baggage-fees based on a lack of information regarding the airline's policy; and, finally, that she has reviewed the proposed rule and believes that, "if finalized," it "would save [her] time" in determining baggage fees and the true cost of booking a flight.  Dkt. 64-4 at 1–2 (Allina Decl. ¶¶ 3–5).

The government responds that Plaintiffs have failed to establish that the Executive Order or OMB Guidance caused the Department to withdraw the proposed rule, and they identify a number of reasons to question Plaintiffs' inference.  Most notably, they point to the

Department's assertion that, after careful study, it concluded that the proposed rule was unnecessary to protect "consumers from hidden fees and to ensur[e] transparency" and that "existing regulations already provide consumers some information regarding fees for ancillary services." 82 Fed. Reg. at 58778; *see also* Dkt. 75 at 8–9.  The government also disputes Plaintiffs' reading of the statement "[t]he withdrawal . . . is consistent with Executive Order 13771," contained in the notice withdrawing the rule.  82 Fed. Reg. at 58778; *see also* Dkt. 75 at 8.  According to the government, "'*consistent*' with . . . does not mean . . . *because* of," particularly when read in light of the Department's further assertion that it withdrew the proposed rule because, on further consideration, it was deemed unnecessary. *Id.* (emphasis added).  For similar reasons, the government also argues that the "temporal proximity" of the Department's decision to withdraw the rule and the adoption and implementation of the Executive Order is insufficient to establish causation. *Id.* at 9.  What matters, according the government, is the rationale stated in the notice withdrawing the rule, which must be afforded the presumption of good faith—and not temporal proximity, other statements made in the Department's Significant Rulemaking Reports, or a passing reference to the Executive Order in the final notice.

For present purposes, the Court need not decide whether the proposed rule was withdrawn *because of*, or merely *consistent with*, the Executive Order and OMB Guidance.  The evidence that Plaintiffs proffer is far from conclusive, and absent a showing "that there is no genuine dispute as to any material fact," Fed. R. Civ. P. 56(a), Plaintiffs are not entitled to summary judgment on the issue of standing.

(iii)     *Prevention of Workplace Violence in Healthcare Rule*

Plaintiffs further contend that their members will be injured by the Executive Order because it has delayed the Occupational Safety and Health Administration's promulgation of a safety standard addressing workplace violence in healthcare.  At this early stage of the rulemaking process, however, Plaintiffs cannot show beyond genuine dispute that the agency has delayed issuing a rule—whether because of the Executive Order or for any other reason.

The Occupational Safety and Health Act of 1970, 29 U.S.C. § 651 *et seq.*, authorizes the Secretary of Labor to issue occupational safety or health standards.  29 U.S.C. § 655(b).  Once the Secretary has identified a "significant" risk, he has a "duty to . . . add[] measures so long as they afford [a] benefit and are feasible."  *Bldg. & Constr. Trades Dep't, AFL-CIO v. Brock*, 838 F.2d 1258, 1269 (D.C. Cir. 1988).  In December 2016, the Occupational Safety and Health Administration ("OSHA") of the Department of Labor issued a Request for Information ("RFI"), seeking input on "whether a standard is needed to protect healthcare and social assistance employees from workplace violence" and seeking comments "on issues that might be considered in developing a standard, including scope and the types of controls that might be required."  81 Fed. Reg. 88147 (Dec. 7, 2016).[14]  The next month, OSHA granted citizen petitions from "a broad coalition of labor unions" and "the National Nurses United" for "a standard preventing workplace violence," *see* Fall 2018 Agenda, and agreed to commence a rulemaking to address the hazards of workplace violence in the healthcare and social assistance industries," Letter from David Michaels, Administrator of OSHA to Rep. Bobby Scott, Jan. 8, 2017.  The period to submit comments in response to the RFI closed on April 6, 2017.  *See* 81 Fed. Reg. at 88147.

