UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| PUBLIC CITIZEN, INC., et al.,<br><br>          Plaintiffs,<br><br>v.<br><br>DONALD TRUMP, President of the United States, et al.,<br><br>          Defendants. | Civil Action No. 17-253 (RDM) |

**PLAINTIFFS' MOTION FOR PARTIAL SUMMARY JUDGMENT**

Pursuant to Rule 56 of the Federal Rules of Civil Procedure, plaintiffs Public Citizen, Natural Resources Defense Council, and Communications Workers of America hereby move for partial summary judgment on the issue of standing, on the ground that there is no genuine issue of disputed material fact and that they are entitled to judgment as a matter of law.

In support of this motion, plaintiffs submit the accompanying (1) memorandum, (2) statement of material facts as to which there is no genuine dispute, and (3) proposed order. This motion is also based on declarations previously submitted by plaintiffs.

Plaintiffs also renew their request for summary judgment on the merits of their claims, and ask the Court, after deciding this motion, to proceed promptly to the motion for summary judgment (Dkt. 16) that was fully briefed on the merits issues by the parties in 2017.

Dated: June 17, 2019

Respectfully submitted,

 /s/ Allison M. Zieve

<table>
<tr><td>

Patti A. Goldman
(DC Bar No. 398565)
EARTHJUSTICE
705 2nd Avenue, #203
Seattle, WA 98104
(206) 343-7340

Counsel for all Plaintiffs

Michael E. Wall
(CA Bar No. 170238)
Cecilia D. Segal
(CA Bar No. 310935)
NATURAL RESOURCES DEFENSE
COUNCIL, INC.
111 Sutter Street, Floor 21
San Francisco, CA 94104
(415) 875-6100

Counsel for Natural Resources Defense
Council, Inc.

</td><td>

Allison M. Zieve
(DC Bar No. 424786)
Scott L. Nelson
(DC Bar No. 413548)
PUBLIC CITIZEN LITIGATION GROUP
1600 20th Street NW
Washington, DC 20009
(202) 588-1000

Counsel for all Plaintiffs

Patricia M. Shea
(DC Bar No. 367231)
COMMUNICATIONS WORKERS OF
AMERICA
501 3rd Street NW
Washington, DC 20001
(202) 434-1100

Counsel for Communications Workers
of America

</td></tr>
</table>

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| PUBLIC CITIZEN, INC., et al., | |
| Plaintiffs, | |
| v. | Civil Action No. 17-253 (RDM) |
| DONALD TRUMP, President of the United States, et al., | |
| Defendants. | |

**PLAINTIFFS' MEMORANDUM IN SUPPORT OF
MOTION FOR PARTIAL SUMMARY JUDGMENT**

Patti A. Goldman
(DC Bar No. 398565)
EARTHJUSTICE
705 2nd Avenue, #203
Seattle, WA 98104
(206) 343-7340

Counsel for all Plaintiffs

Michael E. Wall
(CA Bar No. 170238)
Cecilia D. Segal
(CA Bar No. 310935)
NATURAL RESOURCES DEFENSE
COUNCIL, INC.
111 Sutter Street, Floor 21
San Francisco, CA 94104
(415) 875-6100

Counsel for Natural Resources Defense
Council, Inc.

Allison M. Zieve
(DC Bar No. 424786)
Scott L. Nelson
(DC Bar No. 413548)
PUBLIC CITIZEN LITIGATION
GROUP
1600 20th Street NW
Washington, DC 20009
(202) 588-1000

Counsel for all Plaintiffs

Patricia M. Shea
(DC Bar No. 367231)
COMMUNICATIONS WORKERS OF
AMERICA
501 3rd Street NW
Washington, DC 20001
(202) 434-1100

Counsel for Communications Workers
of America

June 17, 2019

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ................................................................................................ ii

INTRODUCTION ............................................................................................................. 1

BACKGROUND ............................................................................................................... 2

    Executive Order 13771 and the OMB Guidances ............................................................. 2

    Implementation of the Executive Order and OMB Guidances ........................................... 3

STANDARD OF REVIEW ................................................................................................ 4

ARGUMENT .................................................................................................................... 5

I.      Plaintiffs have standing because the Executive Order delays and prevents rules that would benefit them and their members. ............................................................................. 5

    A.  Public Citizen has standing based on the Department of Transportation's delay of a rule to require vehicle-to-vehicle communications .................................................... 7

    B.  NRDC and Public Citizen have standing based on the Department of Energy's delay of rules to establish new energy-efficiency standards. ...................................... 13

II.    Plaintiffs' facial challenge is a live case or controversy. ................................................. 20

CONCLUSION ................................................................................................................. 21

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*America Historical Ass'n v. National Archives & Records Administration*,
516 F. Supp. 2d 90 (D.D.C. 2007) ...................................................................................20

*Carpenters Industrial Council v. Zinke*,
854 F.3d 1 (D.C. Cir. 2017) ...........................................................................................6

*Celotex Corp. v. Catrett*,
477 U.S. 317 (1986) ........................................................................................................4

\* *Center for Auto Safety v. NHTSA*,
793 F.2d 1322 (D.C. Cir. 1986) ..........................................................................6, 12, 18

*Center for Food Safety v. Salazar*,
898 F. Supp. 2d 130 (D.D.C. 2012) ............................................................................6, 7

*Chamber of Commerce v. Reich*,
57 F.3d 1099 (D.C. Cir. 1995) ......................................................................................20

*Competitive Enterprise Institute v. NHTSA*,
901 F.2d 107 (D.C. Cir. 1990) ................................................................................12, 18

*Department of Commerce v. U.S. House of Representatives*,
525 U.S. 316 (1999) ........................................................................................................4

*Hawai'i v. Trump*,
859 F.3d 741 (9th Cir.),
*vacated on other grounds*, 138 S. Ct. 377 (2017) ........................................................13

*Hawai'i v. Trump*,
241 F. Supp. 3d 1119 (D. Haw. 2017) ..........................................................................20

*Lujan v. Defenders of Wildlife*,
504 U.S. 555 (1992) .....................................................................................................4, 9

*Massachusetts v. EPA*,
549 U.S. 497 (2007) ................................................................................................11, 18

*National Federation of Federal Employees. v. United States*,
905 F.2d 400 (D.C. Cir. 1990) ........................................................................................7

*National Parks Conservation Ass'n v. Manson,*
  414 F.3d 1 (D.C. Cir. 2005) ..............................................................13

*Nuclear Energy Institute v. EPA,*
  373 F.3d, 1251 (D.C. C.ir. 2004) ...............................................11, 18

\* *Orangeburg, South Carolina v. FERC,*
  862 F.3d 1071 (D.C. Cir. 2017) ...................................................12, 18

*Public Citizen v. Foreman,*
  631 F.2d 969 (D.C. Cir. 1980) ..........................................................18

*Public Citizen v. NHTSA,*
  848 F.2d 256 (D.C. Cir. 1988) ..........................................................12

