**UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

|  |  |
|---|---|
| PUBLIC CITIZEN, INC., *et al.*,<br><br>*Plaintiffs*,<br><br>v.<br><br>DONALD J. TRUMP, *et al.*,<br><br>*Defendants*. | Civil Action No. 17-253 (RDM) |

## MEMORANDUM OPINION

The question whether Plaintiffs have standing to challenge the lawfulness of Executive Order 13,771 and the related Office of Management and Budget ("OMB") Guidance is now before the Court for a third time. The first time that question was presented, the Court granted Defendants' motion to dismiss, holding that Plaintiffs had failed to carry their threshold burden of alleging or proffering facts sufficient to establish Article III standing. *Pub. Citizen, Inc. v. Trump* ("*Public Citizen I*"), 297 F. Supp. 3d 6, 12 (D.D.C. 2018). With leave of the Court, Plaintiffs then filed an amended complaint and moved for partial summary judgment on the sole issue of their standing, Dkt. 67; Dkt. 71, and Defendants moved, once again, to dismiss for lack of standing, Dkt. 70. That time, the Court held that Plaintiffs had met their burden of plausibly *alleging* that they have standing and therefore denied Defendants' motion to dismiss. *Pub. Citizen, Inc. v. Trump* ("*Public Citizen II*"), 361 F. Supp. 3d 60, 64 (D.D.C. 2019). But, the Court concluded that Plaintiffs had failed to adduce undisputed evidence sufficient to *establish* their standing. *Id.* In particular, the Court concluded that Plaintiffs had fallen short in their effort to establish that the Executive Order, rather than separate policy considerations or other factors, caused any delay in issuing a final rule or withdrawal of a rule. *Id.* at 91. The Court,

accordingly, denied Defendants' motion to dismiss and denied Plaintiffs' cross-motion for summary judgment. *Id.* at 93. It then granted Plaintiffs leave to take limited discovery concerning whether the Executive Order had caused any relevant delay or withdrawal of a rule. *See* Dkt. 89 at 2, 5. Following the completion of discovery, Plaintiffs have once again moved for partial summary judgment on the issue of standing, Dkt. 95, and Defendants have cross-moved for summary judgment on the same issue, Dkt. 96. The Court now concludes that Plaintiffs have not established their standing and will, accordingly, dismiss the action for lack of Article III jurisdiction.

In reaching that decision, the Court is mindful that Plaintiffs are large associations with several hundred-thousand members, *see* Dkt. 14 at 4–7 (Am. Compl. ¶¶12–14); that Plaintiffs and their members have wide-ranging interests in government regulation in areas relating to consumer protection, public health and safety, the environment, and workers' rights, *id.*; and that the stated goal and presumptive effect of the Executive Order is to reduce existing federal regulations as well as to discourage the promulgation of new regulations in these and other arenas, *see* Exec. Order No. 13,771, 82 Fed. Reg. 9,339 (Jan. 30, 2017). Against this backdrop, it is certainly plausible, and perhaps likely, that the Executive Order and the OMB Guidance have delayed or derailed at least some regulatory actions that, if adopted, would materially benefit Plaintiffs or some of their members. But, for several reasons, it is hard to say with the requisite degree of confidence which actions those are, what would have occurred in the absence of the Executive Order, how any identifiable individual (or entity) is harmed, and whether any such harm—or risk of harm—is sufficient to establish standing. It is hard to know because, as counsel for the government has acknowledged, "neither the Executive Order nor the OMB Guidance provides a mechanism for notifying the public whether and when a

proposed . . . regulatory action [has been] delayed or abandoned due to the requirements of the Executive Order. *Pub. Citizen II*, 361 F. Supp. 3d at 67 (citing Dkt. 56 at 64 (Tr. Oral Arg. 64:7–22). It is hard to know because agency decisions about whether and how quickly to move forward with regulatory initiatives are often informed by a variety of considerations, and, when agencies simply delay acting on discretionary regulatory initiatives, those considerations are seldom a matter of public record. And, it is hard to know because the Executive Order does not stand alone but, rather, reflects the current Administration's more general wariness of federal regulation. *See*, *e.g.,* Exec. Order No. 13,771, 82 Fed. Reg. 9,339 (Jan. 30, 2017) (generally asserting that "[i]t is essential to manage the costs associated with the government imposition of private expenditures required to comply with Federal regulations."); *see also Public Citizen I*, 297 F. Supp. 3d at 26 (noting that delays in finalizing rules could be "attributed to a change in administration and a shift in policy priorities"); *Public Citizen II*, 361 F. Supp. 3d at 64 (recognizing a "general change in policy between administrations" and that "the administration has reported, in general, its efforts to reduce regulation").

Even in this unusual context, however, Plaintiffs bear the burden of establishing their standing to sue. *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 561 (1992). They must show that the future injury that they allege is both "certainly impending," *Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 401 (2013), and "redressable by a favorable ruling," *Monsanto Co. v. Geertson Seed Farms*, 561 U.S. 139, 150 (2010), and they must demonstrate that they will suffer a cognizable, "personal and individual," as opposed to a generalized, harm in the absence of judicial intervention, *Lujan*, 504 U.S. at 560 n.1. The risk that government action might otherwise escape judicial review does not justify reallocating Plaintiffs' burden of proof or exercising jurisdiction based on conjecture or speculation. *See id.* at 560 (*Lujan* requirements are

"irreducible"); *Clapper*, 568 U.S. at 411–13, 420–21. The Court has provided Plaintiffs with three opportunities to meet this burden and, most recently, allowed Plaintiffs to take focused discovery in aid of establishing jurisdiction. Notwithstanding these opportunities and Plaintiffs' vigorous efforts—including the submission of multiple declarations, the identification of well over a dozen purported regulatory actions or inactions, the amendment of their complaint, and extensive briefing on multiple theories of associational and organizational standing—Plaintiffs have failed to carry their burden.

The Court will, accordingly, deny Plaintiffs' motion for partial summary judgment, Dkt. 95, and will grant Defendants' cross-motion for summary judgment for lack of standing, Dkt. 96.