---

[14]   RIN: 1218-AD08

Plaintiffs allege that the Executive Order has prevented the development of the standard. They argue, in particular, that because "OSHA has taken no public action on the rulemaking" since the close of the RFI comment period, and because it "moved the workplace-violence-prevention rulemaking to '[l]ong-[t]erm [a]ctions' [of the Unified Agenda]" after OMB had instructed the agency to implement Executive Order 13771, one can reasonably infer the Executive Order has delayed OSHA from acting.  Dkt. 71 at 32.  But, since the close of the RFI, OSHA has, in fact, moved the rule to the "pre-rule stage," and it has indicated that it will initiate the Small Business Regulatory Enforcement Fairness Act ("SBREFA") process in March of this year.  Fall 2018 Agenda.  Although almost a year has passed since the comment period for the RFI closed, the Court cannot conclude that Plaintiffs have established beyond genuine dispute that issuance of a proposed rule, much less a final rule, has been delayed by the Executive Order or the OMB Guidance.  To the contrary, as the Court discussed in *Public Citizen I*, almost seven years passed from the time OSHA issued an RFI on infectious diseases to the time it planned to issue a proposed rule, and that far more substantial delay occurred before the Executive Order was adopted.  297 F. Supp. 3d at 24.  Even assuming that seven years is well out of the ordinary, the Court cannot conclude on the present record that the passage of time since the workplace violence RFI comment period closed, even when considered in light of when the Executive Order was issued and in light of the regulatory pronouncements upon which Plaintiffs rely, is sufficient to establish beyond genuine dispute that the Executive Order has delayed issuance of a proposed workplace violence rule.

Plaintiffs face another hurdle as well.  Even if Plaintiffs could show that any such delay has substantially increased the risk that one of their members will suffer a workplace injury and that, once that increased risk is taken into account, there is a substantial probability that such a

member will suffer such an injury, *see Pub. Citizen I*, 297 F. Supp. 3d at 29 (discussing *Pub.*

*Citizen, Inc. v. NHTSA*, 489 F.3d 1279, 1296 (D.C. Cir. 2007)), they have not shown that

invalidating the Executive Order or OMB Guidance would redress that increased risk of harm.

That is because, at least the record now stands, the Court has no basis to conclude that the

putative regulation is even subject to the Executive Order.  To the contrary, it appears that OMB

has yet to determine whether the rule, if issued, would constitute a "major rule," subject to the

Executive Order's directives.  *See* Fall 2018 Agenda; Final Guidance, Q&A 2.

OSHA's workplace violence rule, accordingly, cannot establish Plaintiff's standing

beyond material dispute.

(iv)     *Efficiency Standards for Cooking Products and Water Heaters*

Finally, Plaintiffs contend that the Executive Order and OMB Guidance have delayed the

Department of Energy from establishing two new energy-efficiency standards: one for residential

cooking products and the other for water heaters.  But, as explained below, Plaintiffs have again

failed to demonstrate as a matter of undisputed material fact that either the Executive Order or

OMB Guidance has delayed the finalization of these proposed rules.

The Energy Policy and Conservation Act of 1975, 42 U.S.C. § 6201 *et seq*., established

energy conservation standards for various consumer products and for certain commercial

products, but also authorizes the Department of Energy to impose more stringent standards that

are "technologically feasible," "economically justified," and will save a significant amount of

energy.  *See, e.g*., 42 U.S.C. § 6295(o); *see also Hearth, Patio & Barbecue Ass'n v. Dep't of*

*Energy*, 706 F.3d 499, 450–51 (D.C. Cir. 2013).  The statute further provides that, no later than

six years after issuance of a final rule establishing or amending a standard, the Department must

publish either a notice of determination that the existing standard need not be amended or notice

of a proposed rulemaking with respect to an amended energy-efficiency standard.  42 U.S.C. § 6295(m)(1).  If the Department issues a notice of proposed rulemaking pursuant to the six-year look back provision, it is required to "publish a final rule amending the standard for the product" within two years of publishing the notice of proposed rulemaking.  *Id.* § 6295(m)(3)(A).