*Public Citizen v. NHTSA,*
  374 F.3d 1251 (D.C. Cir. 2004) ........................................................12

*Sierra Club v. EPA,*
  755 F.3d 968 (D.C. Cir. 2014) ..........................................................13

*Sierra Club v. Perry,*
  __ F. Supp. __, 2019 WL 1130723 (D.D.C. 2019) ....................12, 19

**Constitutional Provisions, Statutes, and Rules**

U.S. Constitution, art. II, § 3 ..................................................................1

29 U.S.C. § 651(b) ...................................................................................5

42 U.S.C. § 6295(m) ..............................................................................14

42 U.S.C. § 6295(m)(3)(A) ....................................................................15

42 U.S.C. § 6295(o)(1) .....................................................................14, 15

42 U.S.C. § 6295(o)(2)(A) .....................................................................13

42 U.S.C. § 6295(o)(2)(B)(i) .................................................................14

42 U.S.C. § 6295(o)(3)(B) .....................................................................14

42 U.S.C. § 6313(a)(6)(A)(ii)(II) .....................................................13, 14

42 U.S.C. § 6313(a)(6)(B)(ii) ................................................................14

42 U.S.C. § 6313(a)(6)(B)(iii)(I) ...............................................................................14, 15

42 U.S.C. § 6313(a)(6)(C)(iii)(I) ...............................................................................14, 15

49 U.S.C. § 30101 ...............................................................................................................5

Federal Rule of Civil Procedure 56(c) ..............................................................................4

Federal Rule of Civil Procedure 56(e) ...........................................................................4, 9

**Regulatory Materials**

80 Fed. Reg. 33030 (2015) ................................................................................................15

81 Fed. Reg. 34440 (2016) ...........................................................................................14, 15

82 Fed. Reg. 3854 (2017) ...................................................................................8, 9, 10, 12

82 Fed. Reg. 9339 (2017) ...................................................................................................2

DOE/EE, Energy Conservation Standards for Commercial Water Heating Equipment,
    RegInfo.gov (Spring 2019), https://www.reginfo.gov/public/do/eAgendaViewRule?
    pubId=201904&RIN=1904-AD34...................................................................................15

DOE/EE, Energy Conservation Standards for Commercial Water Heating Equipment,
    RegInfo.gov (Fall 2018), https://www.reginfo.gov/public/do/eAgendaViewRule?
    pubId=201810&RIN=1904-AD34...................................................................................15

DOE/EE, Energy Conservation Standards for Commercial Water Heating Equipment,
    RegInfo.gov (Spring 2018), www.reginfo.gov/public/do/eAgendaViewRule?
    pubId=201804&RIN=1904-AD34...................................................................................15

DOE/EE, Energy Conservation Standards for Commercial Water Heating Equipment,
    RegInfo.gov (Fall 2017), www.reginfo.gov/public/do/eAgendaViewRule?
    pubId=201710&RIN=1904-AD34...................................................................................15

DOT/NHTSA, Federal Motor Vehicle Safety Standard (FMVSS) 150—Vehicle to
    Vehicle (V2V) Communication, RegInfo.gov (Spring 2019),
    https://www.reginfo.gov/public/do/eAgendaViewRule?pubId=201904&RIN=212
    7-AL55 .............................................................................................................................8

DOT/NHTSA, Federal Motor Vehicle Safety Standard (FMVSS) 150—Vehicle to
    Vehicle (V2V) Communication, RegInfo.gov (Spring 2017),

https://www.reginfo.gov/public/do/eAgendaViewRule?pubId=201704&
RIN=2127-AL55 ................................................................................................8

OMB, Agency Rule List – Spring 2019, DOE,
https://www.reginfo.gov/public/do/eAgendaMain?operation=OPERATION_GET_
AGENCY_RULE_LIST&currentPub=true&agencyCode=&showStage=active&
agencyCd=1900&Image58.x=48&Image58.y=17 ...........................................16

OMB, Agency Rule List – Spring 2019, DOT,
https://www.reginfo.gov/public/do/eAgendaMain?operation=OPERATION_GET
_AGENCY_RULE_LIST&currentPubId=201904&showStage=
longterm&agencyCd=2100&Image58.x=52&Image58.y=17 ...........................10

OMB, Current Regulatory Plan and the Unified Agenda of Regulatory and Deregulatory
Actions (Dec. 14, 2017), https://www.reginfo.gov/public/do/eAgendaMain ......................3

OMB, FY 2018 Regulatory Cost Allowances (Sept. 7, 2017),
https://www.whitehouse.gov/sites/whitehouse.gov/files/omb/
memoranda/2017/FY%202018%20Regulatory%20Cost%20Allowances.pdf ....................3

OMB, Regulatory Reform: Cost Caps Fiscal Year 2018 (Dec. 2017),
https://www.reginfo.gov/public/pdf/eo13771/FINAL_TOPLINE_
ALLOWANCES_20171207.pdf ...............................................................................3, 10

OMB, Regulatory Reform: Regulatory Budget for Fiscal Year 2019 (Nov. 2019),
https://www.reginfo.gov/public/pdf/eo13771/EO_13771_Regulatory_Budget_
for_Fiscal_Year_2019.pdf ...............................................................................3, 9, 10, 11

OMB, Regulatory Reform Results for Fiscal Year 2018 (2018),
https://www.reginfo.gov/public/do/eAgendaEO13771 ......................................................5

OMB, Regulatory Reform: Two-for-One and Regulatory Cost Caps
(Dec. 14, 2017), https://www.reginfo.gov/public/do/eAgendaEO13771 ......................4, 5

**Miscellaneous**

Berkley Energy & Resource Collaboration, *DOE Appliance Standards Program*,
Nov. 18, 2017, http://berc.berkeley.edu/doe-appliance-standards-program/ ....................17

DOE, *Saving Energy and Money with Appliance and Equipment Standards in the U.S.*
(Jan. 2017), https://www.energy.gov/sites/prod/files/2017/01/f34/Appliance%
20and%20Equipment%20Standards%20Fact%20Sheet-011917_0.pdf .....................17, 19

Remarks by President Trump on Deregulation, Dec. 14, 2017, https://www.whitehouse.
gov/briefings-statements/remarks-president-trump-deregulation/ ....................................20

## INTRODUCTION

As the Court is aware, this action seeks declaratory and injunctive relief with respect to Executive Order 13771, entitled "Reducing Regulation and Controlling Regulatory Costs," issued by President Trump on January 30, 2017, and two Office of Management and Budget (OMB) Guidances regarding implementation of the Executive Order. Following two rounds of summary judgment briefing and discovery on the issue of standing, the undisputed facts continue to demonstrate that the Executive Order and implementing OMB Guidances block, weaken, or delay regulations authorized or mandated by Congress to protect health, safety, and the environment, across a broad range of topics—from automobile safety, to occupational health, to air pollution, to energy efficiency.[1]

As plaintiffs Public Citizen, Natural Resources Defense Council (NRDC), and Communications Workers of America have set forth in earlier summary judgment briefing, the 1-in, 2-out requirements of the Executive Order and OMB Guidances are not authorized by any statute. No statute authorizes federal agencies to consider the costs of unrelated regulations when determining whether to promulgate new regulations. No statute authorizes any federal agency to withhold issuance of a new regulation unless it repeals existing regulations to offset the new regulation's costs. By imposing rulemaking requirements beyond and in conflict with both the statutes from which the federal agencies derive their rulemaking authority and the requirements of the Administrative Procedure Act (APA), the Executive Order exceeds the President's authority under the Constitution, usurps Congress's Article I legislative authority, and violates the President's obligation to "take Care that the Laws be faithfully executed." U.S. Const. art. II, § 3.