## I. BACKGROUND

### A. Executive Order 13,771 and OMB Guidance

Because the Court has previously described the challenged Executive Order and OMB Guidance at length, *Public Citizen I*, 279 F. Supp. 3d at 13–15; *Public Citizen II*, 361 F. Supp. at 65–68, the Court will do so only briefly here. Executive Order 13,771 imposes three restrictions on the authority of agencies to adopt or to propose new regulations: a "two for one" requirement; an "offset" requirement; and an "annual cap" on the net costs covered regulations. Exec. Order No. 13,771, 82 Fed. Reg. 9,339 (Jan. 30, 2017). First, the "two for one" requirement provides that "whenever an executive department or agency . . . publicly proposes for notice and comment or otherwise promulgates a new regulation," the agency must "identify at least two existing regulations to be repealed." *Id.* § 2(a). Second, the "offset" requirement provides that agencies must offset "any new incremental cost associated with new regulations" by eliminating "existing costs associated with at least two prior regulations." *Id.* § 2(c). Finally, the "annual cap" provision prohibits an agency from adopting new regulations

that, in the aggregate, exceed the agency's "total incremental cost allowance" for the year. *Id.* §

3(d). The total cost allowance—or "cap"—is set each year by the Director of OMB and may be

zero, positive, or negative. *Id.* An agency's total incremental cost is derived by summing the

costs of each new regulations adopted in the relevant year, less any cost savings achieved

through the repeal of existing regulations. *Id.*

OMB issued interim guidance regarding the meaning and implementation of the

Executive Order on February 2, 2017, and it issued final guidance on April 5, 2017. *See* OMB,

Interim Guidance Implementing Section 2 of the Executive Order of January 30, 2017 (2017)

("Interim Guidance"); OMB, Guidance Implementing Executive Order 13,771 (2017) ("Final

Guidance"). In the Final Guidance, OMB explained that the Executive Order applies only to

"significant regulatory action[s]" and "significant guidance document[s]," Final Guidance, Q &

A 2, which, in turn, means that the action is likely to "[h]ave an annual effect on the economy of

$ 100 million or more" or that it meets other, specified criteria, Exec. Order No. 12,866 § 3(f), 3

C.F.R. 638 (1994). Deregulatory actions, in contrast, need not qualify as "significant" to factor

into the required calculus. Final Guidance, Q & A 4.

Importantly, the OMB Guidance further explains, the Executive Order 13,771 considers

only compliance *costs* borne by regulated parties; it does not consider the public *benefit* of the

existing or proposed rule. *See* Final Guidance, Q & A 21, 32; Interim Guidance at 4. Agencies

must determine the present value of the costs of the regulatory or the savings of deregulatory

action "over the full duration of the expected effects of the action[ ]." Final Guidance, Q & A

25. An agency's "total incremental cost" for a fiscal year "means the sum of all costs from"

significant regulatory actions and guidance documents "minus the cost savings

from . . . deregulatory actions." *Id.*, Q & A 8. Agencies may, however, "bank" cost savings and

5

deregulatory actions "for use in the same or a subsequent fiscal year" to offset significant regulatory actions or guidance documents and to meet their "total incremental cost allowance[s]." *Id.*, Q & A 29.

The Executive Order recognizes that agencies face various statutory obligations, and it does not—and could not—purport to override those obligations. Rather, agencies are directed to implement the Executive Order in a manner "consistent with applicable law" and are cautioned that "[n]othing in th[e] [O]rder shall be construed to impair or otherwise affect . . . the authority granted by law to an executive department or agency." Exec. Order No. 13,771 § 5, 82 Fed. Reg. 9,339 (Jan. 30, 2017). In this vein, recognizing that certain federal statutes prohibit agencies from considering costs in determining to take a significant regulatory action, the OMB Guidance explains that the Executive Order does not "change the agency's obligations under [such a] statute." Final Guidance, Q & A 18. Nevertheless, agencies implementing these statutory obligations are "generally . . . required to offset the costs of such regulatory actions through other deregulatory actions taken pursuant to statutes that do not prohibit consideration of costs." *Id.* If an agency faces an imminent statutory (or judicial) deadline for taking a regulatory action, the Executive Order "does not prevent" the agency from complying with that deadline, even if it cannot first satisfy the Executive Order's mandates. *Id.*, Q & A 33. The agency must, however, "offset [the] regulatory action[ ] as soon as practicable thereafter." *Id.* Finally, although the Executive Order creates incentives for agencies to rescind existing regulations— and, when an agency is assigned a negative annual cap, requires it—the OMB Guidance prohibits agencies from relying on the Executive Order "as the *basis or rationale*, in whole or in part, for" taking a deregulatory action. *See* Final Guidance, Q & A 37 (emphasis added).

## B. Procedural Background

Plaintiffs Public Citizen, Inc. ("Public Citizen"), the Natural Resources Defense Council, Inc. ("NRDC"), and the Communication Workers of America, AFL-CIO ("CWA") brought this action against the President, the Director of OMB, the heads of thirteen federal agencies, and the United States in February 2017. Dkt. 1. They challenged Executive Order 13,771 as *ultra vires* and violative of the Administrative Procedure Act ("APA"), 5 U.S.C. § 551 *et seq.*, and the Constitution, Dkt. 1 at 5–6, 43–46 (Compl. ¶¶ 9, 121–47), and they challenged the OMB Guidance on similar grounds, *id.* at 46–48 (Compl. ¶¶ 148–61).