Plaintiffs identify two such required proceedings, which they contend have been unlawfully delayed by the Executive Order.  First, Plaintiffs rely on a proposed rulemaking to set more stringent energy-efficiency standards for residential cooking products, such as residential ovens; and, second, they invoke a proposed rulemaking to set more stringent energy-efficiency standards for commercial water hearing equipment.  *See* Dkt. 71 at 37; *see also id.* at 41.  As with the V2V rulemaking, they contend that the Executive Order has delayed finalization of these rules and that, as a result, some of their members (and Public Citizen itself) will be unable to purchase desirable products that would otherwise be available.  *Id.* at 40; 42; *see also Competitive Enter. Inst.*, 901 F.2d at 112–13.  They further contend, moreover, that one NRDC member, R.J. Mastic, has "a direct professional and business interest in having wider access to affordable energy-efficient commercial water-heating equipment, with a range of features," Dkt. 71 at 42, because he is in the business of "help[ing] commercial property owners increase the efficiencies of their buildings," Dkt. 64-7 at 1–2 (Mastic Decl. ¶ 3).  The Court will address each rulemaking in turn.

The first of the relevant proceedings commenced in June 2015, when the Department of Energy published a notice proposing "new and amended energy conservation standards for residential conventional ovens," and, at the same time, deferring a decision whether to adopt new standards for "conventional cooking tops."  Energy Conservation Program: Energy Conservation

Standards for Residential Ovens, 80 Fed. Reg. 33030 (proposed June 10, 2015).[15]  After a public

meeting and after receiving public comments, the Department issued a supplemental notice of

proposed rulemaking in September 2016, which proposed standards for both residential ovens

and cooking tops.  Energy Conservation Program: Energy Conservation Standards for

Residential Conventional Cooking Products, 81 Fed. Reg. 60784 (proposed Sept. 2, 2016).

Subsequently, the Department issued a notice extending the public comment period until

November 2016.  *See* Energy Conservation Program: Energy Conservation Standards for

Residential Conventional Cooking Products, 81 Fed. Reg. 67219 (Sept. 30, 2016).  According to

the most recent entry in the Unified Agenda, the Department intends to issue a second,

supplemental notice of proposed rulemaking sometime this month.  Fall 2018 Agenda.

 Based on the current record, the Court cannot conclude that Plaintiffs have established

beyond genuine dispute that the Executive Order or OMB Guidance has delayed the Department

in finalizing the residential cooking products energy-efficiency rule.  To be sure, the Department

will be required by the Executive Order and OMB Guidance to find a cost offset.  Final

Guidance, Q&A 33.  The Department's most recent annual cost estimate for the proposed rule of

$42.6 *million*, 81 Fed. Reg. at 60789, however, is several orders of magnitude less than the $2.2

to $5 *billion* cost estimate for the V2V rule, Dkt. 67 at 22 (Second Am. Compl. ¶ 76), and it,

accordingly, does not raise the immediate question how the Department could possibly find an

adequate offset.  But, even more significantly, Plaintiffs correctly note that the Energy Policy

and Conservation Act *requires* the Department to issue a final rule within two years of its

publication of a proposed rule.  Dkt. 71 at 37 (citing 42 U.S.C. § 6295(m)(3)(A)).  Although

Plaintiffs argue that the two-year period has now passed, it is far from clear that either the

---

[15] RIN: 1904-AD15

Executive Order or OMB Guidance is to blame.  To the contrary, the OMB Guidance specifies that the Executive Order "does not prevent agencies from issuing regulatory actions in order to comply with an imminent statutory . . . deadline, even if they are not able to satisfy [the Executive Order's] requirements by the time of issuance."  Final Guidance, Q&A 33.  Finally, unlike the V2V rule, which is currently designated for "[l]ong-[t]erm [a]ction" on the Unified Agenda, Fall 2018 Agenda, the residential cooking products rule remains active, with a planned supplemental notice of proposed rulemaking imminently forthcoming, Fall 2018 Agenda.

The second energy-efficiency standard that Plaintiffs invoke—the commercial water heater rule—raises similar questions that preclude the Court from granting partial summary judgment in Plaintiffs' favor.  Administrative proceedings with respect to that rule commenced in May 2016, when the Department issued a notice proposing to adopt more stringent energy-efficiency "standards for certain commercial water heating equipment."  Energy Conservation Program: Energy Conservation Standards for Commercial Water Heating Equipment, 81 Fed. Reg. 34440 (proposed May 31, 2016).[16]  After receiving a number of requests for additional time, the Department extended the comment period until August 30, 2016.  *See* Energy Conservation Program: Energy Conservation Standards for Commercial Water Heating Equipment; Reopening of Comment Period, 81 Fed. Reg. 51812 (Aug. 5, 2016).  Then, in December 2016, the Department published an updated analysis relating to the proposed rule, with a comment period extending into early 2017.  *See* Energy Conservation Standards for Commercial Water Heating Equipment: Availability of Updated Analysis Results, 81 Fed. Reg. 94234 (Dec. 23, 2016).