---

[1] Exhibits A–C to the Second Amended Complaint are copies of Executive Order 13771 and the OMB Guidances.

This Court previously held that plaintiffs had established standing under the standard applicable at the pleading stage, but not for purposes of summary judgment. The Court subsequently allowed limited discovery related to standing. Defendants' discovery responses, along with the declarations submitted by plaintiffs and agency rulemaking materials, establish that plaintiffs have standing to pursue this action. The Court should therefore enter summary judgment for plaintiffs on the issue of standing and proceed expeditiously to decide the merits of the case based on the 2017 summary judgment briefing. In the alternative, the Court should order expedited supplemental briefs on the merits.

## BACKGROUND

### Executive Order 13771 and the OMB Guidances

President Trump signed Executive Order 13771 on January 30, 2017. 82 Fed. Reg. 9339 (2017). The Executive Order directs that, when a federal agency proposes or promulgates a new regulation, it must identify at least two existing regulations to be repealed, and the Order requires that the costs of new regulations be offset by eliminating existing costs associated with at least two prior regulations. For fiscal year 2017, the Executive Order imposed a cap of zero on the total incremental cost of all new regulations. The Executive Order further directed OMB each year to set regulatory cost caps for the next fiscal year: "No regulations exceeding the agency's total incremental cost allowance will be permitted in that fiscal year, unless required by law or approved in writing by the Director [of OMB]." Sec. 3(d). Executive Order 13771 requires agencies to offset the costs of a new regulation regardless of the benefits associated with the new rule, and regardless of whether the new rule or the existing rules designated for repeal have net benefits.

OMB issued two guidance documents to implement the Executive Order: On February 2, 2017, OMB issued "Interim Guidance Implementing Section 2 of the Executive Order," which

addressed regulations to be issued in fiscal year 2017. On April 5, 2017, OMB issued "Guidance Implementing Executive Order 13771," which "supplements" the Interim Guidance. The OMB Guidances reinforce that the benefits of both new rules and repealed rules are irrelevant to the cost-offset process required by Executive Order 13771. Indeed, the Guidances state that, in calculating the costs of a new rule that must be offset, an agency may not factor in the benefits, including cost savings.

**Implementation of the Executive Order and OMB Guidances**

In a September 7, 2017, memorandum from to "Regulatory Reform Officers at Executive Departments and Agencies" concerning implementation of Executive Order 13771, OMB instructed agencies to "propose a net reduction in regulatory costs for FY2018" in their fall regulatory agendas. OMB, FY 2018 Regulatory Cost Allowances (Sept. 7, 2017).[2] Following OMB's instruction that each agency's total incremental cost for fiscal year 2018 should be a net reduction from fiscal year 2017, each agency set a cost cap of $0 *or less*. *See* OMB, Regulatory Reform: Cost Caps Fiscal Year 2018 (Dec. 2017).[3] Agencies again set their cost caps at or below $0 in fiscal year 2019, including the Department of Transportation at *negative* $1.8695 billion. OMB, Regulatory Reform: Regulatory Budget for Fiscal Year 2019 (Nov. 2019).[4]

Federal agencies, including the agency defendants, have implemented Executive Order 13771 and the OMB Guidances by withdrawing or delaying hundreds of pending rulemakings. *See* OMB, Current Regulatory Plan and the Unified Agenda of Regulatory and Deregulatory Actions,

---

[2] https://www.whitehouse.gov/sites/whitehouse.gov/files/omb/memoranda/2017/FY%202018% 20Regulatory%20Cost%20Allowances.pdf (attached as Exh. C to Zieve Decl.).
[3] https://www.reginfo.gov/public/pdf/eo13771/FINAL_TOPLINE_ALLOWANCES_20171207. pdf (attached as Exh. D to Zieve Decl.).
[4] https://www.reginfo.gov/public/pdf/eo13771/EO_13771_Regulatory_Budget_for_Fiscal_ Year_2019.pdf (attached as Exh. E to Zieve Decl.).

RegInfo.gov (Dec. 14, 2017)[5]; OMB, Regulatory Reform: Two-for-One and Regulatory Cost Caps (Dec. 14, 2017) (reporting "results" of implementation). [6] OMB has attributed numerous withdrawn and delayed actions to Executive Order 13771. *See* OMB, Regulatory Reform: Two-for-One and Regulatory Cost Caps, *supra*.

## STANDARD OF REVIEW

To prevail on a summary judgment motion regarding standing, the plaintiff must "set forth" by affidavit or other evidence "specific facts," Fed. R. Civ. P. 56(e), to prove its allegations of injury. *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 561 (1992); *see Dep't of Commerce v. U.S. House of Representatives*, 525 U.S. 316, 329–30 (1999) (affirming summary judgment for plaintiffs on standing). As with summary judgment motions generally, the moving party "bears the initial responsibility" of "identifying those portions" of the record that "demonstrate the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). If the moving party carries that initial burden, the burden shifts to the nonmoving party to show that sufficient evidence exists for a reasonable jury to find in the nonmoving party's favor with respect to the "element[s] essential to that party's case, and on which that party will bear the burden of proof at trial." *Id.* at 322. The opposition must consist of competent evidence setting forth specific facts showing that there is a genuine issue for trial. *See* Fed. R. Civ. P. 56(c); *Celotex*, 477 U.S. at 324.

---

[5] https://web.archive.org/web/20171215071216/https://www.reginfo.gov/public/do/eAgendaMain (attached as Exh. F to Zieve Decl.).
[6] https://www.reginfo.gov/public/pdf/eo13771/FINAL_TOPLINE_All_20171207.pdf (attached as Exh. G to Zieve Decl.).