Defendants moved to dismiss for lack of standing and for failure to state a claim. Dkt. 9. Plaintiffs amended their complaint as of right, adding additional allegations to bolster their claim that they had standing to sue. *See* Dkt. 14 (First Am. Compl.). Defendants then renewed their motion to dismiss, Dkt. 15, and Plaintiffs cross-moved for summary judgment, Dkt. 16. The Court concluded that Plaintiffs had not plausibly alleged either associational or organizational standing and therefore granted Defendants' motion to dismiss and denied Plaintiffs' motion for summary judgment. *Public Citizen I*, 297 F. Supp. 3d at 40. Most notably, Plaintiffs argued that the Executive Order had delayed finalization of various environmental, public health, and public safety regulations and that this delay substantially increased the risk that several of their members would face a substantial probability of future harm. *Id.* at 28. That increased-risk-of-harm theory of standing is not easily satisfied, and the Court held that Plaintiffs had failed to allege facts or to adduce evidence sufficient to clear that hurdle. *Id.* at 29. The Court also rejected an array of additional theories of standing, including Plaintiffs' contention that one or more of the plaintiff-associations had organizational standing. *Id.* at 40.

Plaintiffs then moved for leave to file a second amended complaint. Dkt. 64. Defendants did not oppose that motion, Dkt. 65, and the Court granted Plaintiffs leave to amend, Minute Order (Apr. 20, 2018). Defendants, once again, moved to dismiss for lack of standing, Dkt. 70, and Plaintiffs cross-moved for partial summary judgment on standing, Dkt. 71. This time, the Court concluded that Plaintiffs had met their threshold burden of plausibly alleging that they had standing to sue—based on additional allegations and their reliance on a new theory of standing— and, accordingly, denied Defendants' motion to dismiss. *Public Citizen II*, 361 F. Supp. 3d at 83. In particular, the Court was convinced that Plaintiffs had plausibly alleged that (1) two members of Public Citizen—Amanda Fleming and Terri Weissman—wanted to purchase cars equipped with vehicle-to-vehicle—or "V2V"—accident avoidance communications systems; (2) the effectiveness of that technology is dependent on the number of vehicles equipped with interoperable V2V technology; (3) the widespread availability and deployment of the V2V technology is dependent on finalization of a proposed Department of Transportation/National Highway Traffic Safety Administration ("NHTSA") rule that would mandate that all new "light vehicles" be equipped with interoperable V2V communication systems on a specified schedule; and (4) the only reason that NHTSA has failed to finalize the proposed rule is because the Executive Order considers only costs to regulated parties, and not benefits to the public, and the gross cost of the proposed rule vastly exceeds the Department of Transportation's total incremental cost allowance under the Executive Order. *See id.* at 76–82.

As the Court explained, these allegations were both plausible and sufficient to withstand a motion to dismiss under Plaintiffs' newly asserted purchaser theory of standing. *Id.* at 75–76. Plaintiffs did not argue, as they had under the increased-risk-of-harm theory, that the agency's failure to finalize the regulation increased the risk that an identifiable member would suffer a

future harm, such as injury or death in a car accident that could be prevented through use of the V2V technology. Rather, relying on a line of cases recognizing that consumers, at least at times, have standing to challenge an agency action or inaction that has "prevented the consumers from purchasing a desired product," *id.* at 74 (quoting *Coal. for Mercury-Free Drugs v. Sebelius*, 671 F.3d 1275, 1281–1283 (D.C. Cir. 2012)), they argued that they needed to establish only that the Executive Order has delayed finalization of the V2V rule and has thereby deprived Fleming and Weissman of the opportunity to purchase cars equipped with effective V2V communication systems, *see id.* at 73–75.

At least for purposes of Defendants' motion to dismiss, the Court agreed. The Court explained that

> [I]t is not easy for a plaintiff "plausibly [to] allege or show that [a] putative regulatory action[] . . . would have been taken in the absence" of some event or requirement. That difficulty is the product of multiple factors, not least of which is the Court's obligation to refrain from placing "itself in the role of policymaker" and to avoid "speculating about how governmental entities 'will exercise their discretion.'" But, notwithstanding these hurdles, the Court concluded that Plaintiffs had plausibly alleged that NHTSA intended to finalize the V2V rule and that the Executive Order has delayed that action.

*Id.* at 77 (citations omitted). Among other things, the Court considered the lengthy delay since the comment period had closed, the absence of any expression of substantive disagreement with the proposed rule, various statements made by the Department of Transportation and OMB, and the fact that it was likely to "take *decades* for the Department of Transportation to bank sufficient cost savings to permit the rule to proceed under the Executive Order." *Id.* at 77–78.

That same reasoning, however, did not support Plaintiffs' motion for summary judgment on the question of standing. To be sure, the Court was persuaded that the Plaintiffs' had "plausibly alleged that the Executive Order has injured, and will continue to injure, Fleming and Weissman by delaying issuance of a final V2V rule and thereby interfering with their plans to

purchase and use V2V-equipped vehicles several years from now." *Id.* at 85. But more is required to prevail at the summary judgment stage. Establishing a plausible causal link and a plausible claim of redressability was not enough; rather, Plaintiffs bore the burden of demonstrating—beyond genuine dispute—that the Executive Order has delayed finalization of the V2V rule and that, if the Executive Order were set aside, the rule would take effect, and they would be able to purchase cars equipped with interoperable V2V technology. As to that burden, the Court held that Defendants had raised a genuine dispute of fact about the cause of the delay in finalizing the V2V rule. *Id.* at 85. Pointing to a statement issued by the Department of Transportation in November 2017, Defendants argued that NHTSA was "still reviewing and considering more than 460 comments submitted and other relevant information to inform its next steps," *id.* at 77 (quoting U.S. Dep't of Transp., *V2V Statement* (Nov. 8, 2017)), and that "the delay in finalizing the rule [was simply] the product of 'the kind of run-of-the-mill evaluation of a propose[d] rule that often results in additional consideration and, at times, a decision to take a different substantive approach," *id.* at 85 (quoting Dkt. 75 at 12). Because Defendants had offered their own evidence, and had not merely "offer[red] an unsupported denial" of Plaintiffs' evidence that the Executive Order had delayed the V2V rule, the Court concluded "that Plaintiffs [had] not met their burden of demonstrating, beyond genuine dispute, that any of their members would have standing in their own right to challenge the Executive Order and OMB Guidance based on the alleged delay in finalizing the V2V rule." *Id.*

The Court reached similar conclusions, moreover, with respect to three other regulatory actions that Plaintiffs invoked in support of their motion for summary judgment on the issue of standing. As to each, the Court concluded that Plaintiffs had not established beyond genuine dispute that the rule had been delayed due to the Executive Order, as opposed to other

considerations.  *Id.* at 85–90.  The Court held, for example, that Plaintiffs had failed to demonstrate beyond genuine factual dispute that the Executive Order had delayed finalization of proposed Department of Energy energy-efficiency standards for commercial water heaters and that, in fact, it "appear[ed] that the delay [was] more likely the product of disagreement about the substance of the proposed [commercial water heater] rule."  *Id.* at 90.  Finally, the Court reaffirmed its conclusion that the plaintiff-associations do not have organizational standing to challenge the Executive Order.  *Id.* at 91–92.