---

[16]   RIN: 1904-AD34

In October 2018, however, the Department received a petition requesting that it withdraw the proposed energy-efficiency standard on the ground that the proposed standard "would result in the unavailability of 'performance characteristics' within the meaning of the Energy Policy and Conservation Act," and, in early November, the Department published a notice seeking comments on the petition.  *See* Energy Conservation Program: Energy Conservation Standards for Residential Furnaces and Commercial Water Heaters, Notice of Petition for Rulemaking, 83 Fed. Reg. 54883 (Nov. 1, 2018).  Although that comment period was set to close on January 30, 2019, the Department received requests from interested parties—including NRDC—to extend the comment period to allow time "to develop additional data relevant to the petition," and, on January 29, 2019, the Department granted that request and extended the comment period until March 1, 2019.  Energy Conservation Program: Energy Conservation Standards for Residential Furnaces and Commercial Water Heaters, 84 Fed. Reg. 449 (Jan. 29, 2019).

In light of this history, the Court cannot conclude that Plaintiffs have shown beyond genuine dispute that the Executive Order or OMB Guidance has delayed finalization of the proposed, amended standard.  Although the Court need not—and cannot—resolve that factual issue on the present record, it appears that the delay is more likely the product of disagreement about the substance of the proposed rule.  Moreover, as with the residential cooking products standard, Plaintiffs' contention that the Department was required by statute to issue a final rule in or before April 2018 does little to advance their position.  As explained above, the OMB Guidance provides that such a statutory requirement must be observed, notwithstanding the Executive Order.  It is, of course, possible that the Department is nonetheless reluctant to issue the final rule because its cost might prevent the Department from taking other, possibly higher priority actions.  But that possibility, at this point, is both speculative and at odds with the

evidence that the Department remains engaged in an effort to assess the proposed rule on the merits.  In any event, the Court has no difficulty in concluding that Plaintiffs have failed to meet their burden on summary judgment of showing that the proposed rule has been delayed because of the Executive Order.

       b.    <u>Organizational Standing</u>

Plaintiffs also contend that they have organizational standing to sue in their own right. As they argued during the last round of briefing, Plaintiff contend that the Executive Order and OMB Guidance have put them to "an untenable choice"—either to urge agencies "to adopt new regulations, when adopting those regulations would depend on the repeal of existing regulatory safeguards" that they support, or to "refrain[] from advocating for new public protections to avoid triggering the need to repeal existing ones."  Dkt. 71 at 46–47.  According to Plaintiffs, this dilemma undermines their ability to pursue their respective missions of advocating for health and safety, consumer protection, the environment, and improved working conditions, and, as a result, the Executive Order and OMB Guidance are causing Plaintiffs a cognizable and redressable injury in fact.

The Court rejected this theory of standing in *Public Citizen I* for two reasons.  First, assuming without deciding that "injury to 'pure issue-advocacy' can support standing," *Pub. Citizen I*, 297 F. Supp. 3d at 37, the Court concluded that Plaintiffs had "neither alleged nor offered any evidence that any of them ha[d], in fact, declined—or [were] imminently likely to decline—to advocate for a new rule out of fear that the Executive Order would compel the repeal of existing rules," *id.* at 38.  Rather, they "merely assert[ed] that they have been forced to consider the issue," and, as the Court explained, "having 'to think twice' before engaging in advocacy . . . does not constitute a cognizable injury in fact."  *Id.*  Second, and in the alternative,