**ARGUMENT**

I.   **Plaintiffs have standing because the Executive Order delays and prevents rules that would benefit them and their members.**

Since this case was filed on February 8, 2017, federal agencies have implemented Executive Order 13771 and the OMB Guidances by withdrawing or delaying hundreds of pending rulemakings. *See* OMB, Regulatory Reform Results for Fiscal Year 2018 (2018)[7]; OMB, Regulatory Reform: Two-for-One and Regulatory Cost Caps, *supra* n.6. And former senior regulators have submitted uncontested testimony that complying with Executive Order 13771 will delay rulemakings. *See* Jones Decl. ¶16 (Dkt. 16-15); Michaels Decl. ¶ 36 (Dkt. 16-16); Reicher Decl. ¶ 14 (Dkt. 16-18). In addition to these delays and withdrawals, OMB reported the "Results" of implementing the Executive Order in fiscal year 2017: "Agencies issued 67 deregulatory actions and only 3 regulatory actions," OMB, Regulatory Reform: Two-for-One and Regulatory Cost Caps, *supra* n.6. OMB reported comparable results for fiscal year 2018: "Agencies issued 176 deregulatory actions and 14 significant regulatory actions." OMB, Regulatory Reform Results for Fiscal Year 2018, *supra* n.7.

As explained in earlier motions, plaintiffs cumulatively represent hundreds of thousands of individuals, LeGrande Decl. ¶ 1; R. Weissman Decl. ¶ 2; Wetzler Decl. ¶ 6—members of the public whose interests the federal defendants are directed to serve by administering programs and promulgating regulations to achieve health, safety, consumer, and environmental objectives delegated to them by Congress. *See*, *e.g.*, OSH Act, 29 U.S.C. § 651(b) (stating that purpose of the Act is "to assure . . . safe and healthful working conditions and to preserve our human resources"); Motor Vehicle Safety Act, 49 U.S.C. § 30101 ("The purpose of this chapter is to reduce traffic

---

[7] https://www.reginfo.gov/public/do/eAgendaEO13771 (attached as Exh. H to Zieve Decl.).

accidents and deaths and injuries resulting from traffic accidents."). If the Executive Order is not just a public-relations stunt, and if the "entire regulatory scheme is [not] pointless," *Ctr. for Auto Safety v. NHTSA*, 793 F.2d 1322, 1335 (D.C. Cir. 1986), "common sense" dictates that delays in issuing rules to protect consumers, workers, and the environment cause concrete injury to many of plaintiffs' members. *See Carpenters Indus. Council v. Zinke*, 854 F.3d 1, 6 (D.C. Cir. 2017) ("When performing that inherently imprecise task of predicting or speculating about causal effects, common sense can be a useful tool.").

To illustrate the injury caused by the delay and withdrawal of rules necessitated by the Executive Order, plaintiffs in earlier briefing provided details about five rulemakings that the Department of Transportation (DOT), the Department of Energy (DOE), and the Department of Labor (DOL) had intended to pursue but that are now delayed or withdrawn, and declarations showing that the delay or withdrawal of those rulemakings has injured plaintiffs and their members. *See* Pls. Mot. for Leave to Amend (Dkt. 64), and declarations filed therewith (Dkt. 64-4 – 64-13). As to each of the four pending rulemakings, the agencies agree that they intend to follow the Executive Order, that they have not identified any repeals or cost offsets that would allow them to proceed, and that they have neither sought nor received from OMB a waiver of those requirements. *See* Zieve Decl., Exhs. A (DOT Resp. to Req. for Adm. ##1, 3–5), L (DOE Resp. to Req. for Adm. ##2, 4–6, 11, 13, 14), & P (DOL Resp. to Req. for Adm. ##5, 7–10)

Although plaintiffs continue to believe that each rulemaking discussed in the earlier briefing establishes their standing, in this facial challenge "it is not necessary that [p]laintiffs establish standing with respect to each individual" rule to which the Order applies. *Ctr. for Food Safety v. Salazar*, 898 F. Supp. 2d 130, 141 (D.D.C. 2012) (citing *Alaska Ctr. for Env't v. Browner*, 20 F.3d 981, 985 (9th Cir. 1994)). Rather, because plaintiffs' "declarations allege injury with

respect to" some affected rulemakings, they "are sufficient to ensure that 'the legal questions presented to the court will be resolved, not in the rar[e]fied atmosphere of a debating society, but in a concrete factual context conducive to a realistic appreciation of the consequences of judicial action.'" *Id.* (quoting *Wyo. Outdoor Council v. U.S. Forest Serv.*, 165 F.3d 43, 48 (D.C. Cir. 1999) (quoting *Valley Forge Christian Coll. v. Ams. United for Separation of Church & State, Inc.*, 454 U.S. 464, 472 (1982))). Thus, without waiving their argument that the undisputed material facts previously set forth with respect to each of the previously identified rulemakings also establishes plaintiffs' standing, this motion focuses on only two rulemakings: the DOT rulemaking to establish a federal motor vehicle safety standard for vehicle-to-vehicle (V2V) communications, and the DOE rulemaking to set an energy-efficiency standard for commercial water heating equipment. These two rulemakings, combined with evidence submitted with plaintiffs' earlier summary judgment motions (Dkt. 16, Dkt. 71) and defendants' discovery responses, establish an injury to plaintiffs that is remediable by this Court.[8]

### A. Public Citizen has standing based on the Department of Transportation's delay of a rule to require vehicle-to-vehicle communications.

**1.** As explained in plaintiffs' previous motion for partial summary judgment, DOT in January 2017, through the National Highway Traffic Safety Administration (NHTSA), proposed to require all new light vehicles to include crash-avoidance technologies known as vehicle-to-vehicle (V2V) communications, which will send information about a vehicle's speed, heading, brake status, and other data to surrounding vehicles and receive the same information from other

---

[8] Similarly, only one plaintiff must have standing for the Court to proceed to decide the merits issues in this case. *See Nat'l Fed'n of Fed. Emps. v. United States*, 905 F.2d 400, 402 (D.C. Cir. 1990) ("We affirm the district court's finding that [one plaintiff] has standing to pursue its constitutional claims and consequently need not reach the question of [the other plaintiff's] standing.").

7

vehicles. 82 Fed. Reg. 3854, 3855–57 (2017). NHTSA stated that it expected V2V technology to identify and prevent potential crashes. *Id.* NHTSA proposed to phase in the V2V safety standard over time, with costs that were expected to change over the phase-in period. Total estimated vehicle costs per year range from $2 billion to $5 billion ($135–$300 per vehicle). *Id*. at 3857. On the benefit side, the technology "could potentially prevent 424,901–594,569 crashes and save 955–1,321 lives" annually. *Id*. at 3858. Stating the benefits in terms of dollars, NHTSA "estimate[d] that in 2051 the proposed rule could reduce the costs resulting from motor vehicle crashes by $53 to $71 billion (expressed in today's dollars)." *Id*. NHTSA estimated that the safety standard would have net positive benefits in 3 to 5 years. *Id*. at 3982–4000. The comment period ended on April 12, 2017. *Id*. at 3854.