These conclusions left the case in a state of limbo.  The Court could neither proceed to the merits without first concluding that it had jurisdiction, nor could it dismiss the action because Plaintiffs had established a plausible—albeit disputed—claim of standing.  Both Plaintiffs and Defendants, moreover, asked for the opportunity to investigate and to take discovery to help definitively answer the question of Plaintiffs' standing.  *Id.* at 92.  The Court, accordingly, denied Defendants' motion to dismiss, Dkt. 70, and Plaintiffs' motion for partial summary judgment, Dkt. 71; permitted the parties to conduct limited discovery on standing, Minute Entry (Feb. 27, 2019); and set a new briefing schedule, Minute Entry (May 17, 2019).

To avoid any undue intrusion into the workings of a coordinate branch of government, the Court approached the discovery process in stages, at first authorizing Plaintiffs to serve limited interrogatories and requests for admissions on Defendants, Feb. 27, 2019 Telephonic Conf. Tr. (Rough 1:36–40; 8:17–25), about which the parties then met and conferred, *see* Dkt. 89.  Following a status hearing, the Court directed that Defendants answer Plaintiffs' interrogatories and requests for admissions inquiring into whether the Executive Order had delayed certain rules and that they produce any "list[s] of rules that have not moved forward because of [Executive Order 13,771]."  Dkt. 90 at 31 (Mar. 25, 2019 Hr'g Tr. at 31:1–25).  And,

at a subsequent status conference, the Court provided further direction regarding the scope of permissible discovery. Dkt. 93 at 39 (May 17, 2019 Hr'g Tr. at 39:17–22). After the completion of this discovery, Plaintiffs renewed their motion for partial summary judgment on standing, Dkt. 95, and Defendants cross-moved for summary judgment on standing, Dkt. 96.

## II.  LEGAL STANDARD

A plaintiff bears the burden of demonstrating its standing at every stage of the litigation, but that burden evolves with the progressively more demanding standards that apply over the course of the litigation. *See Lujan v. Defenders of Wildlife*, 504 U.S. 555, 561 (1992). In moving for summary judgment on its standing, a plaintiff may not rest on mere allegations, but, instead, must "cit[e] to particular parts of materials in the record," Fed. R. Civ. P. 56(c), that demonstrate that there is no genuine dispute of material fact as to the existence of "a concrete and particularized 'injury in fact' that is fairly traceable to the challenged action of the defendant and likely to be redressed by a favorable judicial decision." *Lexmark Int'l, Inc. v. Static Control Components, Inc.*, 572 U.S. 118, 125 (2014) (citation omitted). Similarly, a defendant may move for summary judgment on standing, seeking to demonstrate "that there is no genuine dispute as to any material fact," Fed. R. Civ. P. 56(c), and that plaintiffs cannot establish the required elements of Article III standing based on the record evidence, *see Lujan*, 504 U.S. at 561. "The evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in his favor." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986).

## III.  ANALYSIS

The question before the Court is narrow one: whether the additional discovery that the Court authorized the parties to take has produced evidence sufficient to address the standing deficiencies identified in *Public Citizen I* and *Public Citizen II*. Over the course of the litigation,

Plaintiffs have identified a broad array of regulatory initiatives that they contend the Executive Order has delayed or derailed, and they contend that "'common sense' dictates that delays in issuing rules to protect consumers, workers, and the environment [have] cause[d] concrete injury to many of" their hundreds of thousands of members. Dkt. 95 at 14. They also observe that, because they have brought a facial challenge to the Executive Order and the OMB Guidance, they need identify only a single member who has sustained, or who will likely sustain, a redressable injury-in-fact due to the Executive Order or the OMB Guidance in order to establish associational standing. For present purposes, however, Plaintiffs "focus[] on only two rulemakings: [1] the [NTHSA] rulemaking to establish a federal motor vehicle safety standard for [V2V] communications, and [2] the [DOE] rulemaking to set an energy-efficiency standard for commercial water heating equipment."[1] *Id.* at 15.

As explained below, the Court is unpersuaded that either the Executive Order or the OMB Guidance has caused the delay in finalizing either of these proposed rules, and the Court is also unpersuaded that it should reconsider any of its prior conclusions respecting Plaintiffs' other theories of standing. Because Plaintiffs bear the burden of establishing their standing; because the evidence demonstrates that factors unrelated to Executive Order and OMB Guidance have delayed finalization of the V2V and Commercial Water Heating Equipment rules; and because Plaintiffs have failed to demonstrate their standing with respect to any other regulatory initiatives despite multiple attempts to do so, the Court will now dismiss the action for lack of standing.

---

[1] For both rulemakings, Plaintiffs assert only associational standing under the purchaser theory. *See Hunt v. Wash. State Apple Adver. Comm'n*, 432 U.S. 333, 343 (1977) (describing the requirements for an organization to assert associational standing on behalf of its members); *Coal. for Mercury-Free Drugs*, 671 F.3d at 1281–83 (discussing the contours of the purchaser theory of standing); *Public Citizen II*, 361 F. Supp. 3d at 73–75) (discussing purchaser standing).