the Court held that Plaintiffs had failed plausibly to allege causation.  *Id.*  That is, even assuming that Plaintiffs had alleged or shown that they had declined, or would likely decline, to pursue a regulatory initiative out of fear that, by doing so, they would provoke the relevant agency to rescind a rule that they support, Plaintiffs had not drawn a sufficient causal connection to the Executive Order or OMB Guidance.  *Id.*  As the Court explained, the Supreme Court's decision in *Clapper v. Amnesty International USA* establishes that a plaintiff "may not turn an unduly speculative or hypothetical injury into a concrete injury 'by inflicting harm on themselves based on their fears of [the] hypothetical future harm.'"  *Pub. Citizen I*, 297 F. Supp. 3d at 38–39 (quoting *Clapper*, 568 U.S. at 416).  Applying that principle to Plaintiffs' theory, the Court concluded that the chill that Plaintiffs alleged was based on an unduly speculative fear of future harm.  *Id.* at 39.  "[O]ne could only speculate," for example, "about whether the relevant agency would agree to issue the [proposed] rule" that Plaintiffs supported, "about which rules might be repealed in response, about whether those rules would not have otherwise been repealed, and about whether an identifiable member of one of the plaintiff-associations would suffer a cognizable injury-in-fact as a result."  *Id.*

    In renewing their advocacy-chill theory of standing, Plaintiffs candidly concede that they address only the first of the two problems identified in *Public Citizen I*.  Dkt. 71 at 47.  With respect to that shortcoming, they now offer the declaration of Mae Wu, a senior attorney with NRDC, attesting that the organization has "decided not to pursue a rulemaking petition to EPA specifically because of the Executive Order."  Dkt. 64-13 at 2 (Wu Decl. ¶ 7).  Specifically, she attests that "NRDC has decided not to petition EPA for new drinking water standards for contaminants including PFOA and PFOS, microcystins, and legionella" because, if "NRDC's petition were to succeed[,] EPA would have to repeal two or more existing regulations to offset

costs, which would likely undermine other health protections and harm NRDC's members." *Id.*
at 2–3 (Wu Decl. ¶ 7).

Little turns on the adequacy of this factual proffer, however, because the Court remains
convinced that its alternative holding is both sound and sufficient.[17]  For present purposes,
Plaintiffs do not press the point but, rather, merely preserve the question "for possible appeal."
Dkt. 71 at 47.  The Court, in turn, will not rehash the issue.  Suffice it to say that a plaintiff
cannot establish standing based on the "the chilling of [its] advocacy" unless that chill is the
product of a concrete and non-speculative fear of harm.  *Pub. Citizen I*, 297 F. Supp. 3d at 38–
39.  The EPA, however, reports that it has taken thirty-three deregulatory actions since the
Executive Order was issued and that it has another forty-one deregulatory actions "under
development."  EPA Deregulatory Actions.[18]  As just this one example shows, it is far from
clear—and certainly far from sufficient to satisfy the summary judgment standard—that NRDC
would risk inducing the EPA to take some additional, otherwise unplanned, deregulatory action
were it to petition the agency to adopt new drinking water standards for contaminants including
PFOA and PFOS, microcystins, and legionella.

*     *     *

The Court will, accordingly, deny Plaintiffs' motion for summary judgment.

---

[17]   Although the Court need not address the issue here, the government argues that it "lack[s]
information as to the truth or falsity of" whether the Executive Order has prevented NRDC from
petitioning for new drinking water standards claim, "because Defendants have not yet been
afforded the opportunity to conduct discovery into these allegations."  Dkt. 75-1 at 15 (Def's
Response to SUMF ¶ 36).  A party seeking discovery at summary judgment, however, must
"show[] by affidavit or declaration that, for specified reasons, it cannot present facts essential to
justify its opposition."  Fed. R. Civ. P. 56(d).  Although the government has presented a
declaration laying out the need for discovery on a number of Plaintiffs' claims, the declaration
makes no mention of the drinking water standard and NRDC's claims that the Executive Order
has prevented it from petitioning the EPA.  *See* Dkt. 75-2 (Second Bensing Decl.).

[18]   Available at: https://www.epa.gov/laws-regulations/epa-deregulatory-actions.

3.    *Disposition*

Having concluded that the government's facial motion to dismiss must be denied, and that Plaintiffs' cross-motion for partial summary judgment fails as well, the Court must address next steps.