In late July 2017, in the agency's first regulatory agenda after issuance of the Executive Order, NHTSA moved the V2V rulemaking from its "current agenda" to "long term actions," listing the next action as "Undetermined" on a date "To Be Determined." DOT/NHTSA, Federal Motor Vehicle Safety Standard (FMVSS) 150—Vehicle to Vehicle (V2V) Communication, RegInfo.gov (Spring 2017)[9]; *see also* DOT/NHTSA, Federal Motor Vehicle Safety Standard (FMVSS) 150—Vehicle to Vehicle (V2V) Communication, RegInfo.gov (Spring 2019).[10]

Plaintiffs have members, such as Public Citizen members Terri Weissman and Amanda Fleming, who would like to purchase vehicles equipped with V2V communications when they next purchase a new car. *See* T. Weissman Decl. ¶ 4; Fleming Decl. ¶ 5. NHTSA, however, has acknowledged that, "[w]ithout a mandate to require and standardize V2V communications, the

---

[9] https://www.reginfo.gov/public/do/eAgendaViewRule?pubId=201704&RIN=2127-AL55 (attached as Exh. I to Zieve Decl.).
[10] https://www.reginfo.gov/public/do/eAgendaViewRule?pubId=201904&RIN=2127-AL55 (attached as Exh. J to Zieve Decl.).

agency believes that manufacturers will not be able to move forward in an efficient way and that a critical mass of equipped vehicles would take many years to develop, if ever." 82 Fed. Reg. at 3854.

**2.** In the Court's February 2019 memorandum opinion, the Court recognized that "as the record now stands, it appears that the Executive Order currently precludes issuance of the rule." Mem. Op. (2019) 28 (Dkt. 85). Accordingly, the Court found that plaintiffs' allegations concerning the V2V regulation were sufficient to withstand the defendants' motion to dismiss for lack of standing. Those allegations are supported, as described above and below, by "specific facts," Fed. R. Civ. P. 56(e), *see Lujan*, 504 U.S. at 561, establishing that the "to be determined" timetable for finalizing the V2V rulemaking is not simply due to "run-of-the-mill evaluation of a propose[d] rule." Mem. Op. (2019) 29 (quoting defendants' memorandum). Rather, the Executive Order makes it impossible to finalize the V2V rule.

DOT admits that it intends to comply with the Executive Order as long as it remains in force. *See* Zieve Decl., Exh. A (DOT Resp. to Req. for Adm. #1). Yet it has not identified two or more existing regulations to be repealed that would offset the costs of a final V2V rule. *See id.*, Exhs. A (DOT Resp. to Req. for Adm. ##2, 3) & B (DOT Resp. to Interrog. #2). And it has neither requested nor received a waiver from the Executive Order's requirements. *See* Zieve Decl., Exh. L (DOT Resp. to Req. for Adm. ##4–5). At the same time, because of the Executive Order and the OMB Guidances, DOT has a *negative* regulatory cost cap of $1.8695 *billion* for fiscal year 2019 alone. *See* OMB, Regulatory Reform: Regulatory Budget for Fiscal Year 2019, *supra* n.4. DOT's suggestion that, to finalize the V2V rulemaking, "it may not need cost offsets were the agency's annual cost allowance sufficient," Zieve Decl., Exh. A (DOT Resp. to Req. for Adm. #2), is disingenuous, given that the agency's annual regulatory budget was $0 for fiscal year 2017, was

negative $500 million for fiscal year 2018, and is negative $1.8695 billion for fiscal year 2019. *See* OMB, Regulatory Reform: Cost Caps Fiscal Year 2018, *supra* n.3; *See* OMB, Regulatory Reform: Regulatory Budget for Fiscal Year 2019, *supra* n.4.

Moreover, the Executive Order, at section 2(a), directs that "whenever an executive department or agency (agency) publicly proposes for notice and comment or otherwise promulgates a new regulation, it shall identify at least two existing regulations to be repealed." To implement this directive, the OMB Guidance specifies that, "[a]t a minimum, the agency should identify all EO 13771 deregulatory actions, along with cost savings estimates, by the time it submits to OMB for review under EO 12866 the corresponding EO 13771 regulatory action." OMB Guidance (Apr. 2017), Q37; *see also id.* Q38 ("To the extent practicable, agencies should issue EO 13771 deregulatory actions before or concurrently with the EO 13771 regulatory actions they are intended to offset."). Yet DOT has *no* major deregulatory actions listed on its long-term agenda—which is the list of rules that it plans to finalize after 2019—that might offset the costs of the V2V rulemaking.[11] The Executive Order thus makes virtually impossible a new safety standard estimated—by DOT—to cost between $2.2 billion and $5 billion each year for the first several years. 82 Fed. Reg. at 3857. To be sure, the costs estimated in the proposed rule may be different from the cost of the final rule. Zieve Decl., Exh. A (DOT Resp. to Req. for Adm. #2). But DOT offers no factual basis for concluding that the costs will be significantly different, much less that

---

[11] The list of "Current Long Term Actions" posted with the Spring 2019 Unified Agenda in May 2019 is at https://www.reginfo.gov/public/do/eAgendaMain?operation=OPERATION_GET_ AGENCY_RULE_LIST&currentPubId=201904&showStage=longterm&agencyCd=2100& Image58.x=52&Image58.y=17.

they will drop so drastically as to be offset by a set of non-major deregulatory actions—that is, actions estimated to have economic impacts *under* $100 million.[12]

**3.** Because Executive Order 13771 is certain to delay or preclude issuance of a final V2V rule, plaintiffs have standing. Although DOT has represented that the Executive Order is not currently causing delay, Zieve Decl., Exh. B (DOT Resp. to Interog. #1), it has, as noted above, confirmed that it will comply with the requirements of the Order as long as it is in effect and that it has identified no cost offsets that would allow it to proceed with the rule, *id.*, Exh. A (DOT Resp. to Req. for Adm. ##1, 2). Indeed, it has also disclosed that it has yet to give any "meaningful consideration" to how it will comply with the repeal and offset requirements. *See id.* Exh. A (DOT Resp. to Req. for Adm. #3). Yet postponing such consideration adds to the certainty that these requirements will delay or preclude issuance of a final rule. Where injury is certain to occur, it need not be immediate to be sufficiently imminent or impending to satisfy Article III. *See Massachusetts v. EPA*, 549 U.S. 497 522–23 (2007) (relying on injuries expected to accrue "over the course of the next century"); *Nuclear Energy Inst. v. EPA*, 373 F.3d, 1251, 1266 (D.C. Cir. 2004) (holding that plaintiff's member's "claimed injury to his ground-water supply is neither hypothetical nor conjectural," although "radionuclides escaping from the Yucca repository may not reach Goedhart's community for thousands of years").

Moreover, as this Court has recognized, *see* Mem. Op. (2019) 19, the D.C. Circuit has long held that consumers have standing "to challenge agency action that prevented the consumers from

---

[12] DOT is working with the Environmental Protection Agency on a rulemaking to set fuel economy standards for 2021–2026. The agencies have designated the rulemaking as a deregulatory action, with cost savings of more than $120 billion. However, "the Administration has chosen to note the impacts of the SAFE rule separately." OMB, Regulatory Reform: Regulatory Budget for Fiscal Year 2019 at 2 n.*, *supra* n.4. "[I]t is not included in the cost allowances for these agencies." *Id.* Thus, even assuming DOT were to promulgate the rule as proposed, the agency would be required to identify billions of dollars' worth of additional deregulatory actions to complete the V2V rule.