## A.  V2V Communication Technology

Plaintiffs first attempt to establish standing based on NHTSA's failure to promulgate a final rule requiring all new light vehicles to include interoperable V2V technology.  The Court has previously discussed this issue at length and will not repeat that analysis here.  *See Public Citizen I*, 297 F. Supp. 3d at 26–27, 34; *Public Citizen II*, 361 F. Supp. 3d at 76–83.  Suffice it to say that the critical question, at least for present purposes, is whether Plaintiffs have established that either the Executive Order or the OMB Guidance has delayed finalization of the proposed V2V rule.  *See* Federal Motor Vehicle Safety Standards; V2V Communications, 82 Fed. Reg. 3,854 (Jan. 12, 2017) (to be codified at 49 C.F.R. part 571).

The evidence previously before the Court left that question in dispute.  On Plaintiffs' side of the ledger, there was evidence that: (1) shortly after the Executive Order was issued, the Department of Transportation issued a notice suspending various rulemaking schedules to permit evaluation of the proposed rules in accordance with the Executive Order, and it issued similar notices for each of the next five months, *see Public Citizen II*, 361 F. Supp. 3d at 72; (2) the Department moved the "next action" for the V2V rule to the "undetermined" category on the Spring 2017 Unified Agenda, *id.* at 72–73; (3) in briefings regarding the Executive Order, the White House touted the large number of regulatory actions that have been "made inactive" or "delayed," *see Public Citizen I*, 297 F. Supp. 3d at 26; (4) NHTSA has never expressed doubt about the wisdom of promulgating a V2V rule, *Public Citizen II*, 361 F. Supp. 3d at 77; and, (5) perhaps most significantly, "it would likely take decades for the [Department] to bank sufficient cost savings to permit the rule to proceed under the Executive Order," *id.*; *see also Public Citizen I*, 297 F. Supp. 3d at 27 (noting that the Department "would need almost seven decades to offset the costs of the V2V rule" at the present rate of cost cutting).  On Defendants' side of the ledger,

14

in contrast, there was a November 8, 2017 press statement from the Department of Transportation, asserting that "NHTSA has not made any final decision on the proposed rulemaking" and that "NHTSA is still reviewing and considering more than 460 comments submitted and other relevant information to inform its next steps. *Public Citizen II*, 361 F. Supp. 3d at 77 (quoting U.S. Dep't of Transp., V2V Statement (Nov. 8, 2017)).

As the Court explained in *Public Citizen II*, neither Plaintiffs' nor Defendants' evidentiary showing was dispositive at that point. It was possible that, as Plaintiffs argued, the Executive Order has delayed the V2V rule—principally because it appears highly unlikely that the Department of Transportation will be able to "pay" for the rule under the Executive Order, absent extraordinary measures. Nor did the Department's press statement prove anything to the contrary. Even accepting as true the unsworn press statement, the fact that NHTSA was still reviewing comments was not incompatible with the conclusion that the Executive Order had caused delay. Why rush to review comments, for example, when you know that the rule cannot move forward for years to come due to the Executive Order's exhortations? But it was also possible that the V2V rule had been delayed—and would continue to be delayed—for reasons entirely unrelated to the Executive Order.

The discovery that Plaintiffs have now taken addresses the prior uncertainty as to why a final rule has not issued, and it leaves the Court with little doubt that, at least to date, the delay in finalizing the V2V rule is unrelated to the Executive Order and the OMB Guidance. When asked to "[d]escribe in detail any consideration of Executive Order [13,711] in [the Department of Transportation's] discussions of or decisions as to the V2V rulemaking," a Department official responded—under the penalty of perjury—that the Executive Order "has not been a factor affecting any [Department of Transportation] decisions about when or whether to issue a Final

Rule with respect to the V2V Rulemaking." Dkt. 95-2 at 16 (Responses to Plaintiffs' First and Second Set of Interrogatories). The Department of Transportation ("DOT") further explained:

> DOT continues to engage in evaluation of the substance and merits of the rulemaking. In December 2018, DOT requested public comments on several technical questions related to vehicle-to-vehicle, vehicle-to-infrastructure, and vehicle-to-pedestrian communications. 83 Fed. Reg. 66,338 (Dec. 26, 2018). DOT's request for comments noted that the proposed rule issued in the V2V Rulemaking identified Dedicated Short-Range Communications ("DSRC") as the primary communications medium, stated that there has been progress in two other technologies, "both of which may, or may not, offer both advantages and disadvantages over DSRC," and asked for public comments on this and several other technical matters. As it continues to evaluate the substance and merits of the V2V Rulemaking, DOT is reviewing and considering the 166 comments received in response to this request, and 460 comments received with respect to the proposed rule, and other information. This evaluation, review, and consideration has not been prompted by, or connected with, [Executive Order 13,711].

*Id.* at 16–17. This interrogatory response resolves the question whether the Executive Order has, to date, delayed finalization of the V2V rule. The Department attests, without qualification, that the Executive Order has played no role in the delay, and Plaintiffs have not pointed to any evidence that would permit a reasonable trier of fact to reject that pronouncement. The Court concludes that the uncontroverted evidence establishes that the delay thus far has been unrelated to the Executive Order.

That does not end the matter, however, because Plaintiffs have pivoted in light of the Department's discovery responses, and they now argue that, even if it has not done so to date, the Executive Order will inevitably delay or derail finalization of the V2V rule at some point in the future, thereby injuring Fleming and Weissman. *See* Dkt. 95 at 19–22. For support, Plaintiffs once again invoke the vast disparity between the gross cost of the proposed rule and the Department of Transportation's annual incremental cost cap (which is currently set at negative $1.8695 billion), *see* OMB, Regulatory Reform: Regulatory Budget for Fiscal Year 2019 (Nov.

2019), as well as the Department's representations that it: (1) intends to comply with the Executive Order in the V2V rulemaking, (2) has not identified two or more existing regulations to repeal in order to make room for the V2V rule, and (3) has not applied to OMB for a waiver of application of the Executive Order to the V2V rule, Dkt. 95-2 at 7–9 (Responses to Plaintiffs' Requests for Admissions).