This case currently sits in a liminal state.  The Court, of course, cannot consider the merits of Plaintiffs' underlying claims without first concluding that it has jurisdiction.  *See Steel Co.*, 523 U.S. at 94–95.  But nor can either party move forward absent further factfinding.  The government argues that it needs "an opportunity to investigate and take discovery on Plaintiffs' conclusory claims that the Executive Order will affect a particular regulatory activity and thereby cause injury to the organizational Plaintiffs or their members."  Dkt. 75-2 at 3 (Second Bensing Decl. ¶ 7).  Plaintiffs likewise need more information to press their claim that the Executive Order and OMB Guidance have delayed or derailed the proposed rules they have identified.  In fashioning next steps, "[t]he [C]ourt has considerable latitude in devising the procedures it will follow to ferret out the facts pertinent to jurisdiction," *Prakash*, 727 F.2d at 1179, and, although the Court will consider "whether limited discovery to explore jurisdictional facts is appropriate," *Obama v. Klayman*, 800 F.3d 559 (D.C. Cir. 2015), there may be other vehicles—short of formal discovery—to tee up the unresolved factual issues for decision.  The Court will, accordingly, schedule a status conference to discuss next steps and how best to move this case closer to resolution.

## B.    The States' Motion to Intervene as Plaintiffs

There is one additional matter that the Court must address.  Plaintiffs are not alone in seeking to challenge the Executive Order and OMB Guidance.  The states of California and Oregon have moved to intervene as of right under Federal Rule of Civil Procedure 24(a) or, in the alternative, for permissive intervention under Rule 24(b).  Dkt. 73.  According to the

proposed intervenors, they "have unique interests in the health and well-being of their citizens, natural resources, infrastructure, institutions, and economies, among other things, and these interests cannot be adequately represented by the NGO Plaintiffs." *Id.* at 19.  In support of their motion, the proposed intervenors have also filed a request for judicial notice of seven publications (in either full or excerpted form) "downloaded from the websites of California, Oregon, and the United States government agencies," Dkt. 81 at 5, which purportedly support their claim of standing.  The government opposes the intervention, *see* Dkt. 77, but has not taken a position with respect to the request for judicial notice.  The Court will therefore grant the request for judicial notice.  But, because this Court's jurisdiction remains in doubt for the reasons discussed above, the Court must deny the States' motion to intervene as premature.

"The general rule is that '[i]ntervention presupposes the pendency of an action in a court of competent jurisdiction.'" *Aeronautical Radio, Inc. v. F.C.C.*, 983 F.2d 275, 283 (D.C. Cir. 1993) (quoting Charles Alan Wright & Arthur R. Miller, Federal Practice and Procedure § 1917, at 457 (2d ed. 1986)).  As a result, "intervention will not be permitted to breathe life into a 'nonexistent' law suit," *Fuller v. Volk*, 351 F.2d 323, 328 (3d Cir. 1965) (cited with approval in *Aeronautical Radio*, 983 F.2d at 283).  "[T]his rule is so deeply entrenched in our jurisprudence that it is an axiomatic principle of federal jurisdiction in every circuit to have addressed the question."  *Disability Advocates, Inc. v. New York Coal. for Quality Assisted Living, Inc.*, 675 F.3d 149, 160–61 (2d Cir. 2012); *see also Janus v. Am. Fed'n of State, Cty., & Mun. Emps., Council 31*, 138 S. Ct. 2448, 2462–63 (2018) (assuming that a lack of Article III standing cannot be cured by an intervenor's standing but holding that a district court may nonetheless treat an intervenor's complaint as the operative complaint in a new lawsuit).

The threshold question posed by any motion to intervene, accordingly, is whether there is a case in which to intervene.  *See Ruiz v. Estelle*, 161 F.3d 814, 832 (5th Cir. 1998) (intervention "presumes that a justiciable case or controversy already exists before the court").  Because that question remains unresolved at this point in the litigation, California and Oregon's motion to intervene is premature.  The Court will, accordingly, deny their motion without prejudice.  Should the Court subsequently conclude that one or more of the existing Plaintiffs have standing, California and Oregon may renew their motion to intervene at that time.

## CONCLUSION

For the foregoing reasons, Defendants' motion to dismiss, Dkt. 70, is hereby **DENIED**, and Plaintiffs' motion for partial summary judgment, Dkt. 71, is also **DENIED**.  It is further **ORDERED** that the motion to take judicial notice, Dkt. 81, is **GRANTED**, and the motion for intervention, Dkt. 73, is **DENIED** without prejudice.

**SO ORDERED**.

/s/ Randolph D. Moss
RANDOLPH D. MOSS
United States District Judge

Date:  February 8, 2019