11

purchasing a desired product." *Orangeburg, S.C. v. FERC*, 862 F.3d 1071, 1077–78 (D.C. Cir. 2017) (quoting *Coal. for Mercury-Free Drugs v. Sebelius*, 671 F.3d 1275, 1281 (D.C. Cir. 2012), and collecting cases). NHTSA's proposal to phase in the final rule by requiring 50 percent of new cars to have V2V communications in the first year and 100 percent in the third year, *see* 82 Fed. Reg. at 4006, would necessarily provide Public Citizen members with a meaningful opportunity to purchase vehicles with this technology—an opportunity that NHTSA has determined they will not otherwise have. 82 Fed. Reg. at 3854 (stating that, without a federal mandate, "a critical mass of equipped vehicles would take many years to develop, if ever"); *see Ctr. for Auto Safety v. NHTSA*, 793 F.2d at 1331–35 (finding organization had standing to challenge NHTSA's failure to adopt a meaningful fuel-efficiency standard, based on reduced consumer choice of fuel-efficient vehicles); *accord Pub. Citizen v. NHTSA*, 848 F.2d 256, 262–63 (D.C. Cir. 1988); *see also Pub. Citizen v. NHTSA*, 374 F.3d 1251 (D.C. Cir. 2004) (deciding on the merits Public Citizen's challenge to a NHTSA safety standard). "[A] lost opportunity to purchase vehicles of choice is sufficiently personal and concrete to satisfy Article III requirements." *Competitive Enter. Inst. v. NHTSA*, 901 F.2d 107, 113 (D.C. Cir. 1990); *see Pub. Citizen v. NHTSA*, 848 F.2d at 262–63 (finding standing to challenge NHTSA action that "will diminish the types of fuel-efficient vehicles and options available" (quoting *Ctr. for Auto Safety*, 793 F.2d at 1332)).[13]

Further, where a plaintiff's members have attested in sworn statements that they intend to purchase the product at issue, a "statement of 'definite dates is not necessary to establish Article III standing.'" *Sierra Club v. Perry*, __ F. Supp. __, 2019 WL 1130723, at *6 (D.D.C. 2019)

---

[13] In addition, several cases in this Circuit have considered on the merits challenges to NHTSA motor vehicle standards, including standards related to safety. *See Pub. Citizen v. NHTSA*, 374 F.3d at 1253 (challenge to NHTSA airbag standard); *Competitive Enter. Inst.*, 901 F.2d at 113 (challenge to fuel-economy standard on safety ground); *see also Ctr. for Auto Safety*, 793 F.2d at 1323 (challenge to NHTSA fuel-economy standard).

(quoting *Sierra Club v. FERC*, 827 F.3d 59, 68 (D.C. Cir. 2016)). Absent Executive Order 13771, Public Citizen's members' plans to buy new vehicles (now, 3–5 years from now and 3 or so years from now, respectively) easily fit within a reasonable time frame for issuing a V2V standard, including a phase-in period. "A district court order setting aside [the Executive Order] doubtless would significantly affect these ongoing proceedings." *Nat'l Parks Conservation Ass'n v. Manson*, 414 F.3d 1, 7 (D.C. Cir. 2005). "That is enough to satisfy redressability. 'A significant increase in the likelihood that the plaintiff would obtain relief that directly redresses the injury suffered' will suffice for standing." *Id.* (quoting *Utah v. Evans*, 536 U.S. 452, 464 (2002)); *see also Sierra Club v. EPA*, 755 F.3d 968, 973 (D.C. Cir. 2014) ("When, as here, the party seeking judicial review challenges an agency's regulatory failure, the [party] need not establish that, but for that misstep, the alleged harm certainly would have been averted."); *Hawai'i v. Trump*, 859 F.3d 741, 763, 767 n.8 (9th Cir.) (finding standing where challenged executive order posed a barrier that delayed or prevented issuance of visas, notwithstanding existence of other barriers), *vacated on other grounds*, 138 S. Ct. 377 (2017); *Nat'l Parks Conservation Ass'n*, 414 F.3d at 7 (finding standing to challenge agency action where ruling for plaintiff would affect ongoing proceedings, although not guarantee plaintiff's desired outcome).

**B.  NRDC and Public Citizen have standing based on the Department of Energy's delay of rules to establish new energy-efficiency standards.**

**1.** The Energy Policy and Conservation Act (EPCA) authorizes the Department of Energy (DOE) to set energy-conservation standards for various consumer products and certain commercial and industrial equipment. Specifically, DOE must set energy-efficiency standards that achieve the maximum improvement in energy efficiency that DOE determines is technologically feasible and economically justified. 42 U.S.C. §§ 6295(o)(2)(A), 6313(a)(6)(A)(ii)(II). DOE must periodically review already-established energy conservation standards, and any new or amended standard must

result in "significant conservation of energy." *Id.* §§ 6295(m), 6295(o)(3)(B); *see id.* § 6313(a)(6)(A)(ii)(II). In deciding whether a new or amended standard is economically justified, DOE must determine whether the benefits of the standard exceed its burdens, taking into account seven statutory factors. *Id.* §§ 6295(o)(2)(B)(i), 6313(a)(6)(B)(ii). EPCA also contains an "anti-backsliding" provision that bars the agency from prescribing any standard that either increases the maximum allowable energy use or decreases the minimum required energy efficiency of a covered product. *Id.* §§ 6295(o)(1), 6313(a)(6)(B)(iii)(I).

In May 2016, DOE proposed a rule under EPCA to strengthen the energy-efficiency standards for commercial water heating equipment. 81 Fed. Reg. 34440 (2016). By law, DOE was supposed to publish a final rule no later than two years after this proposal—that is, by April 2018. 42 U.S.C. § 6313(a)(6)(C)(iii)(I). DOE estimated that the proposed standard for commercial water heating equipment would reduce energy use by 1.8 quadrillion British thermal units, or a savings of about 8 percent. 81 Fed. Reg. at 34445. DOE estimated that the proposed standard would increase annual equipment costs by $144 million, but provide annual benefits of $367 million in reduced equipment operating costs, and annual benefits from reduced air pollution of more than $200 million, with an annualized net benefit of more than $427 million per year. *Id.* at 34526. DOE calculated that the cumulative net present value of total commercial consumer savings from the proposed standard would be between $2.26 billion and $6.75 billion. DOE further calculated that the standard would result in cumulative emissions reductions of 98 million metric tons of carbon dioxide, more than 1000 tons of methane, and significant quantities of other air pollutants, providing pollution-reduction benefits with a net present value of between about $1 billion and $10 billion. *Id.* at 34445.