The risk of future injury can, at times, support a party's standing to sue. *See*, *e.g., Bennett v. Spear*, 520 U.S. 154, 168 (1997) (concluding that plaintiffs had standing based on the future injury of reductions in available water that would result from implementation of the challenged Biological Opinion); *Knife Rights, Inc. v. Vance*, 802 F.3d 377, 385–86 (2d Cir. 2015) (concluding that plaintiffs had standing based on high likelihood of future prosecution); *see also Bristol-Myers Squibb Co. v. Shalala*, 91 F.3d 1493, 1497 (D.C. Cir. 1996) (noting that there is not always a "need to wait for injury from specific transactions to claim standing" (quoting *El Paso Natural Gas Co. v. FERC*, 50 F.3d 23, 27 (D.C. Cir. 1995)). A party "alleging only future injuries," however, "confronts a significantly more rigorous burden to establish standing." *United Transp. Union v. ICC*, 891 F.2d 908, 913 (D.C. Cir. 1989). To satisfy that burden, Plaintiffs must show that the asserted future injury "is 'certainly impending[]' or [that] there is a 'substantial risk' that the harm will occur.'" *Susan B. Anthony List v. Driehaus*, 573 U.S. 149, 158 (2014) (citation omitted). "Although imminence is concededly a somewhat elastic concept, it cannot be stretched beyond its purpose, which is to ensure that the alleged injury is not too speculative for Article III purposes—that the injury is *certainly* impending," *Lujan*, 504 U.S. at 564 n.2 (quotation and citation omitted), and not merely "*possible*," *Clapper*, 568 U.S. at 409 (citation omitted).

For several reasons, Plaintiffs cannot satisfy this demanding test.  First, there is no telling when NHTSA will reach a final decision on the substance of the V2V rule, and, as a result, there is no telling whether, even in the absence of the Executive Order, the rule would be in place in time to benefit Fleming and Weissman.  Fleming attested in March 2017 that she planned "to buy a new car in the next 5 years or so," Dkt. 16-7 at 2 (Fleming Decl. ¶ 5), and, at the same time, Weissman attested that she planned "to buy a new car in the next 5–7 years," Dkt. 16-10 at 2 (T. Weissman Decl. ¶ 4).  The proposed V2V rule, however, would not take effect for two years and would include a three-year phase-in period.  Because Fleming anticipates purchasing a new car in March 2022, and Weissman sometime between March 2022 and March 2024, it is unclear whether they would benefit from the rule even if it were finalized in the next several months, and it is unlikely that they would benefit from it if the Department continues to wrestle with the substance of the rule for the next few years.  Although there is no reason to believe that the Department will abandon the proposed rule in whole, the record does not reveal when the Department is likely to finalize it.  Because Plaintiffs bear the burden of proof, that lacuna is dispositive.

Other variables only add to this uncertainty.  OMB, for example, sets a new total incremental cost cap for each agency each year.  Exec. Order No. 13,771 § 3(d), 82 Fed. Reg. 9,339 (Jan. 30, 2017).  Although one might reasonably assume that the cap for 2020 will be in line with the caps set to date—at zero or in the negative—that assumption becomes increasingly speculative as it forecasts the caps for more distant years.  Just as it is uncertain what cap OMB will set for the Department in future years, moreover, it is also uncertain how much the Department will "bank" in savings over that same period and uncertain how much the V2V

rule—as possibly modified in light of comments and technological developments—will ultimately cost.

Concluding that an injury to Fleming and Weissman—as members of Public Citizen—caused by the Executive Order will occur in the future requires conjecture and depends on a variety of "predictive assumptions" potentially involving the behavior of several actors. *See Fla. Audubon Soc. v. Bentsen*, 94 F.3d 658, 670 (D.C. Cir. 1996); *see also Food & Water Watch, Inc. v. Vilsack*, 808 F.3d 905, 913 (D.C. Cir. 2015) ("[W]hen considering any chain of allegations for standing purposes, we may reject as overly speculative those links which are predictions of future events." (quoting *Arpaio v. Obama*, 797 F.3d 11, 19 (D.C. Cir. 2015))). The Department might continue to evaluate the comments and technology for a month or for three years; Fleming and Weissman might purchase new cars in the next two years or they might wait on a final V2V rule, even if it issues years down the road; the substance of the rule itself could change in material respects; OMB might substantially increase the Department's annual incremental cost cap for the year in which the rule is ultimately finalized; and the Department might bank substantial deregulatory credits, thereby allowing it to finalize the rule while complying with the Executive Order. As a result, the causal chain is too attenuated to permit the Court to conclude that the alleged future injury is "certainly impending," *Clapper*, 568 U.S. at 409, or that "there is a 'substantial risk' that the harm will occur,'" *Susan B. Anthony List*, 573 U.S. at 158 (citations omitted).

B.      **Energy Efficiency Standards for Commercial Water Heating Equipment**

Plaintiffs also rely on the Department of Energy's delay in issuing stricter energy-efficiency standards for commercial water heating equipment. Dkt. 95 at 21–28. The Department of Energy issued a proposed rule to that effect in May 2016, Energy Conservation

Program: Energy Conservation Standards for Commercial Water Heating Equipment, 81 Fed. Reg. 34,440 (May 31, 2016), but the Department has yet to finalize the rule. In Plaintiffs' view, the Executive Order has caused a delay in the rule's finalization, and both the delay to date and any future delays has harmed and will continue to harm R.J. Mastic, a member of the NRDC who owns and operates an energy efficiency consulting firm, Dkt. 64-7 at 1 (Mastic Decl. ¶¶ 1–2), among others.