14

In its 2017 fall regulatory agenda, DOE moved this rulemaking to its list of "long term actions," listing the next action as "Undetermined" on a date "To Be Determined." *See* DOE/EE, Energy Conservation Standards for Commercial Water Heating Equipment (Fall 2017).[14] DOE later estimated that it would issue the rule in October 2018 and, later, estimated January 2019.[15] Currently, DOE publicly states that it anticipates finalizing the rule in December 2019.[16]

Importantly, there is no question that DOE is required to issue, but has delayed issuing, a new standard: DOE has concluded that the statutory factors for issuing new standards have been met. *See* 80 Fed. Reg. 33030 (2015); 81 Fed. Reg. 34440. EPCA contains an anti-backsliding provision. 42 U.S.C. §§ 6295(o)(1), 6313(a)(6)(B)(iii)(I). And the agency's proposal to issue the standard triggered a statutory requirement (and deadline). *Id*. §§ 6295(m)(3)(A), 6313(a)(6)(C)(iii)(I).

**2.** DOE has stated that the energy-efficiency standard for commercial water heating equipment is a significant regulatory action, 81 Fed. Reg. at 34527, and is subject to Executive Order 13771, *see* DOE/EE, Energy Conservation Standards for Commercial Water Heating Equipment, RegInfo.gov (Spring 2019), *supra* n.15; Zieve Decl., Exh. L (DOE Resp. to Req. for Adm. ##10–13). Therefore, notwithstanding the proposed standard's huge net benefits, Executive Order 13771 requires DOE to offset the proposed standard's costs, and to repeal at least two prior regulations, as a condition of promulgating the standard. DOE does not disagree. *See* Zieve Decl., Exh. L (DOE Resp. to Req. for Adm. ##10–13). Moreover, although the OMB Guidances state

---

[14] https://www.reginfo.gov/public/do/eAgendaViewRule?pubId=201710&RIN=1904-AD34 (attached as Exh. K p.1 to Zieve Decl.).

[15] *See* https://www.reginfo.gov/public/do/eAgendaViewRule?pubId=201804&RIN=1904-AD34 (Spring 2018); https://www.reginfo.gov/public/do/eAgendaViewRule?pubId=201810&RIN=1904-AD34 (Fall 2018) (attached as Exh. K pp. 2–3, to Zieve Decl.).

[16] *See* https://www.reginfo.gov/public/do/eAgendaViewRule?pubId=201904&RIN=1904-AD34 (Spring 2019) (attached as Exh. K p. 4, to Zieve Decl.).

that the Executive Order does not prevent agencies from issuing regulations to meet statutory deadlines, *see* OMB Guidance Q33, DOE has *already* violated the statutory deadline with respect to completion of this rulemaking. The OMB statement with respect to deadlines is thus inapposite now.

Moreover, the facts as to the agency's publicly announced timetables for completion of the rulemaking render its conclusory denials that the Executive Order is delaying or will delay the agency's completion impossible to credit. As explained above, the agency has repeatedly announced that completion of the rulemaking is imminent: In November 2018, the agency indicated that it would issue a final rule two months later; currently, it indicates that it will issue a final rule in six months. Nonetheless, DOE's regulatory agenda, which indicates that the agency will be ready to finalize the commercial water heater rule this year, does not list *any* major deregulatory actions intended for completion this year. *See* OMB, Agency Rule List – Spring 2019, DOE.[17] Consistent with the evidence that DOE has no major deregulatory actions on the horizon, DOE admits that it has not yet identified two or more existing regulations to be repealed or repeals that would offset the costs of a final rule on commercial water heating equipment. *See* Zieve Decl., Exh. L (DOE Resp. to Req. for Adm. #13). Indeed, although it stated last fall that issuance of the rule was only two months away and even now projects completion on the rule by the end of this calendar year, DOE states that its work on this rulemaking "has not yet advanced to a stage where meaningful consideration of E.O. 13771's requirements would be made." *Id.* DOE's admission

---

[17] *See* https://www.reginfo.gov/public/do/eAgendaMain?operation=OPERATION_GET_AGEN CY_RULE_LIST&currentPub=true&agencyCode=&showStage=active&agencyCd=1900& Image58.x=48&Image58.y=17.
    DOE also has not requested, much less received, a waiver from the Executive Order's requirements. *See* Zieve Decl., Exhs. L (DOE Resp. to Req. for Adm. #14) & N (OMB Resp. to Interrog. #7).

that it has not yet given "meaningful consideration" to how it will comply with the Executive Order's 1-in, 2-out and offset requirements, together with its regulatory agenda, demonstrates that the Executive Order will, necessarily, delay issuance of the rule.

**3.** DOE's proposed standard, if finalized, would benefit plaintiffs' members by allowing them to reliably select commercial water heating equipment that is energy efficient and would give them a broader selection of energy-efficient products with lifecycle cost savings. *See* Mauer Decl. ¶¶ 4, 10–13. These benefits are not speculative: As DOE has stated, the dissemination of "reliable and comparable product operating cost information" and "access to improved products with new features and comfort attributes" are "benefits resulting from appliance … standards." DOE, *Saving Energy and Money with Appliance and Equipment Standards in the U.S.*, Jan. 2017.[18] DOE has also observed that energy-efficiency standards "increase[] the availability and affordability of energy efficient products." *Id*. Because DOE's "efficiency standards have pushed manufacturers to develop high-efficiency equipment for cost-competitive prices," Berkeley Energy & Resource Collaboration, *DOE Appliance Standards Program*, Nov. 8, 2017,[19] its proposed standard would make products that are more energy-efficient, are widely available, and would save purchasers money over the lifetime of the products. *See* Mauer Decl. ¶¶ 4, 10–14.

Some of NRDC's members, such as R.J. Mastic, have a direct professional and business interest in having wider access to affordable energy-efficient commercial water-heating equipment, with a range of features. *See* Mastic Decl. ¶¶ 3–7. By, among other things, increasing the selection and reducing the costs of energy-efficient products and encouraging manufacturers

---

[18] https://www.energy.gov/sites/prod/files/2017/01/f34/Appliance%20and%20Equipment%20Standards%20Fact%20Sheet-011917_0.pdf (attached as Exh. N to Zieve Decl.).
[19] https://berc.berkeley.edu/news/doe-appliance-standards-program (attached as Exh. O to Zieve Decl.).

to develop more efficient technologies, *see* Mauer Decl. ¶ 4, energy-efficiency standards allow

members such as Mr. Mastic to attract and better serve clients. Thus, Mr. Mastic is experiencing

an injury similar to that which sufficed to establish standing in *Center for Auto Safety*, 793 F.2d at

1332, where the D.C. Circuit held that an organization had standing to challenge an agency's

failure to adopt a meaningful fuel-efficiency standard, based on its members' interest in purchasing

fuel-efficient vehicles. The D.C. Circuit explained:

> There is no difficulty in linking the petitioners' injury to the challenged agency action. NHTSA sets standards for the purpose of making vehicles more fuel-efficient…. The petitioners, in turn, complain of less fuel-efficient vehicles. The object of the agency's regulation and the injury are thus directly linked. If setting a higher standard cannot result in vehicles with increased fuel efficiency, then the entire regulatory scheme is pointless. In sum, this case involves none of the multiple, tenuous links between challenged conduct and asserted injury that have characterized claims in which causation has been found lacking.