As the Court has previously explained, the Department extended the comment period for the proposed rule until August 30, 2016, and then, in December 2016, it published an updated analysis relating to the proposed rule and invited public comment until early 2017. *Public Citizen II*, 361 F. Supp. 3d at 90. In October 2018, the Department received a petition requesting that it withdraw the proposed rule, and, in early November, the Department published a notice seeking public comment on that petition. *Id.* Most recently, the Department extended that public comment period until March 1, 2019. *Id.* In light of this history, the Court concluded in *Public Citizen II*, which the Court issued before the close of the comment period, that Plaintiffs had not "shown beyond genuine dispute that the Executive Order or OMB Guidance ha[d] delayed finalization of the proposed, amended standard," and that, although the Court could not resolve the factual dispute between the parties "on the . . . record [at that time], it appear[ed] that the delay [was] more likely the product of disagreement about the substance of the proposed rule." *Id.* Finally, the Court was unpersuaded by Plaintiffs' contention that the Executive Order must be to blame because, under the governing statute, the Department was required "to issue a final rule in or before April 2018." *Id.* As the Court explained, "the OMB Guidance provides that such a statutory requirement must be observed, notwithstanding the Executive Order," and that

proviso means that the Executive Order did not, in fact, preclude the Department from finalizing the rule. *Id.*

The Court concludes that, even with the benefit of discovery, Plaintiffs still have not established that the Executive Order has caused any delay in finalizing the commercial water heater energy-efficiency rule. Although Plaintiffs continue to posit that Defendants' "denials that the Executive Order is delaying or will delay the agency's completion [of the rule are] impossible to credit," Dkt. 95 at 24, they point to no additional evidence in support of that contention. In contrast, Defendants invoke the Department of Energy's interrogatory responses—offered under the penalty of perjury—which reject the premise of Plaintiffs' arguments. Thus, when asked to "[d]escribe in detail any consideration of Executive Order [13,711] in the agency's discussions of or decisions about the rulemaking Energy Conservation Standards for Commercial Water Heating Equipment, RIN 1904-AD34," the Department of Energy ("DOE") responded:

> [Executive Order 13,711] has not been a factor affecting any DOE decision about when or whether to issue a final rule in the Commercial Water Heating Equipment Rulemaking. Currently pending with DOE is a petition by several entities in the natural gas utility industry to make certain determinations pertaining to condensing versus non-condensing technology in heating and water heating equipment, and, as a consequence, to withdraw the proposed commercial water heating equipment rule. *See* 83 Fed. Reg. 54,883 (Nov. 1, 2018). Furthermore, several industry representatives have raised challenges to purported methodological flaws in DOE's analytical model, which they argue corrupted the results of DOE's analysis in a number of rulemakings, including the Commercial Water Heating Equipment Rulemaking. Additionally, DOE has conducted a number of meetings with the Air-conditioning, Heating & Refrigeration Institute ("AHRI") and certain of its members raising issues regarding the legal definitions that divide consumer water heaters from commercial water heaters. Given that these foregoing developments all have a bearing on the substance of any standards that DOE may adopt for commercial water heating equipment, it is necessary for DOE to resolve such prerequisite issues before attempting to finalize the Commercial Water Heating Equipment Rulemaking.

Dkt. 96-3 at 7–8 (Responses to Plaintiffs' First Set of Interrogatories). Plaintiffs have offered no evidence to contradict this account of the rulemaking and the causes of the delays that have occurred to date. Thus, as with the V2V rule, the interrogatory response resolves the question whether the Executive Order has delayed finalization of the rule.

Plaintiffs press two arguments in response. First, as they did in their briefs leading up to the Court's *Public Citizen II* decision, *see* Dkt. 71 at 37, 41, Plaintiffs argue that the Energy Policy and Conservation Act of 1975, 42 U.S.C. § 6201 *et seq.*, mandates that, if the Department of Energy publishes a notice of a proposed rule amending an energy efficiency standard, it is then required to "publish a final rule amending the standard for the product" within "2 years after the notice is issued," 42 U.S.C. § 6295(m)(3)(A). Based on that statutory mandate, Plaintiffs contend that the Department was required to issue a final rule in or before April 2018. This shows, according to Plaintiffs, that "there can be no question that the rule has been, and is being, delayed." Dkt. 99 at 13.

Even accepting the premise that the Department has violated the Energy Policy and Conservation Act by failing to issue a final standard within the allotted time, the Court is unpersuaded that the Executive Order caused that delay. To the contrary, the Department's interrogatory answer is unequivocal in attesting that the Executive Order "has not been a factor affecting [its] decision about when or whether to issue a final rule in the Commercial Water Heating Equipment Rulemaking." Dkt. 96-3 at 7 (Responses to Plaintiffs' First Set of Interrogatories). That evidence, moreover, is consistent with the Court's prior observation "that the Executive Order 'does not prevent agencies from issuing regulatory actions in order to comply with an imminent statutory . . . deadline, even if they are not able to satisfy [the Executive Order's] requirements by the time of issuance.'" *Public Citizen II*, 361 F. Supp. 3d at

89 (quoting Final Guidance, Q & A 33). Accordingly, any legal wrong Plaintiffs have suffered—at least to date—is the result of the Department's failure to comply with its obligation under the Energy Policy and Conservation Act, not a consequence of the challenged Executive Order.

Second, as with the V2V rule, Plaintiffs contend that, even if Executive Order has not caused the delay to date, "there can be no question that the Executive Order will increase the delay" in the future. Dkt. 99 at 13. In support of this contention, Plaintiffs note that the Department is "ready to finalize the commercial water heater rule this year, but it does not list any major regulatory actions intended for completion this year," and the Department "admits that it has not yet identified two or more existing regulations to be repealed" or "identified repeals that would offset the costs of a final rule on commercial water heating equipment." *Id.* Plaintiffs' observations highlight the speculative nature of the present inquiry because intervening events have overtaken Plaintiffs' argument; according to the most recent report on the OMB website, the Department now estimates that it will not take final action on the proposed standard until February 2020. *See* Energy Conservation Standards for Commercial Water Heating Equipment, *Timetable*, https://www.reginfo.gov/public/do/eAgendaViewRule?pubId=201910&RIN=1904-AD34 (last visited Dec. 20, 2019). Although Plaintiffs' prediction that the Department will fail to identify any offsetting deregulatory action in 2019 might well extend to 2020, the Court cannot say so decisively given the fluidity of the regulatory process.