*Id.* at 1334–35; *accord Competitive Enter. Inst. v. NHTSA*, 901 F.2d at 112–13 (finding

organization had standing to challenge NHTSA fuel-economy standard issued under EPCA where

its members had been "frustrated by the declining availability and high prices of large cars, which

they prefer for reasons of safety, comfort, and performance"). Similarly here, the delay in issuing

DOE's final commercial water heating standard injures plaintiffs' members, by making energy-

efficient, affordable products less accessible. *See also Orangeburg, S.C.*, 862 F.3d at 1077–78

(recognizing standing to challenge agency action that prevented consumers from purchasing a

desired product). After all, "[t]he lost opportunity to purchase a desired product is a cognizable

injury, … 'even if [the consumer] could ameliorate the injury by purchasing some alternative

product,'" *id.* at 1078 (citation omitted), or by purchasing the desired product only at a high price,

*see Pub. Citizen v. Foreman*, 631 F.2d 969, 974 n.12 (D.C. Cir. 1980).

Furthermore, as explained above, because the injury is certain, it need not be immediate to

satisfy Article III. *See Massachusetts v. EPA*, 549 U.S. at 522–23; *Nuclear Energy Inst.*, 373 F.3d,

at 1266; *Sierra Club v. Perry*, 2019 WL 1130723, at *6 (rejecting argument that organization's members had to state plans to purchase energy-efficient products by a specific date to support organization's standing to challenge delayed energy-efficiency standard). Plaintiffs have presented a declaration attesting to plans to purchase equipment after an energy-efficiency standard is in effect: Mr. Mastic runs an energy-efficiency consulting business, and his clients—commercial property owners—hire him to help them obtain energy-efficient products that meet their needs. Mastic Decl. ¶¶ 3–4. Mr. Mastic has explained that a new energy-efficiency standard will increase his business because, when a new standard is in effect, his clients "cannot simply buy the same model they had previously bought" and so employ his company "to help them find a different model that meets the new standard, is cost effective, and satisfies their other requirements." *Id.* ¶ 5. A "wider selection of products" better enables his company to do so. *Id.* ¶ 6.

Although some energy-efficient commercial water heaters are available, DOE's findings—outside of litigation—show that issuance of the standard would have significant benefit: DOE estimated that the proposed water heater rule would provide annual benefits of $367 million in reduced equipment operating costs, 81 Fed. Reg. at 34445, and it recognized that energy-efficiency standards "increase[] the availability and affordability of energy efficient products." DOE, *Saving Energy and Money with Appliance and Equipment Standards in the U.S.*, *supra* n.18; *see also* Mauer Decl. ¶ 4.

In sum, DOE has represented that it intends to issue this energy-efficiency rule, yet the Executive Order necessarily will delay the rule. Indeed, based on the items on the agency's agenda, there is no reasonable prospect that DOE will be able to meet the Executive Order's conditions by December, when the agency currently says it intends to complete the rulemaking—or at any point

19

in the foreseeable future. Because the Executive Order will delay, or block, a final rule that would benefit plaintiffs' members, plaintiffs have standing to bring this action.

**II.      Plaintiffs' facial challenge is a live case or controversy.**

Seeking to avoid judicial review of this facial challenge, defendants have suggested throughout this litigation that plaintiffs should proceed by challenging delays of individual rulemakings. Importantly, however, defendants do not suggest that the Executive Order's unlawful impact is too speculative for review. Defendant President Trump has touted the significant impact of the Executive Order: "We ordered that for every one new regulation, two old regulations must be eliminated. … Within our first 11 months, we cancelled or delayed over 1,500 planned regulatory actions." Remarks by President Trump on Deregulation, Dec. 14, 2017, https://www.whitehouse.gov/briefings-statements/remarks-president-trump-deregulation/.    And defendants do not contest that the Executive Order affects agency decisionmaking across the board, because every decision whether to issue a significant new rule, every decision about the content of the rule, and every decision about repealing a rule must be made under the shadow of the Order's mandate to identify and repeal two regulations to offset the cost of any one regulation issued. Moreover, considering the issues presented here in the context of a particular rulemaking would not "assist the court in analyzing [plaintiffs'] facial challenge." *Chamber of Commerce v. Reich*, 57 F.3d 1099, 1100 (D.C. Cir. 1995). *See Am. Historical Ass'n v. Nat'l Archives & Records Admin.*, 516 F. Supp. 2d 90, 106, 107–08 (D.D.C. 2007) (holding challenge to executive order ripe where Archivist's reliance on order caused delay that adversely affected plaintiffs and plaintiffs' claim was "not made in a vacuum with respect to [relevant provision of executive order] as requested documents are pending review"); *see also Hawai'i v. Trump*, 241 F. Supp. 3d 1119, 1133 (D. Haw. 2017) (entertaining facial challenge to executive order barring noncitizens from

entering the country notwithstanding the government's argument that individuals could potentially qualify for visa waivers). In these circumstances, plaintiffs have alleged a case or controversy that is concrete, ongoing, and adequately developed for judicial review.

## CONCLUSION

For the foregoing reasons, this Court should grant plaintiffs' motion for partial summary judgment and declare that plaintiffs have standing to pursue this action and that the Court has subject matter jurisdiction over plaintiffs' claims. The Court should then expeditiously consider the merits on the 2017 summary judgment briefing or, in the alternative, order the parties to submit supplemental briefs on the merits on an expedited schedule.

Dated: June 17, 2019                          Respectfully submitted,

                                               /s/ Allison M. Zieve
Patti A. Goldman                              Allison M. Zieve
(DC Bar No. 398565)                           (DC Bar No. 424786)
EARTHJUSTICE                                  Scott L. Nelson
705 2nd Avenue, #203                          (DC Bar No. 413548)
Seattle, WA  98104                            PUBLIC CITIZEN LITIGATION GROUP
(206) 343-7340                                1600 20th Street NW
                                              Washington, DC  20009
Counsel for all Plaintiffs                    (202) 588-1000

Michael E. Wall                               Counsel for all Plaintiffs
(CA Bar No. 170238)
Cecilia D. Segal                              Patricia M. Shea
(CA Bar No. 310935)                           (DC Bar No. 367231)
NATURAL RESOURCES DEFENSE                      COMMUNICATIONS WORKERS OF
COUNCIL, INC.                                 AMERICA
111 Sutter Street, Floor 21                   501 3rd Street NW
San Francisco, CA  94104                      Washington, DC  20001
(415) 875-6100                                (202) 434-1100

Counsel for Natural Resources Defense          Counsel for Communications Workers
Council, Inc.                                  of America

21