More importantly, regardless of whether the Department can identify the required offsetting deregulatory actions, there is no evidence that the Executive Order is likely to cause further delay in finalizing the commercial water heater rule. To the contrary, as the Court has

previously noted, the Executive Order requires that agencies implement its requirements in a manner "consistent with applicable law," Exec. Order No. 13,771 § 5(b), 82 Fed. Reg. 9,339 (Jan. 30, 2017), and the OMB Guidance clarifies that the Order "does not prevent agencies from issuing regulatory actions in order to comply with an imminent statutory or judicial deadline, even if they are not able to satisfy [the Order's] requirements by the time of issuance," OMB, Guidance Implementing Executive Order 13,771 (2017) at Q & A 33; *see also Public Citizen II*, 361 F. Supp. 3d at 89 (quoting same). Because the Energy Policy and Conservation Act mandates that the Department "publish a final rule amending the standard for the product" within "2 years after the notice is issued," 42 U.S.C. § 6295(m)(3)(A), and because those two years have now expired, the Executive Order and OMB Guidance—by their own terms—do not preclude the Department from finalizing the standard. To be sure, as the Court has previously observed, it is possible that the Department may be "reluctant to issue the final rule because [the rule's] cost might prevent the Department from taking other, possibly higher priority actions," *Public Citizen II*, 361 F. Supp. at 90, or because the Department is unconvinced that the exception for statutory deadlines offers the shelter the Court suggests. Plaintiffs, however, have failed to proffer any evidence that would support such a finding, and the Department attests that it intends to comply with both the Executive Order and "all applicable statutes" in the commercial water heater rulemaking. *See* Dkt. 95-2 at 69 (Responses to Plaintiffs' First Set of Requests for Admission); *see also Bracy v. Gramley*, 520 U.S. 899, 909 (1997) ("Ordinarily, we presume that public officials have 'properly discharged their official duties.'" (quoting *United States v. Armstrong*, 517 U.S. 456, 464 (1996))).

Because Plaintiffs have failed to carry their burden of demonstrating that any of their members have suffered or will likely suffer a harm relating to the commercial water heater

rulemaking as a result of the Executive Order, they cannot premise their claim of associational standing on that rulemaking. *See Elec. Privacy Info. Ctr. v. U.S. Dep't of Educ.*, 48 F. Supp. 3d 1, 11, 22 (D.D.C. 2014) (concluding that organization lacked associational standing where none of its named members had established an injury-in-fact to confer Article III standing); *cf. Wash. Alliance of Tech. Workers v. U.S. Dep't of Homeland Sec.*, 395 F. Supp. 3d 1, 16 (D.D.C. 2019) (concluding that organization had associational standing where it had demonstrated a "substantial probability that at least one of [its] members" would be injured by the action they challenged).

**C.      Additional Rules, Parties, and Arguments**

Plaintiffs make two final points. First, they argue that the forest ought not be lost for the trees: As they explain, they have brought a facial challenge to an Executive Order that Defendants have "touted" as affecting every significant regulatory decision and as driving sweeping deregulatory change. Dkt. 95 at 28. Relying on the D.C. Circuit's decision in *Chamber of Commerce v. Reich*, Plaintiffs maintain that, because "the context of a particular rulemaking would not 'assist the court in analyzing [plaintiffs'] facial challenge,'" the breadth of their facial challenge as a whole establishes their standing. *Id.* (citing 57 F.3d 1099, 1100 (D.C. Cir. 1995)). But this argument conflates ripeness with standing. The *Reich* decision considered whether "[t]he two-pronged test for ripeness established by the Supreme Court in *Abbott Laboratories v. Gardner*, 387 U.S. 136, 148–49 (1967)" was satisfied—that is, was the dispute at issue "fit[]" for resolution and would withholding review impose a "hardship" on the plaintiffs. 57 F.3d at 1100. Although "related to standing, the question of ripeness for review [involves] a discrete inquiry." *Action Alliance of Senior Citizens of Greater Phil. v. Heckler*, 789 F.2d 931, 939–40 (D.C. Cir. 1986). "Standing doctrine is designed to determine *who* may institute the

asserted claim for relief," while "[r]ipeness doctrine addresses a *timing* question." *Id.* at 940.

Here, Plaintiffs fail to clear the standing hurdle because they have not shown who has been or

will likely be injured by the Executive Order. The plaintiffs in the *Reich* case, in contrast,

cleared that hurdle by showing that the Executive Order that they challenged created "a

disincentive for employers [in general] to hire replacement workers," regardless of whether the

Secretary of Labor might decline to terminate or debar a government contractor "in the context

of a particular case." *Reich*, 57 F.3d at 1100. It is presumably for this reason that the *Reich*

decision focuses on ripeness, and not standing. Here, in contrast, the Court is focused on

standing.

Finally, Plaintiffs stress that they have not abandoned or waived their claim of

organizational standing or their claims against the defendants not mentioned in this final round of

summary judgment briefing. Dkt. 99 at 15–17. Understandably, Plaintiffs do not ask the Court

to readdress the many issues it resolved in *Public Citizen I* and *Public Citizen II.* Instead, they

merely take issue with Defendants' suggestion, Dkt. 96 at 34, that any theories of standing that

Plaintiffs have not repeated in this round of briefing have been "abandoned and waived," Dkt. 99

at 15–17. The parties have made their respective records concerning this issue. It is not the role

of this Court, however, to determine which arguments the parties have properly preserved for

appeal. *See, e.g.*, *Wilson v. Dryvit Sys., Inc.*, 71 F. App'x 960, 961–62 (4th Cir. 2003) (noting

that *it*—the Court of Appeals—"must first determine whether the issues raised in the appeal are

properly before the Court"); *Mayweathers v. Woodford*, 393 F. App'x 425, 426 (9th Cir. 2010)

(same). For present purposes, it suffices for the Court to conclude that no further issues remain

for *it* to resolve.

**CONCLUSION**

For the foregoing reasons, the Court will DENY Plaintiffs' motion for partial summary judgment, Dkt. 95, GRANT Defendants' cross-motion for summary judgment, and will accordingly DISMISS the case for lack of jurisdiction.

A separate order will issue.


/s/ Randolph D. Moss
RANDOLPH D. MOSS
United States District Judge


Date: December 20, 2019